# 22-1506

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

Dr. Ahmed Diaa Eldin Ali Hussein,

*Plaintiff-Appellant,*

—against—

Dr. Mohamed Ahmed Maait, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME I OF II
### (Pages A-1 to A-222)

Linda C. Goldstein
Tiffany Engsell
Dechert LLP
3 Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Defendant-Appellee*

Jonathan R. Jeremias
Alan E. Sash
McLaughlin & Stern, LLP
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries .............................................. A-1

Defendant's Notice of Removal, dated March 30, 2022................... A-8

    Exhibit 1 to Notice of Removal—
    Plaintiff's Notice of Motion for Summary Judgment in Lieu
    of Complaint, dated December 13, 2021 ........................... A-18

    Exhibit 2 to Notice of Removal—
    Plaintiff's Memorandum of Law in Support of Motion
    for Summary Judgment in Lieu of Complaint,
    dated December 13, 2021 ......................................... A-21

    Exhibit 3 to Notice of Removal—
    Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein,
    dated November 2, 2021 .......................................... A-37

    Exhibit 4 to Notice of Removal—
    Request for Judicial Intervention, dated December 13, 2021........ A-46

    Exhibit 5 to Notice of Removal—
    Amended Summons, dated December 27, 2021 ..................... A-49

    Exhibit 6 to Notice of Removal—
    Plaintiff's Amended Notice of Motion for Summary Judgment
    in Lieu of Complaint, dated December 27, 2021 ................... A-52

    Exhibit 7 to Notice of Removal—
    eFiled Document List ............................................ A-55

    Exhibit 8 to Notice of Removal—
    Request for Service Abroad of Judicial or Extra
    Judicial Documents, sworn to January 24, 2022 ................... A-57

    Exhibit 9 to Notice of Removal—
    Notice of Suit with Attachment.................................... A-61

ii

PAGE

Exhibit 10 to Notice of Removal—
Notice of Electronic Filing, dated December 27, 2021 .............. A-83

Exhibit 11B to Notice of Removal—
Certified Translation of Hussein Affirmation,
dated August 4, 2014 ............................................ A-86

Exhibit 12C to Notice of Removal—
Certified Translation of Hussein Affirmation...................... A-134

Plaintiff's Notice of Motion to Remand, dated April 8, 2022 ........... A-139

Declaration of Daniel A. Schnapp, for Plaintiff, in Support of Motion
to Remand, dated April 8, 2022................................... A-141

Exhibit 1 to Schnapp Declaration—
Results of LexisNexis Search.................................... A-143

Exhibit 2 to Schnapp Declaration—
PACER Spreadsheet ............................................ A-146

Declaration of Tiffany E. Engsell, for Defendant, in Opposition
to Motion for Remand, dated April 14, 2022 ...................... A-148

Exhibit 1 to Engsell Declaration—
The Post Privatization Development of Former Law 203
Companies June 2000 Special Study .............................. A-150

Exhibit 2 to Engsell Declaration—
Screenshot from the Bloomberg Terminal Professional Services
of Exchange Rate of the Egyptian Pound to US Dollar
as of April 13, 2022............................................. A-211

Declaration of Lela Kassem, for Defendant, in Opposition to Motion
for Remand, dated April 13, 2022 ................................ A-213

Declaration of Linda C. Goldstein, for Defendant, in Opposition
to Motion for Remand, dated April 14, 2022 ...................... A-219

iii

PAGE

Defendant's Notice of Errata, dated April 18, 2022 ..................... A-223

Conference Transcript, dated April 18, 2022........................... A-225

Order of the Honorable Jed S. Rakoff, Denying Motion for Remand,
  dated April 20, 2022 ............................................. A-236

Defendant's Notice of Motion to Dismiss the Motion for Summary
  Judgment in Lieu of Complaint, dated April 20, 2022 .............. A-237

Declaration of Linda C. Goldstein, for Defendant, in Support
  of Motion to Dismiss, dated April 20, 2022 ...................... A-239

  Exhibit 1 to Goldstein Declaration—
  Notice of Arbitration, dated February 3, 2021 .................... A-242

  Exhibit 2 to Goldstein Declaration—
  Verified Complaint, dated October 4, 2013
  (*Hussein v. Sheldon Razin et al.,* Case No. 30-2013-00679600-
  CU-NP-CJC) ..................................................... A-306

  Exhibit 3 to Goldstein Declaration—
  Definitive Proxy Statement Pursuant to Section 14(a)
  of the Securities Exchange Act of 1934 .......................... A-349

  Exhibit 4 to Goldstein Declaration—
  Application for Authority of National Investments Co.,
  dated April 17, 1996 ............................................ A-387

  Exhibit 5 to Goldstein Declaration—
  Certificate of Status, dated April 14, 2022 ..................... A-395

  Exhibit 6 to Goldstein Declaration—
  Letter from Daniel A. Schnapp to Dr. Abo Bakr El-Sedeek Amer,
  dated March 24, 2021 ............................................ A-398

Declaration of Bahieldin H.Z. Elibrachy, in Support of Motion
  to Dismiss, dated April 18, 2022................................. A-403

iv

PAGE

Declaration of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein,
in Opposition to Motion to Dismiss, dated May 3, 2022 . . . . . . . . . . . A-420

  Exhibit A to Hussein Declaration—
  Curriculum Vitae of Dr. Ahmed Diaa Eldin Ali
  Mohamed Hussein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-425

  Exhibit B to Hussein Declaration—
  Spreadsheet of Egyptian Stock Exchange Records
  and Currency Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-427

Order Staying Merits Discovery Pending Disposition of Motion
to Dismiss Plaintiff's Summary Judgment Motion
in Lieu of Complaint, dated April 20, 2022 . . . . . . . . . . . . . . . . . . . . . . A-419

Memorandum Order, dated June 13, 2022 . . . . . . . . . . . . . . . . . . . . . . . . A-429

Judgment Appealed From, dated June 14, 2022 . . . . . . . . . . . . . . . . . . . . A-442

Plaintiff's Notice of Appeal, dated July 11, 2022 . . . . . . . . . . . . . . . . . . . A-443

9/12/22, 9:52 AM                                SDNY CM/ECF NextGen Version 1.6

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02592-JSR

| | |
|---|---|
| Hussein v. Maait | Date Filed: 03/30/2022 |
| Assigned to: Judge Jed S. Rakoff | Date Terminated: 06/14/2022 |
| Case in other court: State Court - Supreme, 161134/2021 | Jury Demand: None |
| Cause: 28:1441ds Petition for Removal- Contract Dispute | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Dr. Ahmed Diaa Eldin Ali Mohamed Hussein**

represented by **Daniel Adam Schnapp**
Nixon Peabody LLP (NYC)
55 West 46th Street
New York, NY 10036
212-940-3026
Email: dschnapp@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Catherine Anne Savio**
Nixon Peabody LLP (NYC)
55 West 46th Street
New York, NY 10036
212-940-3104
Fax: 844-917-1533
Email: catherine.savio@rivkin.com
*ATTORNEY TO BE NOTICED*

**Eric M. Ferrante**
Nixon Peabody LLP (Clinton Sq, Rochester)
1300 Clinton Square
Rochester, NY 14616
585-263-1362
Email: eferrante@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dr. Mohamed Ahmed Maait**
*in his official capacity as Minister of Finance of the Arab Republic of Egypt*

represented by **Tiffany Engsell**
Dechert, LLP
2929 Arch Street
Philadelphia, PA 19104
215-994-2907
Email: tiffany.engsell@dechert.com

**A-2**

*ATTORNEY TO BE NOTICED*

**Linda Ceilia Goldstein**
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
212-698-3817
Fax: 212-698-0684
Email: linda.goldstein@dechert.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2022 | 1 | **FILING ERROR - EXHIBITS NOT CLEARLY TITLED** NOTICE OF REMOVAL from New York, County of New York. Case Number: 161134/2021. (Filing Fee $ 402.00, Receipt Number ANYSDC-25935499).Document filed by Dr. Mohamed Maait. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12).(Goldstein, Linda) Modified on 3/31/2022 (sj). (Entered: 03/30/2022) |
| 03/30/2022 | 2 | CIVIL COVER SHEET filed..(Goldstein, Linda) (Entered: 03/30/2022) |
| 03/31/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Linda Ceilia Goldstein. The party information for the following party/parties has been modified: Ahmed Diaa Eldin Ali Mohamed Hussein, Mohamed Ahmed Maait. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text contained a typographical error. (sj)** (Entered: 03/31/2022) |
| 03/31/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Linda Ceilia Goldstein to RE-FILE Document No. 1 Notice of Removal. The filing is deficient for the following reason(s): Pursuant to ECF Filing Rule 13.3, Notice of Removal exhibits must be filed as attachments and labeled. Each attachment must be clearly titled in the ECF entry so the subject of the exhibit is clear. They cannot be labeled "Exhibit A, Exhibit B, etc.". Re-file the pleading using the event type Notice of Removal found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (sj)** (Entered: 03/31/2022) |
| 03/31/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Linda Ceilia Goldstein. The following case opening statistical information was erroneously selected/entered: Citizenship Defendant code 5 (Incorporated/Principal Place of Business-Other State); County code New York. The following correction(s) have been made to your case entry: the Citizenship Defendant code has been modified to 3 (Citizen or Subject of a Foreign Country); the County code has been modified to XX Out of U.S.. (sj)** (Entered: 03/31/2022) |
| 03/31/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Jed S. Rakoff. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, |

SDNY CM/ECF NextGen Version 1.6

| | | |
|---|---|---|
| | | located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(sj) (Entered: 03/31/2022) |
| 03/31/2022 | | Magistrate Judge Stewart D. Aaron is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sj) (Entered: 03/31/2022) |
| 03/31/2022 | | Case Designated ECF. (sj) (Entered: 03/31/2022) |
| 03/31/2022 | 3 | NOTICE OF REMOVAL from New York, County of New York. Case Number: 161134/2021..Document filed by Mohamed Ahmed Maait. (Attachments: # 1 Notice of Motion for Summary Judgement in Lieu of Complaint, # 2 Memorandum of Law in Support of Motion for Summary Judgement in Lieu of Complaint, # 3 Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, # 4 Request for Judicial Intervention, # 5 Amended Summons, # 6 Amended Notice of Motion for Summary Judgment in Lieu of Complaint, # 7 State Court Docket Sheet, # 8 Request for Service Abroad of Judicial or Extra Judicial Documents, # 9 FSIA Notice of Suit and Attachment, # 10 Notice of Electronic Filing, # 11 Hussein Affirmation Ex. B, # 12 Hussein Affirmation Ex. C). (Goldstein, Linda) (Entered: 03/31/2022) |
| 04/01/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 4/1/2022, without transcription or recording( Telephonic Initial Conference set for 4/18/2022 at 04:00 PM before Judge Jed S. Rakoff.,and Telephonic Oral Argument set for 4/18/2022 at 04:00 PM before Judge Jed S. Rakoff.)The dial-in information for the call will be as follows: USA Toll-Free (888) 363-4735; USA Caller Paid/International Toll: (215) 446-3657; Access Code: 1086415.Courts decision: Plaintiff is granted leave to file their motion to remand the case, which must be filed by April 8, 2022; defendants reply must be filed by April 14, 2022. The parties should confer and prepare and submit a proposed case management plan one week in advance of April 18, 2022. The Court grants in part defendants request for an extension of time to file his answer; the answer must be filed by April 19, 2022. (Kotowski, Linda) (Entered: 04/04/2022) |
| 04/04/2022 | 4 | NOTICE OF COURT CONFERENCE: DATE AND PLACE OF CONFERENCE AND ARGUMENT: 4-18-2022, ON A TELECONFERENCE LINE AT 4:00pm. The dial-in information for the call will be as follows: USA Toll-Free (888) 363-4735; USA Caller Paid/International Toll: (215) 446-3657; Access Code: 1086415. Initial Conference set for 4/18/2022 at 04:00 PM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 4/4/2022) (kv) (Entered: 04/04/2022) |
| 04/08/2022 | 5 | NOTICE OF APPEARANCE by Eric M. Ferrante on behalf of Ahmed Diaa Eldin Ali Mohamed Hussein..(Ferrante, Eric) (Entered: 04/08/2022) |
| 04/08/2022 | 6 | NOTICE OF APPEARANCE by Daniel Adam Schnapp on behalf of Ahmed Diaa Eldin Ali Mohamed Hussein..(Schnapp, Daniel) (Entered: 04/08/2022) |
| 04/08/2022 | 7 | NOTICE OF APPEARANCE by Catherine Anne Savio on behalf of Ahmed Diaa Eldin Ali Mohamed Hussein..(Savio, Catherine) (Entered: 04/08/2022) |
| 04/08/2022 | 8 | MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*. Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein. Return Date set for 4/18/2022 at 04:00 PM..(Schnapp, Daniel) (Entered: 04/08/2022) |
| 04/08/2022 | 9 | DECLARATION of Daniel A. Schnapp in Support re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*.. Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein. (Attachments: # 1 Exhibit 1 - Results of |

| | | |
|---|---|---|
| | | LexisNexis Search, # 2 Exhibit 2 - PACER Spreadsheet).(Schnapp, Daniel) (Entered: 04/08/2022) |
| 04/08/2022 | 10 | MEMORANDUM OF LAW in Support re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*. . Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein..(Schnapp, Daniel) (Entered: 04/08/2022) |
| 04/08/2022 | 11 | PROPOSED ORDER. Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein. Related Document Number: 8 ..(Schnapp, Daniel) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 04/08/2022) |
| 04/11/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 11 Proposed Order was reviewed and approved as to form. (tp)** (Entered: 04/11/2022) |
| 04/14/2022 | 12 | MEMORANDUM OF LAW in Opposition re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*. . Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/14/2022) |
| 04/14/2022 | 13 | DECLARATION of Tiffany E. Engsell in Opposition re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*.. Document filed by Mohamed Ahmed Maait. (Attachments: # 1 Exhibit 1., # 2 Exhibit 2.).(Goldstein, Linda) (Entered: 04/14/2022) |
| 04/14/2022 | 14 | DECLARATION of Lela Kassem in Opposition re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*.. Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/14/2022) |
| 04/14/2022 | 15 | DECLARATION of Linda C. Goldstein in Opposition re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*.. Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/14/2022) |
| 04/14/2022 | 16 | PROPOSED ORDER. Document filed by Mohamed Ahmed Maait. Related Document Number: 12 ..(Goldstein, Linda) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 04/14/2022) |
| 04/15/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 16 Proposed Order was reviewed and approved as to form. (tp)** (Entered: 04/15/2022) |
| 04/18/2022 | 17 | NOTICE of Errata Re: Memorandum of Law in Opposition to Plaintiff's Motion for Remand, ECF No. 12 . Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/18/2022) |
| 04/18/2022 | 18 | MEMORANDUM OF LAW in Opposition re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York. (Corrected Memorandum of Law)*. Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/18/2022) |
| 04/18/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Initial Pretrial Conference held on 4/18/2022,Telephone Oral Argument held on 4/18/2022 re: 8 MOTION to Remand to State Court *Supreme Court of the State of New York, County of New York*. filed by Ahmed Diaa Eldin Ali Mohamed Hussein, Conference held on 4/18/2022. (Kotowski, Linda) (Entered: 04/18/2022) |
| 04/18/2022 | 19 | CIVIL CASE MANAGEMENT PLAN: The case is to be tried to a jury. Motions - 4/20/2022, Response - 5/4, Reply - 5/11. Amended Pleadings due by 5/18/2022. Joinder of Parties due by 5/18/2022. Motions due by 8/12/2022. Responses due by 8/26/2022 Replies due by 9/7/2022. Deposition due by 7/15/2022. Discovery due by 7/22/2022. Final Pretrial Conference set for 9/14/2022 at 04:00 PM before Judge Jed S. Rakoff. Ready for Trial by 9/19/2022. (Signed by Judge Jed S. Rakoff on 4/18/2022) (kv) (Entered: 04/18/2022) |

| 04/20/2022 | 20 | ORDER DENYING MOTION FOR REMAND: denying 8 Motion to Remand to State Court. it is hereby ORDERED: Plaintiff's Motion to Remand this action to the Supreme Court of the State of New York, County of New York, is hereby DENIED; and The Court finds that removal was proper under 28 U.S.C. 1441(d) and that Defendant has shown cause to enlarge the time for removal. SO ORDERED. (Signed by Judge Jed S. Rakoff on 4/20/2022) (ama) (Entered: 04/20/2022) |
| --- | --- | --- |
| 04/20/2022 | 21 | MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint.*, MOTION to Stay *Merits Discovery*. Document filed by Mohamed Ahmed Maait.. (Goldstein, Linda) (Entered: 04/20/2022) |
| 04/20/2022 | 22 | DECLARATION of Linda C. Goldstein in Support re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*.. Document filed by Mohamed Ahmed Maait. (Attachments: # 1 Exhibit 1., # 2 Exhibit 2., # 3 Exhibit 3., # 4 Exhibit 4., # 5 Exhibit 5., # 6 Exhibit 6.).(Goldstein, Linda) (Entered: 04/20/2022) |
| 04/20/2022 | 23 | DECLARATION of Bahieldin H.Z. Elibrachy in Support re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*.. Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/20/2022) |
| 04/20/2022 | 24 | PROPOSED ORDER. Document filed by Mohamed Ahmed Maait. Related Document Number: 21 ..(Goldstein, Linda) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 04/20/2022) |
| 04/20/2022 | 25 | PROPOSED ORDER. Document filed by Mohamed Ahmed Maait. Related Document Number: 21 ..(Goldstein, Linda) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 04/20/2022) |
| 04/20/2022 | 26 | MEMORANDUM OF LAW in Support re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*. . Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 04/20/2022) |
| 04/20/2022 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 24 Proposed Order 25 Proposed Order was reviewed and approved as to form. (km)** (Entered: 04/20/2022) |
| 04/20/2022 | 27 | ORDER STAYING MERITS DISCOVERY PENDING DISPOSITION OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S "SUMMARY JUDGMENT MOTION IN LIEU OF COMPLAINT" : granting 21 Motion to Dismiss; granting 21 Motion to Stay re: 21 MOTION to Dismiss Plaintiff's Motion for Summary Judgment in Lieu of Complaint. MOTION to Stay Merits Discovery. it is hereby ORDERED: Defendant's request for a stay of merits discovery is hereby GRANTED; and All merits discovery is STAYED until the Court rules on the issue of subject matter jurisdiction and this Court issues a further Order allowing such discovery. SO ORDERED. (Signed by Judge Jed S. Rakoff on 4/20/2022) (ama) (Entered: 04/20/2022) |
| 05/03/2022 | 28 | MEMORANDUM OF LAW in Opposition re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*. . Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein..(Schnapp, Daniel) (Entered: 05/03/2022) |
| 05/03/2022 | 29 | DECLARATION of DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN in Opposition re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*.. Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein. (Attachments: # 1 Exhibit Curriculum Vitae, # 2 Exhibit Egyptian Stock Exchange Records).(Schnapp, Daniel) (Entered: 05/03/2022) |

**A-6**

| | | |
|---|---|---|
| 05/06/2022 | 30 | MOTION for Tiffany E. Engsell to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26115956. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Mohamed Ahmed Maait. (Attachments: # 1 Affidavit of Tiffany E. Engsell in Support, # 2 Exhibit A - Pennsylvania Certificate of Good Standing, # 3 Exhibit B - New Jersey Certificate of Good Standing, # 4 Text of Proposed Order for Pro Hac Admission).(Engsell, Tiffany) (Entered: 05/06/2022) |
| 05/09/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 30 MOTION for Tiffany E. Engsell to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-26115956. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 05/09/2022) |
| 05/09/2022 | 31 | ORDER FOR ADMISSION OF TIFFANY E. ENGSELL PRO HAC VICE granting 30 Motion for Tiffany E. Engsell to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys.. (Signed by Judge Jed S. Rakoff on 5/9/2022) (kv) (Entered: 05/09/2022) |
| 05/10/2022 | 32 | REPLY MEMORANDUM OF LAW in Support re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*. . Document filed by Mohamed Ahmed Maait..(Goldstein, Linda) (Entered: 05/10/2022) |
| 06/13/2022 | 33 | MEMORANDUM ORDER re: 21 MOTION to Dismiss *Plaintiff's Motion for Summary Judgment in Lieu of Complaint*. MOTION to Stay *Merits Discovery*. filed by Mohamed Ahmed Maait. For the reasons above, the Court hereby grants Maait's motion to dismiss the summary judgment motion in lieu of complaint. The Clerk of Court is directed to enter judgment dismissing the complaint for want of jurisdiction and to close the case. (Signed by Judge Jed S. Rakoff on 6/13/2022) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 06/13/2022) |
| 06/14/2022 | 34 | CLERK'S JUDGMENT re: 33 Order in favor of Mohamed Ahmed Maait against Ahmed Diaa Eldin Ali Mohamed Hussein. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Order dated June 13, 2022, Maait's motion to dismiss the summary judgment motion in lieu of complaint is granted. Judgment is entered dismissing the complaint for want of jurisdiction; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 6/14/2022) (Attachments: # 1 Right to Appeal) (km) (Entered: 06/14/2022) |
| 07/12/2022 | 35 | NOTICE OF APPEAL from 34 Clerk's Judgment,,. Document filed by Ahmed Diaa Eldin Ali Mohamed Hussein. Filing fee $ 505.00, receipt number 2639. Form D-P is due within 14 days to the Court of Appeals, Second Circuit..(nd) (Entered: 07/12/2022) |
| 07/12/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 35 Notice of Appeal..(nd) (Entered: 07/12/2022) |
| 07/12/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 35 Notice of Appeal filed by Ahmed Diaa Eldin Ali Mohamed Hussein were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/12/2022) |

| |
|---|
| **PACER Service Center** |
| **Transaction Receipt** |

**A-7**

SDNY CM/ECF NextGen Version 1.6

| 09/12/2022 09:39:17 | | | |
|---|---|---|---|
| **PACER Login:** | teamrpacc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02592-JSR |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN, | Civil Action No. <u>22-cv-02592</u> |
| Plaintiff, | Electronically filed |
| v. | Removed from: |
| DR. MOHAMED AHMED MAAIT, in his official capacity as MINISTER OF FINANCE OF THE ARAB REPUBLIC OF EGYPT, | Supreme Court of the State of New York County of New York |
| Defendant. | Index No.: 161134/2021 |

### NOTICE OF REMOVAL

**TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:**

**PLEASE TAKE NOTICE THAT** Defendant Dr. Mohamed Ahmed Maait ("Defendant"), sued in his official capacity as Minister of Finance of the Arab Republic of Egypt, by and through his undersigned counsel, Dechert LLP, and reserving any and all defenses and exceptions, hereby removes to this Court the action described below pursuant to 28 U.S.C. § 1441(d).

In support of this Notice of Removal, Defendant states as follows:

### PROCEDURAL BACKGROUND

1. On or about December 13, 2021, Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein ("Plaintiff") filed a Notice of Motion for Summary Judgment in Lieu of Complaint in the Supreme Court of the State of New York for the County of New York, captioned *Dr. Ahmed Diaa Eldin Ali Mohamed Hussein v. Dr. Mohamed Ahmed Maait*, Index No. 161134/2021 (the "State Court Case").  A true and correct copy of that Notice, the accompanying Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, the accompanying Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein (with its "Exhibit

A"), and the accompanying Request for Judicial Intervention are attached as Exhibits 1, 2, 3, and 4, respectively.  The action seeks the recognition of several documents that purportedly constitute an Egyptian judgment against Dr. Maait.

2.      On or about December 27, 2021, Plaintiff filed an Amended Summons and an Amended Notice of Motion for Summary Judgment in Lieu of Complaint in the State Court Case.  True and correct copies of the Amended Summons and Amended Notice are attached as Exhibits 5 and 6.  The Amended Notice states that the motion shall be heard on August 25, 2022.

3.      Since the filing of Plaintiff's Amended Summons and Amended Notice, there have been no other proceedings or docketed events in the State Court Case.  A true and correct copy of the docket sheet of the State Court Case is attached as Exhibit 7.

4.      To effect service upon the Defendant, who is sued in his official capacity as the Minister of Finance for the Arab Republic of Egypt, and is a citizen of Egypt, Plaintiff submitted a Request for Service Abroad of Judicial or Extra Judicial Documents, dated January 24, 2022. A true and correct copy of that Request is attached as Exhibit 8.  The Request states that "Defendant is required to file a RESPONSE with the Court and serve a copy upon Plaintiff's attorney within sixty (60) days after having received the Amended Summons and other documents herein." Ex. 8 ("RSA") at 3.

5.      The Request also included an "FSIA Notice of Suit and Attachment."  A true and correct copy of that Notice is attached as Exhibit 9.  The Notice of Suit also states that Defendant has 60 days to respond.

6.      The Request and its accompanying papers[1] were served upon an employee of the Egyptian State Lawsuits Authority in Egypt on February 3, 2022.

## GROUNDS FOR REMOVAL

7.      Removal is warranted under 28 U.S.C. § 1441(d) and this Court has jurisdiction under 28 U.S.C. § 1330 because the "real party in interest" against which Plaintiff's claims are brought is the Arab Republic of Egypt, a foreign sovereign state.  *See, e.g.*, *Samantar v. Yousuf*, 560 U.S. 305, 324–25 (2010).  Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332 because Plaintiff asserts that he is a citizen of New York and Defendant is a subject of the Arab Republic of Egypt.

8.      In recognition of the "important" objective of "allow[ing] for a uniform body of law concerning foreign states to emerge in the federal courts," *Refco, Inc. v. Galadari*, 755 F. Supp. 79, 83 (S.D.N.Y. 1991), Congress enacted 28 U.S.C. § 1441(d), which provides that "[a]ny civil action brought in a State court against a foreign state," as defined in section 1603(a) of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), "may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending."

---

[1] In addition to the Request, Exhibit 8, and the Notice, Exhibit 9, the Request was served along with the Request for Judicial Intervention, the Amended Summons, the Amended Notice of Motion for Summary Judgment in Lieu of Complaint, the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, and the Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein (with its "Exhibit A"), Exhibits 2–6, and a Notice of Electronic Filing, a true and correct copy of which is attached as Exhibit 10. Two additional exhibits to the Hussein Affirmation (its "Exhibit B" and "Exhibit C") were filed in the State Court Case but were not served with the Request; those two documents are attached as Exhibits 11 and 12.

9.      "Foreign state," for purposes of the FSIA, includes "a political subdivision of a foreign state" or "an agency or instrumentality of a foreign state," defined as any entity "which is a separate legal person, corporate or otherwise" that "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" and that "is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(a), (b).

10.      Where plaintiffs, "through 'artful pleading'" or otherwise, bring an action against a foreign official "in his official capacity," courts will treat the action as "against the foreign state itself" if the foreign state is "the real party in interest."  *Samantar*, 560 U.S. at 324–25 (quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1102 (9th Cir. 1990)); *see also Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, No. 12-7316, 2014 WL 288705, at *11 (S.D.N.Y. Jan. 27, 2014) ("[W]here an official is sued in his official capacity, and where the action is clearly against the foreign state itself as the real party in interest, the case may be treated as an action 'against the foreign state itself, as the state is the real party in interest.'" (quoting *Samantar*, 560 U.S. at 325)).

11.      The Arab Republic of Egypt is the "real party in interest" with respect to the State Court Action.  First, Plaintiff seeks damages not from Defendant's "own pockets," *Samantar*, 560 U.S. at 325, but rather from the Arab Republic of Egypt.  Plaintiff expressly seeks "compensat[ion]" from "the *Egyptian Government*," not Defendant, Ex. 1 ("MSJ") at 4 (emphasis added), given that the judgment Plaintiff seeks to enforce purportedly "arises from a foreign nation's [*i.e.*, the Arab Republic of Egypt's] expropriation of a New York resident's property," *id.* at 10.  *See also* Ex. 3 (Hussein Aff.) ¶ 10 ("To date, I have not received any compensation from the Egyptian government for the taking of my interest in SIMO."); *id.* ¶ 16

3

("[T]he Egyptian government refused to honor the court's binding decision, or the decision which had been issued by the Chairman of the Investment Authority on behalf of the country."); *id.* ¶ 27 ("To date, the Egyptian government has refused to compensate the shareholders of SIMO, including myself, for the effective nationalization of the Company as required by Egyptian Law, the Egyptian constitution, and the final and binding Egyptian Judgment.").

12.     Accordingly, because Plaintiff seeks compensation from the Arab Republic of Egypt, and not from Defendant in his individual capacity, the Arab Republic of Egypt is the "real party in interest" with respect to Plaintiff's claims.  *See Smith*, 2012 WL 2930462, at *11; *see also Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 35 (D.D.C. 2013), *aff'd* 764 F.3d 31 (D.C. Cir. 2014) (holding Kenyan government was "real party in interest" because, among other things, "any damages that [plaintiff] recovers in th[e] suit will be payable by the Kenyan government and not from the individual defendants").

13.     Second, Plaintiff makes no allegations against Dr. Maait *as an individual*.  Rather, Plaintiff's descriptions of the dispute underlying the purported judgment all pertain to the Arab Republic of Egypt or the "Minister of Finance," without identifying Dr. Maait by name.  *See* MSJ at 2 (alleging "the Chairman of the Companies' Regulatory Authority issued a decision without legal authority or precedent to do so . . . and gave control of the Company to the Egyptian Government, under the auspices of the Chemical Holding Company, effectively expropriating all the shares of SIMO"); *id.* (alleging "the Chairman of the Investment Authority ordered that the Company be returned to its rightful owners out of the respect for the final binding order . . . [h]owever, the Egyptian government refused to honor the court's binding decision"); *cf. id.* at 3 (alleging "[i]n 2014, the Prime Minister of Egypt affirmed the Administrative Court Decision via Decree No. 961 and directed that the Minister of Finance

4

compensate all shareholders of SIMO, including Mr. Hussein, for the loss of their investment in the Company" (citation omitted)); *id.* at 3 (alleging Plaintiff "communicated with the Minister of Finance" and other government officials who "advised" him "to bring the matter before the Egyptian General Authority for Investment & Free Zones Technical Secretariat Ministerial Committee for Investment Disputes Settlement . . . in order to obtain his compensation for the Company"). Indeed, Plaintiff himself states that his basis for bringing this action is because "*the Egyptian Government* has failed and refused to compensate [him] in accordance with the final and binding Egyptian Judgment," MSJ at 4 (emphasis added), not because of anything Defendant did in his personal capacity.

14. This, too, indicates that Plaintiff's claims are brought not against Defendant, individually, but against the Arab Republic of Egypt. *See Rahim v. Sec., Establishment Div., Government of People's Republic of Bangladesh*, No. 11-3368, 2011 WL 3625580, at *2 (E.D.N.Y. Aug. 12, 2011), *aff'd* 481 F. App'x 18 (2d Cir. 2012); *see also Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 72 (D.D.C. 2013) (foreign state was "real party in interest" where plaintiff alleged individual defendants' actions "were actions of the Iranian 'regime'"); *Gomes v. ANGOP, Angola Press Agency*, No. 11-0580, 2012 WL 3637453, at *13 (E.D.N.Y. Aug. 22, 2012) (finding foreign state was "real party in interest" where "Plaintiff ma[de] no allegations against the Individual Defendants regarding actions taken by them outside of their respective roles in Angola's political structure").

15. Finally, Plaintiff has not purported to serve Dr. Maait in his individual capacity. Rather, service was made upon the Egyptian State Lawsuits Authority, which is designated under Egyptian law to accept service upon ministers in their official capacities.

16.     Accordingly, because the Arab Republic of Egypt is the "real party in interest" with respect to this action, this Court has jurisdiction under 28 U.S.C. § 1330 and removal is proper pursuant to 28 U.S.C. § 1441(d).  Alternatively, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

<div align="center">

**REMOVAL IS TIMELY**

</div>

17.     This Notice of Removal is timely under 28 U.S.C. § 1441(d), which provides that "[w]here removal is based upon" § 1441(d), the 30-day removal deadline under § 1446(d) "may be enlarged at any time for cause shown."

18.     Factors considered in determining whether the requisite "cause" is shown include "the purpose of the removal statute, the extent of prior activity in the state system, the prejudice to both parties, the effect of the substantive rights of the parties and any intervening equities." *Refco*, 755 F. Supp. at 83; *see also Steadman v. Sinclair*, No. 96-599, 1996 WL 257664 at *3 (S.D.N.Y. May 16, 1996).  Each of these factors weigh in favor of permitting enlargement of the 30-day removal deadline.

19.     First, because the Arab Republic of Egypt is the "real party in interest," "the desire to have claims against foreign states heard in federal court and to develop a uniform body of law applicable to foreign states, are important factors to be considered in determining whether cause has been shown." *Steadman*, 1996 WL 257664, at *3; *Leith v. Lufthansa German Airlines*, 793 F. Supp. 808, 811 (N.D. Ill. 1992) (courts "must be mindful of Congress' objective of uniformity in the law and impartiality toward the foreign entity").  The "purpose of the removal statute," thus, weighs in favor of enlarging the 30-day removal deadline.

20.     Second, as described above, there has been no activity in the State Court Action, apart from the filing of Plaintiff's Notice and Amended Notice and Motion for Summary Judgment in Lieu of a Complaint.  *See* Ex. 7.  Plaintiff has not yet filed a return of service form

<div align="center">

6

</div>

in the State Court Action. *Id.* Accordingly, this factor, too, weighs in favor of enlarging the 30-day removal deadline. *See, e.g.*, *Refco*, 755 F. Supp. at 84 (cause shown despite five year delay, where there had been little progress in state court); *Fabe v. Aneco Reinsurance Underwriting Ltd.*, 784 F. Supp. 448, 451–52 (S.D. Ohio 1991) (removal allowed despite five month delay); *Leith*, 793 F. Supp. at 811 (late removal allowed given "little or no progress" in the state court, which "eliminat[es] the concern of wasting judicial resources").

21.     Finally, enlargement of the 30-day removal deadline would not prejudice the parties or affect their substantive rights, given the advantages and Congressional preference of litigating this case in a federal forum. *See Steadman*, 1996 WL 257664, at *3; *Leith*, 793 F. Supp. at 811. Additionally, this Court is well suited to apply any New York state law or applicable federal law, including the FSIA, that is likely to arise during the course of these proceedings.

22.     Defendant moved expeditiously to obtain qualified United States counsel, which required proper diligence and identification of counsel competent to litigate the complex issues in this case arising under the FSIA. Given that Defendant did not engage the undersigned counsel until March 1, 2022, the preparation and filing of this Notice of Removal was made as soon as was reasonably possible.

23.     Accordingly, cause exists to enlarge the 30-day removal deadline.

**WHEREFORE**, Defendant notices the removal of this action from the Supreme Court of the State of New York for the County of New York to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1330 and 1441(d).[2]

---

[2] Nothing in this Notice of Removal is intended or should be construed as an express or implied admission by Defendant, including but not limited to an admission of any fact alleged by

7

Dated:  New York, New York
         March 30, 2022

Respectfully submitted,

*/s/ Linda C. Goldstein*

Linda C. Goldstein
DECHERT LLP
1095 Avenue of the Americas
Three Bryant Park
New York, New York 10036
Telephone: (212) 698-3500
Email: linda.goldstein@dechert.com

*Counsel for Defendant Dr. Mohamed Ahmed
Maait, in his official capacity as Minister of
Finance of the Arab Republic of Egypt*

---

Plaintiff; the validity or merit of any of Plaintiff's claims or allegations; or that Plaintiff is entitled to any of the relief that he seeks in the Amended Notice or any other relief.  Further, nothing in this Notice of Removal is intended to or should be construed as a limitation of any of Defendant's rights, claims, remedies, or defenses in connection with this action.  Defendant expressly reserves all such rights and defenses.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of March 2022, a true and correct copy of the foregoing Notice of Removal was served upon counsel of record for Plaintiff by first class mail and email at the addresses below:

> Daniel A. Schnapp
> Eric M. Ferrante
> Catherine A. Savio
> NIXON PEABODY LLP
> 55 West 46th Street
> New York, NY 10036-4120
> Tel.: (212) 940-3000
> dschnapp@nixonpeabody.com
> eferrante@nixonpeabody.com
> csavio@nixonpeabody.com

> Clerk of Court, Supreme Court of the State of New York for the County of New York

Dated: New York, New York        /s/ Linda C. Goldstein
      March 30, 2022        Linda C. Goldstein
                                     DECHERT LLP
                                     1095 Avenue of the Americas
                                     Three Bryant Park
                                     New York, New York 10036
                                     Telephone: (212) 698-3500
                                     Email: linda.goldstein@dechert.com

                                     *Counsel for Defendant Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt*

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

Defendant.

**NOTICE OF MOTION
FOR SUMMARY
JUDGMENT IN LIEU
OF COMPLAINT**

Index No.

**PLEASE TAKE NOTICE** that, upon the Affirmation of Dr. Ahmed Diaa Eldin Ali

Mohamed Hussein, executed on November 2, 2021, and the exhibits annexed thereto; and the

accompanying Memorandum of Law, dated December 13, 2021, Plaintiff Dr. Ahmed Diaa Eldin

Ali Mohamed Hussein ("Plaintiff") will move this Court at the Motion Submission Part

Courtroom (Room 130), 60 Centre Street, New York, New York 10007, on the 20th day of

January, 2022, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an Order pursuant

to New York Civil Practice Law and Rules ("CPLR") §§ 3212 and 5301 *et seq.* recognizing and

enforcing the money judgment of the Administrative Court, Seventh Circle (Economic &

Investment Disputes Circle) of the Arab Republic of Egypt against Dr. Mohamed Ahmed Maait,

in his official capacity as Minister of Finance of the Arab Republic of Egypt, dated August 4,

2014, and subsequent affirmed by the Prime Minister of the Arab Republic of Egypt, Eng.

Ibrahim Mehleb, via Decree No. 961 of the Year 2014, in the total amount of $15.756 million,

with interest to be calculated at the time of judgment in favor of Plaintiff and such other and

further relief as the Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR § 2214(b), answering

affidavits, if any, shall be served at least seven (7) days prior to the return date of this motion.

- 3 -

**A-20**

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR § 2214(b), reply or responding affidavits, if any, shall be served at least one (1) day prior to the return date of this motion.

**PLEASE TAKE FURTHER NOTICE** that Plaintiff requests oral argument on the instant motion.

Dated:  December 13, 2021
       New York, New York

**NIXON PEABODY LLP**

By: */s/ Daniel A. Schnapp*
     Daniel A. Schnapp
     Eric M. Ferrante
     Catherine A. Savio

     Tower 46
     55 West 46th Street
     New York, NY 10036-4120
     Tel. (212) 940-3000
     dschnapp@nixonpeabody.com
     eferrante@nixonpeabody.com
     csavio@nixonpeabody.com

     *Attorneys for Plaintiff Dr. Ahmed Diaa*
     *Eldin Ali Mohamed Hussein*

4825-9452-2865.5

- 4 -

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 7

INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

                                                    Plaintiff,

                              - vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
As Minister of Finance of the Arab Republic of Egypt,

                                                    Defendant.

Index No.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

**NIXON PEABODY LLP**

Daniel A. Schnapp
Eric M. Ferrante
Catherine A. Savio
55 West 46th Street
New York, NY 10036-4120
Tel.: (212) 940-3000
dschnapp@nixonpeabody.com
eferrante@nixonpeabody.com
csavio@nixonpeabody.com

*Attorneys for Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................1

     Mr. Hussein's Efforts to Cause Egypt to Satisfy the Egyptian Judgment ...........................3

LEGAL STANDARD................................................................................................ 4

     A.    Legal Standard Under CPLR § 3213. ...................................................4

     B.    Legal Standard Under Article 53 of the CPLR...........................................4

     C.    Legal Standard Under the Doctrine of Comity. ..........................................6

ARGUMENT..............................................................................................................6

     POINT I

     THE EGYPTIAN JUDGMENT SHOULD BE RECOGNIZED UNDER
     ARTICLE 53.........................................................................................................6

     A.    The Egyptian Judgment is "Final, Conclusive and Enforceable."
          Judgment in New York. ...................................................................... 6

     B.    The Egyptian Judgment Was Rendered by Impartial Egyptian Courts Under
          Procedures Compatible with the Requirements of Due Process of Law. ................7

     C.    The Egyptian courts had jurisdiction over the Egyptian Minister of Finance. ....... 7

     POINT II

     THE EGYPTIAN JUDGMENT SHOULD BE RECOGNIZED UNDER THE
     DOCTRINE OF COMITY ....................................................................................9

CONCLUSION...........................................................................................................10

- i -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

INDEX NO. 161134/2021

NYSCEF DOC. NO. 7

RECEIVED NYSCEF: 12/13/2021

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank PJSC v. Saad Trading, Contr. & Fin. Servs. Co.*,
  117 A.D.3d 609 (1st Dep't 2014) ...............................................5

*Att'y Gen. of Canada v. Gorman*,
  2 Misc.3d 693 (Civ. Ct. 2003) ...............................................6

*Can. Imperial Bank of Commerce v. Saxony Carpet Co., Inc.*,
  899 F.Supp. 1248 (S.D.N.Y. 1995) ...............................................5

*CIBC Mellon Trust Co. v. Mora Hotel Corp.*,
  100 N.Y.2d 215 (2003), *cert. denied* 540 U.S. 948 (2003) ...................5, 7

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*,
  773 F.2d 452 (2d Cir. 1985)...............................................6

*Greschler v. Greschler*,
  51 N.Y.2d 368 (1980) ...............................................10

*Hilton v. Guyot*,
  159 U.S. 113 (1895)...............................................6, 9

*Ingersoll Milling Machine Co. v. Granger*,
  833 F.2d 680 (7th Cir. 1987) ...............................................7

*Intercontinental Hotels Corp. (P.R.) v. Golden*,
  15 N.Y.2d 9 (1964) ...............................................5

*John Galliano, S.A. v. Stallion, Inc.*,
  15 N.Y.3d 75 (2010) ...............................................4

*Lenchyshyn v. Pelko Elec.*,
  281 A.D.2d 42 (4th Dep't 2001)...............................................5

*Maldonado v. Man-Dell Food Stores*,
  178 Misc.2d 541 (Civ. Ct. N.Y. Cnty. 1998)...............................................7

*S.C. Chimexin S.A. v. Velco Enters. Ltd.*,
  36 F.Supp.2d 206 (S.D.N.Y. 1999) ...............................................9

*Somportex Ltd. v. Philadelphia Chewing Gum Corp.*,
  453 F.2d 435 (3d Cir. 1971), *cert. denied,* 405 U.S. 1017 (1972)...............................................8

- ii -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021

NYSCEF DOC. NO. 7    RECEIVED NYSCEF: 12/13/2021

*SpringPrince, LLC v. Elie Tahari, Ltd.*,
   173 A.D.3d 544 (1st Dep't 2019) ................................................................4

*Sung Hwan Co., Ltd. v. Rite Aid Corp.*,
   7 N.Y.3d 78 (2006) .....................................................................................5

*Tradewell Inc. v. Am. Sensors Elecs., Inc.*,
   No. 96 Civ. 2474 (DAB), 1997 WL 423075 (S.D.N.Y. July 29, 1997) ..................10

**Statutes**

Uniform Foreign Country Money-Judgments Recognition Act ....................................5

**Other Authorities**

Administrative Court Decision via Decree No. 961 ......................................................3

CPLR §§ 3212 and 5303 *et seq.*................................................................................10

CPLR § 3213......................................................................................................4

CPLR § 5302.................................................................................................5, 6

CPLR §§ 5302 and 5303......................................................................................6

CPLR § 5303......................................................................................................5

CPLR § 5303(b).................................................................................................4

CPLR § 5304(a)(1)............................................................................................7

CPLR § 5304(a)(2)............................................................................................9

CPLR § 5305(a).............................................................................................8, 9

CPLR § 5305(a)(1)–(4).....................................................................................9

- iii -

## PRELIMINARY STATEMENT

Pursuant to Section 3213 and Article 53 of the CPLR, Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein ("Plaintiff" or "Mr. Hussein"), through his counsel, Nixon Peabody LLP, respectfully submits this Motion for Summary Judgment in Lieu of Complaint, arising out of a final and conclusive judgment rendered by the courts of the Arab Republic of Egypt and affirmed by the Prime Minister of Egypt in 2014.

## <u>BACKGROUND</u>

In 1994, Mr. Hussein partnered with the National Bank of Egypt, which is owned by the Egyptian Government and is by far the largest bank in Egypt, to found a full service investment bank in Egypt, known as the National Investment Company. (Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, sworn to November 2, 2021 (the "Hussein Aff.") ¶ 3.) Mr. Hussein did so, in order to conduct brokerage, money management, underwriting, and hedge fund services. (*Id.*)

In 1997, Mr. Hussein purchased all the shares of the National Investment Company and transferred the company into a holding company that owned his personal investments in Egypt. (*Id.* ¶ 4.) Under the auspices of Mr. Hussein's company, Mr. Hussein transferred in excess of $200 million dollars from his personal accounts in New York, in addition to funds borrowed using his investments in the United States as collateral, to fund this company. (*Id.* ¶ 5.)

Also in 1997, using the funds which originated from his account in New York to fund his company, Mr. Hussein purchased what amounted to approximately 70% of SIMO Middle East Paper Company ("SIMO" or the "Company") through an open market transaction. (*Id.* ¶ 6.) Mr. Hussein's investment in SIMO was equivalent to approximately $15.756 million. (*Id.* ¶¶ 7, 8; *id.* Ex. A.)

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 7                                        RECEIVED NYSCEF: 12/13/2021

In March 1999, the Chairman of the Companies' Regulatory Authority issued a decision without legal authority or precedent to do so, which took control of SIMO from the legitimate board of directors and gave control of the Company to the Egyptian Government, under the auspices of the Chemical Holding Company, effectively expropriating all shares of SIMO. (*Id.* ¶ 9.)

As a result, Mr. Hussein immediately instituted legal action in the Egyptian courts. (*Id.* ¶ 11.) The government's own expert, appointed by the Egyptian court, sided with Mr. Hussein and the owners of the company, and criticized the government for its illegal action. (*Id.* ¶ 12.)

In 2005 the Egyptian court ruled in favor of returning the Company to its owners, and compensating them for any damages caused by the illegal seizure. (*Id.* ¶ 13.)

In 2006, the Egyptian appellate court ordered SIMO to be returned to its rightful owners, cancelling the 1999 decision of the Chairman of the Companies' Regulatory Authority and ordering compensation for all the repercussions that resulted from that decision. (*Id.* ¶ 14.)

Mr. Hussein took steps against the Chairman of the Investment Authority for not upholding the Egyptian court's binding decision, and in 2007, the Chairman of the Investment Authority ordered that the Company be returned to its rightful owners out of the respect for the final binding court order. (*Id.* ¶ 15.)

However, the Egyptian government refused to honor the court's binding decision, or the decision which had been issued by the Chairman of the Investment Authority. (*Id.* ¶ 16.)

Due to a lawsuit in 2014 started by a disinterested party, the Administrative Court ordered the return of SIMO to the state because it was sold to shareholders at an inappropriately low price, ignoring that all the shares were purchased in the Egyptian market in an open market transaction (the "Administrative Court Decision"). (*Id.* ¶ 17.)

- 2 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 7          Case 1:22-cv-02592-JSR          Document 3-2          Filed 03/31/22          Page 8 of 16          RECEIVED NYSCEF: 12/13/2021

In 2014, the Prime Minister of Egypt affirmed the Administrative Court Decision via Decree No. 961 and directed that the Minister of Finance compensate all shareholders of SIMO, including Mr. Hussein, for the loss of their investment in the Company (the "PM Decree" and collectively with the Administrative Court Decision, the "Egyptian Judgment"). (*Id.* ¶¶ 19, 20; *id.* Ex. C.)

### Mr. Hussein's Efforts to Cause Egypt to Satisfy the Egyptian Judgment

Mr. Hussein communicated with the Minister of Finance, the Minister of Public Sector, the Chairman of the Investment Authority, the Head of the Holding Company for Chemical Industries, and other responsible government representatives, who advised Mr. Hussein to bring the matter before the Egyptian General Authority for Investment & Free Zones Technical Secretariat Ministerial Committee for Investment Disputes Settlement, headed by the Prime Minister, in order to obtain his compensation for the Company. (*Id.* ¶ 23.)

By letter dated July 6, 2020, Mr. Hussein was informed that the Ministerial Committee for Investment Dispute Settlement, in its meeting held on June 8, 2020, issued a decision stating: "[t]he incompetence of ministerial committee for investment dispute settlement to try and hear the current dispute[.]" (*Id.* ¶ 24.)

Next, by letter dated September 8, 2020, Mr. Hussein was informed that, at its session on July 27, 2020, the Ministerial Committee for Investment Dispute Settlement decided that it was "not competent to settle investment disputes …[.]" (*Id.* ¶ 25.)

Subsequently, on February 3, 2021 Mr. Hussein filed a notice of arbitration with the International Centre for Dispute Resolution under UNICTRAL Rules and the Bilateral Investment Treaty between the United States of America and Egypt (the "BIT"), but Egypt refused to consent to the arbitration. (*Id.* ¶ 26.)

- 3 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 7   Case 1:22-cv-02592-JSR   Document 3-2   Filed 03/31/22   Page 9 of 16   RECEIVED NYSCEF: 12/13/2021

To date, the Egyptian Government has failed and refused to compensate Mr. Hussein in accordance with the final and binding Egyptian Judgment, and, thus, Mr. Hussein now brings this motion for summary judgment in lieu of complaint.  (*Id.* ¶ 27.)

## LEGAL STANDARD

### A. Legal Standard Under CPLR § 3213.

A request that a New York court recognize a judgment entered by the courts of a foreign country falls within the parameters of CPLR § 3213.  *See* CPLR § 5303(b) (providing that recognition of a foreign country judgment shall be raised by "a motion for summary judgment in lieu of complaint seeking recognition of the foreign country judgment").  CPLR § 3213 provides that a plaintiff "may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint" when an action is "based upon . . . any judgment." This procedure is meant "to provide quick relief on documentary claims so presumptively meritorious that 'a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless.'"  *SpringPrince, LLC v. Elie Tahari, Ltd.,* 173 A.D.3d 544, 545 (1st Dep't 2019) (quoting *Weissman v. Sinorm Deli,* 88 N.Y.2d 437, 443 (1996)).

### B. Legal Standard Under Article 53 of the CPLR.

"New York has been traditionally a generous forum in which to enforce judgments for money damages rendered by foreign courts . . . ."  *John Galliano, S.A. v. Stallion, Inc.,* 15 N.Y.3d 75, 79-80 (2010) (quoting *CIBC Mellon Trust Co. v. Mora Hotel Corp.,* 100 N.Y.2d 215, 221 (2003), *cert. denied* 540 U.S. 948 (2003)).  Consistent with this approach, foreign judgments are recognized under principles of comity "[a]bsent some showing of fraud in the procurement . . . or that recognition of the judgment would do violence to some strong public policy of the State."

- 4 -

A-30

*Sung Hwan Co., Ltd. v. Rite Aid Corp.,* 7 N.Y.3d 78, 82 (2006) (quoting *Greschler v. Greschler,* 61 N.Y.2d. 368, 376 (1980); *see also Intercontinental Hotels Corp. (P.R.) v. Golden,* 15 N.Y.2d 9, 13 (1964) (explaining that a foreign judgment will be enforced in New York unless it is "inherently vicious, wicked or immoral, and shocking to the prevailing moral sense").

New York adopted the Uniform Foreign Country Money-Judgments Recognition Act as Article 53 to the CPLR "to promote the efficient enforcement of New York judgements abroad by assuring foreign jurisdictions that their judgments would receive streamlined enforcement here." *CIBC Mellon Trust Co.,* 100 N.Y.2d at 221.  In a proceeding under Article 53, "the judgment creditor does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country judgment and converting it into a New York judgment." *Id.* at 222 (quoting *Lenchyshyn v. Pelko Elec.,* 281 A.D.2d 42, 49 (4th Dep't 2001)).

Pursuant to CPLR § 5302, New York courts are required to recognize a judgment from a foreign country that "grants or denies recovery of a sum of money" and that is "final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal." *See also* CPLR § 5303 (a foreign country judgment "is conclusive between the parties to the extent that it grants or denies a sum of money").

"[M]ere divergence from American procedure does not render a foreign judgment unenforceable." *Can. Imperial Bank of Commerce v. Saxony Carpet Co., Inc.,* 899 F.Supp. 1248, 1252 (S.D.N.Y. 1995).  It is not necessary for the party against whom recognition of the foreign country judgment is sought to be subject to personal jurisdiction in New York before the foreign country judgment can be recognized.  *Abu Dhabi Commercial Bank PJSC v. Saad Trading, Contr. & Fin. Servs. Co.*, 117 A.D.3d 609, 611 (1st Dep't 2014); *see also Lenchyshyn v.*

- 5 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 7    Case 1:22-cv-02592-JSR   Document 3-2   Filed 03/31/22   Page 11 of 16   RECEIVED NYSCEF: 12/13/2021

*Pelko Elec.*, 281 A.D.2d 42, 47 (4th Dep't 2001) ("[A] party seeking recognition in New York of a foreign money judgment (whether of a sister state or a foreign country) need not establish a basis for the exercise of personal jurisdiction over the judgment debtor by the New York courts.").

Only a showing of a "modicum of facts that equate to making a *prima facie* case" is needed to meet Article 53's requirements. *Att'y Gen. of Canada v. Gorman,* 2 Misc.3d 693, 701 (Civ. Ct. 2003).

### C. Legal Standard Under the Doctrine of Comity.

Comity is the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895). Foreign judgments are recognized under the doctrine of comity where "the foreign court is a court of competent jurisdiction, and . . . the laws and public policy of [New York] and the rights of its residents will not be violated." *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir. 1985).

### ARGUMENT

### POINT I

### THE EGYPTIAN JUDGMENT SHOULD BE RECOGNIZED UNDER ARTICLE 53

Here, the Egyptian Judgment satisfies each Article 53 requirement and should be recognized and enforced by this Court.

### A. The Egyptian Judgment is "Final, Conclusive and Enforceable."

The Egyptian Judgment is final, conclusive and enforceable within the meaning of CPLR §§ 5302 and 5303. First, the Egyptian Judgment "grants . . . recovery of a sum of money" as required by CPLR § 5302. (Hussein Aff. ¶ 22.)

- 6 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 7    Case 1:22-cv-02592-JSR   Document 3-2   Filed 03/31/22   Page 12 of 16    RECEIVED NYSCEF: 12/13/2021

Specifically, the Egyptian Judgment provides that the Minister of Finance must "provide all necessary financial credits related to the shareholders' rights as well as the procurement of the wages and salaries of [the] company's personnel as well as their defined financial privileges." Thus, the Egyptian Judgment requires that of the amount of $15,756,622 million to Mr. Hussein, at present value, representing the return of his investment in SIMO, plus interest. *See also Maldonado v. Man-Dell Food Stores,* 178 Misc.2d 541 (Civ. Ct. N.Y. Cnty. 1998) (granting summary judgment in lieu of complaint on agreement requiring payment "of all Notices of Violation" and relying on extrinsic evidence of value of notices of violation).

Second, the Egyptian Judgment is "final, conclusive, and enforceable" in Egypt as it has not been and cannot be overturned since it has been ordered by the highest Court in Egypt. (Hussein Aff. ¶ 22.)

As both requirements are met, Mr. Hussein is entitled to full recognition of the Egyptian Judgment in New York.

**B. The Egyptian Judgment Was Rendered by Impartial Egyptian Courts Under Procedures Compatible with the Requirements of Due Process of Law.**

The relevant inquiry under CPLR § 5304(a)(1) is the overall fairness of the foreign country's legal "system." *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.,* 100 N.Y.2d 215, 222 (2003). CPLR § 5304(a)(1) "does not demand that the foreign tribunal's procedures exactly match those of New York." *Id.* "Rather, the statute is satisfied if the foreign court's procedures are 'compatible with the requirements of due process of law.'" *Id.* (quoting *Guinness PLC v. Ward,* 955 F.2d 875, 882 (4th Cir. 1992)); *see also Ingersoll Milling Machine Co. v. Granger,* 833 F.2d 680, 687 (7th Cir. 1987) ("The drafters of the Uniform [Foreign Money-Judgments Recognition] Act made it clear that a mere difference in the procedural system is not a sufficient

- 7 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 7    Case 1:22-cv-02592-JSR    Document 3-2    Filed 03/31/22    Page 13 of 16

INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

basis for nonrecognition.  A case of serious injunctive must be involved." (internal citation and quotation omitted)).

In determining whether a foreign court's procedures are compatible with the United States' conception of due process, "[t]he polestar is whether a reasonable method of notification is employed and reasonably opportunity to be heard is afforded to the person affected." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 443 (3d Cir. 1971), *cert. denied,* 405 U.S. 1017 (1972).

Here, as shown in the decisions attached to the Hussein Affidavit, the Administrative Court of Egypt employs a reasonable method of notification and a reasonable opportunity to be heard by the defendant.  (*See* Hussein Aff. Exs. B, C.)

Moreover, the Minister of Finance appeared and had his interests represented at the hearing before the Administrative Court via the Vice Chairman of the State Council, the State Commissioner, and the Secretariat.  (*See* Hussein Aff. ¶ 21, Ex. B, C.)

**C.  The Egyptian courts had jurisdiction over the Egyptian Minister of Finance.**

CPLR § 5305(a) provides a list of circumstances establishing that the foreign court had jurisdiction over the defendant including, *inter alia*:

1. the defendant was served personally in the foreign state;

2. the defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure in the proceedings or of contesting the jurisdiction of the court over him;

3. the defendant prior to the commencement of the proceedings had agreed to submit to the jurisdiction of the foreign court with respect to the subject matter involved;

4. the defendant was domiciled in the foreign state when the proceedings were instituted or, being a body corporate had its

- 8 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021
NYSCEF DOC. NO.    Case 1:22-cv-02592-JSR    Document 3-2    Filed 03/31/22    Page 14 of 16    RECEIVED NYSCEF: 12/13/2021

> principal place of business, was incorporated, or had otherwise
> acquired corporate status in the foreign state.

CPLR § 5305(a)(1)–(4).  A court may not refuse to recognize a foreign country judgment for

lack of personal jurisdiction under CPLR § 5304(a)(2) if any basis for personal jurisdiction

applies sunder CPLR § 5305(a).  *S.C. Chimexin S.A. v. Velco Enters. Ltd.,* 36 F.Supp.2d 206, 212

(S.D.N.Y. 1999).  As the Minister of Finance appeared in the proceedings that resulted in the

Egyptian Judgment, there is no basis to refuse to recognize the Egyptian Judgment under CPLR

§ 5305(a).

## POINT II

## THE EGYPTIAN JUDGMENT
## SHOULD BE RECOGNIZED UNDER THE DOCTRINE OF COMITY

In addition to meeting the standards under Article 53, the Egyptian Judgment should be

recognized under the doctrine of comity as all of the doctrine's requirements are met.  Moreover,

the doctrine of comity applies to *all* final foreign judgments and is not limited to judgments for a

specific sum of money.  *See Hilton,* 159 U.S. at 166 (holding that comity applies to "[e]very

foreign judgment, *of whatever nature*" (emphasis added)); *see also id.* at 168 ("[Foreign

judgments] under which a person has been compelled to pay money, are so far conclusive that

the justice of the payment cannot be impeached in another country . . .").  Thus, like under

Article 53, as long as the Egyptian Judgment comports with the fundamental standards of due

process and is not in violation of the public policies of New York, the Egyptian Judgment must

be recognized.

There can be no dispute that the Egyptian courts had personal jurisdiction over the

Minister of Finance.  Similarly, there can be no dispute that Egyptian Judgment comports with

the fundamental standards of due process.  Additionally, there are no public policy interests of

New York that would be violated by recognition of the Egyptian Judgment, particularly in light of the fact that the Egyptian Judgment arises from a foreign nation's expropriation of a New York resident's property that was purchased using funds originating from a New York bank account.

Moreover, the Egyptian Judgment is final, has been recognized by the Prime Minister's Decree, and as no further judicial action is required to resolve the issue of the return of Mr. Hussein's investment in SIMO and the Egyptian Judgment is subject to immediate enforcement in the amount of Dr. Hussein's initial investment in SIMO, at present value, plus interest[1]. *see, e.g., Tradewell Inc. v. Am. Sensors Elecs., Inc.*, No. 96 Civ. 2474 (DAB), 1997 WL 423075, at *4 (S.D.N.Y. July 29, 1997) (applying comity to breach of contract action even where no specific sum was sought); *Greschler v. Greschler,* 51 N.Y.2d 368 (1980) (applying comity to divorce decree that did not involve sum certain).

## <u>CONCLUSION</u>

For the foregoing reasons, the motion for summary judgment of Mr. Ahmed Diaa Eldin Ali Mohamed Hussein should be granted pursuant to CPLR §§ 3212 and 5303 *et seq.* or, alternatively, under the doctrine of comity, recognizing and enforcing the Egyptian Judgment against the Minister of Finance of Egypt with further interest to be calculated at the time of judgment in favor of Mr. Hussein, and any and all other relief that the Court deems just and proper.

*[Signature block on next page]*

---

[1] Plaintiff will submit a proposed Judgment in the total amount owed as of the date of the Court's Order granting summary judgment.

- 10 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

INDEX NO. 161134/2021

NYSCEF DOC. NO. 7

Case 1:22-cv-02592-JSR   Document 3-2   Filed 03/31/22   Page 16 of 16

RECEIVED NYSCEF: 12/13/2021

Respectfully submitted,

Dated: December 13, 2021            **NIXON PEABODY LLP**
      New York, New York

By: */s/ Daniel A. Schnapp*
    Daniel A. Schnapp
    Eric M. Ferrante
    Catherine A. Savio

    Tower 46
    55 West 46th Street
    New York, NY 10036-4120
    Tel. (212) 940-3000
    dschnapp@nixonpeabody.com
    eferrante@nixonpeabody.com
    csavio@nixonpeabody.com

    *Attorneys for Plaintiff Dr. Ahmed Diaa*
    *Eldin Ali Mohamed Hussein*

# EXHIBIT 3

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 3    Case 1:22-cv-02592-JSR   Document 3-3   Filed 03/31/22   Page 2 of 9

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
As Minister of Finance of the Arab Republic of Egypt,

Defendant.

**AFFIRMATION
OF DR. AHMED DIAA
ELDIN ALI MOHAMED
HUSSEIN**

Index No.

**DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN**, an individual physically located outside of the geographic boundaries of the United States, hereby affirms the following pursuant to CPLR Section 2106:

1.    I am over the age of eighteen, maintain a residence in New York County, New York, and also reside in the Arab Republic of Egypt ("Egypt"). I am a dual citizen of the United States of America and Egypt. I make this affirmation based upon my personal knowledge of the matters set forth herein and in support of my Motion for Summary Judgment in Lieu of Complaint.

2.    I bring this motion to recover on a judgment of the courts of the Arab Republic of Egypt. To date, the Minister of Finance, who was ordered to return my investment, has refused to make payment in accordance with the final and binding judgment that I obtained on behalf of myself, my family, and my company.

3.    In 1994, I partnered with the National Bank of Egypt, which is owned by the Egyptian Government and is by far the largest bank in Egypt, to found a full service investment bank in Egypt, known as the National Investment Company. I did so, in order to conduct brokerage, money management, underwriting, and hedge fund services.

4.      In 1997, I purchased all the shares of the National Investment Company and transferred the company into a holding company that owned my personal investments in Egypt.

5.      Under the auspices of this newly formed holding company, I transferred in excess of $200 million from my personal accounts in New York, in addition to funds borrowed using my investments in the United States used as collateral, to fund this company.

6.      Also in 1997, using the funds which originated from my account in New York to fund my company, I purchased what amounted to about 72% of SIMO Middle East Paper Company ("SIMO" or the "Company") through an open market transaction.

7.      My investment in SIMO was equivalent to approximately $15.714 million at the time that it was made.

8.      A correct copy of a document prepared by my auditors which reflects the value of my investments in SIMO over the years, according to official Egyptian exchange records, and the currency value according to the Central Bank of Egypt at that time, is attached hereto as **Exhibit A**.

9.      In March 1999, the Chairman of the Companies' Regulatory Authority issued a decision without legal authority or precedent to do so, which took control of SIMO from the legitimate board of directors and gave control of the Company to the Egyptian government, under the auspices of the Chemical Holding Company, effectively expropriating all of the shares of SIMO.

10.     To date, I have not received any compensation from the Egyptian government for the taking of my interest in SIMO.

11.     I immediately instituted legal action in the Egyptian courts to return the Company to the rightful owners, and obtain compensation for the damage caused by this illegal taking.

- 2 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 3   Case 1:22-cv-02592-JSR   Document 3-3   Filed 03/31/22   Page 4 of 9

INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

12.   The government's own expert panel, appointed by the Egyptian court, unanimously sided with the owners of the Company, and criticized the government for its illegal action.

13.   In 2005, the Egyptian court ruled in favor of returning the Company to its owners, and compensating them for any damages caused by the illegal seizure.

14.   In 2006, the Egyptian appellate court ordered that SIMO be returned to its rightful owners, cancelling the 1999 decision of the Chairman of the Companies' Regulatory Authority and ordering compensation for all of the effects resulting from that decision.

15.   Thereafter, we took steps against the Chairman of the Investment Authority for not upholding the Egyptian court's binding decision, and in 2007, the Chairman of the Investment Authority ordered that the Company be returned to its rightful owners out of respect for the final binding court order.

16.   However, the Egyptian government refused to honor the court's binding decision, or the decision which had been issued by the Chairman of the Investment Authority on behalf of the country.

17.   In 2014, due to a lawsuit started by a disinterested party, the Administrative Court ordered the return of SIMO to the state because it was sold to shareholders at an inappropriately low price, ignoring that all the shares were purchased in the Egyptian market in an open market transaction (the "Administrative Court Decision"). The Administrative Court did not address at all in its findings the final and binding decision from the Egyptian appellate court in 2006.

18.   A correct copy of a certified translation of the Administrative Court Decision is attached hereto as **Exhibit B.**

- 3 -

**A-41**

19.     In 2014, the Prime Minister of Egypt affirmed the Administrative Court Decision via Decree No. 961, and directed that the Minister of Finance compensate all shareholders of SIMO, for the loss of their investment in the Company (the "PM Decree" and collectively with the Administrative Court Decision, the "Egyptian Judgment").

20.     A correct copy of a certified translation of the PM Decree is attached hereto as **Exhibit C**.

21.     Throughout the proceedings that resulted in the Egyptian Judgment, the Minister of Finance received reasonable notification of the proceedings and had a reasonable opportunity to be heard. The Minister of Finance appeared at the proceedings and his interests here represented via the Vice Chairman of the State Council, the State Commissioner, and the Secretariat.

22.     Under Egyptian law, the Egyptian Judgment is conclusive and enforceable in Egypt and is the equivalent of a judgment granting the recovery of a sum of money.

23.     I have communicated repeatedly, on behalf of myself and other shareholders, over the last seven years with the Minister of Finance, the Minister of Public Sector, the Chairman of the Investment Authority, the Head of the Holding Company for Chemical Industries, and other responsible government representatives, who later advised me to bring the matter before the Egyptian General Authority for Investment & Free Zones Technical Secretariat Ministerial Committee for Investment Disputes Settlement, headed by the Prime Minister and including several cabinet members, in order to obtain this compensation for the Company.

24.     By letter dated July 6, 2020, I was informed that the Ministerial Committee for Investment Dispute Settlement, in its meeting held on June 8, 2020, issued a decision stating: "[t]he incompetence of ministerial committee for investment dispute settlement to try and hear

- 4 -

A-42

the current dispute[.]" The Committee did not cancel the Egyptian Judgment or provide any further instruction.

25.      By letter dated September 8, 2020, I was informed that, at its session on July 27, 2020, the Ministerial Committee for Investment Dispute Settlement reaffirmed that it was "not competent to settle investment disputes ...[.]"

26.      Subsequently, on February 3, 2021, I filed a notice of arbitration with the International Centre for Dispute Resolution under UNCITRAL Rules and the Bilateral Investment Treaty between the United States of America and Egypt (the "BIT"), but Egypt refused to consent to the arbitration.  I am not aware of any precedent to this action, or another instance where Egypt has refused to consent to international arbitration.

27.      To date, the Egyptian government has refused to compensate the shareholders of SIMO, including myself, for the effective nationalization of the Company as required by Egyptian Law, the Egyptian constitution, and the final and binding Egyptian Judgment.

- 5 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 3

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-02592-JSR   Document 3-3   Filed 03/31/22   Page 7 of 9

28.     In light of the foregoing, I respectfully request that this Court order a return of the present value of my investment in SIMO, interest thereon, and my costs and attorneys' fees incurred throughout the duration of this dispute.

I affirm this 2 day of November, 2021, under penalties of perjury under the laws of New York, which may include fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN

- 6 -

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 4

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 4

INDEX NO. 161134/202

RECEIVED NYSCEF: 12/13/202

the value of slmo shares **according** to the offical **egyptian exchange** records and the **currency** value **according** of the center bank of **egypt** at the same date

| year | dollar price | number of shares | the value EG | the value $ |
|------|-------------|------------------|--------------|-------------|
| 1997 | 3.388 | 1,202,865 | 32,114,877 | 9,479,007.38 |
| 1998 | 3.388 | 372,528 | 5,971,479 | 1,762,538.08 |
| 1999 | 3.405 | 118,842 | 1,101,816 | 323,587.67 |
| 2000 | 3.69 | 16,731 | 97,172 | 26,333.88 |
| 2001 | 4.49 | 7,245 | 30,738 | 6,845.88 |
| 2002 | 4.5 | 11,793 | 54,693 | 12,154.00 |
| 2003 | 6.146 | 6,950 | 28,053 | 4,564.43 |
| 2004 | 6.131 | 3,708 | 15,668 | 2,555.54 |
| 2005 | 5.726 | 2,100 | 6,053 | 1,057 |
| 2007 | 5.513 | 75,694 | 1,627,661 | 295,240.5 |
| 2008 | 5.503 | 135,974 | 5,729,765 | 1,041,207.5 |
| 2009 | 5.475 | 1,239,105 | 12,391,050 | 2,263,205.5 |
| 2011 | 6.021 | 78,581 | 541,922 | 90,005.3 |
| 2012 | 6.309 | 238,202 | 1,838,074 | 291,341.6 |
| 2013 | 6.928 | 53,227 | 403,933 | 58,304.4 |
| 2014 | 7.13 | 40,177 | 397,033 | 55,684.9 |
| total | | 3,603,722 | 62,349,987 | 15,713,633.64 |

# EXHIBIT 4

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021

NYSCEF DOC. NO. 8    Case 1:22-cv-02592-JSR    Document 3-4    Filed 03/31/22    Page 2 of 3    RECEIVED NYSCEF: 12/13/2021

## REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

SUPREME ▼ COURT, COUNTY OF NEW YORK ▼

Index No: _____    Date Index Issued: _____

| | For Court Use Only: |
|---|---|

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

IAS Entry Date

Dr. Ahmed Diaa Eldin Ali Mohamed Hussein

Plaintiff(s)/Petitioner(s)

Judge Assigned

-against-

Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt,

RJI Filed Date

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ○ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):    ○ Residential    ○ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Tax Certiorari
- ○ Tax Foreclosure
- ○ Other Real Property (specify): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution    [see NOTE in COMMERCIAL section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ◉ Other (specify):  Contract - Non-Commercial

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M).*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- ○ Asbestos
- ○ Child Victims Act
- ○ Environmental: _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (specify): _____
- ○ Other Negligence (specify): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration) [see NOTE in COMMERCIAL section]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (specify): _____
- ○ Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◉ | ○ | If yes, date filed: 12/13/2021 |
| Has a summons and complaint or summons with notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ◉ Notice of Motion    Relief Requested:  Summary Judgment in Lieu of Complaint    Return Date: 01/20/2022
- ○ Notice of Petition    Relief Requested: _____    Return Date: _____
- ○ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Requested: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

**A-48**

INDEX NO. 161134/2021
NYSCEF DOC. NO. 8
Case 1:22-cv-02592-JSR   Document 3-4   Filed 03/31/22   Page 3 of 3
RECEIVED NYSCEF: 12/13/2021

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. |
| --- | --- |

If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| PARTIES | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. |
| --- | --- |

If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties — List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants — For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined — For each defendant, indicate if issue has been joined. | Insurance Carriers — For each defendant, indicate insurance carrier, if applicable. |
| --- | --- | --- | --- | --- |
| ☐ | Name: Dr. Ahmed Diaa Eldin Ali Mohamed Hussein Role(s): Plaintiff | Daniel Schnapp, Nixon Peabody LLP, Tower 46, 55 West 46th Street, New York, NY 10036-4120, 212-940-3026, dschnapp@nixonpeabody.com | ○ YES   ○ NO | |
| ☑ | Name: Dr. Mohamed Ahmed Maait Role(s): Defendant | Ministry of Finance Towers, Nasr City, Extension of Ramsis Street, Abbassiya, Cairo, Egypt | ○ YES   ◉ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |
| ☐ | Name: Role(s): | | ○ YES   ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: ___12/13/2021___

_____
Signature

___4005799___
Attorney Registration Number

Daniel A. Schnapp
Print Name

# EXHIBIT 5

FILED: NEW YORK COUNTY CLERK 12/27/2021 12:17 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 10    Case 1:22-cv-02592-JSR   Document 3-5   Filed 03/31/22   Page 2 of 3    RECEIVED NYSCEF: 12/27/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

\- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

Defendant.

**AMENDED SUMMONS**

Index No. 161134/2021

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to submit to plaintiff's attorney your answering papers on this motion within the time provided in the notice of motion annexed hereto. In case of your failure to submit answering papers, summary judgment will be taken against you by default for the relief demanded in the notice of motion.

Plaintiff designates New York County as the place of trial.  The basis of the venue designated is the residence of the Plaintiff.

*[Signature block on next page]*

FILED: NEW YORK COUNTY CLERK 12/27/2021 12:17 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 10                                         RECEIVED NYSCEF: 12/27/2021

Dated: December 27, 2021                    **NIXON PEABODY LLP**
      New York, New York

                                    By: */s/ Eric M. Ferrante*
                                          Daniel A. Schnapp
                                          Eric M. Ferrante
                                          Catherine A. Savio

                                          Tower 46
                                        55 West 46th Street
                                          New York, NY 10036-4120
                                          Tel. (212) 940-3000
                                          dschnapp@nixonpeabody.com
                                          eferrante@nixonpeabody.com
                                          csavio@nixonpeabody.com

                                          *Attorneys for Plaintiff Dr. Ahmed Diaa*
                                          *Eldin Ali Mohamed Hussein*

- 2 -

# EXHIBIT 6

**A-53**

INDEX NO. 161134/2021
NYSCEF DOC. NO. 11
Case 1:22-cv-02592-JSR   Document 3-6   Filed 03/31/22   Page 2 of 3
RECEIVED NYSCEF: 12/27/2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

Defendant.

**AMENDED NOTICE OF MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT**

Index No. 161134/2021

   **PLEASE TAKE NOTICE** that, upon the Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, executed on November 2, 2021, and the exhibits annexed thereto; and the accompanying Memorandum of Law, dated December 13, 2021, Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein ("Plaintiff") will move this Court at the Motion Submission Part Courtroom (Room 130), 60 Centre Street, New York, New York 10007, on the 25th day of August, 2022, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an Order pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 3212 and 5301 *et seq.* recognizing and enforcing the money judgment of the Administrative Court, Seventh Circle (Economic & Investment Disputes Circle) of the Arab Republic of Egypt against Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, dated August 4, 2014, and subsequent affirmed by the Prime Minister of the Arab Republic of Egypt, Eng. Ibrahim Mehleb, via Decree No. 961 of the Year 2014, in the total amount of $15.756 million, with interest to be calculated at the time of judgment in favor of Plaintiff and such other and further relief as the Court may deem just and proper.

   **PLEASE TAKE FURTHER NOTICE** that, pursuant to 28 U.S.C. § 1608(d), answering affidavits, if any, shall be served within sixty (60) days of service of this motion.

- 3 -

FILED: NEW YORK COUNTY CLERK 12/27/2021 12:18 PM
NYSCEF DOC. NO. 11
INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/27/2021

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR § 2214(b), reply or responding affidavits, if any, shall be served at least one (1) day prior to the return date of this motion.

**PLEASE TAKE FURTHER NOTICE** that Plaintiff requests oral argument on the instant motion.

Dated: December 27, 2021
Rochester, New York

**NIXON PEABODY LLP**

By: */s/ Eric M. Ferrante*
Daniel A. Schnapp
Eric M. Ferrante
Catherine A. Savio

Tower 46
55 West 46th Street
New York, NY 10036-4120
Tel. (212) 940-3000
dschnapp@nixonpeabody.com
eferrante@nixonpeabody.com
csavio@nixonpeabody.com

*Attorneys for Plaintiff Dr. Ahmed Diaa
Eldin Ali Mohamed Hussein*

- 4 -

# EXHIBIT 7



# New York State Unified Court System

## *WebCivil Supreme - eFiled Documents Detail*

Court:     **New York Supreme Court**
Index Number:     **161134/2021**
Case Name:     **Hussein, Dr. Ahmed Diaa Eldin Ali Mohamed vs. Maait, Dr. Mohamed Ahmed**
Case Type:     **OM-Other**
Track:     **Standard**

**Document List** - Click on the document name to view the document

| Document # | Date Received/Filed | Document | Description | Motion # | Filing User |
|---|---|---|---|---|---|
| 1 | 12/13/2021 | SUMMONS | --none-- | | DANIEL ADAM SCHNAPP |
| 2 | 12/13/2021 | NOTICE OF MOTION | Notice of Motion for Summary Judgment in Lieu of Complaint | 001 | DANIEL ADAM SCHNAPP |
| 3 | 12/13/2021 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION | Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein in Support | | DANIEL ADAM SCHNAPP |
| 4 | 12/13/2021 | EXHIBIT(S) | SIMO Value of Investments | | DANIEL ADAM SCHNAPP |
| 5 | 12/13/2021 | EXHIBIT(S) | 2014 Administrative Justice Court Decision | | DANIEL ADAM SCHNAPP |
| 6 | 12/13/2021 | EXHIBIT(S) | Certified Translation of PM Decree | | DANIEL ADAM SCHNAPP |
| 7 | 12/13/2021 | MEMORANDUM OF LAW IN SUPPORT | Memorandum of Law in Support of Motion for Summary Judgment in Lieu of Complaint | | DANIEL ADAM SCHNAPP |
| 8 | 12/13/2021 | RJI -RE: NOTICE OF MOTION | --none-- | | DANIEL ADAM SCHNAPP |
| 9 | 12/21/2021 | NOTICE OF APPEARANCE (POST RJI) | Notice of Appearance of Eric Ferrante on behalf of Plaintiff | | ERIC MICHAEL FERRANTE |
| 10 | 12/27/2021 | SUMMONS (POST RJI) (AMENDED) | --none-- | | ERIC MICHAEL FERRANTE |
| 11 | 12/27/2021 | NOTICE OF MOTION (AMENDED) | --none-- | 001 | ERIC MICHAEL FERRANTE |

Close

# EXHIBIT 8

## REQUEST
## FOR SERVICE ABROAD OF JUDICIAL OR EXTRA JUDICIAL DOCUMENTS

*DEMANDE*
*AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ETRANGER*
*D'UN ACTE JUDICIARE OU EXTRAJUDICIAIRE*

Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, November 15, 1965

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matierè civile*
*ou commerciale, signée à La Hage, le 15 Novembrè 1965.*

| Identity and address of the applicant | Address of receiving authority |
|---|---|
| *Indentité et adresse du requérant* | *Adrese de l'autorité destinataire* |
| L. Celeste Ingalls ** <br> Crowe Foreign Services <br> 733 SW Vista Avenue <br> Portland, Oregon 97205 <br> USA <br> Email: Lci@foreignservices.com <br> Facsimile No. 1-503-222-3950 | Ministry of Justice <br> Magles El Shaab St. <br> Lazoughly Sq., Lazoughly <br> CAIRO <br> Egypt <br> Tel.: +20 (2) 792 2263 Fax: +20 (2) 795 8103 |

The undersigned applicant has the honour to transmit - in duplicate - the documents listed below and, in conformity with article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.,
(identity and address)

*Le requérant soussigné a l'honneur de faire parvenir - en double exemplaire - a l'autorité destinataire les documents ci-dessous énumérés en la priant conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, savoir:*
*(identité et adresse)*

**Dr. Mohamed Ahmed Maait**
**In his official capacity as Minister of Finance of the Arab Republic of Egypt**
**1 Ramsis extension St., Ministry of Finance Towers**
**Nasr City, Cairo, Egypt**

☒ (a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*
   *a) selon les formes légales (article 5, alinéa premier, lettre a).*

☐ ~~(b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:~~
   ~~*b) selon la forme particulière suivante (article 5, alinéa premier, lettre b):*~~

☐ ~~(c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*.~~
   ~~*c) le cas échéant, par remise simple (article 5, alinéa 2).*~~

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes* - with a certificate as provided on the reverse side.

*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes - avec l'attestation figurant au verso.*

List of documents
*Enumération des pièces*

|  |  |
|---|---|
| *** Hague "Summary" (2 pages) | Done at Portland, Oregon, USA, the 24th day of *Jan*, 2022. |
| *** FSIA Notice of Suit and Attachment | *Fait à Portland, Oregon, USA, le...* |
| *** Request for Judicial Intervention | **Signature and/or stamp.** |
| *** Amended Summons | *Signature et/ou cachet* |
| *** Amended Notice of Motion for Summary Judgment | |
| *** Memorandum of Law in Support of Plaintiff | |
| *** Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein | |
| *** Exhibit A | |
| *** Notice of Electronic Filing | |

OFFICIAL STAMP
LYLE CELESTE INGALLS
NOTARY PUBLIC-OREGON
COMMISSION NO. 971979
MY COMMISSION EXPIRES MARCH 04, 2022

L. Celeste Ingalls

\* Delete if inappropriate
*Rayer les mentions inutiles*

\*\* Authorized applicant pursuant to Rule 4(c)(2) of the Federal Rules
of Civil Procedure, Public Law 97-462

\*\*\* With Arabic translation

# CERTIFICATE

## ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☐ **1. that the document has been served\***
que la demande a été exécutée\*

| — the (date) / le (date): | |
|---|---|
| — at (place, street, number):<br>à (localité, rue, numéro) : | |

— **in one of the following methods authorised by Article 5:**
dans une des formes suivantes prévues à l'article 5 :

☐ **a)** **in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention\***
selon les formes légales (article 5, alinéa premier, lettre a)\*

☐ **b)** **in accordance with the following particular method\*:**
selon la forme particulière suivante\* :

☐ **c)** **by delivery to the addressee, if he accepts it voluntarily\***
par remise simple\*

**The documents referred to in the request have been delivered to:**
Les documents mentionnés dans la demande ont été remis à :

| **Identity and description of person:**<br>Identité et qualité de la personne : | |
|---|---|
| **Relationship to the addressee (family, business or other):**<br>Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | |

☐ **2. that the document has not been served, by reason of the following facts\*:**
que la demande n'a pas été exécutée, en raison des faits suivants\*:

| |
|---|
| |

☐ **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.**
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.

*Annexes / Annexes*

| **Documents returned:**<br>Pièces renvoyées : | |
|---|---|
| **In appropriate cases, documents establishing the service:**<br>Le cas échéant, les documents justificatifs de l'exécution : | |

\* if appropriate / s'il y a lieu

| **Done at / Fait à**<br><br>**The / le** | **Signature and/or stamp**<br>Signature et / ou cachet |
|---|---|

**A-60**

# SUMMARY OF THE DOCUMENT TO BE SERVED
*ELEMENTS ESSENTIELS DE L'ACTE*

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965**

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudiciares en matière civile ou commerciale, signée à La Hage, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa 4)*

**Name and address of the requesting authority:**
*Nom et adresse de l'autorité requérante:*

> L. Celeste Ingalls
> Crowe Foreign Services
> 733 SW Vista Avenue
> Portland, Oregon, USA 97205

**Particulars of the parties*:**
*Indentité des parties:*

Dr. Ahmed Diaa Eldin Ali Mohamed Hussein ................................................. **PLAINTIFF**
Dr. Mohamed Ahmed Maait ................................................................................**DEFENDANT**

## JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:* To give notice to defendant, Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, of a claim for civil damages and to summon him to answer the claim.

**Nature and purpose of the proceedings, and, where appropriate, the amount in dispute:**
*Nature et objet de l' instance, le cas échéant, le montant du litige:*

Plaintiff has filed a case to recognize and enforce a judgment against the Defendant and award Plaintiff the amount of $15,756,622 million by the courts of Egypt, which is final, conclusive and enforceable.

**Date and place for entering appearance**:**
*Date et lieu de la comparution:*                    **N/A**

**Court which has given judgment**:**
*Juridiction qui a rendu la décision:*              **N/A**

**Date of judgment**:**
*Date de la décision:*                               **N/A**

**Time limits stated in the document**:**
*Indication des délias figurant dans l'acte:*      Defendant is required to file a RESPONSE with the Court and serve a copy upon Plaintiff's attorney within sixty (60) days after having received the Amended Summons and other documents herein.

## EXTRAJUDICIAL DOCUMENT*
*ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:*                         **N/A**

**Time limits stated in the document**:**
*Indication des délias figurant dans l'acte:*      **N/A**

\* If appropriate, identity and address of the person interested in the transmission of the document.
  *S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.*

\*\* Delete if inappropriate.
  *Rayer les mentions inutiles.*

# EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED
HUSSEIN,

                              Plaintiff,

       vs.

DR. MOHAMED AHMED MAAIT, in his official
capacity as Minister of Finance of the Arab Republic
of Egypt,

                            Defendants.

Index Number: 161134/2021

**NOTICE OF SUIT**

| | |
|---|---|
| FOREIGN STATE ENTITY TO BE SERVED: | DR. MOHAMED AHMED MAAIT, in his official capacity as Minister of Finance of the Arab Republic of Egypt 1 Ramsis extension St. Ministry of Finance Towers, Nasr City Cairo, EGYPT |
| DOCUMENTS TO BE SERVED: | Summons, Request for Judicial Intervention, Amended Notice of Motion for Summary Judgment, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint, Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, with Exhibit A, and Notice of Electronic Filing, with Arabic Translations thereof. |
| NATURE OF ACTION: | Plaintiff has filed a case in the above Court to recognize and enforce a Judgment against the above named defendant and awarded to Mr. Hussein the amount of $15,756,622 million by the courts of Egypt, which is "final, conclusive, and enforceable". |
| RESPONSE REQUIREMENTS: | In accordance with §1608(d) of Title 28, United States Code, the foreign sovereign defendant has **60 days** in which to file a response with the court, and serve a copy of their response upon the plaintiff or plaintiff's counsel, after receipt of the aforementioned documents above.  Failure to respond within **60 days** can result in a default ruling. |

JURISDICTION:                          Pursuant to the protocol of the FOREIGN
                                       SOVEREIGN IMMUNITIES ACT OF 1976
                                       (Title 28 United States Code (U.S.C.))[1], the
                                       above named defendant as described in this
                                       matter, , can be defined under §1603 of Title
                                       28, U.S.C. as an agency of the foreign state of
                                       Egypt, and shall not be immune from the
                                       jurisdiction of this court as defined by §1605
                                       of Title 28, U.S.C.

---

[1] Copy of Foreign Sovereign Immunities Act (Pub. L. 94-583, 90 Stat. 2891, 28 U.S.C. Sec. 1330, 1332(a), 1391(f) and 1601-1611) attached

**FOREIGN SOVEREIGN IMMUNITIES ACT**
**TITLE 28 UNITED STATES CODE**
**Sec. 1330, 1332(a), 1391(f) and 1601-1611**
**and**
**SHORT TITLE OF 1976 AMENDMENTS Pub. L. 94-583,**

## TITLE 28

**Sec. 1330**. Actions against foreign states

•(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

•(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

•(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title. -SOURCE- (Added Pub. L. 94-583, Sec. 2(a), Oct. 21, 1976, 90 Stat. 2891.) EFFECTIVE DATE Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94-583, set out as a note under section 1602 of this title.

**Sec. 1332**. - Diversity of citizenship; amount in controversy; costs

•(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -

•(1) citizens of different States;

•(2) citizens of a State and citizens or subjects of a foreign state;

•(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

•(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

•(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is

finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

•(c) For the purposes of this section and section 1441 of this title -

•(1) a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business; and

•(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

•(d) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico

## Sec. 1391. Venue generally

•(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought –

•(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

•(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

•(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

•(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

## Section 1441.  Removal of Civil Actions

(d) Actions against foreign States.--Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.

**Section 1602.** Findings and declaration of purpose

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts.  Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities.  Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

**Sec. 1603.** Definitions

For purposes of this chapter -

•(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

•(b) An "agency or instrumentality of a foreign state" means any entity -
   •(1) which is a separate legal person, corporate or otherwise, and
   •(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
   •(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, nor created under the laws of any third country.

•(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

•(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

•(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

**Section 1604.** Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**Sec. 1605**. General exceptions to the jurisdictional immunity of a foreign state

•(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case -

•(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

•(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

•(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

•(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

•(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to –

•(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

•(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights;

•(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter

capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if

•(A) the arbitration takes place or is intended to take place in the United States,

•(B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards,

• (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or • • (D) paragraph (1) of this subsection is otherwise applicable; or

•(7) not otherwise covered by paragraph (2), in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph –

•(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later so designated as a result of such act; and

•(B) even if the foreign state is or was so designated, if –

•(i) the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

•(ii) the claimant or victim was not a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

•(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: Provided, That –

•(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a

result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

•(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

•(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

•(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in the Ship Mortgage Act, 1920 (46 U.S.C. 911 and following). Such action shall be brought, heard, and determined in accordance with the provisions of that Act and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

•(e) For purposes of paragraph (7) of subsection (a) –

•(1) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991;

•(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages; and

•(3) the term "aircraft sabotage" has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.

•(f) No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

•(g) Limitation on Discovery. –

•(1) In general. –

• (A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for subsection (a)(7), the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

•(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

•(2) Sunset. –

• (A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

•(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would –

•(i) create a serious threat of death or serious bodily injury to any person;

•(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

•(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

•(3) Evaluation of evidence. - The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

•(4) Bar on motions to dismiss. - A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

•(5) Construction. - Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

(h) Jurisdictional immunity for certain art exhibition activities.--

(1) In general.--If--

(A) a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

(B) the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

(C) the notice thereof has been published in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

(2) Exceptions.--

(A) Nazi-era claims.--Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

(iii) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(iv) a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(B) Other culturally significant works.--In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

(iii) the taking occurred after 1900;

(iv) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(v) a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(3) Definitions.--For purposes of this subsection--

(A) the term "work" means a work of art or other object of cultural significance;

(B) the term "covered government" means--

(i) the Government of Germany during the covered period;

(ii) any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

(iii) any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

(iv) any government in Europe that was an ally of the Government of Germany during the covered period; and

(C) the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

**Section 1605A.  Terrorism exception to the jurisdictional immunity of a foreign state.**

(a) In general.--

(1) No immunity.--A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

(2) Claim heard.--The court shall hear a claim under this section if--

(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in

effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--

(I) a national of the United States;

(II) a member of the armed forces; or

(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

(b) Limitations.--An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) not later than the latter of--

(1) 10 years after April 24, 1996; or

(2) 10 years after the date on which the cause of action arose.

(c) Private right of action.--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such

(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

(3) the term "material support or resources" has the meaning given that term in section 2339A of title 18;

(4) the term "armed forces" has the meaning given that term in section 101 of title 10;

(5) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(6) the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

(7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).

**Section 1605B.   Responsibility of foreign states for international terrorism against the United States.**

(a) Definition.--In this section, the term "international terrorism"--

(1) has the meaning given the term in section 2331 of title 18, United States Code; and

(2) does not include any act of war (as defined in that section).

(b) Responsibility of foreign states.--A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by--

(1) an act of international terrorism in the United States; and

(2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

(c) Claims by nationals of the United States.--Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

(d) Rule of construction.--A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.

**Section 1606.** Extent of liability

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages, except any action under section 1605(a)(7) or 1610(f); if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

**Section 1607.** Counterclaims

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim
•(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or
•(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or  (c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

**Sec. 1608.** Service; time to answer; default

•(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
•(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
•(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
•(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
•(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a

translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services - and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted. As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

•(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

•(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

•(2) if no special  arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

•(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state -

•(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

•(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

•(C) as directed by order of the court consistent with the law of the place where service is to be made.

•(c) Service shall be deemed to have been made -

•(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

•(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

•(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

•(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall

be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

**Section 1609.** Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

**Section 1610.** Exceptions to the immunity from attachment or execution

•(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if

   •(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

   •(2) the property is or was used for the commercial activity upon which the claim is based, or

   •(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

   •(4) the execution relates to a judgment establishing rights in property –

      •(A) which is acquired by succession or gift, or

      •(B) which is immovable and situated in the United States:  Provided, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence  of the Chief of such mission, or

   •(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

   •(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

   •(7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

•(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if

　•(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

　•(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), (5), or (7), or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based.

　•(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

•(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

•(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if

　•(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

　•(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

•(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

•(f)　　•(1)　　•(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order,

action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

(d) Additional damages.--After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

(e) Special masters.--

(1) In general.--The courts of the United States may appoint special masters to hear damage claims brought under this section.

(2) Transfer of funds.--The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

(f) Appeal.--In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

(g) Property disposition.--

(1) In general.--In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is--

(A) subject to attachment in aid of execution, or execution, under section 1610;

(B) located within that judicial district; and

(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

(2) Notice.--A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

(3) Enforceability.--Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

(h) Definitions.--For purposes of this section--

(1) the term "aircraft sabotage" has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7).

　　•(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

　　•(2)　　•(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7), the Secretary of the Treasury and the Secretary of State shall fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

　　•(B) In providing such assistance, the Secretaries -
　　　(i)　　may provide such information to the court under seal;
　　　(ii)　　(ii) shall provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

　　•(3)　　Waiver.--The President may waive any provision of paragraph (1) in the interest of national security.

(g) Property in certain actions.--
　　(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--
　　　(A) the level of economic control over the property by the government of the foreign state;
　　　(B) whether the profits of the property go to that government;
　　　(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
　　　(D) whether that government is the sole beneficiary in interest of the property; or
　　　(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.
　　(2) United States sovereign immunity inapplicable.--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1)

applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) Third-party joint property holders.--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

**Section 1611. Certain types of property immune from execution**

•(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

•(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if -  (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or  (2) the property is, or is intended to be, used in connection with a military activity and (A) is of a military character, or (B) is under the control of a military authority or defense agency.

•(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

-------------------

**SHORT TITLE OF 1976 AMENDMENTS Pub. L. 94-583**
**Section 1**, Oct. 21, 1976, 90 Stat. 2891, provided: "That this Act (enacting sections 1330 and 1602 to 1611 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under section 1602 of this title) may be cited as the 'Foreign Sovereign Immunities Act of 1976'." SOURCE Added Pub. L. 94-583, Sec. 4(a), Oct. 21, 1976, 90 Stat. 2892.

**SEPARABILITY**
**Section 7** of Pub. L. 94-583 provided that: "If any provision of this Act (enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title) or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable."

**EFFECTIVE DATE**
**Section 8** of Pub. L. 94-583 provided that: "This Act (enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title) shall take effect ninety days after the date of its enactment (Oct. 21, 1976)."

**SHORT TITLE**
For short title of Pub. L. 94-583 as the "Foreign Sovereign Immunities Act of 1976", see section 1 of Pub. L. 94-583, set out as a Short Title of 1976 Amendments note under section 1 of this title.

# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York
-----------------------------------------------------------------------x
Dr. Ahmed Diaa Eldin Ali Mohamed Hussein

Plaintiff/Petitioner,

- against -                                    Index No. 161134/2021

Dr. Mohamed Ahmed Maait, in his official capacity as
Minister of Finance of the Arab Republic of Egypt

Defendant/Respondent.
-----------------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Consensual Case)
(Uniform Rule § 202.5-b)

**You have received this Notice because:**

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
Give this Notice to your attorney.  (<u>Attorneys</u>: see "Information for Attorneys" pg. 2)**.**

- **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

**If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

- serving and filing your documents electronically

- free access to view and print your e-filed documents

- limiting your number of trips to the courthouse

- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit:  <u>http://www.nycourts.gov/efile-unrepresented</u>  or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at <u>www.nycourts.gov</u>

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**

An attorney representing a party who is served with this notice must either consent or decline consent to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated:    December 27, 2021

Daniel A. Schnap, Esq.                                    55 West 46th Street
        Name                                                          Address
Nixon Peabody LLP
                                                                  New York, NY 10036-4120
        Firm Name

                                                                  212-940-3000
                                                                        Phone

                                                                  dschnapp@nixonpeabody.com
                                                                        E-Mail

To:    Mohamed Maait

       1 Ramsis Extension Street, Ministry of Finance Towers

       Nasr City, Cairo

                                                                  6/6/18

        Index  #                        Page 2  of 2                        EF-3

# EXHIBIT 11

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 5

INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021

NYSCEF DOC. NO. 5                                        RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-03502-JSR  Document 2-11  Filed 03/31/22  Page 3 of 48

### In The Name of People

### State Council

### Administrative Justice Court

### Economic & Investment Disputes Circle

### Seventh Circle

At the hearing held publicly on Saturday dated 15/03/2014 under the chairmanship of Mr. Consultant. Hassouna Tawfik HassounaMahgoub – Vice-Chairman of State Council & Chief of The Court; and

The membership of Mr. Consultant. Nasser Farag Abdelmaksoud Osman – Vice-Chairman of State Council; and

The membership of Mr. Consultant. Mohamed Helmy Abdeltawab – Vice-Chairman of State Council; and

The attendance of Mr. Consultant. Osama Mohamed Elgarwany – State Commissioner; and the Secretariat of Mr. Ahmed Mahmoud Soliman – The Secretary of the hearing.

### The following judgment was issued

In lawsuit No. 6193 of the year 66 J

### Filed by

| 1- Wagdy Abdelnaby Allam Ghoneim | 2- Osama Ali Mahmoud Teima |
|---|---|
| 3- Ashraf Sobhy Ahmed Mohamed | 4- Atef Ahmed Hussein Mekhaimar |
| And the implicated litigants joined to the plaintiffs. They are | |
| 5- Sayed Kanal Mohamed Abu Okeila | 6- Refaey Shaaban Ali Mohamed |
| 7- Mamdouh Ramadan Ahmed Amer | 8- Mohamed Abdelhakam Hussein Mohamed |

1

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

### Against

1- Prime Minister – by his capacity.

2- Vice-Prime Minister and Minister of Sector of Public Businesses – by his capacity.

3- Minister of Finance – by his capacity.

4- Minister of Industry and Trade – by his capacity.

5- Minister of Investment – by his capacity.

6- Chairman of General Authority for Investment & Free Zones – by his capacity.

7- Legal Representative of Chemical Industries Holding Company – by his capacity.

8- Legal Representative of Paper Middle East Company (SIMO) – by his capacity.

9- Chairman of Central Auditing Agency – by his capacity (Implicated Litigant).

10- Chairman of General Financial Supervisory Authority – by his capacity (Implicated Litigant).

11- Legal Representative of Stock Exchange – by his capacity (Implicated Litigant).

12- Legal Representative of Al-Ahli Investment Company – by his capacity (Implicated Litigant).

13- Legal Representative of Almaleya Investment Company – by his capacity (Implicated Litigant).

14- Legal Representative of Aldawleya Company for managing investment Funds – by his capacity (Implicated Litigant).

15- Legal Representative of Ahmed Hussein Foundation for Financing Lease – by his capacity (Implicated Litigant).

16- Ahmed Diaaeldin Ali Hussein (Implicated Litigant)

17- Mohamed Shawky Abdelkader – commissioned to manage the funds of Mr. Ahmed Diaaeldin – by his capacity as the chairman of SIMO.

Merits: the plaintiffs filed their current lawsuit pursuant to a pleading sheet signed by a lawyer and was filed at Bureau of Clerks at this court on

2

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM                    INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                                   RECEIVED NYSCEF: 12/13/2021

10/11/2011. At the conclusion of such pleading sheet, they requested the court to issue the judgment with accepting the lawsuit in form and on an expedient Basis with stopping the selling of the company in Cairo & Alexandria Stock Exchange and put them under sequestration under the possession of their holders as well as sequestrating the plot of land, the factories and the equipment and preventing disposing of them and in subject with cancelling the challenged decision issued by the cabinet and Ministry of Sector of Public Businesses and privatization ministerial committee with agreeing on offering and selling the shares of Paper Middle East Company (SIMO) and the resulting consequences; particularly the annulment of selling the company's shares in the stock exchange and transferring the company into an Egyptian Joint Stock Company and the annulment of disposing of the shares old to Mr. Ahmed Diaaeldin Ali Hussein and his two wives, his children and his companies and enabling the state to retrieve the assets of the company free from encumbrances and mortgages and re-operating the company on its entire plot of land as well as returning the personnel back to their previous positions with making them enjoy their full rights and privileges and incentives with obligating the defendants with expenses.

In describing their lawsuit, the plaintiffs stated that Paper Middle East Company was incorporated pursuant to the Royal Decree issued on 16/July/1945. Its affiliation was transferred to the state pursuant to presidential decree No. 119 of the year 1961 and became affiliated to Egyptian General Establishment for Chemical Industries (Chemical Industries Holding

3

Company). Then, the company's main articles of incorporation were amended pursuant to the provisions of law No. 203 of the year 1991 issued for companies of Sector of public businesses. On 05/12/1995, the company's main articles of incorporation were amended with increasing its capital and joining of National Investment Bank so that the capital became amounting (26 Million, Nine Hundred and Fourteen Thousand, Seven Hundred and Sixty Egyptian Pounds) whereas Chemical Industries Holding Company owns 68.15% from the company's capital and National Investment Bank owns 31.85% from its capital. Then, its capital was increased again to become amounting (…. Million Egyptian Pounds). On 06/04/1997, the company's shares were enrolled at Cairo & Alexandria Stock Exchange.

The plaintiffs added that the company began to enter into a new stage as an execution for the government's program for expanding the private ownership base whereas the offering of a share amounting 10% - increasable to 75% - was declared in addition to 10% from the company's shares for personnel federation is declared to be offered for sale in the stock exchange. At such declaration, a brief summary about the basic elements of the company and their privileges were mentioned as follows:

(The purpose of the company is represented in producing and trading in paper and carton of its various types. The company is from the largest duplex producers sufficing all needs of the Egyptian Market. The company is characterized with being the production line for thick carton which is considered the first and largest production line for such type of carton in the

4

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 12/13/2021

middle east. 40% from the production volume of such kind of such product is exported to the international markets. The company has the largest machine for producing spiral pipes in Egypt satisfying the needs of the Egyptian Market while the rest of the production is exported abroad. The company also owns the largest machine for producing eggs' carton trays satisfying the needs of the Egyptian market while more than 20% from the production is exported abroad. The company has the precedence in executing the industrial sanitation and electricity economization projects. The company also owns additional surface areas of plots of lands that can be used for expansion and increasing its investments. Finally, the company is currently on its way to take the procedures for getting International ISO Certificate ....)

Pursuant to this announcement mentioned the privileges of the company, 85% from the company's shares was sold to private sector. Therefore, the company got out from the scope of the provisions of law No. 203 of the year 1991 regarding companies of sector of public businesses to be subjected to the provisions of joint stock companies' law No. 159 of the year 1981.

The plaintiffs described the report of evaluation committee formed as a response to the instructions of Minister of Sector of Public Businesses as a random report that did not identify the actual company's price. It even stated the company's price with less than one fourth of the actual price in addition to the void and null procedures applied ibn the process of offering and selling the shares which in turn had a great and severe effect on the share price.

5

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 8 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM        INDEX NO. 161134/2021

NYSCEF DOC. NO. 5                                    RECEIVED NYSCEF: 12/13/2021

The plaintiffs concluded the pleading sheet of their lawsuit with the aforementioned requests.

The lawsuit was referred to state commissioners' Authority to prepare it and to draft a report with the legal opinion in it. The hearing held on 09/4/2012 was defined for examining the lawsuit. It was deliberated in the hearings during which the agent attending on behalf of the plaintiffs presented five dockets of documents including the documents whose titles were mentioned on their covers. From among such documents:

1- A photocopy of the white for privatizing Paper Middle East Company (SIMO) including all information about selling the company.

2- A certificate issued by Chemicals' General Syndicate stating that the capacity of the plaintiffs as they are members at Syndicate Committee of the company.

The agent attending on behalf of the defendants presented a number of notified pleading sheets with the implication of the defendants from the ninth defendant to the seventeenth defendant in the lawsuit. The agent attending on behalf of the Egyptian Stock Exchange (implicated litigant) presented a docket of documents including the aforementioned documents mentioned on its cover and he presented a defense memorandum. The agent attending on behalf of the implicated litigants (from the fourth to the eighth) presented a notified pleading sheet stating with their joint implication for the favor of the plaintiffs. They presented a docket of documents including certificates issued from Chemicals' General Syndicate stating their capacities that they are

6

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                      RECEIVED NYSCEF: 12/13/2021

members at company's syndicate committee. Finally, the agent attending on behalf of general financial supervisory authority (implicated litigant) presented a defense memorandum.

State Commissioners' Authority drafted a report with the legal opinion in the lawsuit after adapting the requests of the plaintiffs that they are represented in stopping the execution and cancelling the decision issued by the company's extraordinary general assembly of Metallurgical Industries Holding Company as the representative of the state in Privatization Ministerial Committee for agreeing on selling the share corresponding to its contribution share in the shares it owns in the capital of Paper Middle East Company exceeding 51% from its capital to the companies, investment funds and the public through subscribing in them at the stock exchange and the resulting consequences; particularly the retrieval of the state for all assets and properties of such company free from dispositions made for them and returning the personnel back to the company with cashing all their financial dues and obligating the administrative agency with expenses. It prepared a report concluded the presentation of the judgment proposal: First: with accepting the implication of the implicated litigants to the plaintiffs' part. Second: with rejecting the defense for the non-accepting the lawsuit due to being filed from persons who had no capacities to file it with respect to the eleventh defendant. Third: with accepting the form in form and in subject with cancelling the decision issued by the extraordinary general assembly of chemical industries holding company – representative of the state – and is represented in privatization

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021
NYSCEF DOC. NO. 5    RECEIVED NYSCEF: 12/13/2021

ministerial committee to agree on selling the share corresponding to its contribution share in the shares it owns in the capital of Paper Middle East Company exceeding 50% from its capital to the companies, investment funds and the public through subscribing in them at the stock exchange and the resulting consequences; particularly the retrieval of the state for all assets and properties of such company free from dispositions made for them and returning the personnel back to the company with cashing all their financial dues and obligating the defendants with expenses.

The oral pleading hearings were defined and determined at this court – hearing held 08/06/2013. The lawsuit was deliberated in the manner mentioned in the records of the hearings whereas the agent attending on behalf of the plaintiffs presented a docket of documents and a pleading sheet with litigating Mr. Mohamed Shawky Abdelkader – the delegated agent to manage the funds of Mr. Ahmed Diaaeldin – chairman of SIMO Company while he agent attending on behalf of the SIMO Paper Company presented two dockets of documents and a memorandum. The agent attending on behalf of the seventh defendant company presented a memorandum with its defense in which he defended with the incompetence of the court to examine and hear the lawsuit and requested to reject the lawsuit in subject. He presented four dockets of documents. The agent attending on behalf of National Investment Bank while the agent attending on behalf of the defendant authority – General Financial Supervisory Authority – presented a defense memorandum in which he requested the court to issue the judgment with the incompetence to hear

8

such lawsuit and not accepting it due to being filed after the legal deadline and not accepting it due to being filed by a litigant party who had no capacity with the respect to the defendant authority. At the hearing held on 15/02/2014, the court decided to pronounce the judgment in the lawsuit on today's hearing with authorizing the memoranda within one week. Such term lapsed without presenting any documents from the litigants.

At this hearing, the court was issued and its draft including its pronouncement and its reasons was filed upon pronouncing it.

## The Court

After checking the documents, hearing the clarifications and after legal deliberation:

Since the decision issued by the administration agency with concluding a contract representing the disclosure about its will for the purpose of making a legal action. With analyzing the legal process ended with concluding the contract into the parts forming it, it shall be clear that the previous or the subsequent decisions and the decision to award the auction or the bid are undoubtedly independent administrative decisions away from the contract such as the drafting of the auction or the bid conditions by the administration and the decisions of tenders inspection committee and decision committee. Therefore, such decisions can be challenged with cancellation due to exceeding the authority. Compensation can be claimed for the consequent damages if the compensation has a justification (court of administrative justice – lawsuit No. 734 of the year 7 J – hearing dated 08/01/1956 – V. 10 – Page 135 – and

9

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021

NYSCEF DOC. NO. 5   RECEIVED NYSCEF: 12/13/2021

supreme administrative court – Challenge No. 666/24-J – Hearing 14/04/1979 – M: 15 – Y: Page: 178).

Adaptation between the contract concluded by the administration agency and the procedures preparing for concluding this contract or preparing its birth should be distinguished. Regardless of being a civil or an administrative contract, such procedures include those procedures made pursuant to the decision issued by the competent administrative authority. Such decision shall have the properties and components of the administrative decision regarding the disclosure of its binding intention in accordance with its general authority pursuant to the provisions of laws and regulations for the purpose of making a legal position to achieve a general interest desired by the law. Despite their contribution in forming and implementing the contract, such decisions are independent and different in nature from the fact whether the contract is civil or administrative and are away from it. Therefore, the concerned parties can challenge them independently. Courts of State Council have solely the jurisdiction to examine the cancellation request since the reason for jurisdiction is the sound explanation for the disposition. (Supreme Administrative Court – Challenges No. 456 & 320 of the year 17 J – Hearing 05/04/1975 – Y: 20 – Page: 307).

Ministerial Committee for sector of public businesses and expanding the ownership base (privatization Program) issued on its meeting held on 03/06/1997 a decision with unanimous approval on offering 10% from the shares of Paper Middle East Company (SIMO) for sale through the stock

10

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

exchange with the rate of LE 20.00 for the share with the system of the exploring price. Pursuant to demand state in the stock Exchange, the sale percentage can be reached 90% from the shares of the company in addition to allocating 10% from the shares for incorporating personnel federation with the conditions defined in this regard.

On the basis of the aforementioned facts, the requests of the plaintiffs are represented – in accordance with the express contents of the requests that should not be deviated or explained in another manner – in requesting the stoppage of the execution and then cancelling the decision of Ministerial Committee for sector of public businesses and expanding the ownership base issued on 03/06/1997 with agreeing on selling a share representing 90% from the shares of the Paper Middle East Company (SIMO) and the resulting consequences; particularly the annulment of the resulting decisions and dispositions taken and arising from the challenged decision including the disposition for Mr. Ahmed Diaaeldin and his family and his companies as well as the state retrieval for the assets of the company free from encumbrances and mortgages, returning the personnel to their previous positions at the company, cashing their financial dues in full and obligating the defendants with the expenses.

Since the territorial jurisdiction is considered from the matters of public order and its always raised before the court as a primary and basic matter in which it automatically adjudicates without any need to any defense from one of the litigants in the manner ensuring that the court shall not rule on the

11

INDEX NO. 161134/2021

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5                                                                    RECEIVED NYSCEF: 12/13/2021

lawsuit or any part hereof while the dispute is entirely out of its territorial jurisdiction (Supreme Administrative Court – Challenge No. 382 – of the year 34 J – Hearing dated 20/06/1994 – Challenge No. 1597 of the year 30 J – Hearing dated 08/06/1999).

Since the challenged decision is considered in accordance with its estimation from the form and subject aspects an administrative decision, the decision was issued by an administrative agency represented in Ministerial Committee for sector of public businesses and expanding the ownership base through its authority defined for deciding the privatization matters and executing the state policy in this regard in order to achieve the control of the state on all production means and to apply the provisions of article No. 33 of current constitution of Egypt stipulating that the state has to the ownership of all its three types public, private and cooperative. The same matter has been maintained in the provisions of the previous constitutions starting from the constitution of the year 1971 as well as the provisions of law of sector of public businesses issued by law No. 203 of the year 1991 and its executive regulation regarding the conferring of some authorities and powers for Minister of Sector of public businesses regarding the companies subjected to the provisions of this law. Therefore, there is no dispute in considering such decision from among the administrative decisions included within the jurisdiction scope of state council courts according to the provisions of tenth article of state council regularization law issued by law No. 47 of the year 1972 and so the defense claiming the territorial jurisdiction incompetence of this

12

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                         RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-02592-JSR  Document 2-11  Filed 03/31/22  Page 15 of 48

court has become without any legal or actual basis; particularly it focuses on the challenged decision which is naturally independent from the contractual process whatever the opinion in considering it from special contracts or from the administrative contracts. Therefore, it is necessary to neglect such defense and consequently neglecting the defense with non-accepting the lawsuit due to the absence of the administrative decision.

With respect to accepting the implication or not, the matter of examining the formal and subjective defenses and defense and checking the presented documents entirely in order to reach a result come at first to determine the litigation prior to investigating the lawsuit. Such matters may result in non-accepting the lawsuit or may result in examining and investigating the subject and accepting the implication in the lawsuit is primarily conditioned on the desired interest of the implicated litigant but it does not depend on the result of ruling on the lawsuit afterwards so that it cannot result in losing a later action or cancelling a sooner one. Therefor, the court examines the implication on the first place to determine the litigation prior to deliberating the investigation of the litigation in form and in subject.

With respect to the provisions of article No. 126 of civil and commercial procedure law, implications have two types: joining implication. It means that the implicated litigant tries to maintain his rights through assisting one of the litigation parties in defending his rights and an attacking implication or litigating implication from which the implicated litigant desires to defend his special interest against the lawsuit litigant parties, it is conditioned for

13

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                         RECEIVED NYSCEF: 12/13/2021

accepting the implication with its two types the availability of two conditions: the first condition is that the implication applicant should have an interest in the implication. The second condition is that there is a connection between the implication applicant and the original lawsuit. Such connection is achieved with the existence for a relation making the examining of them is for the good progress of justice to investigate both of them and to adjudicate both of them with one judgment in order to avoid the possibility of issuing contradicting judgments or in order to avoid the difficulty of reconciling between them. It is necessary to implicate in the lawsuit with two means: the first one with the ordinary procedures to file the lawsuit prior to the hearing day. The second means is made with requesting it orally at the hearing with the attendance of the litigants. No implications is made after closing the oral pleading. If either of the two litigant parties is absent, the implications shall not be made except with ordinary procedures for filing the lawsuit. Violating such provisions results in the annulment. Such annulment is related to public order due to being related to bases of litigation. The court adjudicates automatically with such annulment. Ever y concerned party has the right to insist on it. The annulment shall not be rectified for only the existence of the litigant party, who was absent, in the following hearings.

With respect to the request of the implicated litigants who jointly implicated to the part of the plaintiffs with notified pleading sheets after the payment of legally charges, they are the implicated litigants: (1) Sayed Kamal Mohamed Abo Okeila, (2) Refaey Shaaban Ali Mohamed, (3) Mohamed Abdelhakam

14

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM                INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                                    RECEIVED NYSCEF: 12/13/2021

Hussein, (4) Mamdouh Ramadan Ahmed, Article No. (34) of the current constitution issued in (2014) (corresponding to Article No. 33 of The Egyptian Constitution issued in 1971) stipulates: (The public property is a holy thing which may not be prejudiced and it should be protected pursuant to the law). So, the constitutional legislator made each citizen bear the liability for protecting the public property from any aggression and defend it against anyone attempting to tamper them or violate its holiness. Such matter makes each citizen has a confirmed interest and capacity to resort to the judicial authority to get the adjudication with protecting the public property, whether by filing the lawsuit from the beginning or by implication into a filed lawsuit. Since the company – subject matter of the dispute – is from the properties owned by the company, each citizen, including the plaintiffs and the implicated litigants, has the obligation to protect it by requesting to verify the legitimacy of the procedures taken for disposing of them and to verify the authenticity of their shares selling contract. So, the implicated litigants have the relation and the interest in supporting the plaintiffs in their requests and joined to them; particularly they are from among the personnel of the sold company, to get the judgment with cancelling the challenged decision and therefore, their implication in the lawsuit jointly to the part of the plaintiffs is accepted.

Although the decision was issued on 03/06/1997, the knowledge and awareness of the plaintiffs with the issuance of this decision was not proven from the documents. Furthermore, the execution of the contract for selling the

15

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 18 of 48

company where the plaintiff were working did not state their awareness of the challenged decision since the employees at the company do not have to follow up the details and the stages of selling the company and the procedures and decisions issued in this regard. In addition, neither the administration agency nor any of the defendants provided what proved the publishing of this decision or what confirmed the awareness of the plaintiffs with such decision within a time preceding the date of filing this lawsuit. So, the lawsuit became filed within the legal deadline defined pursuant to the text of article No. 24 of state council regularization law issued by law No. 47 of the year 1972. The lawsuit had an expedited part with requesting to halt the execution of the challenged decision, it became exempted from the condition of presenting the application to dispute settlement committee according to the provisions of law No. 7 of the year 2000 regarding the incorporation of dispute settlement committee in which one of the ministries or one of general authorities is a party in it.

It is legally determined that the adjudication in the subject matter of the lawsuit suffices the adjudication in the expedited part of it.

Although the challenged decision was issued pursuant to the documents on the basis of procedures followed by Chemical Industries Holding Company – which is one of the Holding Companies and is considered from the legal characters as it is from among the joint stock companies subjected to the texts of law of joint stock companies, partnerships limited by shares and limited liability companies issued by law No. 159 of the year 1981 according to the

16

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5

INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

provisions of the first article of the articles of issuing law of companies of sector of public businesses issued by law No. 203 of the year 1991; furthermore, it was issued by depending on the basis that such procedures followed by Chemical Industries Holding Company starting from the decision of company's extraordinary general assembly dated 25/08/1996 with the approval on selling a percentage exceeding 50% from the share of the holding company in the capital of SIMO Company within privatization and ownership expansion base program. Then, it agreed with National Investment Bank – contributing in the capital of the company – with a percentage amounting 31.85% to sell the shares of the company with a rate no less than LE 17.5 for the share. It is the same price with which the share was previously paid to the bank. Then, such act was followed by the decision of general assembly of SIMO Company dated 07/05/1997 for taking the procedures to expand the ownership base in a preparation to make the company get out from being subjected to the provisions of law No. 203 of the year 1991 to be subjected to the provisions of law No. 159 of the year 1981 provided that the price of the share should be no less than LE 17.5. then, such act was followed by the agreement of the holding company on sale as an execution for the decision taken by the extraordinary general assembly on 25/08/1996. All such acts are done pursuant to examining the company's financial position on 30/06/1996 and the proven need of the company to correct its financial position and to be supported and to decrease the losses it incurred.

17

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 20 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021

NYSCEF DOC. NO. 5   RECEIVED NYSCEF: 12/13/2021

With respect to the aforementioned procedures, they were taken as an application for the provisions of law of companies of public businesses sector issued by law No. 203 of the year 1991 whose first article stipulates: (sector of public businesses is subjected to the provisions of the enclosed law. The sector means holding companies and their subsidiaries subjected to the provisions of this law. Such companies of the two kinds take the form of joint stock companies. The texts of law of joint stock companies and partnerships limited by shares ..... issued by law No. 159 of the year 1981are applied on them regarding the matters for which no special text is mentioned at this law).

Article No. 6 of the same law stipulates: (The company's board of directors has the right to assume all authorities required for disposing of the funds of the company and to carry out all necessary actions to achieve the purpose for which it was established. With the exception of such matters conferred to the general assembly, the board of directors – in order to achieve such purposes – has the right in particular to do what follows: (1) setting out the general policies and defining the necessary means to achieve them. (2) managing the company's financial portfolios by selling and purchase for the shares, financing stocks, bonds and any other instruments and financial assets...).

Article No. 10 of this law stipulates: (with the observation of the provisions of this law and its executive regulation and the company's main articles of incorporation, the ordinary general assembly is concerned with what follows: .......... No disposition should be made by selling any asset from the basic

18

NYSCEF DOC. NO. 5

production lines except after getting the approval of the general assembly and pursuant to the rules defined by the executive regulation).

Article No. 19 of the said law stipulates: (if any in-kind, material or corporeal shares are included in the formation of the company's capital upon its incorporation or upon increasing its capital, the incorporators or the board of directors – as the case may be – have to request from the concerned minister to verify whether such shares are correctly evaluated.

A committee formed pursuant to a decree issued by the concerned minister shall assume the task of verifying such evaluation ………. The committee shall present a report to the concerned minister ...... such evaluation shall not become final except after having been approved by him.)

Article No. 20 of the law stipulates: (the company's shares can be are circulated pursuant to such provisions set forth in the executive regulation of stock exchanges issued by law No. 161 of the year 1957 and law of joint stock companies, partnerships limited by shares and ....... Issued by law No. 159 of the year 1981).

Article No. 17 of the executive regulation of the said law issued pursuant to prime minister's decree No. 1590 of the year 1991 stipulates: (The board of directors of the holding company has the authority to form and manage the financial portfolio of the company and to invest its funds whether by itself or through its subsidiaries...... the financial portfolio consists of the following investments: (1) ..........., (2) …………, (3) disposing by sale of the shares it owns in the subsidiaries and other companies).

19

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 22 of 48

Article No. 25 of the same regulation stipulates: (The extraordinary general assembly is concerned with what follows: …….…….. Fifth: the selling of all or some of the shares of the subsidiaries results in decreasing the share of the holding company or general artificial persons and banks of public sector in its capital than 51%).

Article No. 26 of the same regulation amended by prime minister decree No. 2781 of the year 1998 stipulates: (no disposition by sale may be made for the asset of basic production lines except with the consent and agreement of the extraordinary general assembly and pursuant to what follows: (1) the company is unable to operate such lines in an economic operation or the continuity of operating them result in confirmed losses. (2) the selling price should not be less than the value estimated by the committee stipulated to be formed pursuant to the provisions of Article No. 19 of the law).

In case of not reaching the highest price of the value estimated by the aforementioned committee, such matter shall be referred to the extraordinary general assembly of the holding company to take a decision with the approval or reevaluation by another committee as the case may be.

Article No. (55) of law No. 159 of the year 1981 regarding the companies stipulates: (any act or disposition issued by the general assembly or the board of directors or any of its committees or any of its members representing it in the administration during exercising the management tasks in ordinary manner shall be binding to the company. Other third parties with good intention shall have the right to object such act or disposition before the

20

Case 1:22-cv-02592-JSR   Document 2-11   Filed 03/31/22   Page 23 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021

NYSCEF DOC. NO. 5                                          RECEIVED NYSCEF: 12/13/2021

company in case the disposition is made through exceeding the authority of its issuer or in case the legally defined procedures are not followed ......).

For all the aforementioned facts, the legislator – pursuant to the provisions of law No. 203 of the year 1991 regarding companies of sector of public businesses and pursuant to the executive regulation of such law – stated all provisions under which such companies are subjected and stated their legal system in detail. The legislator also stated the necessary rules and regulations governing the disposition of the funds of these companies and how to circulate them and how to develop their resources. The legislator conferred the board of directors of the holding company all powers and authorities necessary for running the affairs of the company and implementing all acts necessary for implementing the purposes of the company. The legislator also entrusted the board of director of the holding company to lay down the general policies and to define the necessary means to achieve them. It has also the right to manage the financial portfolio of the company by selling and purchase for the shares, financing stocks, bonds and any other instruments and financial assets. Since the legislator is keen on maintaining the properties, funds and assets of the company and to ensure the implementation of the target and purpose from establishing such companies represented in the necessity to contribute to increasing the general production resources and to develop the national economy, the legislator restricted the disposition by sale of the asset of basic production lines at the subsidiary with the approval and consent of the general assembly ay the holding company and pursuant to the limits defined

21

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                      RECEIVED NYSCEF: 12/13/2021

by the executive regulation of the law. It made the evaluation of the in-kind or material or corporeal shares made by a committee formed by the concerned minister – who is minister of sector of public businesses. Such evaluation shall not become final except after being approved by the minister. Pursuant to the text of article No. 25 of the executive regulation of the law, the legislator conferred the company's extraordinary general assembly the authority to sell all or some of the shares of the subsidiary in the manner resulting in decreasing the share of the holding company or the share of general artificial persons and public sector banks in its capital less than 51%.

Pursuant to provisions of article No. 26 of the same regulation amended by prime minister decree No. 2781 of the year 1998 (Official Gazette Issue No. 40 dated 01/10/1998), the legislator forbids the disposition by sale for the asset of basic production lines except with the consent and agreement of the extraordinary general assembly and on condition of: (1) the company is unable to operate such lines in an economic operation or the continuity of operating them result in confirmed losses. (2) the selling price should not be less than the value estimated by the committee stipulated to be formed pursuant to the provisions of Article No. 19 of the law. At the same time, it authorized the general assembly to approve the sale in case of not reaching – upon sale – the value estimated by the aforementioned committee. Therefore, for implementing such disposition, it is necessary to get the approval of the ordinary and extraordinary general assembly of the company and the observation of the aforementioned disposition rules.

22

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM       INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                       RECEIVED NYSCEF: 12/13/2021

With respect to the role entrusted to privatization committee, it is represented in controlling the procedures taken by the holding company for selling or for buying. In such manner, the committee has the authority to lay down the rules and regulations enabling it to effect its control on the disposition of the company and to verify the conformity of such disposition with the targeted purpose from privatization program and to enable the state to reach the comprehensive development and to increase the gross national product (GNP) and with the observant ion of reconciliation between the public interest and the interest of the shareholders in the companies.

Privatization is not considered a bad evil that should be confronted. However, it is not considered an absolute bless for which all routes should be paved and all doors should be widely opened. So privatization means in its technical conception that the state transfers the ownership of the public institutions or public projects – entirely or partially – to private sector, privatization aims to improving the economic efficiency through depending on market mechanisms and competition and decreasing the financial burdens from the shoulder of such countries suffering from gross losses in public sector companies and expanding the volume of the private sector and depending more on it in development and growth process. Therefore, privatization method includes – in addition to transferring the ownership of public facilities into private facilities – changing the work means whereas new work methods were adopted. Such methods, are interested – on the first place – with competition and meeting the market needs. Such methods shall result in improving the

23

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021
NYSCEF DOC. NO. 5    RECEIVED NYSCEF: 12/13/2021

efficiency and the productivity of such corporations. Privatization also includes giving the free market and the private sector the largest role in the community. Privatization is also characterized with its targeting for increasing the production efficiency of the corporation that has been privatized and improving its performance and to increase the type and quality of the services and commodities provided to the customers through approaching from the needs and desires of customers, rationalizing costs, increasing competition among companies, increasing the effectiveness of the administration through decreasing the role of the state in managing public corporations, getting rid of governmental and routine and bureaucratic restrictions and expanding domestic and international investment opportunities by attracting domestic and international capitals for buying or leasing projects or public services and redistributing state resources and revenues in a better manner. From among privatization methods (direct sale or commercial sale) which is the sale conducted in cases of losing companies or selling public companies as separate units or in case of the nonexistence of a developing financial market suitable for executing privatization processes. Such direct sale is often used for what is known as the strategic investor or the basic investor.

With respect to the aforementioned provisions of law No. 203 of the year 1991, this law aimed to achieve the economic and social development which is considered one of the desired goals on general and special levels. The constitutional provisions sought to assuring the necessity of achieving such

24

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

Case 1:22-cv-03583-JSR  Document 2-11  Filed 08/31/22  Page 27 of 48  INDEX NO. 161134/2021

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 12/13/2021

goal in the manner that does not prejudice the principle of social justice as article No. 28 of the current constitution stipulates that the economic, production, service and information businesses are basic constituents for the national economy and the state is obliged to protect them (at such point the role of privatization ministerial committee is clear) and to increase their competitiveness and to provide the environment attracting production ....., the variety of ownership into public, private and cooperative ownership complement each other and is considered a distribution for the roles among them which does not prevent their support and achieving the public interest in the light of such variety. The authorization conferred by the legislator in article No. 20 of law of companies of public businesses sector to circulate the shares of the subsidiaries even with selling them to the private sector did not mean a cancellation for the leading role of public investment bit it is considered as the maintenance for resources that may not be wasted or scattered in order to keep the development and to maintain the connection of their circles in the framework of cooperation among their partners.

(referred to the judgment issued by supreme constitutional court issued at hearing dated 01/02/1997 in lawsuit No. 7/16 J – Constitution)

Since the agreed upon role in this regard is that the administrative decision should be based on a reason justified by reality and by law as one of its elements. The reason in the administrative decision is an actual or legal case making the administration intervene with the purpose of making a legal effect which is the subject matter of the decision for the purpose of implementing

25

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 28 of 48
FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                   RECEIVED NYSCEF: 12/13/2021

the public interest which is the aim of the decision. Although the administration is not obliged to mention the reasons for its decisions and it is supposed in case of the non-reasoned decision is to depend on a correct and sound reason unless the documents reveal the illegality of the reason.. However, if if mentions reasons for such decision, it shall be subjected to the control of administrative justice to verify the extent of their conformity or inconformity with the law and their effect on the result concluded by the decision.

For investigating the legality of the challenged decision, it is necessary to verify the extent of the compliance of such decision with the regulations and standards related to privatization in addition to the extent of observing the laws and regulations regulating the auction process and the extent of the compliance of auction with the articles of the contract and the execution of the contract pursuant to the rules of standards of privatizing the company – subject matter of the contract – stipulated in the decision.

The aforementioned law No. 203 of the year 1991 and law No. 159 of the year 1981 regarding the companies complementing it pursuant to the provisions of the first article of the issuance articles of law No. 203 of the year 1991 are considering the governing law for all dispositions made by companies of sector of public businesses regarding selling or buying the assets and the shares of their subsidiaries and pursuant to the provisions of Article No. 55 of law No. 159 of the year 1981, any act or disposition issued by the general assembly or the board of directors or any of its committees or any of its members

26

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                   RECEIVED NYSCEF: 12/13/2021

representing it in the administration during exercising the management tasks in ordinary manner shall be binding to the company. Other third parties with good intention shall have the right to object such act or disposition before the company in case the disposition is made through exceeding the authority of its issuer or in case the legally defined procedures are not followed.

Since there is no dispute that companies of sector of public businesses – holding companies and the subsidiaries – take the form of joint stock companies; so, they are not considered from private law persons and so such fact result in excluding the possibility of subjecting them to the provisions of public law upon conducting any of the necessary dispositions required for their business and for achieving their purposes. In addition, their subjection to the provision of law No. 89 of the year 1998 regarding the organization of auctions and bids is not a possible matter as the application of the provisions of this law is limited to private companies and its application – pursuant to the provisions of the first article from its issuance articles – is limited to ministries, governmental authorities and agencies with special balance sheets and domestic management units and public authorities – service or economic.

Pursuant to the documents, Paper Middle East Company (SIMO) was incorporated in 1945 and in accordance with presidential decree No. 119 of the year 1961, its affiliation was transferred to Egyptian Foundation for Chemical Industries (currently Chemical Industries Holding Company). The company's capital was formed from the total contributions of the holding company 68.15% and National Investment Bank with the percentage of 31.85

27

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021

NYSCEF DOC. NO. 5                                              RECEIVED NYSCEF: 12/13/2021

and then with the percentage of 10% for shareholders federation. On 06/04/1996, the company was registered at Capital market and the shares of the company was enrolled in the official schedule oat stock exchange. To cope with privatization program, the extraordinary general assembly of SIMO Company agreed to sell a part of the shares of the holding company, even if such selling percentage exceeds 50% of the company's shares in the capital of the net assets of the SIMO Company. In order to execute such matter, minister of sector of public businesses issued decree No. 360 of the year 1996 for constituting a committee to verify the authenticity of evaluating the nets assets of SIMO Company. The company assumed its work and concluded that the price of the share pursuant to cash flows is 19.35% and with the substitutive value 29.60^ for the share. The value of the share price pursuant to cash flows is deemed to be adopted as it is the most suitable price for offering the shares at the stock exchange. It is the followed method in selling the shares of SIMO Company. The board of directors of the holding company agreed on 31/05/1997 to sell the shares of the company provided that the share price shall not exceed LE 17.5 which shall be the minimum limit suitable for offering. After that, the challenged decision was issued with the agreement to offer the shares of SIMO Company for sale through the stock exchange with the price of LE 20.00 per share with the system of the exploring price and in accordance with the demand state at the stock exchange. The offering of the company's shares was published and the contract was concluded after offering the shares at the stock exchange whereas the selling percentage

28

Case 1:22-cv-02562-JSR Document 1-12 Filed 0031/22 Page 81 of 48

reached 75% from the company's shares for 7554 subscribers with the rate of LE 22.00 per share.

Pursuant to the provisions of the aforementioned law No. 203 of the year 1991, for determining the selling of one of the basic production lines, it is necessary that the company is unable to operate such lines in an economic operation or the continuity of operating them result in confirmed losses.

The agreement of the extraordinary general assembly of the holding company dated 25/08/1996 for agreeing on selling the share of Chemical Industries Holding Company in SIMO Company even if the sale percentage exceeded 50% from the company's capital, the meeting minutes of the assembly was free from the availability of the selling requisite for a percentage exceeding 50% of the company's capital pursuant to the provisions of article No. 26 of the executive regulation for Law No. 203 of the year 1991 as it did not state in its contents or reasons the inability of the company to operate its production lines. Pursuant to the aforementioned provision, the selling requisite was refuted with the fact that the announcement for selling SIMO Company mentioned the privileges of the company including what follows: It has the one of the largest production lines in the Middle East which is thick carton line The company has a machine for producing spiral pipes in Egypt satisfying the needs of the Egyptian Market while the rest of the production is exported abroad. The company also owns a machine for producing eggs' carton trays satisfying the needs of the Egyptian market while the rest of the production is exported abroad. Furthermore, the report of the accounts'

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 32 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021

NYSCEF DOC. NO. 5                                        RECEIVED NYSCEF: 12/13/2021

controller at the sold company for the company's balance sheet on 30/06/1997 revealed that the company owns fixed assets represented in unutilized machines and equipment whose value exceed Ten Million Egyptian Pounds. The stock value of the spare parts exceeded on the date of the balance sheet exceed Nine Million and Five Hundred Thousand Egyptian Pounds. The company's capital was increased to become amounting Thirty Million Egyptian Pounds after the contribution of Central Bank in the shares of the company with the percentage equivalent to 31% from the shares. The company achieved sales for this year with a value exceeding Thirty Eight Million Egyptian Pounds. all such facts undoubtedly mean that the financial position of the company was good and there was no justification for selling the company and so the company was sold without the existence of any requisites and without the availability of the conditions stipulated in the aforementioned article No. (26) and so the sale of the company was against the provisions of the law.

For the aforementioned merits, the contract was concluded in contradiction with the procedures and rules governing this contract, and are stipulated in the aforementioned law No. 203 of the year 1991 and without the observation of all stages and steps defined by this law as the general assembly of the holding company agreed on such sale without the availability of its conditions. The challenged decision was issued by privatization committee without controlling the aforementioned report of the assembly and the extent of its conformity with the provisions of the law. Therefore, such decision was issued

30

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

NYSCEF DOC. NO. 5

Case 1:22-cv-02592-JSR Document 2-11 Filed 08/31/22 Page 88 of 48 161134/2021

RECEIVED NYSCEF: 12/13/2021

in contradiction with the law. Consequently, the contract concluded for selling the company – executed on the basis of the this decision – lacked the condition of its legal authenticity and so it became null and so it is necessary to issue the judgment with canceling and the annulment of the contract. The gross and severe mistakes committed by the investor confirmed such annulment. Such mistakes include what follows: 1- the non-implementation of the contract purpose which increasing the production efficiency of the company that has been privatized and improving its performance, improving the quality and type of service provided to customers, increasing competition and expanding investment opportunities. 2- The investor left personnel and did not pay their salaries and wages, laid off some of them without any legal justification and with the violation of the contract. At the report of the committee constituted for studying and evaluating Paper Middle East Company formed pursuant to decree issued by minister of sector of public businesses under No. 360 of the year 1996, it was mentioned on the third chapter that: (evaluation pursuant to cash flows) that evaluation approach was based on what follows: (1) the company, its factories and its personnel are integrated continuous entity ….. (4) it was supposed that the prices of the products are fixed….. and the value of the wages were estimated on the basis of the actual needs of the company from the personnel and completing cadres for some factories. The meeting of the board of directors of the holding company No. 76 dated 31/05/1997 on whose basis, the board agreed upon offering the shares of SIMO Company at the stock exchange. On the Sixth Article regarding the approval of the board

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021

NYSCEF DOC. NO. 5   RECEIVED NYSCEF: 12/13/2021

on the project of early retirement, it was mentioned that the application of such systems should be in severe insolvent companies. The board decided to apply the system on the some of the companies defined in the aforementioned meeting minutes, not including SIMO Company. The board recommended with sending letters to other non-insolvent companies to announce the early retirement system and to procure sources of its financing provided that such companies should agree with syndicate unions and the necessity to involve them in all execution steps.

With respect to the aforementioned  report of evaluation committee and the meeting minutes of the board of directors, they are considered integral parts of the contract executed for selling the shares of SIMO Company due to being from among the preliminary procedures preceding the execution of the contract – subject matter of the dispute. Neither of them did not mention the matter of laying off the company's employees or ending the service of either of them. So, the matter of ending the service of the company's employees was made in violation to the provisions of the law and without any basis from the contract – subject matter of the dispute. The company did not observe such obligation and did not keep the company's employees or all their rights as the company liquidated and laid off the employees in consideration of giving them trifling remunerations. Such matter contradicted with the decision of ministerial committee of sector of public businesses for expanding the ownership base in addition to violating the provisions of article No. 45 of the aforementioned law No. 203 of the year 1991 stating cases of ending services

of companies' employees including reaching the legal retirement age (Sixty Years). So, It is necessary to make the employees – whose service was ended – return back to their work as of the date of selling the shares of the company with making the necessary financial settlement between the cashed remunerations and pensions for these employees and the duly payable salaries and likewise by supposing their stay in service as of the date of ending the service to the date of returning them back to work. 3- The company entered into liquidation stage and appointing a commissioner for managing it after the investor intentionally hindered the business of the company, did not attend its general assemblies, did not develop the company according to his obligation mentioned in the contract and so he breached the purpose of the sale. Furthermore, there was a decision was issued to sequestrate the funds and properties of Mr. Ahmed Diaaeledin Ali Hussein – company's chairman – and shareholder with a percentage exceeding 60% from its capital. The sequestration decision on his properties and funds was confirmed pursuant to the judgment issued by Banha Criminal Court in lawsuit No. 2202 of the year 2013. Such judgment proved the violation of the said person for the provisions of capital market law No. 95 of the year 1992. All such violations resulted in suspending the business at the sold company and knocking the employees out of the company , which in turn threatened the state to lose one of its important companies and necessitate to return the case of the company to its previous position prior to selling it and working on keeping it and maintaining its assets and utilizing the cadres of the its workers and employees. So, the court

33

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM   INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                    RECEIVED NYSCEF: 12/13/2021

adjudicates with cancelling the challenged decision with its resulting consequences; particularly the annulment of the contract on whose basis Paper Middle East Company (SIMO) was sold and enable the state to retrieve the company free from encumbrances and mortgages and returning the employees to work at the company and cashing the equivalent amounts corresponding to their financial dues like their colleagues existing in service.

With respect to the expenses of the lawsuit, the court obligates the losing litigant parties to bear tem pursuant to the provisions of article No. 184 of civil and commercial procedure law.

### For These Reasons
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### The court adjudicated with:

**First**: With accepting the implication of the implicated litigants joined to the plaintiffs in their requests.

**Second**: With accepting the lawsuit in form and in subject with cancelling the decision issued by Privatization Ministerial Committee – expanding the ownership base – issued on 03/06/1997 for agreeing on selling the share of Chemical Industries Holding Company in the shares of Middle East Company (SIMO) with its resulting consequences; particularly the annulment of disposition by selling of the shares of the company and and enable the state to retrieve the company free from encumbrances and mortgages and returning the employees to work at the company and cashing their financial dues in the

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 5

Case 1:22-cv-03592-JSR Document 2-11 Filed 03/31/22 Page 97 of 48 INDEX NO. 161134/2021

RECEIVED NYSCEF: 12/13/2021

manner mentioned in the reasons and obligates the defendants with their capacities with the expenses.

| Court Secretary | Court Chairman |
|---|---|
| Signature: Signed | Signature: Signed |

**Administrative Justice Court**
This true copy was issued and delivered to Mr. Abdelgahffar Meghawry Abdelgahffar on behalf of the first plaintiff only. It was registered under No. 24193 of the year 68 J
Date: 08/04/2014

**Administrative Justice Court**
This true copy was issued and delivered to Mr. Abdelgahffar Meghawry Abdelgahffar on behalf of the second plaintiff only. It was registered under No. 24194 of the year 68 J
Date: 08/04/2014



Case 22-1506, Document 57, 09/13/2022, 3381474, Page128 of 227

**A-123**

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM          INDEX NO. 161134/2021
NYSCEF DOC. NO. 5                                RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-02592-JSR   Document 2-11   Filed 03/31/22   Page 32 of 48

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 40 of 48

Case 22-1506, Document 57, 09/13/2022, 3381474, Page131 of 227
A-126
FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 12/13/2021

تابع الحكم الصادر في الدعوى رقم ٦١٩٢ لسنة ٦١ ق.

************

بعد الإطلاع على الأوراق وسماع الإيضاحات وبعد المداولة قانوناً.

وحيث إن القرار الذي يصدر من جهة الإدارة بإبرام عقد من العقود يمثل إفصاح الإدارة عن إرادتها بقصد إحداث قانوني. وبتحليل العملية القانونية التى تنتهي بإبرام العقد إلى الأجزاء المكونة له، يتضح أن القرارات السابقة أو اللا البت، والقرار بإرساء المناقصة أو المزايدة، هى بغير منازع قرارات إدارية منفصلة عن العقد على العقد، كوضع الإد لشروط المناقصة أو المزايدة، وقرارات لجنة فحص العطاءات، وقرارات لجنة البت ، ومن ثم يجوز الطعن فيها بالإل بسبب تجاوز السلطة، ويمكن المطالبة بالتعويض عن الأضرار المترتبة عليها إن كان لهذا التعويض محل. (محكمة القض الإداري، الدعوى رقم ٧٣١ لسنة ٧ ق. جلسة ١٩٥٦/١/٨ ـ س ١٠ ص ١٣٥ ـ والمحكمة الإدارية العليا . الطعن ر ٢٤/٦٦٦ ق ـ جلسة ١٩٧٩/٤/١٤ ـ م ١٥ سنة ص ١٧٨)

وحيث إنه ينبغي التمييز في مقام التكييف بين العقد الذي تبرمه جهة الإدارة، وبين الإجراءات التي يمهد بها لإبر هذا العقد أو تهيئ لمولده، ذلك أنه بقطع النظر عن كون العقد مدنياً أو إدارياً فإن من هذه الإجراءات ما يتم بقرار من السلا الإدارية المختصة له خصائص القرار الإداري ومقوماته من حيث كونه إفصاحاً عن إرادتها الملزمة بناء على سلطتها العا بمقتضى القوانين واللوائح بقصد إحداث مركز قانوني تحقيقاً لمصلحة عامة يتغياها القانون. ومثل هذه القرارات وإن كاذ تسهم في تكوين العقد وتستهدف إتمامه، فإنها تنفرد في طبيعتها عن العقد مدنياً كان أو إدارياً وتنفصل عنه، ومن ثم يجو لذوى الشأن الطعن فيها استقلالا، ويكون الاختصاص بنظر طلب الإلغاء والحال كذلك معقوداً لمحاكم مجلس الدولة دو غيرها، ذلك أن المناط في الاختصاص هو التكييف السليم للتصرف. (المحكمة الإدارية العليا. الطعنان رقما "٥٦٢ و ٣٢٠ لسنة ١٧ق. جلسة ١٩٧٥/٤/٥ـ س ٢٠ ص ٣٠٧)

وحيث إن اللجنة الوزارية لقطاع الأعمال العام وتوسيع قاعدة الملكية (برنامج الخصخصة) أصدرت باجتماعه المعقود بتاريخ ١٩٩٧/٦/٣ قراراً بالموافقة بالإجماع على طرح ١٠% من أسهم شركة الورق للشرق الأوسط (سيمو للبيع من خلال بورصة الأوراق المالية بسعر ٢٠ جنيهاً للسهم بنظام السعر الاستكشافي وطبقاً لحالة الطلب بالبورصة فإذ يمكن الوصول بنسبة البيع إلى ٩٠% من أسهم الشركة بالإضافة إلى ١٠% لاتحاد العاملين المساهمين بالشروط المقرر في هذا الشأن .

وحيث إنه بالبناء على ما تقدم فإن حقيقة طلبات المدعين إنما تتمثل حسب صراحة الطلبات التي لا يتعين الحيا عنها أو تأويلها علي غير مبتغاها ، في طلب الحكم بوقف تنفيذ ثم إلغاء قرار اللجنة الوزارية لقطاع الأعمال العام وتوسيع قاعدة الملكية الصادر بتاريخ ١٩٩٧/٦/٣ بالموافقة على بيع حصة تصل إلى ٩٠% من أسهم شركة الورق للشرق الأوسط ( سيمو ) وما يترتب علي ذالك من آثار ؛ أهمها :- بطلان جميع القرارات والتصرفات الناجمة التي تقررت وترتبت علي القرار المطعون فيه ومنها التصرف للسيد أحمد ضياء الدين وعائلته وشركاته ، واسترداد الدولة لأصول الشركة مطهرة من القيود والرهون وإعادة العاملين إلى سابق وضعهم بالشركة وصرف مستحقاتهم المالية كاملة ~~وإلزام المدعى عليهم المصروفات.~~

وحيث إنه من الأمور المسلمة أن الاختصاص الولائي يعتبر من النظام العام، ويكون مطروحا دائما على المحكمة كمسألة أولية وأساسية تقضى فيها من تلقاء نفسها دون حاجة إلى دفع بذلك من أحد الخصوم بما يكفل ألا تقضى المحكمة في الدعوى أو في شق منها على حين تكون المنازعة برمتها مما يخرج عن اختصاصها وولايتها. (المحكمة الإدارية العليا ـ الطعن رقم ٣٨٢ لسنة ٣٤ ق ـ جلسة ٢٠-٦-١٩٩٤ . الطعن رقم ١٥٩٧ لسنة ٣٠ ق ـ جلسة ٨-٦-١٩٩١)

ومن حيث إن القرار المطعون فيه بحسب تقييمه من الناحية الشكلية والموضوعية يعد قراراً إدارياً ، فقد صدر القرار من جهة إدارية ممثلة في اللجنة الوزارية لقطاع الأعمال العام وتوسيع قاعدة الملكية ،وبما لها من سلطة مقررة للبت في مسائل الخصخصة ، وإنفاذ سياسة الدولة في هذا الخصوص ، تحقيقا لرقابة الدولة علي كافة وسائل الإنتاج ، وعملا بأحكام المادة ٣٣ من دستور مصر الحالي التي نصت على أن تحمى الدولة الملكية بأنواعها الثلاثة العامة والخاصة والتعاونية ، وهو ذات ما حرصت عليه أحكام الدساتير السابقة بدءا من دستور سنة ١٩٧١ وكذا ما تضمنه قانون قطاع الأعمال العام الصادر بالقانون رقم ٢٠٣ لسنة ١٩٩١ ولائحته التنفيذية من تقرير بعض السلطات والاختصاصات لوزير قطاع الأعمال العام

٤

Case 1:22-cv-02592-JSR   Document 3-11   Filed 03/31/22   Page 42 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
INDEX NO. 161134/2021

NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-02592-JSR Document 2-11 Filed 03/31/22 Page 43 of 48

9

تقريراً إلى الوزير المختص ............. ولا يصبح التقدير نهائيا إلا بعد اعتماده منه .

ونصت المادة (٢٠) من القانون على أن :- ( تكون أسهم الشركة قابلة للتداول طبقا للأحكام المبينة في اللائحة العامة لبورصات الأوراق المالية الصادرة بالقانون رقم ١٦١ لسنة ١٩٥٧ وقانون شركات المساهمة وشركات التوصية بالأسهم ................. الصادر بالقانون رقم ١٥٩ لسنة ١٩٨١ ........)

وقد نصت المادة (١٧) من اللائحة التنفيذية للقانون المذكور الصادرة بقرار رئيس مجلس الوزراء رقم (١٥٩٠) لسنة ١٩٩١ على أن: ( يختص مجلس إدارة الشركة القابضة بتكوين وإدارة محفظة الأوراق المالية للشركة واستثمار أموالها سواء بنفسها أو من خلال الشركات التابعة لها ......... وتتكون محفظة الأوراق المالية من الاستثمارات الآتية (١)................. (٢)............... (٣) التصرف بالبيع في الأسهم التي تملكها في الشركات التابعة وغيرها من الشركات ..................)

ونصت المادة (٢٥) من ذات اللائحة على أن :- ( تختص الجمعية العامة غير العادية بما يأتي :- ........................ خامسا : بيع كل أو بعض أسهم الشركة التابعة بما يؤدى إلى خفض حصة الشركة القابضة أو الأشخاص الاعتبارية العامة وبنوك القطاع العام في رأس مالها عن ٥١% ).

ونصت المادة (٢٦) من ذات اللائحة والمعدلة بقرار رئيس مجلس الوزراء رقم ٢٧٨١ لسنة ١٩٩٨ على أنه :- ( لا يجوز التصرف بالبيع في أصل من خطوط الإنتاج الرئيسية إلا بموافقة الجمعية العامة غير العادية وطبقا لما يأتي : (١) أن تكون الشركة عاجزة عن تشغيل هذه الخطوط تشغيلا اقتصاديا أو أن يؤدى الاستمرار في تشغيلها إلى تحميل الشركة خسائر مؤكدة. (٢) أن لا يقل سعر البيع عن القيمة التي تقدرها اللجنة المنصوص عليها في المادة ١٩ من القانون .

وفي حالة عدم وصول أعلى سعر للقيمة المقدرة بمعرفة اللجنة المشار إليها يعرض الموضوع على الجمعية العامة غير العادية للشركة القابضة لاتخاذ قرار بالموافقة أو إعادة التقييم بمعرفة لجنة أخرى حسب الظروف .

وقد نصت المادة (٥٥) من القانون ١٥٩ لسنة ١٩٨١ بشأن الشركات على أن :- ( يعتبر ملزما للشركة أي عمل أو تصرف يصدر من الجمعية العامة أو مجلس الإدارة أو أحد لجانه أو من ينوب عنه من أعضائه في الإدارة أثناء ممارسته لأعمال الإدارة على الوجه المعتاد ، ويكون للغير حسن النية أن يحتج بذلك في مواجهة الشركة ولو كان التصرف صادراً بالتجاوز لسلطة مصدره ، أو لم تتبع بشأنه الإجراءات المقررة قانونا ................................)

وحيث إنه في ضوء ما تقدم، فقد تكفل المشرع بموجب أحكام القانون رقم ٢٠٣ لسنة ١٩٩١ ، الخاص بشركات قطاع الأعمال العام ، وكذا بموجب اللائحة التنفيذية لهذا القانون ، ببيان كافة الأحكام التي تخضع لها هذه الشركات وبيان النظام القانوني لها تفصيلا ، و بين المشرع القواعد والضوابط اللازمة والحاكمة للتصرف في أموال هذه الشركات وكيفية تداولها وتنمية مواردها ، و منح المشرع مجلس إدارة الشركة القابضة كافة السلطات اللازمة لتصريف أمور الشركة والقيام بكافة الأعمال اللازمة لتحقيق أغراض الشركة ، وناط المشرع بمجلس إدارة الشركة القابضة وضع السياسات العامة وتحديد الوسائل اللازمة لتحقيقها ، وله إدارة محفظة الأوراق المالية للشركة بيعاً وشراءً بما تتضمنه من أسهم وصكوك تمويل وسندات وأية أدوات وأصول مالية أخري . وحرصا من المشرع علي أموال الشركة وأصولها ، وضمانا لتحقيق المستهدف من هذه الشركات من ضرورة المساهمة في زيادة موارد الإنتاج العام ، و تنمية الاقتصاد الوطني ، قيد المشرع التصرف بالبيع في أصل من خطوط الإنتاج الرئيسية بالشركة التابعة ، بموافقة الجمعية العامة بالشركة القابضة ، ووفق ما تحدده اللائحة التنفيذية للقانون ، وجعل تقييم الحصص العينية مادية كانت أو معنوية منوطا بلجنة يتم تشكيلها من الوزير المختص وهو وزير قطاع الأعمال العام ، ولا يصبح تقديرها نهائيا إلا باعتماد الوزير ، وجعل المشرع بموجب نص المادة ٢٥ من اللائحة التنفيذية للقانون الاختصاص ببيع كل أو بعض أسهم الشركة التابعة بما يؤدى إلى خفض حصة الشركة القابضة أو الأشخاص الاعتبارية العامة وبنوك القطاع العام في رأس مالها عن ٥١% منوطاً بالجمعية العامة غير العادية للشركة،

NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 12/13/2021
FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021
Case 1:22-cv-02592-JSR Document 3-11 Filed 03/31/22 Page 44 of 48
A-129
Case 22-1506, Document 57, 09/13/2022, 3381474, Page134 of 227

وحظر بموجب نص المادة ٢٦ من ذات اللائحة المعدلة بقرار رئيس مجلس الوزراء رقم ٢٧٨١ لسنة ١٩٩٨ ( الجريدة الرسمية العدد ٤٠ بتاريخ ١٩٩٨/١٠/١ ) التصرف بالبيع في أصل من خطوط الإنتاج الرئيسية إلا بموافقة الجمعية العامة غير العادية بالشركة القابضة وبشرط ١- أن تكون الشركة عاجزة عن تشغيل هذه الخطوط تشغيلاً اقتصادياً ، أو أن يؤدى الاستمرار في تشغيلها إلى تحميل الشركة خسائر مؤكدة . ٢- ألا يقل سعر البيع عن القيمة التي تقدرها اللجنة المنصوص عليها في المادة ١٩ من القانون ، وأجاز في ذات الوقت للجمعية إقرار البيع في حالة عدم الوصول لدى البيع للقيمة المقدرة بمعرفة اللجنة المشار إليها، وعليه فإنه يتعين لإتمام هذا التصرف موافقة كل من الجمعية العامة العادية والجمعية العامة غير العادية وبمراعاة ما تقدم من ضوابط التصرف.

ومن حيث أنه لا ريب في أن الدور المنوط بلجنة الخصخصة يتمثل في الرقابة على ما يتم اتخاذه من إجراءات من قبل الشركة القابضة للبيع أو الشراء ، و للجنة في سبيل ذلك أن تضع من القواعد والضوابط ما يمكنها من إعمال رقابتها على تصرف الشركة ، والتحقق من اتفاق هذا التصرف مع ما هو مستهدف من وراء برنامج الخصخصة ، وبما يمكن الدولة من الوصول إلى التنمية الشاملة ، وزيادة الناتج القومي ، و بمراعاة التوفيق بين الصالح العام ومصالح المساهمين في هذه الشركات.

وحيث إن الخصخصة في ذاتها ليست شرا مستطيرا يجب مقاومته ، كما أنها ليست خيرا مطلقا يتعين أن تذلل أمامه الطرق وتفتح الأبواب على مصراعيها ، فالخصخصة إنما تعني في مفهومها الفني قيام الدولة بتحويل ملكية المؤسسات العامة أو المشروعات العامة جزئيا أو كليا إلى القطاع الخاص، وتهدف الخصخصة إلى تحسين الكفاءة الاقتصادية من خلال الاعتماد على آليات السوق والمنافسة، وتخفيف الأعباء المالية عن الدول التي تعاني من الخسارة الكبيرة في شركات القطاع العام، وتوسيع حجم القطاع الخاص، والاعتماد عليه أكثر في عملية النمو والتنمية، وعلى هذا فإن أسلوب الخصخصة يتضمن – إلى جانب تحويل ملكية المنشآت العامة إلى خاصة – التحول أيضا في أساليب العمل حيث يتم إتباع أساليب عمل جديدة تهتم في المقام الأول بالمنافسة وتلبية احتياجات السوق وهو ما يؤدي إلى الارتقاء بكفاءة وإنتاجية المؤسسات ،كما أنه يتضمن إعطاء السوق الحر والقطاع الخاص الدور الأكبر في المجتمع، وتتميز الخصخصة باستهدافها رفع الكفاءة الإنتاجية للمنشأة التي تم تخصيصها وتحسين أدائها، وتحسين نوعية وجودة الخدمات والسلع المقدمة للعملاء، وذلك من خلال الاقتراب من حاجات ورغبات العملاء، وترشيد التكاليف، وزيادة المنافسة بين الشركات، وزيادة فعالية الإدارة من خلال تقليص دور الدولة في إدارة المؤسسات العامة والتخلص من القيود الحكومية والروتينية والبيروقراطية، وتوسيع فرص الاستثمار المحلي والدولي، من خلال اجتذاب رؤوس الأموال المحلية والعالمية لشراء أو تأجير المشروعات أو الخدمات العامة، وإعادة توزيع مصادر وإيرادات الدولة بشكل أفضل ، ومن أساليب الخصخصة (البيع المباشر أو التجاري) وهو البيع الذي يتم في حالات الشركات الخاسرة أو بيع الشركات العامة كوحدات منفصلة أو في حالة عدم وجود سوق مالية نامية تصلح لتنفيذ عمليات الخصخصة، وغالبا ما يستخدم البيع المباشر لما يعرف بالمستثمر الاستراتيجي أو المستثمر الرئيسي

ومن حيث أن أحكام القانون رقم ٢٠٣ لسنه١٩٩١ سالف البيان قد استهدفت تحقيق التنمية الاقتصادية والاجتماعية وهو أحد الأهداف المبتغاة على المستوى العام والخاص ، وقد حرصت الأحكام الدستورية على ضرورة تحقيق هذا الهدف وبما لا يخل بمبدأ العدالة الاجتماعية ، إذ نصت المادة ٢٨ من الدستور الحالي على أن الأنشطة الاقتصادية الإنتاجية والخدمية والمعلوماتية مقومات أساسية للاقتصاد الوطني وتلتزم الدولة بحمايتها ( وهنا يبرز دور اللجنة الوزارية للخصخصة ) وزيادة تنافسيتها وتوفير المناخ الجاذب للاستثمار وتعمل على زيادة الإنتاج ...................... ، كما أن تنوع الملكية إلى ملكية عامة وخاصة وتعاونية إنما تكمل بعضها بعضا وتعد توزيعا للأدوار فيما بينها لا يحول دون تساندها وتحقيق الصالح العام في ضوء هذا التنوع ، وليس في إجازة المشرع بالمادة ٢٠ من قانون شركات قطاع الأعمال العام تداول أسهم الشركات التابعة ولو ببيعها للقطاع الخاص ما يمثل ردة عن الدور الرائد للاستثمار العام ، بل هو صون لموارد لا يجوز تبديدها أو بعثرتها ضمانا لتواصل التنمية وترابط حلقاتها في إطار التعاون بين شركاتها.

( يراجع حكم المحكمة الدستورية العليا الصادر بجلسة ١٩٩٧/٢/١ في الدعوى رقم ١٦/٧ق دستورية)

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021
NYSCEF DOC. NO. 5 RECEIVED NYSCEF: 12/13/2021
Case 1:22-cv-02592-JSR Document 3-11 Filed 03/31/22 Page 45 of 48
A-130
Case 22-1506, Document 57, 09/13/2022, 3381474, Page135 of 227

<u>تابع الحكم الصادر في الدعوى رقم ٦١٩٢ لسنة ٦٦ ق ع</u>

وحيث إن القاعدة المستقرة هي أن القرار الإداري يجب أن يقوم على سبب يبرره في الواقع وفي القانون، وذا
كركن من أركان انعقاده، والسبب في القرار الإداري هو حالة واقعية أو قانونية تحمل الإدارة على التدخل بقصد إحداث إثر
قانوني هو محل القرار ابتغاء الصالح العام الذي هو غاية القرار، وأنه ولئن كانت الإدارة غير ملزمة بتسبيب قراراها
ويفترض في القرار غير المسبب أنه قام على سببه الصحيح ما لم تكشف الأوراق عن عدم مشروعية السبب، إلا أنها إن
ذكرت أسباباً له فإنها تكون خاضعة لرقابة القضاء الإداري للتحقق من مدى مطابقتها أو عدم مطابقتها للقانون وأثر ذلك في
النتيجة التي انتهى إليها القرار.

وحيث إنه وبغير لبحث مشروعية القرار المطعون فيه التحقق من مدى التزام هذا القرار بالضوابط والمعايير المتعلقة
بالخصخصة ، فضلاً عن مدى مراعاة القوانين واللوائح المنظمة لعملية المزايدة ومدى التزام المزايدة وبنود التعاقد وتنفيذ
العقد لقواعد ومعايير خصخصة الشركة محل التعاقد ، التي يكون القرار قد نص عليها .

وحيث أن القانون رقم ٢٠٣ لسنة ١٩٩١ سالف البيان ومن بعده القانون رقم ١٥٩ لسنة ١٩٨١ بشأن الشركات
والمكمل له وفق حكم المادة الأولى من مواد إصدار القانون رقم ٢٠٣ لسنة ١٩٩١ ، بعد هو الشريعة الحاكمة لكل
التصرفات التي تقوم بها شركات قطاع الأعمال العام بخصوص بيع أو شراء أصول وأسهم الشركات التابعة لها ، وطبقاً
للمادة ٥٥ من القانون رقم ١٥٩ لسنة ١٩٨١ يعتبر ملزماً للشركة أي عمل أو تصرف يصدر من الجمعية العامة أو من
مجلس إدارة الشركة أثناء ممارسة أعمال الإدارة ، وللغير حسن النية أن يحتج بذلك في مواجهة الشركة ولو كان التصرف
صادراً بالتجاوز لسلطة مصدره أو لم تتبع بشأنه الإجراءات المقررة قانوناً .

وحيث إنه خلافاً على اتخاذ شركات قطاع الأعمال العام القابضة منها والتابعة شكل شركات المساهمة ، وعليه فإنها تعد
من أشخاص القانون الخاص ، بما يستوجب معه إمكانية خضوعها لأحكام القانون العام لدى قيامها بأي من التصرفات اللازمة
لنشاطها وتحقيق أهدافها ، ويغدو خضوعها للقانون رقم ٨٩ لسنة ١٩٩٨ بتنظيم المناقصات والمزايدات أمراً غير متصور ، إذ
ينحصر تطبيق أحكام هذا القانون عن الشركات الخاصة ، ويقتصر تطبيقه طبقاً للمادة الأولى من مواد إصداره على
الوزارات والمصالح والأجهزة ذات الموازنات الخاصة ووحدات الإدارة المحلية والهيئات العامة خدمية كانت أو اقتصادية .

وحيث أن الثابت من الأوراق أنه تم تأسيس شركة الورق للشرق الأوسط ( سيمو ) في ١٩٤٥ وبموجب القرار الجمهوري
رقم ١١٩ لسنة ١٩٦١ تم نقل تبعيتها للمؤسسة المصرية للصناعات الكيماوية ( حالياً الشركة القابضة للصناعات الكيماوية
) وقد تكون رأس مال الشركة من مجموع مساهمات خاصة بالشركة القابضة بلغت ٦٨,١٥ % وبنك الاستثمار القومي
بنسبة ٢١,٨٥% ثم ١٠% لاتحاد المساهمين ، وبتاريخ ١٩٩٦/٤/٦ تم قيد الشركة في هيئة سوق المال وتم إدراج أسهم
الشركة بالجدول الرسمي ببورصة الأوراق المالية ، وتمشيا مع برنامج الخصخصة وأقلت الجمعية العامة غير العادية
للشركة القابضة على بيع حصة من أسهم الشركة القابضة حتى لو جاوزت نسبة البيع ٥٠% من أسهم الشركة في رأس مال
شركة سيمو ، وتنفيذاً لذلك صدر قرار وزير قطاع الأعمال العام رقم ٣٦ لسنة ١٩٩٦ بتشكيل لجنة للتحقق من صحة تقويم
صافي أصول شركة سيمو ، وقد باشرت اللجنة عملها حيث انتهت إلى تقويم سعر السهم بحسب التدفقات النقدية ١٩,٣٥ %
، وبالقيمة الاستبدالية ٢٩,٦ % للسهم ، وقد رؤى الأخذ بقيمة السهم بحسب التدفقات النقدية باعتباره الأنسب لطرح
الأسهم في البورصة وهو الأسلوب المتبع في بيع أسهم شركة سيمو ، ووافق مجلس إدارة الشركة القابضة في
١٩٩٧/٥/٣١ على بيع أسهم الشركة على أن لا يقل سعر السهم عن ١٧.٥ جنيهاً ، وهو الحد الأدنى الذي يراه مناسباً
للطرح ثم صدر بعد ذلك القرار المطعون فيه بالموافقة على طرح أسهم شركة سيمو للبيع من خلال بورصة الأوراق المالية
بسعر ٢٠ جنيهاً للسهم بنظام السعر الاستكشافي وطبقاً لحالة الطلب بالبورصة ، وتم الإعلان عن عملية طرح أسهم الشركة
وجرى التعاقد بعد طرح الأسهم للبورصة حيث بلغت نسبة البيع ٧٥% من أسهم الشركة لعدد ٧٥٥٤ مكتتب بسعر ٢٢
جنيهاً للسهم .

.......................... وبدون لتقرير بيع أحد خطوط الإنتاج الرئيسية أن تكون الشركة عاجزة عن تشغيله تشغيلاً
لسنة ١٩٩١ سالف البيان ، وبدون لتقرير بيع أحد خطوط الإنتاج الرئيسية أن تكون الشركة عاجزة عن تشغيله تشغيلاً
اقتصاديا أو أن يؤدي الاستمرار في تشغيله إلى تحميل الشركة خسائر مؤكدة .

Case 1:22-cv-02502-JSR    Document 2-11    Filed 03/31/22    Page 47 of 48

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM
NYSCEF DOC. NO. 5
INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

# EXHIBIT 12

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM

INDEX NO. 161134/2021

NYSCEF DOC. NO. 6

RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-02592-JSR   Document 3-12   Filed 03/31/22   Page 2 of 5

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM    INDEX NO. 161134/2021

NYSCEF DOC. NO.    Case 1:22-cv-02592-JSR    Document 3-12    Filed 03/31/22    Page 3 of 5    RECEIVED NYSCEF: 12/13/2021

Arab Republic of Egypt

Prime Minister

### Prime Minister Decree No. 961 of the year 2014

**Prime Minister:**

After checking the modified constitution issued on the 18th of January, 2014; and

Civil and Commercial Procedure Law; and

Judiciary Law; and

Law No. 47 of the year 1972 regarding the state council; and

Law of companies of sector of public businesses issued by law No. 203 of the year 1991; and

The judgment issued by Administrative Justice Court – Seventh Circle – in lawsuit No. 6193 of the year 66 J, and

The presentation made by minister of trade, industry and investment.

### Decided

### First Article

The judgment issued by administrative justice court in the aforementioned lawsuit No. 6193 of the year 66 J is to be executed and Paper Middle East Company (SIMO) is returned back to sector of public businesses as a subsidiary company to chemical industries holding company with subjecting it to the provisions of law No. 203 of the year 1991.

FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM INDEX NO. 161134/2021
NYSCEF DOC. NO. 6 Case 1:22-cv-02592-JSR Document 3-12 Filed 03/31/22 Page 4 of 5 RECEIVED NYSCEF: 12/13/2021

## Second Article

The Chemical Industries Holding Company has to take the necessary legal procedures and call the company's extraordinary general assembly to hold a meeting to regularize its conditions and to draft its main articles of incorporation according to the provisions of law of companies of sector of public businesses and taking the procedures for subjecting it to the control of central auditing agency and the formation of a board of director for it.

## Third Article

Minister of Finance has to provide all necessary financial credits related to the shareholders' rights as well as the procurement of the wages and salaries of company's personnel as well as their defined financial privileges.

## Fourth Article

This decree is effective and applicable as of its issuance date. The concerned agencies have to execute it.

Prime Minister

| Official Seal of The Republic Cabinet Prime Minister's Office |
| --- |

Eng. Ibrahim Mehleb

Issued at the Cabinet on the fifth of Shaaban, Year 1425 H.C. corresponding the 2nd of June, Year 2014 A.D.

Copy sent to

Mr. Minister of Trade, Industry and Investment.

Chairman of Cabinet Consultants' Authority

Consultant \ Elsayed Mohamed Elsayed Eltahaan.



**FILED: NEW YORK COUNTY CLERK 12/13/2021 05:44 PM**   INDEX NO. 161134/2021

NYSCEF DOC. NO. 5   Case 1:22-cv-02592-JSR   Document 3-12   Filed 03/31/22   Page 5 of 5   12/13/2021





جمهورية مصر العربية
رئاسة الوزراء

قرار رئيس مجلس الوزراء
رقم ٩٦١ لسنة ٢٠١٤

رئيس مجلس الوزراء

بعد الاطلاع على الدستور المعدل الصادر في الثامن عشر من يناير سنة ٢٠١٤ ،
وعلى قانون المرافعات المدنية والتجارية ،
وعلى قانون السلطة القضائية ،
وعلى القانون رقم ٤٧ لسنة ١٩٧٢ بشأن مجلس الدولة ؛
وعلى قانون شركات قطاع الأعمال العام الصادر بالقانون رقم ٢٠٣ لسنة ١٩٩١ ؛
وعلى الحكم الصادر من محكمة القضاء الإداري –بالدائرة السابعة– في الدعوى رقم ٦١٩٢ لسنة ٦٦
وبناء على ما عرضه وزير التجارة والصناعة والاستثمار .

قــرر

( المادة الأولى )

ينفذ الحكم الصادر من محكمة القضاء الإداري في الدعوى رقم ٦١٩٢ لسنة ٦٦ القضائية المشار
إليه، ولعود شركة الورق للشرق الأوسط " سيمو" إلى قطاع الأعمال العام كشركة تابعة للشركة القابضة
للصناعات الكيماوية وخضوعها لأحكام القانون رقم ٢٠٣ لسنة ١٩٩١ .

( المادة الثانية)

على الشركة القابضة للصناعات الكيماوية اتخاذ الإجراءات القانونية اللازمة لذلك ، ودعوة
الجمعية العامة غير العادية للشركة لتوفيق أوضاعها وعمل النظام الأساسي لها طبقاً لقانون شركات قطاع
الأعمال العام وما يتبع ذلك من إجراءات خضوعها لرقابة الجهاز المركزي للمحاسبات وتشكيل مجلس
إدارة لها .

( المادة الثالثة )

على وزير المالية تدبير كافة الاعتمادات المالية اللازمة والمتعلقة بحقوق المساهمين وكذا تدبير
أجور العاملين بالشركة ومزاياهم المالية المقررة .

( المادة الرابعة)

يعمل بهذا القرار من تاريخ صدوره وعلى الجهات المختصة تنفيذه .

رئيس مجلس الوزراء

(م. مهندس/إبراهيم محلب)

صدر برئاسة مجلس الوزراء في    ٥  شعبان   سنة ١٤٣٥ هـ
الموافق    ٢  يونيـــــه  سنة ٢٠١٤ م

صورة مرسلة إلى السيد / وزير التجارة والصناعة والاستثمار

دولة مستشاري مجلس الوزراء
الرئيسية

المستشار/ السيد محمد الزنيد العلمان

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

Defendant.

Civil Action No.:
1:22-cv-02592-JSR

**NOTICE OF MOTION
TO REMAND**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law, dated April 8, 2022, the Declaration of Daniel A. Schnapp, executed on April 8, 2022, and exhibits thereto, and all prior pleadings and proceedings herein, and in accordance with this Court's Order dated April 1, 2022, Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein ("Plaintiff") hereby moves this Court before the Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York located at 500 Pearl Street, New York, New York 10007, on April 18, 2022, at 4:00 PM, for an order remanding the above-captioned proceeding to the Supreme Court of the State of New York, County of New York (the "Motion") pursuant to 28 U.S.C. § 1447(c).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's April 1, 2022 Order, Defendant has until April 14, 2022, to file an opposition to Plaintiff's Motion.

[*Signature block on next page*]

Dated: April 8, 2022
     New York, New York

Respectfully submitted,

**NIXON PEABODY LLP**

By: _____
    Daniel A. Schnapp
    Eric M. Ferrante
    Catherine A. Savio

Tower 46
55 West 46th Street
New York, NY 10036-4120
Telelphone: (212) 940-3000
dschnapp@nixonpeabody.com
eferrante@nixonpeabody.com
csavio@nixonpeabody.com

*Attorneys for Plaintiff*
*Dr. Ahmed Diaa Eldin Ali Mohamed Hussein*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

                              Plaintiff,

             - vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

                          Defendant.

Civil Action No.:
1:22-cv-02592- JSR

Hon. Jed S. Rakoff

---

**DECLARATION OF DANIEL A. SCHNAPP IN SUPPORT OF**
**PLAINTIFF DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN'S**
**<u>MOTION TO REMAND</u>**

I, Daniel A. Schnapp, declare as follows:

1.     I am a Partner with Nixon Peabody LLP and am admitted to practice before this Court.  I am counsel to Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein in the above-captioned case.

2.     I respectfully submit this Declaration in support of Plaintiff's Motion to Remand and to place the relevant exhibits before this Court.

1.     Annexed hereto as **Exhibit 1** is a true and correct copy of the results of a search performed on LexisNexis showing that Dechert LLP and Linda Goldstein have previously represented the Arab Republic of Egypt in this District.

2.     Annexed hereto as **Exhibit 2** is a true and correct copy of a spreadsheet generated by PACER showing cases that involved the Arab Republic of Egypt in this District.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 8th day of April, 2022, in New York, New York.

By: _____
Daniel A. Schnapp

# EXHIBIT 1



**Results for:** (plaintiff-litigant(Arab Republic of Egypt) or def...

**Dockets**

1. ### Union Fenosa Gas, S.A. v. The Bank of New York Mellon Co

   ... CORPORATION PURSUANT TO 28 USC 1782 AID A FOREIGN PROCEEDING 2022-04-01T10:40:05.090 **Arab Republic of Egypt** P Movant - Appellant **ARAB REPUBLIC EGYPT** 2022-04-01T10:40:05.090 Patrick Andriola, Esq., -...

   **Dechert** LLP 27th Floor Mailroom 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 212-698-3817 **Dechert** LLP 3 Bryant Park New York NY 10036 LINDA CEILIA GOLDSTEIN **DECHERT** LLP...

   **Dechert** LLP 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 212-641-5619 **Dechert** LLP 3 Bryant Park New York NY 10036 PATRICK ANDRIOLA **DECHERT** LLP...

   **Dechert** LLP 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 917-388-8304 **Dechert** LLP 3 Bryant Park New York NY 10036 TAMER MALLAT **DECHERT** LLP...

   **Court**: US Court of Appeals for the Second Circuit │ **Date Filed**: Jul 24, 2020 │ **Docket Number**: 20-2507 │ **Nature of Suit**: 3890: STATUTES-Other │ **Status**: Terminated

2. ### Union Fenosa Gas, S.A. v. The Depository Trust Company

   ... COMPANY PURSUANT TO 28 USC 1782 AID A FOREIGN PROCEEDING 2021-03-15T00:59:37.377 **Arab Republic of Egypt** P Movant - Appellant **ARAB REPUBLIC EGYPT** 2021-03-15T00:59:37.380 Patrick Andriola, Esq., -...

   **Dechert** LLP 27th Floor Mailroom 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 212-698-3817 **Dechert** LLP 3 Bryant Park New York NY 10036 LINDA CEILIA GOLDSTEIN **DECHERT** LLP...

   **Dechert** LLP 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 212-641-5619 **Dechert** LLP 3 Bryant Park New York NY 10036 PATRICK ANDRIOLA **DECHERT** LLP...

   **Dechert** LLP 3 Bryant Park 1095 Avenue **of** the Americas New York, NY 10036 917-388-8304 **Dechert** LLP 3 Bryant Park New York NY 10036 TAMER MALLAT **DECHERT** LLP...

   **Court**: US Court of Appeals for the Second Circuit │ **Date Filed**: Jun 29, 2020 │ **Docket Number**: 20-2052 │ **Nature of Suit**: 3899: Other Statutes │ **Status**: Terminated

3. ### Union Fenosa Gas, S.A. V. The Bank Of New York Mellon Corporation

   ... 2013-08-12T17:01:12.507 **Arab Republic of Egypt** O Movant **ARAB REPUBLIC EGYPT** 2004-05-19T10:06:00 2 **Arab Republic of Egypt** Linda Ceilia Goldstein LEAD ATTORNEY;ATTORNEY TO BE NOTICED -1 **Dechert** LLP (NYC) 1095 Avenue **Of** The Americas...

   ... 212-698-3817 Fax: 212-698-0684 Email:Linda.Goldstein@ **dechert**.Com USA 1 O Patrick Nicholas Andriola ATTORNEY TO BE NOTICED -1 **Dechert**, LLP Three Bryant Park 1095 Avenue **Of** The Americas Ste 27-037 New York NY...

   **Court**: United States District Court, New York Southern │ **Date Filed**: Mar 26, 2020 │ **Docket Number**: 1:20mc171 │ **Nature of Suit**: Unknown │ **Status**: Closed

4. ### Union Fenosa Gas, S.A. V. The Depository Trust Company

**A-145**

Page 2 of 2

... 2013-08-12T17:01:12.507 **Arab Republic of Egypt** O Movant **ARAB REPUBLIC EGYPT** 2004-05-19T10:06:00 2 **Arab Republic of Egypt** Linda Ceilia Goldstein LEAD ATTORNEY;ATTORNEY TO BE NOTICED -1 **Dechert** LLP (NYC) 1095 Avenue **Of** The Americas...

... 212-698-3817 Fax: 212-698-0684 Email:Linda.Goldstein@ **dechert**.Com USA 1 O Patrick Nicholas Andriola ATTORNEY TO BE NOTICED -1 **Dechert**, LLP Three Bryant Park 1095 Avenue **Of** The Americas Ste 27-037 New York NY...

**Court**: United States District Court, New York Southern │ **Date Filed**: Apr 08, 2020 │ **Docket Number**: 1:20mc188 │ **Nature of Suit**: Unknown │ **Cause**: Assistance to Foreign Tribunals (incl letter rogatory) │ **Status**: Closed

# EXHIBIT 2

Case 1:22-cv-02592-JSR   Document 9-2   Filed 04/08/22   Page 2 of 2
PACER

| Court | Party Name | Role | Egypt Counsel | Docket # | Case Title | Filed | Term | NOS |
|-------|-----------|------|---------------|----------|-----------|-------|------|-----|
| nysdc | Arab Republic of Egypt | dft | none listed | 1:2020cv09160 | Union Fenosa Gas, S.A. v. Arab Republic of Egypt et al | 11/2/2020 | 3/23/2021 | 370 |
| nysdc | Arab Republic of Egypt | mov | Patrick Nicholas Andriola & Linda Ceilia Goldstein, Dechert | 1:2020mc00188 | Union Fenosa Gas, S.A. v. The Depository Trust Company | 4/8/2020 | 5/29/2020 | |
| nysdc | Arab Republic of Egypt | mov | Patrick Nicholas Andriola & Linda Ceilia Goldstein, Dechert | 1:2020mc00171 | Union Fenosa Gas, S.A. v. The Bank of New York Mellon Corporation | 3/26/2020 | 4/8/2020 | |
| nysdc | Arab Republic of Egypt | dft | John Hermina, Hermina Law Group | 1:2013cv08894 | Bahgat et al v. Arab Republic of Egypt et al | 12/16/2013 | 3/31/2015 | 470 |
| nysdc | Arab Republic of Egypt | dft | none listed | 1:2012cv05614 | Abdel-Karim v. Egyptair Holding Company et al | 7/20/2012 | 8/5/2015 | 360 |
| nysdc | Arab Republic of Egypt | dft | none listed | 1:2000cv05245 | Daniel J. Edelman v. Arab Republic Egypt | 7/17/2000 | 12/29/2000 | 190 |
| nysdc | Arab Republic of Egypt | dft | none listed | 1:1994cv09143 | Weiner v. Arab Republic Egypt, et al | 12/21/1994 | 7/14/1995 | 360 |
| nysdc | Arab Republic of Egypt | pla | none listed | 1:1989cv03779 | Arab Republic Egypt v. M Resolute, et al | 5/31/1989 | 4/29/1991 | 120 |
| nysdc | Arab Republic of Egypt | dft | none listed | 7:1988cv03380 | lcd Group Inc. v. Societe Cooperative | 5/13/1988 | 1/30/1991 | 190 |
| nysdc | Arab Republic of Egypt | pla | none listed | 1:1988cv01894 | INS. CO. of North Am v. S Emadala, et al | 3/18/1988 | 3/8/1990 | 120 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DR. AHMED DIAA ELDIN ALI MOHAMED    :
HUSSEIN,                            :
                                    :
            Plaintiff,              :
                                    :
        - against -                 :        1:22-cv-02592-JSR
                                    :
DR. MOHAMED AHMED MAAIT, in his     :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,      :
                                    :
            Defendant.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### DECLARATION OF TIFFANY E. ENGSELL IN SUPPORT OF DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND

I, Tiffany E. Engsell, Esquire, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am an attorney whose motion for admission *pro hac vice* in the above-captioned matter is forthcoming.  I am an associate at Dechert LLP, which is counsel to Defendant Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, in this matter.

2.      I make this declaration in Support of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Remand to provide the Court with copies of the exhibits referenced in that Memorandum of Law.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the research paper *Post Privatization Development of Former Law 203 Companies*, *15 Case Studies, Special Study, June 2000* (the "PCSU Report").  This document was previously filed as an exhibit in *Jeffrey H.*

*Batter et al. v. Hecla Mining Co. et al.*, No. 19-CV-05719 (ALC) (S.D.N.Y), in which Judge Carter held that Dr. Hussein, the Plaintiff in the instant matter, was "not an adequate lead plaintiff," even though he was the presumptive lead under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(bb) because he "lacks the honesty, conscientiousness, and other affirmative personal qualities required of a class representative . . . ." *Batter v. Hecla Mining Co.*, No. 19-CV-05719 (ALC), 2020 WL 1444934, at *8 (S.D.N.Y. Mar. 25, 2020), *reconsideration denied sub nom. Batte v. Hecla Mining Co.*, No. 19-CV-4883 (ALC), 2021 WL 516546 (S.D.N.Y. Feb. 11, 2021).

    4.    Attached hereto as Exhibit 2 is a true and correct copy of a screenshot from the Bloomberg Terminal Professional Services data service showing the exchange rate of the Egyptian pound to the United States dollar as of the afternoon of Wednesday, April 13, 2022.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Philadelphia, PA
      April 14, 2022

Tiffany E. Engsell

EXHIBIT 1



**PRIVATIZATION COORDINATION SUPPORT UNIT**

# The Post Privatization Development of Former Law 203 Companies

# 15 Case Studies

## Special Study

### June 2000

Provided to the

**United States Agency for International Development**

by

**CARANA Corporation**

under the

**USAID Coordinating and Monitoring Services Project**

Contract # PCE-1-800-97-00014-00, Task Order 800

*Unless otherwise stated, opinions expressed in this document are those of the PCSU.  They do not necessarily reflect those of USAID, the US Government, or the Government of Egypt.*



# Table of Contents

*Introduction* _____ *2*

*Section I: Criteria for the 15 Privatized Companies into Group A, B and C.* _____ *4*

   **Group A: Noticeably Reformed Privatized Enterprises** _____ **4**

   **Group B: Transitional Privatized Companies** _____ **5**

   **Group C: Slow to Reform Privatized Companies** _____ **6**

*Summary Case Studies of Privatized Companies* _____ *7*

*Group A: Noticeably Reformed Privatized Companies* _____ *8*

   **Al Ahram Beverages Company (ABC)** _____ **8**

   **El Nasr Bottling Company (Coke) and The Egyptian Bottling Company (Pepsi)** _____ **12**

*Group B: Transitional Privatized Companies* _____ *16*

   **Ideal (Delta Industrial)** _____ **16**

   **The Arab Company for Transistors and Electronics (Telemisr)** _____ **20**

   **Electro Cables Egypt (Kabelat)** _____ **24**

   **The Egyptian Financial Industrial Company (EFIC)** _____ **28**

   **Kafr El Zayat Pesticides and Chemicals (KZPC)** _____ **32**

   **Nasr City Housing** _____ **36**

*Group C: Slow to Reform Privatized Companies* _____ *40*

   **The Middle East Paper Company (SIMO)** _____ **40**

   **Middle & West Delta Flour Mills, East Delta Flour Mills and** _____ **44**

   **Upper Egypt Flour Mills** _____ **44**

   **Misr Free Shops Company** _____ **49**

   **Al Nasr Casting** _____ **53**

*Section III: Conclusions and Recommendations* _____ *56*



## Introduction

The objective of this study is to evaluate the post privatization development of 15 former state owned enterprises (SOEs) which have been sold off by the Egyptian government as part of the privatization and public enterprise reform program. Egypt first became committed to privatization of its public sector enterprises in 1991, when it came to an agreement for a structural adjustment loan with the World Bank and the International Monetary Fund to stabilize the macro-economy. The centre piece of this agreement concerning privatization was the promulgation of Law 203, which re-organized 314 public sector enterprises under 27 Holding Companies, detached these companies from "soft" credit policies previously extended through public sector banks, and encouraged them to become profitable, market oriented  and autonomous of the state in management. It also allowed for equity in these companies to be bought by the private sector, either through the capital markets or through strategic sale to anchor investors. A new government organ, the Ministry of Public Enterprises, was established to co-ordinate the privatization of the enterprises in the Law 203 sector. However, until 1996 the privatization program proceeded slowly and only a few transactions were effected between 1992-95.

Egypt's privatization program has effectively been under way since May 1996, when the Holding Company for Building and Construction sold off a 75% stake in one of its major affiliate companies, Nasr City Housing. Since that time the government has proceeded to sell off much of the portfolio slated for privatization under Law 203, and has employed both the Stock Exchange and the strategic sales methods as the primary mechanisms for effecting transactions. By the end of the first quarter of 2000, a total of 142 Law 203 companies had been majority privatized and re-incorporated as private companies under corporate law 159. While there is no doubt that the privatization of such a large portfolio of government enterprises is a major achievement, there is presently very little information available about the post privatization development of these companies.

One of the central goals of any privatization transaction is the transfer of ownership of a state owned economic asset to new owners in the private sector. Transfer of ownership, or, majority privatization, usually refers to having 51% or more equity in a government enterprise sold to the private sector in the transaction. From this perspective, given that the Egyptian government has majority privatized 142 companies, one may assume that ownership of these enterprises has been transferred to the private sector and that the government is no longer involved in the internal business affairs of these companies. However, there is presently very little information available about the post privatization development of the Law 203 companies sold off by the Egyptian government and it is subsequently difficult to conclude that the privatized enterprises have indeed become separated from the state after their privatization.

The present study will consequently examine the post privatization development of a sample group of 15 privatized Law 203 companies and seek to evaluate the degree to which they are becoming independent of the state after their privatization. A qualitative evaluation criteria, based on six conditions, has been created in attempt to categorize the degree to which an enterprise has become independent of the government after the privatization. The evaluation criteria is presented below. Enterprise independence will be evaluated according to what may be referred to as *direct conditions* (ie, the amount of equity the state has retained in the company after the privatization; whether the government's lingering influence in corporate governance has led to the enterprise retaining its public sector management structure) and *indirect conditions* (ie, changes to public sector corporate culture; positive adjustments in wages and compensations packages after the privatization). The 15 privatized companies have been grouped into three categories, each group



title reflecting the degree of independence an enterprise categorized within the group has developed from the state after the privatization. The three groups are

**Group A: Noticeably Reformed Privatized Companies**

**Group B: Transitional Privatized Companies**

**Group C: Slow to Reform Privatized Companies**

**Group A** is the most progressive regarding enterprise independence from the government and a company which has been included into this group can be regarded as being highly independent from internal government intervention and has transformed significantly after the privatization. **Group B** contains companies which are showing a degree of probability that they will reach the level of independence of companies in group A, but this is still likely to take some time and at present they are still in many ways restricted either by the government or by their lingering public sector legacy. **Group C** contains companies, which are yet to indicate that they have developed any real independence from the government or lose their public sector identity.

Over all, the findings of this study are not encouraging for the Egyptian privatization program, which itself is widely regarded as one of the most successful amongst the emerging markets. The study shows that only three companies (Al Ahram Beverages, The Egyptian Bottling Company for Coka Cola and El Nasr Bottling Company for Pepsi Cola) have been categorized into **Group A**. A further six companies (Ideal, The Arab Company for Transistors and Electronics, Electro Cables Egypt, The Egyptian Financial Industrial Company, Kafr El Zayat Pesticides and Chemicals, and Nasr City Housing) have been included into **Group B**. The remaining six companies (SIMO for Paper, Middle & West Delta Flour Mills, East Delta Flour Mills, Upper Egypt Flour Mills,  Misr Free Shops Company, and Al Nasr Casting have remained in **Group C**.

The next section (I) contains the methodology used in this study and presents the six conditions employed to evaluate the categorization of a privatized company into **Groups A, B or C**. Section II, comprising the bulk of the study, presents summaries of the information collected about the 15 companies and discusses each case study company according to the criteria set out in Section I. The final part of the study, Section III, presents conclusions and recommendations.



## Section I: Criteria for the 15 Privatized Companies into Group A, B and C.

### Group A: Noticeably Reformed Privatized Enterprises

The companies, which have been, included into **Group A** are Al Ahram Beverages, The Egyptian Bottling Company for Coka Cola and El Nasr Bottling Company for Pepsi Cola.

**Criteria for categorization into Group A:**

**Condition One**. Ownership Structure/Corporate Governance.
One owner or consortium of investors from the private sector have gained control of the company and has led to a visibly different style of corporate governance. The role of the state in ownership and governance has been reduced to that of a regulatory function only.

**Condition Two.** Management/Operations
Significant management/operations changes have been implemented by the new owners, both in terms of personnel/appointments of new individuals (ie, new Chairman and new Managing Director after the privatization), as well as actual management strategies (new marketing strategies, sales techniques, distribution methods, exports, and other new business/operational strategies)

**Condition Three.** Financials
The over-all financial condition of the company has improved noticeably after the privatization, largely as a result of cost cutting measures and other more efficient financial management practices introduced by the new shareholders rather than due to the monopoly market position held by the company or due to continuing "soft-credits" from public sector financial institutions.

**Condition Four**. New Capital Investments
There is clear evidence of major new capital investment injected into the company after the privatization made by the new owners, (ie, opening new factories and upgrading existing technologies)

**Condition Five**. Changes to Public Sector Corporate Culture
The privatized company demonstrates visible changes from the public sector corporate culture and physical condition of the enterprise, including a clean work premises, a stricter work regime, a more serious attitude from workers towards their jobs, disbandendement of titles held by enterprise managers under the public sector, promotion on the basis of meritocracy instead of seniority, and other similar trends.

**Condition Six.** Labor, Wages and Compensations Packages
Fundamental change have occurred in the founding structure of employee-employer relations at the company since the privatization (ie, the parties are free to determine their own enterprise agreements outside the framework of the public sector collective bargaining agreements, positive adjustments in wages have taken place outside of the governments wage indexation system) and the workers have noticeably reduced their association with the public sector national labor organization (union).



## Group B: Transitional Privatized Companies

The companies, which have been, included into **Group A** are Ideal, The Arab Company for Transistors and Electronics, Electro Cables Egypt, The Egyptian Financial Industrial Company, Kafr El Zayat Pesticides and Chemicals, and Nasr City Housing

**Criteria for categorization into Group B:**

**Condition One.** Ownership Structure/Corporate Governance.
There is either still a degree of significant government representation at the Board of Directors level, or if the private sector controls the Board, it still finds itself in a position where it has not been able to implement noticeable corporate governance and managerial/operational changes.

**Condition Two**. Management/Operations.
Vision of management change is present and the rhetoric of senior management and the Board of Directors suggest that there will be managerial changes, but (for a diversity of reasons) management/operational changes have not yet been implemented anywhere near the degree to **Group A**.

**Condition Three.** Financials.
Moving into a similar direction to that developed by the privatized companies In Group **A**.

**Condition Four**. New Capital Investment.
There is evidence of new investments put into the company by its owners since the privatization, though not as conclusive as in the case of **Group A**.

**Condition Five.** Changes to the Public Sector Corporate Culture
Some changes have occurred here though not as convincingly as was the case in **Group A**.

**Condition Six.** Labor, Wages and Compensations Packages
Wages and compensation regime partially determined by the employees and the new owners of the company, partially by the prevailing public sector compensation structure. Wages increases outside of those indexed to the public sector remuneration's levels have not taken place. The majority of the workforce still associates itself with the public sector national labor organization (union).



## Group C: Slow to Reform Privatized Companies

The companies which have been included into **Group C** are SIMO for Paper, Middle & West Delta Flour Mills, East Delta Flour Mills, Upper Egypt Flour Mills, Misr Free Shops Company, and Al Nasr Casting

**Criteria for categorization into Group C:**

**Condition One**. Ownership Structure and Corporate Governance.
Very high levels of state ownership have left  the government still in control of the privatized enterprise. The enterprise has been privatized and control of management was taken over by the private sector, but the government has since regained control of the enterprise. A debt-equity swap has occurred where the enterprise has been passed across from one set of public sector institutions to another.

**Condition Two**. Management/Operations
Over-all there is little evidence of any new significant managerial strategies or operational development since the privatization. Most of the management strategies are a continuation of the approach employed by the company during the Law 203 period. There have been very few new appointments to either senior or middle management and the reduction in the labor force has been minimal since the privatization.

**Condition Three**. Financials
Little development compared to categories A or B. The company may still be a profitable enterprise, but this is due more to its monopoly position in the market, or continued access to "soft-credit" from the state, rather than due to cost cutting measures or improved financial policies taken by senior management.

**Condition Four**. New Capital Investment.
No new significant investments into the company since the privatization.

**Condition Five.** Changes in Public Sector Corporate Culture.
The physical infrastructure of the enterprise appearing somewhat shabby. There is a  lack of cleanliness at the worksite and a lax attitude from workers to their jobs despite the privatization. The public sector management titles are still in place while bureaucracy and hierarchy remain pervasive at all levels of the enterprise.

**Condition Six.** Labor, Wages and Compensations Packages
The public sector compensation regime still very much in place after the privatization. The workers continue their association with the public sector national labor organization (union) after the privatization.



<center>

## Section II:

</center>

## Summary Case Studies of Privatized Companies

## Category A: Noticeably Reformed Privatized Companies

The companies which have been included into **Group A** are Al Ahram Beverages, The Egyptian Bottling Company for Coka Cola and El Nasr Bottling Company for Pepsi Cola.

## Group B: Transitional Privatized Companies

The companies which have been included into **Group A** are Ideal, The Arab Company for Transistors and Electronics, Electro Cables Egypt, The Egyptian Financial Industrial Company, Kafr El Zayat Pesticides and Chemicals, and Nasr City Housing

## Group C: Slow to Reform Privatized Companies

The companies which have been included into **Group C** are SIMO for Paper, Middle & West Delta Flour Mills, East Delta Flour Mills, Upper Egypt Flour Mills, Misr Free Shops Company, and Al Nasr Casting



## Group A: Noticeably Reformed Privatized Companies

### Al Ahram Beverages Company (ABC)

**Background: Public Sector and Law 203**

Al Ahram Beverages Company (ABC) in Giza, Egypt's beer brewing monopoly, is one of the country's most famous industrial enterprises. ABC was established in 1897 by several Belgian businessmen who began operating breweries in Cairo and Alexandria during the late 1890s. It originally went under the name of Bomonti and Pyramids Beer Company, produced a beer of comparatively high quality – under the brand name of Stella – and with sales booming at times during the 1940s, the company's stock was actively traded on the Cairo Stock exchange. As part of the increasing trend of Egyptian and Arab nationalism during the 1950s and 60s, the company's names was Arabised and changed to Al Ahram Beverages Company in 1952. ABC was subsequently nationalized in 1963 and brought under government ownership, which resulted in the departure from the company of much of its foreign managerial staff.

Between 1963-96, ABC first operated as a state owned affiliate of the Ministry of Industry (until 1992) and then was transferred to the Holding Company for Housing, Tourism and Cinema upon its reincorporation as a Law 203 enterprise. The state appointed ABC's Chairman and other government personnel to positions on the Board of Directors and senior management. Under the Public Sector, ABC's corporate mission changed from operating as an Egyptian based, highly profitable, globalize joint venture multinational company, to a government owned and managed enterprise producing beer for domestic purposes according to production quotas set by the Ministry of Industry. Performance standards at ABC also seemed to have changed for the worse during this period as the company became highly overstaffed by excess labor, and the seniority based promotions system reduced worker motivation and productivity. The company's management structure, which included 27 sector heads and 72 general managers, seemed difficult to comprehend even by Egyptian Public Sector standards. Furthermore, the volume of bureaucracy within ABC's organizational culture slowed managerial decision making to such a degree, that black-market beer sales organized within the company became a far more efficient mechanism for distributing its product.

ABC's market position was protected by extremely high tariffs levied on imported beer and the lack of an alternative source of domestically brewed beer gave little incentive for the government to improve the quality of ABC's product. During the early 1990s, when ABC commenced functioning as a Law 203 government enterprise owned and supervised by the Holding Company for Housing, Tourism and Cinema (HCHTC), Egypt's oldest existing brewery ran three plants with a combined production capacity of 675,000 hectolitres per year of alcoholic beer, 600,000 on non-alcoholic beer, and 18 million cases of soft drinks. On the eve of its privatization in 1996, ABC was a highly profitable, mis-managed, public sector brewing monopoly with a reputation for producing its brand of Stella beer of an unpredictable quality.

**The Privatization: Date and Method**

The company was first offered to the public in June 1996 as a minority IPO. The offering was for 30% of the company's equity but the under-subscribed offering resulted in just 25% of the company being transferred to the private sector, including 10% to the employee stock association (ESA). However, between December 1996 and February 1997, the company was acquired by the



Luxor Group in a strategic investor sale. It was the fourth strategic investor transaction of the Egyptian Privatization program.

**Post Privatization Profile**

Ownership Structure/Corporate Governance

When the privatization of ABC was completed after the Luxor Group finally gained control of the company in February 1997, the official ownership structure of the company appeared as:

12% to the Luxor Group
63% Global Depository Receipt (GDR)
10% to the Employee Stock Association (ESA)
05% to Misr Insurance
05% to the Bank of Alexandria
05% free floating equity

Given that ABC was finally privatized in a GDR transaction on the London and Frankfurt Stock Exchanges, the Luxor Group kept 12% equity in the company which was under Egyptian corporate Law the minimum required for it to retain management control in the enterprise. The Luxor Group also represents the remaining 63% of equity holders in the GDR on the company's Board of Directors.

A new Board of Directors was elected at the company after the privatization, and the Chairman of the Luxor Group, Ahmed Zayat subsequently became the Chairman of ABC. Although the Bank of Alexandria, Misr Insurance and the ESA all had representation on the new Board, the Luxor Group has since that time held effective control over the company. The company's new corporate mission was officially pronounced to maintain its local beverages industry dominance and subsequently become the leading beverages company in the Middle East and North Africa region.

Management/Operations

Almost immediately upon gaining control of the company in February 1997, the Luxor Group began the task of transforming the company's management and operational development. The Luxor Group appointed five new executives (including three non-Egyptians) within the first one hundred days of its take over of ABC. During the next 100 days another seven senior executives were hired. Most of the appointments were made in the area of investor relations and media, human resource management, marketing, export promotion and sales management. These appointments reflected an over-haul of senior management at the company. Another 45 people have also been appointed to ABC's sales force.

Although the majority of the company's 3200 strong pre-privatization workforce remained with the company, the Luxor Group succeeded in removing much of the middle and senior management which was associated with ABC's rentierist practices under the public sector, hence clearing the way for substantial restructuring of the company's internal organizational culture. Under the public sector, ABC developed a reputation of an internally hierarchical organization, where people were promoted or rewarded on the basis of their seniority in the hierarchy - not on the merit of their performance. The Luxor Group promoted meritocracy ahead of seniority, sought to replace ABC's internal organizational culture with a modern multinational management



technique by introducing a Performance Evaluation System. This device outlined a job description for every one of ABC's employees, and through a series of bi-annual performance appraisal meetings between the employee and an appointed supervisor, the progress of ABC's entire staff would be monitored and employees held accountable for their performance.

ABC's management style was restructured in a manner where it would be consumer, rather than production, oriented. ABC's management now focused on developing the company's business primarily through corporate mechanisms such as marketing and promotions; standardization and quality of product; and aggressive sales strategies coupled with an expansion of the distribution network. Rather than laying off many of the company's redundant workers, the Luxor group relocated workers within the company from production to sales and distribution oriented functions, and provided them with the appropriate training to undertake their new tasks. A marketing department was created for the first time, and 5% of sales were budgeted towards publicity, advertising and promotional activities. The results of the marketing program in particular became physically noticeable throughout Egypt, since many cafeterias and restaurants became highly decorated with Stella labels, coasters and other promotional materials.

The Luxor Group also hired Danbrew, the consulting arm of Carlsberg Breweries in Denmark, to help improve the beer quality at the three existing plants and build a $65 million state-of-the-art brewery to produce both Stella and Carlsberg. The taste of ABC's product both improved noticeably and was standardized at the quality control level in a short period of time. The company's fleet of trucks was expanded and upgraded and the numbers of its distribution outlets jumped from 10,000 to 45,000 nationwide. A home delivery service was introduced further enhancing availability of ABC's product amongst the consumer.

Since most of these managerial and operational reforms took place during the company's first year back in the private sector, ABC has used its privileged monopoly position to further expand and diversify the Egyptian beer industry. It has furthered its alliance with Carlsberg and introduced several new brands of beer with an imported image. It has also developed other corporate alliances with beer industry giants such as Guinness of Ireland, and will produce some of the Irish company's most famous brand names in Egypt under license. It has also formed a distribution agreement with the premium Egyptian mineral water company, SAFI.

Financials

The company has been highly profitable since the privatization, which is the result of its continued monopoly in the beer brewing industry, as well as highly innovative and effective management strategies and cost cutting measures.

New Capital Investment

Part of the original agreement struck between the Luxor Group and the Holding Company during the privatization of ABC was a provision for ABC to re-locate from its original, historic site in Giza, to a new location in a tax free zone outside of Cairo by the end of 2002. Construction on ABC's Greenfield brewery in El Abour City began in the summer of 1998 under the supervision of Carlsberg and is a $65 million project.

While the greenfield brewery is ABC's major ongoing investment, the Luxor Group has also injected other noticeable investments into the company, which have predominantly been used to



upgrade and expand the company's distribution fleet; and provide for the installation of a computer system tracking everything from how much beer ABC sells in Cairo to developing new routes for the company's fleet of 300 trucks.

<u>Change in Public Sector Corporate Culture</u>

While the Luxor Group has achieved a great deal in eliminating the public sector personality of the company (ie, public sector management titles have for the most part been replaced with standard private sector titles such as marketing manager, sales manager; hierarchical promotions have been replaced by a meritocracy based system; the work regime at the company is characterized by long hours and much higher official salaries for middle management), high levels of internal bureaucracy is still present at the company.  Managerial decision-making, while having adopted the style of a multinational corporation, still has to proceed through a sequence of "in-house approvals", which cause noticeable delays to the conduct of business (though this is not an uncommon feature of internal organization that one will find at numerous other Egyptian public and private sector enterprises)

<u>Labor, Wages and Compensations Package</u>

The salaries of senior and middle management at the company (particularly in the sales and marketing departments) are now compatible with most of the leading private sector enterprises and multinational firms in the country. Wages have not increased drastically for the line workers however, though the bonus system and benefits package has been changed at the company since the privatization to reflect an employee's contribution to productivity, rather than length of tenure at the enterprise. Further, ABC's employees were offered the first share options package made by an Egyptian company and the Luxor Group has introduced a number of profit-sharing schemes since the privatization.

There does not appear to be any strong ties between ABC's  labor force and the public sector's national labor organizations/unions.

Concluding Comment.

Al Ahram Beverages Company remains the most obvious example of a successful privatization in the Egyptian Privatization and Public Enterprise Reform Program. The Luxor Group has gained total control of corporate governance and comprehensively restructured management – both in terms of personnel and the structure of the company's internal organization. The enterprise has transformed from being a public sector monopoly geared towards production of a sub-standard product, to an outward looking corporation highly oriented towards the Egypt's – limited - consumer market.



## El Nasr Bottling Company (Coke) and The Egyptian Bottling Company (Pepsi)

**Background: Public Sector and Law 203**

Mass production of leading international brand names in carbonated soft drinks, including Coke Cola, Pepsi, Schweppes, Fanta is a relatively new phenomenon in Egypt, and dates back to the economic liberalization measures initiated by President Sadat in the mid 1970s. Both the pubic and private sectors were involved in the production of soft drinks in Egypt prior to the privatization of Coke and Pepsi, and all bottling enterprises in the industry either comprised of joint ventures of an Egyptian firm and a foreign partner, or manufactured soft drinks as a franchise under license from the headquarters of the multinational soft drinks company. At the end of the 1980s, the enterprises producing Coke and Pepsi dominated sales in the Egyptian soft drinks market, holding a combined share of around ninety percent. The major enterprises bottling Coke and Pepsi in the country were the government owned Egyptian Bottling Company (EBC-Pepsi) and El Nasr Bottling Company (NBC-Coke), and the Shaher Group from the private sector.

The two public sector bottling companies, NBC and EBC, were fully owned and operated by the government and the state appointed their Chairmen of the Board and senior management. The two enterprises operated 22 bottling plants in different locations spread throughout the county (7 by EBC Pepsi and 15 by NBC Coke), owned a vast distribution fleet of cars and trucks, and employed over 10,000 people. The two enterprises bottled their soft drinks in a market where the price for their product was set by the government and produced soft drinks of a quality where standards could not be guaranteed from one bottle to the next. Since the price for soft drinks was pre-determined and their market duopoly guaranteed volume of sales, there was little incentive for management to monitor the quality of the product. The government financed the EBC and NBC with soft credit through public sector financial institutions and invested very little in marketing their soft drinks amongst consumers.

Company managers had little flexibility to innovate with new product lines or production methods since there was virtually no market research to establish brand popularity, nor managerial control in determining the type of equipment and technologies they would have to work with. Furthermore, there was no incentive for management to promote or discipline their over-staffed workers, as the majority of employees were remunerated under the parsimonious public sector compensation structure while labor laws in government enterprises made it very difficult for management to sack their workers. Both the EBC and NBC were reorganized as Law 203 companies during the early 1990s and placed under the affiliation of the Holding Company for Food Industries (HCFI)

**A-164**



**The Privatization: Method and Date**

The HCFI sold the government's entire equity stake in both companies to two separate consortia of strategic investors in April 1994. The dual privatization was amongst the first transactions to be conducted in the Egyptian public enterprise reform and privatization program. It occurred over two years before the mainstream stock exchange based privatizations commenced.

**Post Privatization Profile**

<u>Ownership Structure/Corporate Governance</u>

NBC-Coke was acquired by a consortium which comprised of the Coka Cola Company (ie, Coke the multinational company) and the Mac Group (the new corporate name for the Shaher Group as mentioned on the previous page). Equity in the privatized enterprise was divided up 70%-30% between the Mac Group and Coke international respectively, and NBC's 15 bottling plants were merged with the four operated by the Mac Group to form one new entity entitled the Coca Cola Bottling Companies of Egypt. (TCCBCE) Mr Abdil Magid Abdul Hak, the Chairman of the Mac Group, also became Chairman of the new entity, which became the largest beverages company in the Middle East. The remainder of positions on the Board of Directors of the new entity came from individuals from the two shareholding companies.

EBC-Pepsi was acquired by a consortium comprised of the Egyptian private sector Alcan Group (49% equity in the privatized company), Bugshan Investments of Saudi Arabia (49%) and Pepsi Cola International (2%). The agreement also entitled Pepsi Inc to increase its equity in EBC to 20 per cent and also to the right to a first refusal to any change in ownership which may take place at EBC in the future. Engineer Mohammad Nosseir, Chairman of Alcan Investments, also became Chairman of the newly privatized enterprise, with the other Board Positions being divided among the three partners to the consortia.

In April 1995, Pepsi Inc acted upon its contractual right to raise its holdings in the consortium, and invested greater equity into Pepsi Egypt by increasing its ownership stake to 20 per cent. The stake held by the Alcan Group and by Bugshan decreased to 40 per cent respectively. Another ownership restructuring subsequently took place in October 1995, when the Alcan Group sold off 20 per cent of its holdings to Bugshan and the new ownership structure was now 60% Bugshan, 20% Alcan and 20% Pepsi Inc. In early February 1999, amidst heightening tensions and diverging interests between the parties to the Pepsi Egypt consortium, Alcan sold off its ownership stake in the consortium to Pepsi Inc, which also acquired a major portion of Bugshan's equity in the company, giving Pepsi Inc a total of 80 per cent equity in Pepsi Cola Egypt. From this period on Pepsi Cola Egypt came under effective corporate governance control of Pepsi Cola international.

<u>Management/Operations</u>

The privatization of the two public sector bottling companies to strategic investors left the government with 0% equity in the companies and given that NBC and EBC were acquired by the industry's leading private sector multinationals and their agents in the domestic Egyptian market, it was inevitable that major changes took place in the structure of management and managerial personnel at both companies.

PCSU

In the case of NBC-Coke, the 15 bottling plants of the former public sector beverages company were about to be integrated into the business ethos and corporate culture of the consortium of Coke International-Mac Investments, requiring the Board of Directors of the newly created entity, TCCBCE, to appoint a new senior and middle management. With the integration of NBC's bottling plants into the Coke Cola – Mac Investments consortium, and their merger with Mac's four existing bottling plants, the face of the former public sector bottler of Coca Cola would change fore-ever and the new entity would now be managed to become a profitable, consumer driven production and marketing entity.

The public sector management style and approach to business was overhauled at NBC and the company's headquarters was re-established at a new site in Cairo's Nasr City. Its new senior management, a number of whom were appointed from Coca Cola's vast network of affiliates throughout the world, channeled an extensive budget into product advertising and other forms of promotion. A marketing department was established at the company and was extended an impressive budget. As part of the extensive marketing campaign, many new, dynamic youthful employees began to appear at TCCBCE and became the catalyst behind the creation of a new image for Coca Cola amongst Egypt's various grades of consumer classes. Senior management also invested substantially in the development of TCCBCE's personnel by providing numerous industry-specific training programs to the workers, and sought to reward company employees on the basis of meritocracy, as opposed to the previous seniority based promotions system.

On the production side, TCCBCE's bottling plants concentrated on quality control and product standardization, to ensure that the consumer would now be guaranteed a genuine bottle of Coka Cola and not a poorly produced imitation. Both the Mac Group and Coke invested heavily into the modernization of the production techniques employed at NBC's bottling plants and gave plant level management a strong degree of local autonomy in conducting its operations.

In the case of the privatized EBC-Pepsi, the new investors' triumvirate which acquired the company – Alcan, Bugshan and Pepsi Inc - also went about changing senior management and demonstrated the company's new commitment towards producing for the consumer (as opposed to producing to government quotas) by strengthening the sales and marketing arms of the company. As was the case at the newly established TCCBCE, Pepsi Egypt now developed a marketing department staffed by a diversity of talented new people from the private sector and was extended a proper budget by the Board of Directors. Pepsi Egypt was also now committed to producing a cola of original quality, to ensure that it would be up to the high standards and levels of consumer-consciousness to those set by its chief market rival. Given both Coke and Pepsi's commitment to be the leading Cola in the Egyptian market, the ferocious competition which emerged between the two soft drinks giants became dubbed as Egypt's war of the Colas.

Financials

Both companies have adopted cost cutting measures and financial policies in line with their respective mother company, Pepsi Cola and Coca Cola International.



<u>New Capital Investment</u>

Both consortiums have invested heavily into the privatized companies since they made the acquisition in 1994. Coke International and Mac Investments have put over 350 million LE into TCCBCE since the privatization while the new owners of EBC-Pepsi were committed to investing 180 million LE into EBC during the first five years after the privatization as part of their original agreement to acquire the company from the Holding Company for Food Industries. Alcan-Bugshan invested heavily into the company, leading to the creation of new products, the purchase of more contemporary equipment and into establishing new bottling plants, such as the one the consortium built in Amereya (Alexandria)

<u>Change in Public Sector Corporate Culture</u>

In the case of both privatized companies, it can be said that their new owners have placed significant resources into changing the public sector management and seniority based promotions system; replace the public sector management titles which reflected civil service appointments more than business titles; rehabilitate and restructure the company's physical assets; and instill a private sector like hours of work regime. However, they have also found that some of the old attitudes have been difficult to break. Senior management at both companies has still found it a burdensome task to promote some workers on the basis of their worthy contribution to the company without causing offence to some of the other employees. Senior management still finds itself operating within the framework of psychological restrictions of Egypt's seniority based promotions system. This situation is not helped by the persisting low wages of the production workers, who are unlikely to feel that their integration into the private sector has taken place until their wages are commensurate with other multinational enterprises engaged in private business.

<u>Labor, Wages and Compensations Package</u>

New income differentials within the companies have emerged between the higher salaried staff employed in senior management and marketing, and the production workers. This trend has served to reinforce the public sector (poor) work ethic amongst many of the company's employees, who have remained compensated by near-public sector remuneration standards. The salaries of senior management have increased substantially since the privatization, especially since a number of the senior executives have been appointed from Coke and Pepsi's international pool of senior managers. Wages for middle managers have remained moderate, though this is a phenomena common across the private sector in the country.

**Concluding Comment**

Like Al Ahram Beverages Company, the privatization of  Coke and Pepsi Colas has given the Egyptian privatization program another relatively evident example of  the private sector gaining total management and operational control over a privatized enterprise. Both the Egyptian Bottling Company and El Nasr Bottling Company have been swallowed up by consortia of investors led by the giants of the international soft drinks bottling industries and have left the Egyptian government playing predominantly a regulatory role over the industry. Both enterprises have moved towards typical marketing and sales oriented  business strategies**,** and are very noticeably reaching out to the Egyptian consumer**.**



## Group B: Transitional Privatized Companies

### Ideal (Delta Industrial)

**Background: Public Sector and Law 203**

Ideal is Egypt's well known former public sector monopoly producer of refrigerators and washing machines. The company was established in 1920 as a private enterprise and nationalized in 1961. The enterprise is comprised of three factories producing fridges and washing machines and one factory producing furniture. All of Ideal's factories are presently located in Cairo, though are expected to relocate to an industrial city outside of the capital within the next two or so years.

As a state owned public sector enterprise, Ideal was an affiliate of the Ministry of Industry and its business was managed for the government by the General Egyptian Organization for Engineering Industries. Its corporate mission was production and provision of employment. The enterprise employed around 10,000 people during the height of production in the late 1970s and early 80s, most of whom would have been redundant in a private sector enterprise functioning in a capitalist economy. Corporate profitability was not the primary concern of enterprise management and Ideal was subsidized by soft loans from public sector financial institutions.

The enterprise produced to quotas/production targets set by the Ministry of Industry and given that it held a monopoly over production in a market characterized by shortage of supply, the company employed little marketing strategies. Management operated to a production plan set down by the Ministry and there was little flexibility in senior level managerial decision making. Pricing was also controlled by the state and Ideal's products were distributed to the consumer through its 18 government owned retail outlets located across the country.

Titles of management reflected senior positions in the civil service and appointments to middle and senior level management were made largely on a political basis. Promotion was based on seniority instead of work based performance. Public sector labor laws also guarded employees against dismissal and, together with the lack of significant wage incentives, a great deal of complacency characterized the work performance of the assembly workers.

Under the government's tariff umbrella, Ideal held a 100% monopoly in the production of fridges and washing machines until 1986. Production was of basic quality and by the mid 1980s, investment into the company began to dry up. The white goods market began to be liberalized during the second half of the 1980s however, and the entry of several private sector enterprises into the sector resulted in Ideal losing some of its market share. Ideal was re-incorporated under Law 203 for public sector enterprises in 1992 and was placed under the supervision of the Holding Company for Engineering Industries.

**Privatization: Date and Method**

In December 1997, the Egyptian government suddenly announced that it would be selling Ideal (75% through an IPO and 25% through a strategic offering) and investors were only given two weeks by the government to prepare their bids for the company. The Olympic Group Financial Investments Company, a private sector Egyptian Holding Company run by the Salam Family, proved to be the best prepared from a group of Egyptian and foreign investors, and succeeded in acquiring the company.



**Post Privatization Profile**

<u>Ownership Structure/Corporate Governance</u>

The privatization left the government with 0% equity in the company and Ideal's new ownership structure appeared as the following:

53% owned by the Olympic Group Financial Investments Company
24% owned by the Ideal Commercial Company (itself owned by the Olympic Group)
11% owned by the El-Abd Family/Zanusi
10% to the Employee Stock Association (ESA)

The Board of Directors changed comprehensively at the company after the privatization and reflected the share-holdings of its new owners. The Chairman of the Olympic Group (Dr Saad Salam) subsequently become Ideal's new Chairman and a new Chief Executive Officer, Ahmed Al-Abd, was also appointed to the company. There is no government representation on the Board of Directors.

**Management/Operations**

Much of Ideal's public sector management structure currently remains in place at the company's four factories - two and a half years after the privatization. Ideal currently continues to adopt a six layered middle management structure, which was its main-stay method of management under the public sector. The Olympic Group has been seeking to change Ideal's management style to make it compatible to the strategies employed by the Olympic Group's other enterprises, which comprises of either two or three levels as deemed appropriate to the enterprise (ie, division heads, department managers, section heads). Hence the Olympic Group has demonstrated that it holds a vision of change for the company's management structure, but it has not been able to as yet implement management reform. A new Human Resources Manager has been appointed to Ideal at the start of this year, and it is expected by the company's senior management that this appointment will lead to a noticeable management overhaul within the next six months.

The relationship between management and production techniques employed at Ideal's factories has also not yet showed capacity for noticeable change since the privatization. The main evident difference is that there are less employees manning the machinery, which is due to numerous employees having left the company as a result of the early retirement programs adopted by the Olympic Group. At both the Almaza and Nasr City plants, the main difference evident in management of production is that the premises is cleaner than what is was under the public sector, and that there are fewer employees at the work-site.

Labor has been reduced significantly at Ideal since the privatization. There were around 7700 employees at the company at the time of the privatization and 2700 today. Yet the company remains noticeably overstaffed and another 400 employees are expected to leave the company this year. The average early retirement package has averaged at around 20,000 LE per employee.

Despite the lack of significant reform of middle management, the company's new senior management has sought to improve the quality of Ideal's production, as well as adopt new marketing strategies which will allow Ideal to compete in a highly competitive Egyptian home appliances market. Ideal's retail outlets have taken on a more professional, consumer oriented appearance and the company ran its first ever TV commercial in 1998. Ideal is still the market



leader for washing machines with a 50% market share, but is facing very stiff competition from the private sector in the fridges market from other private sector companies. It continues to lead the market in the low cost fridges sector through its Almaza plant.


Financials

The company has remained in sound financial condition after the privatization. Cost cutting measures have been amongst the top priorities for Ideal's new senior management. To this extent the company is now much more flexible  in its procurement strategies in comparison to its time under the public sector. Cost cutting measures taken by the new senior management include reducing Ideal's transportation fleet from 500 to 50 vehicles, contracting out transportation companies for more effective distribution, and better sourcing of raw materials. Despite the high cost of labor at the company, these policies have led to improved profitability at the company since the privatization.


New Capital Investments

Ideal was starved of new investments during its last decade of government ownership and upgrading machinery and new capital investment has become a central objective of the company's new owners. The main project that the Olympic Group has developed is a $50 million investment into a new factory at Sixth of October City to where Ideal's entire production will move by the end of 2001. Construction at the new site is under way.

There has been either little or no evident new capital investment into Ideal's existing four factories however. The Almaza Plant, opened in 1960, continues to employ production technologies from the 1960s and produce around 1000 old style refrigerators per day, for a market which still demands a daily production figure of roughly double this amount. Ideal's factory at Nasr City is the most up to date of the company's production facilities, benefiting from comparatively modern production technologies which it acquired during the 1980s. But there has been no new evident investment into this plant since the privatization. Ideal's furniture factory at Shubra is reported to be in the poorest condition out of all of Ideal's factories, and would possibly be liquidated would it not be for the social question of labor.


Changes in Public Sector Corporate Culture.

It is yet inconclusive as to what degree the public sector corporate culture has declined at Ideal. At least two of the company's four plants are much cleaner, less populated by excess labor and seem to be operating to a stricter work regime than what they were under the public sector. However, many of the middle managers still appear to have kept their public sector management titles, implying that a culture of hierarchical management structure is still present. The significance of managerial status lingers at Ideal and other companies in this category of privatized enterprises, a phenomenon which may also assist in accounting for the slowness of management reform in the companies.

The Olympic Group has tried to implement vocational and training programs for its employees, though these have been for the most part limited to training Ideal's retail staff in dealing with the consumer at a more professional level.



<u>Labor, Wages and Compensations Packages.</u>

Over-all, there has not been any significant rise in the wages and compensation package for Ideal's employees since the privatization. At the Almaza factory, workers continue to receive the 200 LE/month they made when Ideal was owned by the government, as well as access to work-place insurance schemes, public health and other similar benefits they received under the public sector. The benefits package has increased slightly for the Almaza workers. Wages have also remained at public sector levels for Ideal workers at the Nasr City plant, while benefits have again increased slightly. The Shubra furniture factory is currently a loss maker, and there appears to be little immediate hope of any improvements in the remuneration package of the factory's employees from what they were under the public sector.

It appears that the compensation package of workers and middle management at the Ideal factories, as well as the collective bargaining process between employer and employees, continues to operate under the framework agreements set down during the public sector. Many of the workers at the company continue to associate with the public sector's national labor organization.


**Concluding Comment.**

In the three and a half years that the company has been privatized, Ideal has changed very little at the management level, though operationally it is much more consumer oriented than under the public sector, having adopted a more professional approach to sales and marketing. Senior management is also more conscious of cost cutting measures and has improved the company's procurement policies. However, Ideal's middle management and its approach to production is largely unchanged since the privatization, giving the impression that the Olympic Group, despite the fact that it acquired the enterprise in a strategic investor transaction, does not have full control over the company.



## The Arab Company for Transistors and Electronics (Telemisr)

**Background: Public Sector and Law 203**

Telemisr is Egypt's leading producer of color televisions, and one of the country's largest producers of electronics goods (including transistor radios, home appliances, cash registers and balasts for fluorescent lamps). The company was established in 1962 in Ismailliya as a public sector enterprise and operates from three different production sites around the country. The main factory is in the Haram (Pyramids) district, in Giza.

Under the public sector, Telemisr was a state owned enterprise affiliated to the Ministry of Industry and its business was supervised for the government by the General Egyptian Electrical and Electronic Organization. Telemisr's Chairman was appointed by the Ministry while appointments to senior and middle management were largely political, both in terms of managerial title (ie, reflected a civil service as opposed to a private sector title) and manner in which the appointment was made. Up until the 1980s, the company's senior management was essentially concerned with fulfilling the government's production plan and providing employment to university graduates. Telemisr employed around 3000 people at its three factories across the country. The state provided the company with capital investment and protected the enterprise from private sector and imported competition.

A culture of – limited – profitability existed at the company since at least the early-to-mid 1980s, when the electronics market in Egypt experienced a degree of liberalization. Telemisr found itself competing against electronics multinationals such as Toshiba and National. The company's Board of Directors and senior management were encouraged to pursue profitability within the framework they were allowed by the public sector legislative regime, and earnt bonuses if they met their financial – as well as production - targets. Hence during the 1980s, the company was already conducting some marketing activities to bolster sales, and worked with private sector agents and distributors as well as those from the public sector.

When Telemisr was re-incorporated under Law 203 in 1992, it was further encouraged to pursue profitability and increase its efficiency, as the government – officially – annulled its soft credits and other subsidies to the company, there-by encouraging its financial and managerial independence. However, while the Law 203 regime encouraged Telemisr to become independent of the state, the government continued to restrict the company's profit making capacity since it still obliged the company to keep most of its redundant labor, as well as prohibit the company form liquidating or selling, some of its loss making assets – such as Telemisr's lamp factory in Ismailliya, which had been incurring annual losses of 6 million LE.

**The Privatization: Date and Method**

1/ Telemisr was first offered for sale by the government to the public in an IPO transaction in September 1996, resulting in the Holding Company for Engineering Industries selling 73% equity, and keeping the remaining 27%.

2/ In October 1999, the Holding Company sold off its remaining 27% in a strategic transaction to one group of investors, comprised of Hani Sorour and Hassan Mckowey – two of Egypt's largest players in the electronics sector.



**Corporate Governance/Ownership Structure**

After the **first** privatization (September 1996) the ownership structure at Telemisr appeared as:

27% to the Holding Company for Engineering Industries
10% to the Employee Stock Association (ESA)
22% to the Sayyad Group
12% to Investment Funds or Financial Institutions (including public sector investors)
29% to the Public (free floating equity)

Of the nine members of the Board of Directors, two were from the Holding Company, one (the newly appointed CEO) was a professor of electronics from the American University Cairo, one represented the ESA, one from Misr Insurance and one from the National Insurance Company, and two were from the private sector (including Esmed Sayyad and Hani Sorour). The Chairman occupied the final Board position.

However, within the first month after the privatization, the Sayyad Group – finding the company to be in much poorer condition than was initially expected – reduced its equity in the company from 22% down to 3%, though the Sayyad group still remained on the Board of Directors.

The ownership structure of the company changed substantially after the **second** privatization (October 1999), when Sorour and Mckowey bought out the Holding Company's 27%, and presently appears as follows :

55% owned by Sorour and Mckowey
10% owned by the ESA
35% Public (free floating equity)

Both Sorour and Mckowey each have three representatives on the new Board of Directors (still comprised of nine members), with the other three positions occupied one each by the ESA representative, the Sayyad Group and Mustapha Kamal (a veteran from the Egyptian electronics industry and long time employee of the public sector). Kamal is presently the Chairman of the Board of Directors of Telemisr.

Sayyad gambled by investing in the company since the government announced the offering of Telemisr rather suddenly, giving investors only around two weeks to study the company. The Sayyad Group was already involved in the electronics industry as distributors, and given that the Stock Market was up at the time, it sought to gain control of the company by acquiring a 22% equity stake. Hanni Sorour, a major player in the electronics sector in Egypt, also sought to acquire equity in the company and looked at the investment from a longer term perspective. The Holding Company was hopeful that with Sayyad and Sorour on the Board, substantial managerial and operational reform would be brought to Telemisr. However, Sayyad sold his equity in the company very soon after his initial acquisition and the only ownership concentration in Telemisr remained that of the Holding Company.  Between the first and second privatizations however, Hani Sorour increased his equity stake in Telemisr, becoming poised to take control of the company, which he finally achieved after the Holding Company sold off its remaining equity stake.



**Management/Operations**

Little management change occurred at Telemisr after the first privatization, given that Sayyad sold most of his equity in the company and the Holding Company retained the largest equity stake. The early retirement program, which was initiated under Law 203, has helped to reduce the company's highly over-staffed workforce from about 2800 at the time of the first privatization to 1930 in May 2000. However, there was no major over-haul of middle management after the first privatization, though changes were made at senior management as was the case with Ideal. With no new investment being injected into the company after the September 1996 privatization, production remained largely as it was under the public sector. Now, after the second privatization has put the private sector in control of the company, Telemisr's new majority shareholders are hiring new people from outside the company to middle management positions and it appears that some new management strategies are likely to be implemented at the company in the not too distant future.

From an operations perspective, Hani Sorour and Dr Sharin Fowzy (the newly appointed CEO of the company after the first privatization) managed to initiate some operational changes, including expanding the base of Telemisr's agents and distributors in the country, introducing new technologies to the company's administration departments (ie, computerizing the company's data base) but many of their ideas were rejected by the public sector members of the Board of Directors due to concern that the these measures would not be affordable to the company, now that it was no longer subsidized by soft credits from the state. Dr Fowzy also brought some changes to the human resource management at the company, particularly by introducing new management techniques such as creation of new work teams, bringing coordination between different departments at the administration level, and creating an Information Technology department at the company.

Now that the Sorour-Mckowey consortium controls the company, they have began to implement further operational and business development changes. These include the establishment of a distribution company for Telemisr products; increasing Telemisr's base of agents and distributors from 15 to 500 country wide; new product launches (including computers) and is looking to pursue broad based cost cutting measures.

Financials

Telemisr has sold its loss making lamp factory in June 1999, which will improve its financial position since the lamp factory was incurring losses of about 6 million LE per year. The sale of the lamp factory was negotiated by the Holding Company however, before Sorour and Mckowey took control at Telemisr. This has been the company's most significant cost cutting measure since the privatization.



<u>New Capital Investment</u>

There was no evident injection of new capital into Telemisr after the first privatization. However, since Sorour and Mckowey have gained control of the company, it appears that Telemisr's main production is moving to a new factory, built and financed by the new owners.

<u>Changes to Public Sector Corporate Culture</u>

As in the case with Ideal, it is difficult to conclude as to the degree that the public sector corporate culture has changed at Telemisr. Middle management titles still appear to reflect civil service appointments and the public sector managerial hierarchy is still, for the most part, in place. This is likely to start changing due to new appointments that the new owners of the company are currently making. There is also now a high level of unified private sector ownership concentration, which is also likely to have an impact on the lingering elements of the company's public sector corporate culture.

The enterprise's premises appear to be far cleaner than what they were under the public sector, and management claims there is far less complacency from the workers to their position of employment. However , it is not difficult to be skeptical of this claim on the grounds that Telemisr's new owners have not yet introduced any significant changes to the basic public sector wages and benefits package previously enjoyed by employees at  the company (see below).

**Labor, Wages and Compensations Packages.**

Although the company was privatized more than two and a half years ago, the basic compensation package determined between workers (including middle management) and employers has remained governed by the framework agreements set down during the public sector. Wages have not increased at Telemisr by any means outside of the 10%-15% annual wages rise which is roughly in line with annual inflation and was standard at the company under the public sector. Like other privatized enterprises, Telemisr is also no longer restricted by public sector labor laws regarding the hiring and firing of new employees, but is still restricted from laying off labor due to social/cultural factors which prevail in Egypt's Arabo-Islamic society.

**Concluding Comment**

Similar to the case of Ideal, Telemisr is now controlled at the corporate governance level by one ownership consortium from the private sector. However, just like at Ideal, Telemisr's new private sector majority shareholders have not yet been able to significantly reform public sector management practice and organizational culture at the enterprise. The company's new Board of Directors, like that of Ideal, has tried to bolster the company's performance by improving marketing and implementing cost cutting measures, which were not attempted with any vigor before the company's privatization.



### Electro Cables Egypt (Kabelat)

**Background: Public Sector and Law 203**

Kabelat is Egypt's leading producer of power and telecommunications cable of all dimensions. The company was established in 1954 as a private enterprise and became the first enterprise to engage in industrial scale production of wires and cables in the Middle East. It was nationalized in 1961. Kabelat operated as a state owned enterprise from 1961 and held a monopoly over the electro cables market in Egypt up until the government allowed some liberalization to occur during the 1980s. As an affiliate of the Ministry of Industry, the enterprise operated in a highly regulated market, with all major business decisions taken at the company having to be approved by the government. Like the other state owned enterprises discussed in this section, Kabelat produced to a quota set by the state, and employed a vast residual of employees, who numbered well over three thousand prior to the privatization.

The Chairman of the company – since 1988, Mr Hassan Helmy Said - was appointed by the Minister of Industry, management was appointed on a political rather than merit basis, and managerial decision making passed thorough a web of bureaucratic checkpoints and controls. Capital investment was financed by the state, through public sector banking institutions on a "soft-finance" basis. Kabelat's main clients were mostly other public sector entities, including ARENTO (the government's telecommunications monopoly) and the Egyptian Electricity Authority and prices for its product were predetermined by the state. The company was also obliged to procure its main raw materials – copper and aluminum -  from other public sector enterprises.

Kabelat's workforce however, enjoyed one of this highest benefits packages for comparative industries in both public and private sectors in Egypt, with the annual wages package at around 14,000 LE. But the remuneration structure in the public sector rewarded all workers equally across-the-board, meaning that an employees' contribution to productivity was not taken as a yard stick for an increase in bonus. The lack of an appropriate incentive structure undermined greater employee contribution to productivity. There was little change to this situation after the electro-cables market was liberalized during the 1980s, or when Kabelat was reincorporated under Law 203 in 1992, even though the company was now encouraged by the government to be financially independent, autonomous in management – a more viable economic entity over-all.

**Privatization: Date and Method**

The company was first offered through an IPO in a minority transaction in 1995, when the Holding Company for Engineering Industries sold a 30%  stake to the public and 10% to the employee stock association. In December 1997, the Holding Company for Engineering Industries sold off its remaining 40% stake in the company, reducing its stake in the company to 0%.



Ownership Structure/Corporate Governance

After the majority privatization of Kabelat, with the Holding Company no longer having an ownership stake in the enterprise, the new ownership structure resembled the following configuration:

10%     The National Bank of Egypt (public sector)
10%     The El Sayyad Group
10%     The Misr Insurance Company (public sector)
05%     The Alem Group
05%     The Commercial International Investment Company (CIIC)
10%     The Employee Stock Association (ESA)
1.5%    The Nile Development Fund
48.5%   (The Public) Free floating equity

There are nine members on the company's new Board of Directors, which include representatives from the following:

Bank Watany, Bank Ahly, CIIC, Misr Insurance, the ESA, Talaat Moustapha, the Sayyad Group, the Allem Group; and the Chairman, Hassan Helmy Said.

Although the company can be considered 100% privatized, since the Holding Company no longer holds an equity stake in Kabelat, government financial institutions still hold considerable interests in the company and have noticeable representation on the Board of Directors (ie, the National Bank and Misr Insurance). However, it appears that most of the major financial and managerial decisions at Kabelat have been taken by three of the Board of Directors' nine members- Esmat Sayyad, Adil Allam and the Chairman, Hassan Helmy Said - who in essence are in control of the company. Said's industry expertise (he has been chairman of the company since 1988) has been coupled with Sayyad's and Allem's private sector business acumen, connections in the financial sector, and established infrastructure in industry trading and distribution. There does not appear to be any "pro-public sector" intervention by the members from government organizations on the Board of Directors which is blocking the initiatives of the Helmy-Sayyad-Allam governance bloc, and given that the public sector Board members are from the financial sector, it is in their further interests to see Kabelat do well economically.

Management/Operations

There are still 69 managers presently at Kabelat, which is essentially the public sector management structure still in place two-and-a-half years after the privatization. Some managers have left the company but this has essentially been part of the early retirement program, as opposed to a concerted policy of management restructuring. Neither has there been a major over-haul at the level of senior management. However, the Chairman of the company – who is also the General Manager – is currently seeking to over-haul the present managerial positions and replace them with 10 key managerial posts. There are also appointments being made at the operations level, with new people being sought by the company in the areas of sales and marketing. Hence while the public sector management structure remains in place, it appears that changes to this



structure may be expected in the future, and will accelerate as more of the Kabelat's public sector "veterans" leave the company.

Although government institutions still hold at least 20% equity in the company, there is no longer any Ministerial intervention in Kabelat's business development/operations. Decisions are taken by the Board of Directors and senior management independently, which has allowed the company to improve its procurement strategies and reduce costs. By way of example we can note that at one industry exhibition attended by Sayyad, Allam and Helmy in Dusseldorf, Germany in 1998, Kabelat's senior management was able to make a "snap decision" to purchase machinery for the production of medium and high tension cable, after its technical committee had made the recommendation to buy. Such flexibility exercised by senior management to make an instant decision regarding a major purchase of capital equipment would not have occurred under the public sector, and currently represents a savings of around 8.5 million LE for the company.

Financials

The company has always been in a relatively good financial position and continues to be profitable now that it is officially in the private sector. Senior management continues to cut costs and adopt prudent procurement strategies when possible.

New Capital Investment

The Sayyad Group has on occasions increased the capital base of the company by deciding retain dividends within the company, as opposed to having them distributed amongst the shareholders. This has worked as a defacto capital injection and has been employed to finance some of the company's purchase of new capital equipment.

Public Sector Corporate Culture

Public Sector management titles are still in place at the company (ie, the most common is a "sector manager") thought the Chairman has every intention to simplify these and make them more compatible with management titles common to the private sector (ie, Financial Manager, Commercial Manager). The public sector corporate culture is changing slowly at the company however, this being largely the result of the comparatively high level compensation package received by Kabelat's employees. However, the voluntary retirement program being implemented at the company and the subsequent labor reductions which are occurring will contribute substantially to the erosion of the public sector corporate mentality. The company is also hiring new staff from outside the public sector, which will further serve to reinforce this trend.

The early retirement program has reduced the labor force at Kabelat from 3400 at the time of the privatization, to about 2100 today. Although the Chairman suggests that he only needs around 1400 to run the company efficiently, reduced labor means that there are less employees "hanging on" at the enterprise, contributing very little to productivity. The work regime has been tightened since the privatization and work hours are said to be more rigidly implemented than prior to the divestiture.



Labor, Wages and Compensations Packages.

With already a comparatively high wages package enjoyed by Kabelat's employees under the public sector,  it would have been quite unlikely that the privatization of the company would have brought a noticeable increase in wages. Indeed, one of the main tasks of Hassan Helmy Said, in his efforts to implement cost reduction policies, has been an attempt to bring down the compensations package at the company. The chairman claims that wages have been reduced by a figure of 8 million LE at Kabelat since the privatization – though much of this must be attributed to the early retirements program. Senior management, which is headed by the Chairman, has succeeded in reducing some of the employees' benefits package but with little change in personnel at the company (apart from departing workers care of the early retirements program), collective bargaining between owners and workers still takes place within the framework set down by the public sector. The workers still associate with the public sector national labor organization and participate in the national labor organization's sporting tournaments, meaning that they can be absent from the company for several weeks at a time on full pay.


**Concluding Comment**

Like Ideal and Telemisr, Kabelat has also been categorized a transitional privatized enterprise since there is enough private sector representation amongst its shareholders to give it the vision and the want to reform itself significantly at management level and lose its public sector corporate personality. However, as has been the case with the other two enterprises, management reform has been notoriously slow. Cost cutting measures and improved procurement strategies have been noticeably adopted by the company's new owners since the privatization. Yet the fact that the public sector national labor organization can take some of the company's leading employees away from the enterprise for two weeks in order to participate in a government football tournament, suggests that there is still a great deal required before the private sector gains full control of the company.



## The Egyptian Financial Industrial Company (EFIC)

### Background: Public Sector and Law 203

The production of fertilizer has been long dominated by two companies in Egypt, the Egyptian Financial Industrial Company (EFIC), the larger of the two and predominantly involved in the production of single super phosphate fertilizer (SSP); and Abu Zaabal Fertilizers, producing triple super phosphate fertilizer (TSP). EFIC was founded as a private sector enterprise in 1929, and is a historically recognized company in Egypt- nationalized in 1961 before returning to the private sector again upon its privatization in 1996. When the company opened its production facility in the Nile Delta town of Kafr Zayat in 1940, it became the first enterprise in the Middle East to produce SSP fertilizer. Its main fertilizer production facility is still located at Kafr Zayat, though it also operates a factory in Assuit, in Upper Egypt.

During the three decades of the 1960s-80s, EFIC operated as a government owned affiliate of the Ministry of Industry. As was the case with other government owned enterprises producing vital commodities for Egyptian agriculture (phosphate fertilizer is one of the five essential agricultural inputs necessitated by Egyptian farmers), EFIC operated under a highly regulated business environment. The company produced fertilizer to a production plan set by the government and the state provided the company with machinery, financed any new technologies required for production and furnished it with the necessary imported raw materials. EFIC had to sell its entire produce back to the state's procurement agency at a pre-determined price, which then took on the responsibility of marketing and selling EFIC's fertilizers directly to the farmers. All of the company's major corporate decisions had to be approved by the government, though – like with many Egyptian government enterprises – enterprise management maintained a strong degree of decentralizm.

In 1991, policy changes resonating from the Egyptian government's structural adjustment agreement with its international creditors, resulted in partial liberalization of government controls over the agricultural sector. The price for fertilizer would now be determined by the market, and the government also annulled its procurement role. EFIC was made into a Law 203 enterprise and placed under the ownership of the Holding Company for Mining and Refractories (HCMR). In a more liberalized market for phosphate fertilizer, EFIC now had to learn to operate autonomously of "soft-finance" from the government and since procurement of its product was no longer guaranteed by the state, EFIC's management had to learn to market its product both within Egypt and abroad. During the first half of the 1990s, in response to the new business environment, the company strengthened and expanded its sales, marketing and distributions functions for expansion of business within Egypt, and developed an export market for its fertilizer.

### Privatization: Date and Method

The company was offered by the HCMR in an IPO on May 1996, in the Egyptian government's second major public offering in the privatization program – after that of Nasr City Housing. Like the offering of Nasr City Housing, EFIC's offering was also highly over-subscribed, resulting in the government selling 75% equity in the company.



<u>Ownership Structure and Governance</u>

The privatization left the ownership of the company divided among the following entities:

25% to the Holding Company for Mining and Refractories
10% to the Employee Stock Association
9% to the National Bank of Egypt
8% to the Commercial International Bank and affiliates
15% to the Sayyad Group (since reduced to 7%)
33% free floating equity

The newly formed Board of Directors now comprised of three representatives from the HCMR (including EFIC's Chairman since 1989), one representative from the ESA (reduced from four as was mandated by Law 203), one each from the National and Commercial International Banks, one from the Sayyad Group, and two from the 33% free float.

Although the privatization left the government with the largest single ownership stake in the company (ie the HCMR's 25%) and three representations on the Board of Directors, the company is widely regarded to have come under the controlling influence of the Sayyad Group, a major Egyptian private sector business group headed by Esmet Al-Sayyad. The Sayyad Group first participated as a minority shareholder in the privatization of El Nasr Boilers in an experimental transaction in 1994. The EFIC privatization was its first major transaction where the group acquired a controlling hand in corporate governance, and since then, the group has also formed a commanding coalition with other investors in the privatization of Electro Cables Egypt; has formed a dominant position on the Board of Directors of Kafr Zayat Pesticides and Chemicals; was involved in Telemisr until it sold its equity in that company; and has also gained control of several other privatized companies from the Law 203 sector which are outside the scope of this study.

The dominant position of the Holding Company on EFIC's Board of Directors and the fact that the government continues to maintain significant interest in the company, has created some corporate governance anomalies. The main one amongst these is the fact that the Chairman of Abu Zaabal Fertilizers, Mr Abdul Fatah Shita, an enterprise which EFIC sought to acquire from the government and EFIC's main competitor in Egypt's fertilizer industry, was until recently also a member of EFIC's Board of Directors. Mr Shita was essentially one of the HCMR's three representatives on EFIC's Board. During this time however, he was also elevated to the position of Abu Zaabal's Chairman, simultaneously to retaining his position on EFIC's Board. This created an obvious difficulty for the remainder of EFIC's Board, particularly Mr Sayyad, and though EFIC's initial appeal to the HCMR to have Mr Shita removed from his position at EFIC brought little success, this situation has since been rectified and Mr Shita's position at EFIC has since been replaced.

<u>Management/Operations</u>

As is the case with most of the other IPO privatizations discussed in this study, management change has also been rather slow at EFIC and much of the management structure in place prior to EFIC's IPO is still in place at present. There have been few new noticeable appointments at

PCSU

management level and the reduction to the company's 3000 strong pre-privatization workforce has generally been small compared to companies like Ideal, Electro Cables Egypt and Telemisr.

At the operations level, the privatization has strengthened the business strategies adopted by EFIC's management in response to the more liberalized business environment which emerged during the first half of the 1990s. The company has continued to seek developing a market for its fertilizer abroad as well as maintaining its market presence within Egypt. It has also sought to raise its production capacity and adjust its line of production from powder to granulated based fertilizer. Since the influence of the Holding Company has been reduced at EFIC, it appears that the company has significantly greater freedom in major business decisions, since the Board no longer has to go to the Holding Company to approve its business plan. This has given greater flexibility in procurement policies, particularly in acquiring raw materials and purchasing capital goods and other investment related activities. Again, much of the greater flexibility is associated with the presence of the Sayyad Group on the company's Board of Directors.

Financials.

EFIC was a profitable company before the privatization and remains one at present. This has been more due to better procurement strategies and cost cutting measures as opposed to revenues from sales, which have been declining in recent times.

New Capital Investment

While the shareholders have not brought an external injection of capital into the company since the privatization, EFIC's financial position was regarded as generally sound at the time of the privatization. The company's new projects since the privatization have for the most part been financed internally, though it is most likely that the financial consortium comprised of the Sayyad Group and the Commercial International Bank (present on the company's Board of Directors) is capable of injecting new capital into the company if required.

Public Sector Corporate Culture

Like many of the other IPO privatizations referred to in this study, there are notable semblances of public sector corporate culture still present at EFIC. These include many of the public sector management titles still used at the company, incongruence between employment titles and salary, the observation of a public-sector-like hours of work regime, and the lack of rehabilitation of some of the company's physical space – particularly its representative office in down-town Cairo, which has been in a state of refurbishment since (at least) late 1998 to the present. However, the controlling influence of the coalition of investors led by the Sayyad Group gives EFIC a somewhat different flavor to some of the other IPO privatizations where the influence of the private sector is felt far less at the Board of Directors level.



<u>Labor, Wages and Compensations Package</u>

There is little evidence of any alteration to the basic public sector structure for wages and compensation package for workers which existed at the company prior to the privatization. Nor has the significance of the national public sector labor organizations declined for EFIC's workforce since the company has returned to the private sector.

**Concluding Comment.**

The presence of the Sayyad Group has been the major factor responsible for the inclusion of EFIC into **Group B**. This has been the main influence that the private sector has had on corporate governance, and has helped management improve its procurement strategies, cut costs where possible and generally improve the company's financial performance despite decreasing sales. However, EFIC's management structure and its senior and middle management personnel have for the most part remained the same after the privatization. The Holding Company for Mining and Refractories is still the largest single shareholder in the company with a 25% equity stake. Many aspects of the public sector corporate culture are still present at the company, while there has been little change in employee's wages and labor relations. All of these factors suggest that control of the company is divided between the government and the private sector.



## Kafr El Zayat Pesticides and Chemicals (KZPC)

**Background: Public Sector and Law 203**

Kafr El Zayat Pesticides and Chemicals Company (KZPC) was established in 1955 as a state owned entity for the purpose of producing pesticides and sulfur predominantly for Egyptian agriculture, but also for industrial and household use. The company commenced operations in 1957, when it was placed under the tutelage of the Ministry of Industry and its business was managed by the government through the General Egyptian Chemical Industries Organization. Like its neighboring company, EFIC, KZPC is located in the town of Kafr El Zayat, and its 38 acre plant is comprised of a chemicals factory, a powder pesticides factory, a sulfur production plant and an aerosols factory. The company had a workforce of 740 employees before the privatization, and while the number is fewer than that of EFIC, over-staffing was also present at KZPC and reflected the government's intention that SOEs would fulfil the state's social as well as economic objectives.

During the three decades from the late 1950s to the end of the 1980s, KZPC operated under much the same regime which regulated EFIC and other agro-industrial SOEs. Production and distribution of pesticides was controlled by the state, creating an uncompetitive market and no incentives for companies involved in the pesticides business to adjust productive resources to any form of perceived market need. Retail prices for pesticides were kept below world prices and subsidized by the state. The market was protected by high tariff barriers and export of pesticides was defacto forbidden. KZPC was obliged to sell all of its production to the state's procurement agency, which marketed, sold and distributed domestic and imported pesticides to Egyptian farmers and other domestic customers. Centralization of price and product distribution allowed the state to control the supply and demand for pesticides in a similar manner to fertilizers and the regulatory regime ensured that KZPC held a monopoly over the pesticides market in Egypt, controlling a virtually 100 per cent market share up until the early 1990s.

The government's protective policies towards agricultural commodities began to undergo liberalization during the early 1990s however, at which time tariffs placed on imported pesticides declined. The result was a rush of cheap imported pesticides into the Egyptian market which led to the decline of KZPC's strong hold over the domestic pesticides market. As was the case with EFIC, KZPC, now operating as a Law 203 affiliate of the Holding Company for Chemical Industries (HCCI), had to adapt its management strategies to the new business environment. No longer being protected by soft-finance from the state, and with the cancellation of the state's procurement policies no longer guaranteeing the company automatic purchase of its product, KZPC had to learn to fight to maintain its share of the domestic pesticides market. It began to experiment with marketing projects amongst the farming community in the Nile Delta, and to strengthen its sales and distribution networks throughout the country. It also developed a market for its product abroad, proving particularly successful in selling its household pesticides in Romania and in Russia.

**Privatization: Date and Method**

The company was privatized through an IPO in August 1996. The offering was initially for 50% stake in the company but given that the offering was once again over-subscribed, the HCCI sold off 75% of the equity it owned in the enterprise.



Ownership Structure/Corporate Governance

The privatization created the following ownership blocs on in the company, each of whom gained representation on the Board of Directors, which was comprised of 7 persons:

25% to the Holding Company  (2 Board members, including the Chairman)
22% to Public Sector Investment Funds (2 Board members)
05% to the Employee Stock Association, ESA, (1 Board member)
04% to Albert Dabaa, a pesticides trader from the private sector (1 Board member)
0?% to the Sayyad Group (1 Board member)

A new Board of Directors (including a new Chairman) was elected in September 1999 however, which came to include individuals from the Holding Company (2 members), the ESA (1 member), Albert Dabaa (1 member), Bank Misr (2 members), and the International Investment Fund (1 member).

It is likely that the Sayyad Group may have developed a controlling influence in KZPC as it did in EFIC had it not been for the heavy handed manner in which the Ministry of Health began to regulate KZPC's pesticides production as of early 1997. At that point in time, the Ministry of Health began to place a ban on many of KZPC's pesticides products, severely restricting the company's capacity to maintain its market share against competition from the private sector. The company's sales were effected negatively and although KZPC's research department would respond to this situation by developing new products, the government's regulatory policies led the Sayyad Group to reduce its interest in the enterprise.

Nevertheless, the influence of the private sector has been felt at the level of corporate governance. While the HCCI still maintains strong degree of influence on KZPC's Board of Directors, the latter does not have to go to the Holding Company for approval of its major business decisions. In this sense, KZPC's foundation of a subsidiary enterprise in February 1997, Kafr El Zayat Pesticides International (a new company established by KZPC in a free zone which was specifically designed to help the mother company further develop its export market) was an independent decision taken by the company's Board – without Holding Company interference.
Sources from the company allude to the fact that this project was the initiative of the Sayyad Group. Furthermore, Mr Albert Dabaa, a private trader and one of Egypt's leading distributors of pesticides, has also been an influencing force on the company's Board and has been responsible for strengthening KZPC's distribution network in Egypt.

Management/Operations

From a structural perspective, there has been little change to the company's management strategies or change in managerial personnel. Production of pesticides and chemicals is a fairly precise business and demands highly professional management and the chemists and engineers who managed KZPC's production were regarded to be highly effective during the company's period under the public sector and under law 203. The need for precision in production method has led to the retaining of most of the company's professional managerial staff after the privatization. The company's workforce has been reduced from 740 at the time of the privatization to about 600 at present.



Operationally, the company is now more independent in decision making from the Holding Company than it was before the privatization, though the HCCI still retains influence over the company given its leading shareholding position. The Chairman of the company, presently Engineer Allam Sayyad Allam, is also the HCCI's representative on the Board of Directors. The reverse side of independence for KZPC is that the Holding Company is no longer in a position to (officially) intervene on behalf of KZPC should business takes a down-turn for the company, as it is no longer in a position to influence other government organizations to purchase the company's products or have government financial institutions extend it finance on soft terms.

KZPC has learnt to be even more market oriented since the privatization than it was under Law 203, and the company has further developed its marketing strategies, network of agents and distributors (particularly as a result of the intervention of Mr Albert Dabaa), and its research and development function – since it has to invent new products to offset the ban on many of its pesticides imposed upon it by the Ministry of Health. While most of these strategies were being developed at KZPC during its time as a Law 203 affiliate of the HCCI, they have been taken noticeably further after the entry of some of the company's new private sector shareholders since the privatization.

Financials

The company held a monopoly over the industry prior to the privatization and was profitable, and although its profits have declined after the market for pesticides was liberalized, the company remains in reasonable financial condition after the privatization. Management has tried to cut costs where possible.

New Capital Investment

There is little evidence of the major shareholders injecting new capital investment into the company since the privatization and most of the company's new projects have been financed internally (ie, establishment of KZPC's new company in the free zone).

Changes to Public Sector Corporate Culture

Similar to the case of most of the other Law 203 enterprises privatized through the IPO route, KZPC's employees have continued to use public sector management titles which still accord them status at the company. The work regime has remained similar to that under the public sector, with most of the enterprise's workforce completing their daily contribution by mid afternoon. Much of the company's physical infrastructure remains in need of rehabilitation and many of the company's basic technologies – even telephones and typewriters – are of a highly antiquated nature. Living quarters for many of KZPC's employees can still be found at the enterprises, located not too far from some of the company's production plants.

Labor, Wages and Compensations Package

The basic framework for the public sector wages and compensations package is still applicable for most of the company's employees. Furthermore, KZPC's Chairman suggests that, although there is increased opportunity for employees to share in the company's profit after the



privatization, the concept of profit itself has not yet entered the work-place psychology of the company's workers. Most are still concerned with regulating the production process in a long winded manner, as opposed to getting the product out on to the market as quickly as possible with minimal attention to standards, as is the norm in the operational mentality of the private sector pesticides producers operating in the country.

**Concluding Comment**

In a similar privatization experience to its neighboring company, EFIC, the influence of the private sector is felt at KZPC since the company's post privatization experience also shows that private businessmen have played a central role in business development. This has led to the company improving its sales and distribution functions, market research, as well as establishing a new subsidiary company for export purposes in a tax free zone. However, middle management has remained the same after the privatization, while the corporate culture of the public sector and the public sector remuneration structure have also remained. Most of the company's operational strategies are a continuation of what they were under Law 203 and the Holding Company is also the largest single shareholder in the company. The Sayyad Group has since reduced its interest in the company, and minimized its ownership stake, which is likely to result in the Holding Company playing a greater role in corporate governance.



## Nasr City Housing

**Background: Public Sector and Law 203**

Nasr City Housing and Development Company was established in 1959 as a public sector land development company, with the chief responsibility of developing Cairo's Nasr City district for the Egyptian government. During the late 1950s, Nasr City - a district of around 4,500 hectares located between central Cairo and Cairo Airport - was largely undeveloped desert land close to the heart of the Egyptian capital. Its urbanization along the lines of a well planned, modern urban community was a chief priority for the Egyptian government's program of infrastructural development and the public sector subsequently took on the responsibility of carrying out the task.

The main activity of Nasr City Housing is real estate development, including land acquisition, construction of residential, commercial and administrative housing units (including the installing of utilities) and the sale & lease of these units. During the 1960s and 70s the company vigorously went about the work of the district's urban development, a massive undertaking resulting in the construction of an entire satellite city with building projects including 14,000 units of housing for different income levels, 77 schools, 8,500 pieces of land with fully installed utilities (water works, electricity, roads) for the development of further housing projects, and land for shopping centers, hospitals, police & fire stations, petrol stations and postal services. The company also developed numerous sites for major government building projects including the Cairo Sports Stadium, the International Cairo Fair, the Cairo International Conferences Centre, and Al-Azhar & Ain Shams universities

As was the case with many Egyptian SOEs, Nasr City Housing's business was owned and managed by the government and the company's performance was evaluated by its fulfillment of National Plan objectives. It was particularly responsible for providing housing at a reasonable price to low-to-middle income groups. Its participation in land development for commercial purposes - such as luxury housing - was minimal. The company's budget was part of the state budget, and its financial and operational performance was overseen by the General Egyptian Organization for Housing & Urbanization (GEOHU), which was responsible for the company directly to its line Ministry. The company employed around 650 people prior to the privatization, many of whom were present at the company as a result of the government's policies of guaranteeing employment to citizens in the public sector.

In 1993 Nasr City Housing was pronounced a Law 203 company and was made an affiliate of the Holding Company for Building and Construction (HCBC). Law 203 sought to prepare state owned enterprises (SOEs)  for privatization and provided the institutional framework to make SOEs profit oriented, autonomous from their line Ministries at management level and independent of government operational subsidies & finance for company investments. It was during this period that the company's Chairman, Tahar El Maghraby, began to move the company towards more profitable activities, particularly land development for luxury housing and diplomatic communities. The company's business was still noticeably restructured by the state however. The amount of land which Nasr City could develop for luxury housing remained under state regulation and the company was still required to develop much of its land assets for "popular", or people's housing. It was still obliged to sell developed land to government organizations at a discount.

**The Privatization: Date and Method**



In May 1996, the Holding Company for Building and Construction (HCBC) conducted an Initial Public Offering (IPO) for a minority 15% of its equity in Nasr City Housing through the Cairo Stock Exchange. The offering was however more than four times over-subscribed and the HCBC decided to sell 75% of the company's equity. The government still retained 25% equity in Nasr City Housing, which was represented by the HCBC's share. The transaction was the first majority privatization completed through the stock exchange in the Egyptian privatization program.

Ownership Structure/Corporate Governance.

The privatization created a diverse pattern of ownership in the enterprise with the chief beneficiaries being the Holding Company for Construction), investment funds, banks & insurance companies, the company's employee stock association (ESA) and several individual Arab investors. The new ownership structure in the privatized company appeared as the following:

| | |
|---|---|
| The HCBC | 25% |
| A consortium of 40 foreign banks | 11% |
| Mutual funds | 10% |
| The ESA | 10% |
| An Egyptian bank | 11% |
| An Egyptian insurance company | 11% |
| A Moroccan individual | 11% |
| A Saudi individual | 5% |
| An Egyptian individual | 5% |

The new Board of Directors was expanded to include 11 members, with the HCBC taking three Board positions (including the Chairman, Tahar El-Maghraby, who retained his position on the Board after the privatization), and one position going to a representative of each of the other shareholders listed above. A de-concentrated ownership structure, where the government remained the largest single shareholder ahead of a field of a number of smaller equity shareholders emerged after the privatization. The model of ownership established by Nasr City became somewhat typical of other IPO privatizations which took place after that of Nasr City.

Given the lack of private sector ownership concentration in the enterprise after the privatization, it is not surprising that the government has retained a strong degree of influence at the level of corporate governance. Although Nasr City is theoretically free from Holding Company intervention, the HCBC already has substantial representation on the company's Board of Directors. This situation has caused some debate over the amount of independence the company's Board of Directors has from the Holding Company in making its major business decisions. Nasr City's acquisition of El Nasr Civil Works demonstrates the point, since there was strong belief from some sources that Nasr City only made the purchase after its Board was persuaded to do so by the government.



<u>Management/Operations</u>

There has been little change in management personnel or strategies since the privatization. Most of the company's senior and middle management are still in place since Nasr City's entry into the private sector. Some, like the company's Chief Financial Officer, have been with Nasr City for over three decades. There has been little adaptation of new technologies, introduction of novel marketing strategies and with most of the "old guard" still in senior positions, El Maghraby has taken the persona of the father of Nasr City Housing as opposed to the chief executive of a major private corporation. A patrimonial management style is present in the majority of Egyptian businesses however, and promotion on the basis of seniority as opposed to merit has remained the norm at the company.

Nasr City's business is relatively specific to land development projects and the manner in which the company has gone about conducting business has not differed greatly since the privatization. The company's management generally has greater freedom now to conduct its own decisions and there appear to be fewer restrictions now on how much land the company is obliged to develop for "popular housing" projects - since most of the company's projects are directed towards the higher incomes or luxury housing market. The company still engages in housing development for lower income groups, but this is due to the fact that a market exists for this type of business, rather than the result of government regulations.

Less than one third of the housing units that Nasr City develops are now for the low income market and most of the land development projects in which the company now engages are profitable high revenue projects, currently including development of the *Embassies Area* (a region of Nasr City originally intended to house some of Cairo's diplomatic community but now devoted primarily to luxury housing), which is expected to generate revenues of 86 million LE; *Victory Gardens* (a project which will develop 1.6 million square meters of land for residential, commercial and service properties over a period of five years), expected to yield a turnover of 1.5 billion LE; and *Al Waha* (development of 140 thousand square meters of land similar to Victory Gardens), where revenues are expected to exceed 350 million LE. Plans for the development of all of these projects were already in blue-print form at the company before the privatization.

<u>Financials</u>

The company's profits have been increasing since Tahar El Maghraby took over as Chairman and Nasr City began increasing its land development projects for commercial purposes (especially luxury housing) instead of "popular" housing. Profits continue to expand on this basis, rather than as a result of alternative financial policies adopted by senior management. It should also be noted that the company's Chief Financial Officer has been with Nasr City Housing for over three decades.

<u>New Capital Investment</u>

There is no available evidence of finance for Nasr City's new projects coming from sources outside of the company's own revenue or its Board of Directors' ability to access credit from the financial sector



Change in Public Sector Corporate Culture

There has been little change to the public sector corporate culture at the company, since the fragmented post privatization ownership base has for the most part left Tahar El Maghraby and his senior management in charge of the company. The company's pre-privatization workforce (650 employees) has for the most part remained at Nasr City after the privatization, and most of the public sector management titles, discrepancy between management titles and compensations package, public sector style hours of work regime have not changed noticeably since Nasr City Housing joined the private sector. While the enterprise is clearly much more a profit seeker today than it was during the height of its land development activities during the 1960s and 70s, and while there are far fewer restrictions placed on its capacity to be profitable today than under the public sector, both trends were already emerging at Nasr City prior to the privatization, since one of the main principles of Law 203 was to make government owned enterprises operationally efficient, profit seeking and autonomous in senior management.

Labor, Wages and Compensations Package

The main framework of the public sector compensations package is still applicable for Nasr City Housing's workforce, the public sector bonus system has not yet been entirely restructured, and the labor force still identifies with the public sector national labor organizations. However, both senior management and employees are believed to have stock-option plans as part of their reward package at the company. Since the company's profitability has been rising annually post-privatization, these packages give all of Nasr City's employees the chance for greater material reward which did not exist at the company during the public sector.

**Concluding Comment**

There is still a very large volume of government equity in Nasr City Housing, which extends well beyond the 25% stake held by the Holding Company for Building and Construction. Much of the public sector management is still in place and most management policies and business strategies are a continuation from the Law 203 period. Much of this is to do with the presence of the company's Chairman, Tahar El Maghraby, who is the architect of the privatization and in many ways the "father" of the company. Many aspects of the public sector corporate culture are still in place at the company while the government also appears to be influential in corporate governance and may have played a part in Nasr City acquiring El Nasr Civil Works. However, Nasr City's profitability and the ability of its Board of Directors to make some major corporate decisions independent of the Holding Company (such as the purchase of El Nasr Utilities) gives the company some private sector ethos.



# Group C: Slow to Reform Privatized Companies

## The Middle East Paper Company (SIMO)

**Background: Public Sector and Law 203**

SIMO was established in 1945 as a private sector enterprise for the production of various types of paper (including duplex board, manila, and heavy grey board) and the conversion of paper and board for packaging. It was nationalized in 1961. Located in the outer Cairo suburb, Mustorid, it was one of three public sector enterprises engaged in the production of paper in Egypt.

The company was owned and operated by the Egyptian government from 1961 until its privatization in 1997. It was an affiliate of the Ministry of Industry (which also appointed the company's Chairman) and its business was supervised for the government by the General Egyptian Chemical Industries Organization (GECIO). The company produced output to targets set by the Ministry, and cooperated with the two other public sector paper companies in meeting the government's over-all business plan for the sector. There was no competition between the different paper companies and the price for their product was set by the government and kept below the international market price. The company itself was managed by highly qualified line engineers and chemists, was supplied by GECIO with modern machinery during the 1970s and 80s, and developed the largest production line of heavy cartons in the Middle East.

The company employed around 1100 people, whose work-place position was protected by the public sector labor codes, and like the other government enterprises discussed in this study, was well over-staffed by redundant employees. SIMO's management had some enterprise level autonomy from the government and although the price for paper in the domestic market was set by the government, the sales and distribution functions of SIMO's business were to some degree decentralized from state control. The state acted as an intermediary linking SIMO's production to would-be clients in both the public and private sectors and did not engage in the practice of bulk purchasing of SIMO's production, as it did in the case of some of the other SOEs, particularly those in the agricultural sector.

SIMO's business practice was further liberalized during the early to mid 1990s, when the company was re-incorporated under Law 203 and became an affiliate of the Holding Company for Chemical Industries (HCCI). Like other Law 203 state owned enterprises, SIMO was encouraged by the state to be independent both financially and in terms of management and the price for its production was no longer set by the government but was now determined by the international paper market. The company began to export some of its production to neighboring countries (it adopted the ISO for internationally recognized production standards), as well as implement labor restructuring policies (ie, undertook an early retirement program in an effort to reduce some of its redundant workforce).

**Privatization: Date and Method**

The company was offered by the HCCI and the National Investment Bank (co-owners of the company since 1995) through an IPO on June 18th 1997. This transaction resulted in the sale of 85% equity that the government held in the company



**Ownership Structure/Corporate Governance**

The privatization created a new ownership structure at the company, where the main stake holders in the enterprise were now:

48% to The Diyya Group
22% to The Khorafy family
15% to the Holding Company for Chemical Industries
10% to the Employees (ESA)

The transaction led to substantial re-organization on the company's Board of Directors, including the elevation of two individuals from the Diyya Group to the Board and one from the Khorafy group. The Holding Company retained two positions on the Board (including the Chairman, Mr Moustapha Magdi) and the ESA was allocated one position. The privatization of SIMO was the first transaction effected through the capital markets where one group of private sector investors were able to take a commanding stake in a privatized SOE and appeared poised to take control over management away from the Holding Company.

Between June 1997 and April 1998, the ownership bloc headed by Ahmed Diyya Hussein (48% equity in SIMO) acquired more equity in the company, raising its stake to 55% and on April 1st 1998, Ahmed Diyya became SIMO's Chairman of the Board. However, during the ensuing months, corporate governance and industrial relations problems engulfed the company. SIMO was working profitably at the time of the privatization and was in reasonable financial condition - though susceptible to the volatility of price fluctuations in the international paper market. As the price for SIMO's product began to fall on the international market, the company's sales declined. By the end of 1998 SIMO's profits declined sharply and the company incurred losses of 2 million LE. The company's financial position deteriorated to the extent that its employees were not being paid their basic monthly wage during certain periods of 1998, leading to a tense atmosphere between the employees and the company's major shareholder.

The tense atmosphere deteriorated further as rumor began to spread quickly at the enterprise that Ahmed Diyya was now exercising the intention of closing either some – or all – of SIMO's production line/paper factories and employ the company's land assets for alternative commercial purposes. The tense atmosphere and the deteriorating financial position of the company reached a climax at the end of 1998 at a time when the company's internal problems could not be resolved between its major shareholders, senior management and the employees. The HCCI, still one of the major shareholders in the company with a 15% equity stake, made a recommendation to the *Musllahat Al-Sharikat* (the Companies Authority in the Ministry of Economy), that SIMO's Board of Directors (including its present Chairman, Ahmed Diyya) be temporarily suspended and that a new Chief Executive Officer (CEO) be appointed by the government to run the company. This administrative measure undertaken by the Holding Company and the Companies Authority, which effectively suspended SIMO's Board of Directors, resulted in the removal of Ahmed Diyya from his position as SIMO's Chairman and his replacement by a government appointed CEO, Engineer Taha Abd-Al Roba.

Abd Al-Roba was seconded from the National Paper Company in Alexandria (a Law 203 affiliate of the Holding Company for Chemical Industries), and was given a mandate by the government to rehabilitate SIMO's financial status to its previous position. The measure was intended to be of a transitional nature and the government has alluded towards the intention of reinstating SIMO's



Board of Directors once the company's operational and financial position is once again at a satisfactory level. However, while together the Khorafy family and the Diyya Group still maintain an equity stake amounting to around 77% of the company, under the current arrangement they are prevented from exercising any influence over SIMO's management or major corporate level decisions. In essence, they are currently prohibited from exercising their basic rights as shareholders. This is particularly distressing for Ahmed Diyya who currently owns 55% in the company and has filed an appeals case at an industrial tribunal. The case is pending and remains unresolved to this day.

**Management/Operations**

As SIMO has been in essence "re-nationalized" since the end of 1998,  the company has only been effectively  under private sector control during the period April-December 1998 – a period which itself was hardly conducive to undertaking any serious managerial or operational restructuring. Hence there are presently no new non-government managerial appointments at the company, nor are there any evident operational adjustments resulting from the initiatives undertaken by the company's private sector shareholders. While the government has alluded to its intention of re-instating the company's Board of Directors, there is no tangible evidence of any plans to restructure the public sector management system which presently governs SIMO's operations.

It is evident that Ahmed Diyya had his own vision for running the company since he began making a number of changes in management personnel after he became Chairman. However, after the administrative measures taken against him by the Holding Company and Companies Authority, these individuals have since been removed and their place taken by persons appointed by the Holding Company.

Financials

Since the removal of Ahmed Diyya from the position of Chairman of SIMO's Board of Directors, the company's loss making position has improved, and losses have been minimized to 150,000 LE during 1999-2000, as compared to 2 million LE during April-December 1998. There have been no new financial policies implemented at the company however and the Central Auditing Agency remains SIMO's chief auditor, as is the case with public sector enterprises and other companies where the government holds a significant ownership stake.

New Capital Investment

There have been no new evident investments made into the company from its private sector shareholders.

Changes to Public Sector Corporate Culture

While SIMO remains in the odd position of being a private sector owned, public sector managed enterprise, its corporate culture has retained the flavor of the public sector. The company's grounds in Mustorid, are littered by large volumes of decaying paper and other residual products and are in need of refurbishment. Management titles employed at the company reflect the status oriented political appointments made under the public sector and are still, for the most part, in

**PCSU**

place. The company's employees, many of whom have spent their entire careers with the enterprise, continue to associate with the pan-public sector labor organizations and their colleagues in the two other public sector paper producing enterprises, rather than with the private sector. They continue to observe the hours of the public sector work regime. Further, it can be added that they see the HCCI (ie, the government) as a form of protection as well as representation of their interests, particularly after the manner in which their wages were with-held during Ahmed Diyya's time as Chairman of the company, and the industrial unrest which subsequently resulted.

Given the problems that have occurred at SIMO, and its dearth of experience with the operational culture of the private sector, it is perhaps not surprising that the present CEO of the company has suggested that in developing countries like Egypt, it is important to have the public sector controlling mainstream industries which hold broad significance for society, including the paper production. The present CEO appears to be playing more the role of a civil servant than a senior level businessman, since he refers to his present position at SIMO as a transitional one, where he was asked by the Holding Company (ie, the government) to come across from the National Paper Company in Alexandria to help put things back in place for the government at SIMO, before returning back to Alexandria when the situation at SIMO returns to what the government may consider "normality".

Labor, Wages and Compensations Packages

The basic Public Sector wages and benefits package, together with its labor and employment codes, continue to provide the base framework for employee-employer relations at the company. There have been no wage increases for SIMO's employees outside of the automatic public sector annual increases enjoyed by employees in the public sector proper.

**Concluding Comment.**

The post privatization experience of SIMO gives a strong indication of the degree of power that the state can exert over majority privatized enterprises. It shows that even where the private sector gains a single majority ownership consortium within a privatized company, the state is still in a position to exercise a controlling hand in corporate governance – even if its stake in the company is substantially smaller than that of the private sector shareholders. The lack of transparency around the government's take over of the company in late 1998, and the state of uncertainty in which it has left the company's main shareholders is particularly distressing for a country seeking to expand its privatization program and attract foreign investment.



## Middle & West Delta Flour Mills, East Delta Flour Mills and Upper Egypt Flour Mills

### Background: Public Sector and Law 203

All three companies were established in 1967 and operated as government owned flour milling monopolies in their particular regions of the country. Middle and West Delta Flour Mills (MWDFM) was based in Tanta, East Delta (EDFM) in Zagazig, and Upper Egypt Flour Mills (UEFM) in Souhag. They were three of a total of seven state owned flour milling enterprises established by the government between 1965-67.

Under the public sector, the enterprises were fully government owned and operated, employed numerous workers, and owned substantial productive assets including mills, silos for storage, bakeries, macaroni factories, warehouses, distribution centers and large fleets of vehicles. MWDFM was the largest of the milling companies, operating 17 mills and 2 silos in five governorates; running 23 bakeries and a macaroni factory; owning 43 warehouses and 37 distribution centers; and employing around 6400 workers. The central mission of all public sector flour milling companies was to meet the  wheat milling production targets set by the Ministry of Supply and Trade. Production targets were set on a daily and an annual basis, and the largest of the flour milling companies, Middle and West Delta (MWDFM) had an annual milling capacity of over one million tons.

Bread has traditionally remained the single most important component of an Egyptian's diet and the state has exercised thorough control over its production process. Price was subsidized by the government and all inputs required for production were supplied to the flour milling enterprises by the state, particularly the supply of wheat to be milled be the companies, which was supplied by the Ministry of Supply and Trade. Moreover, of the two types of bread produced in Egypt - 82% dark bread (consumed by the bulk of the population) and 72% white bread – the public sector mills were restricted to milling wheat for the production of 82% bread, which is in essence a highly unprofitable line of production. Given its relative profitability on the other hand, the private sector has traditionally engaged in the milling of the 72% white bread.

All public sector flour milling companies were reincorporated under Law 203 in 1992 and made affiliates of the Holding Company for Rice and Flour Mills (HCRFM), were officially separated from "soft" government finance, and were encouraged to strive towards greater efficiency and autonomy in management. As of 1995, the government also lifted its ban prohibiting the public sector from milling wheat for the production of 72% bread, which resulted in the Law 203 flour mills adjusting some of their milling capacity to allow for the production of the profitable white bread. However, the flour milling SOEs were still restricted in the amount of wheat they could mill for the production of the profitable white bread, and the bulk of their milling activities were still geared towards the 82% "popular" bread market.

### Privatization: Date and Method

All three companies were offered as IPOs by the HCRFM during August and September 1996 initially as minority offerings. The offerings were over-subscribed however and the Holding Company decided to sell a 61% majority stake in each of the companies, while keeping 39%.



**Post Privatization Profile**

Ownership Structure/Corporate Governance

The same post privatization ownership structure emerged in all three companies after the IPO:

39% to the Holding Company
10% to the Employee Stock Association (ESA)
51% to the public (free floating equity)

However, public sector financial institutions hold substantial chunks of equity in the 51% free float, giving the government well over 51% stake in the companies even though they are officially majority privatized according to official statistics. Hence under closer examination, the ownership structure of Middle and West Delta Flour Mills (MWDFM) appears as:

39% to the Holding Company
10% to Misr Bank
10% (approx) to Ahly Bank
10% to Misr Insurance
10% to the ESA
21% free floating equity (which is also likely to have further stakes from public sector financial institutions)

Hence the 9 member Board of Directors of the company is made up of 3 members from the Holding Company, 1 from the ESA, 1 from a public sector bank, 2 from *zawid el-khibra* (two external experts from the industry elected to the Board by the General Assembly and who are allowed to represent the shareholders on the Board even though they themselves may not be shareholders in the company), and 2 from external investors.

The ownership structure of East Delta and Upper Egypt Flour Milling Companies are similar to the above, though East Delta is reported to have more equity held by public sector investment funds and insurance companies as opposed to government banks. The Holding Company retains no less than 3 positions on the Board of both of the companies as is the case with MWDFM, with the other positions taken up by representatives from the ESA, the public sector financial institutions, the 2 non-equity holding external industry experts, and a few small equity holding investors.

Even though these companies are officially majority privatized, the government has maintained disproportionately large equity in all three, which reduces the private sector's equity hold to well under the initially perceived 51%. This is not surprising given the strategic nature of bread production to the Egyptian government and to some extent it is surprising that the government majority privatized these three companies in the first place. However, it is still evident that major Board of Directors decisions and senior management are still directed by the government.

The Chairmen of the Boards of the three companies are still Board members of the Holding Company and appear to equally represent the interests of both the Holding Company as well as its former Law 203 affiliates. This creates a paradox where independence from the state as well as lingering government control are simultaneously present at the privatized companies. That is, the privatized companies are now clearly more independent of the government since they do not have to present their major business decisions to the Holding Company for approval. However, the



Holding Company has three representatives on the Board of Directors of the privatized companies (including the Chairman) and is the dominant force in decision making.

The Chairman of Middle and West Delta Flour Mills, Engineer Mohammad Abu Zaid, was elected to his present position immediately upon the privatization of the company, though he came from the position of Chairman of Middle Egypt Flour Mills Company in Minya, where he had spent the previous 33 years. At East Delta Flour Mills, we are faced by an even more unusual situation when three months ago, a new Chairman, Engineer Mahmoud Khatab,  was elected to the company. Engineer Khatab was brought across to East Delta Flour Mills from the government owned Al Ahram Shops Company, where he was based between 1997-99. Prior to the 1997 Engineer Khatab was the Chairman of the government owned Grand Cairo Bakeries, where he was employed since 1985. Hence the elevation of Engineer Khatab represents another corporate governance anomaly at the privatized flour milling companies where a public sector man has effectively been brought across to run a company which has been in the private sector for almost three years.

Despite the over-riding influence that the government still holds over the privatized flour milling companies, there is still some concern from the state that it will gradually lose control over these enterprises. The main issue of concern is that the companies' Board of Directors will apply pressure on the Ministry of Supply to allow them to mill more wheat for the production of the more profitable 72% bread, which could cause a shortage in the production of 82% bread. While at the moment there is no sign of any alteration to the restrictions still placed on the privatized companies in the volume of wheat they can mill for the production of 82% bread, the government has reconfirmed its intention to dominate this strategic sector of the economy by holding off the privatization of the four remaining Law 203 flour milling enterprises.

Management/Operations

There have been no major changes in the structure of management in the privatized companies from the flour milling sector.  Nor have there  been any major changes in management personnel at the companies since the privatization. At MWDFM, there were 23 General Managers before the privatization and there are still 23 currently present at the company. There is no early retirement program being implemented at this or the other privatized milling companies, and the workforce of MWDFM has only been reduced from 6400 at the time of the privatization to around 6200 at present.

The privatized companies' over-riding operational goal remains to meet the Ministry of Supply's production target of wheat to be milled for the production of 82% extraction flour bread. The price of 82% bread remains subsided by the government and engagement in its production is for the most part a profitless under-taking. The largest of the privatized companies, MWDFM is expected by the government to direct no less than 60% of the 1.1 million tons of wheat that it annually mills towards the production of 82% bread. The remainder of milling activities may then be channeled towards the production of the profitable 72% bread. The company's major inputs into production – essentially wheat – are still supplied to it by the government at pre-determined prices. The other  two privatized flour mills are governed by more or less the same regime though their annual millage volume is below that of MWDFM.

While some operational and business development adjustment have been taking place at the privatized flour mills since their departure from Law 203 – establishment of a marketing department, the introduction of new bands of macaroni and other side products, some market



research – most of these were already being developed while the companies were still Law 203 affiliates of the HCRFM and are not the result of any infusion of new ideas from private sector members of their Boards of Directors.

Financials

All three companies are still highly restricted in their profitability due to the state's requirement that they produce such large volumes of 82% extraction flour bread.

New Capital Investment

There has been no new injection of capital investment by the shareholders of the company since the privatization. This is not to say however that there has been no new capital investment in the companies since the privatization. MWDFM for example, has acquired two new storage silos since the privatization. However, the acquisition of one of these was funded by the Egyptian government, while the other came courtesy of a grant provided by a USAID project which comes within the framework of American aid provided to the Egyptian government.

Such financial aid policies from the Egyptian government and foreign aid projects are obviously not typical examples of how a private sector entity finances its new capital investment and alludes to MWDFM's continued close association to the Egyptian government. Similarly, EDFM has benefited from an Italian government grant through which it financed a new silo in Ismailliya. The company has also built another mill for production of 82% bread which it financed internally, and is also about to embark on another similar project in Mansoura.

Public Sector Corporate Culture

Most of the management titles reflecting public sector appointments are still present at the privatized mills companies. The status which these titles accord to individuals within the enterprise has retained its significance. At EDFM, one will find individuals with titles such as General Manager for Bakeries, General Manager for Transport, General Manager for Silos. Individuals carrying these titles however may have no more than 2 or 3 employees under their management, while their salary may be as little as 150 LE per month. The lack of correspondence between employment title and wages remains for most of the management as it did under the public sector, which has resulted in the departure of some of the more technically qualified and experienced staff from the privatized companies to the private sector proper.

The work regime remains similar to what it was during the public sector, with workers finishing the day before mid afternoon. Furthermore, with so few employees leaving the companies, and with little rehabilitation of their productive assets, the physical appearance of the enterprises remains of a similar appearance to what it was under the public sector.

Labor, Wages and Compensations Package

The basic framework for the remuneration package at the privatized companies has remained largely the same during the three years since the privatization. Annual wages increases, indexed roughly to the rate of inflation, still apply. However, the companies appear to have greater



freedom to structure their bonus systems and create other material incentives for workers. At EDFM for example, there is a tendency to move the bonus system away from the egalitarian approach which existed under the public sector (and to a great degree still exists today) towards a system aligned closer to individual increases in productivity.

The majority of the employees of the privatized companies continue to associate with the national public sector labor organizations rather than with workers in the private sector. Employees at the privatized companies still participate in "rituals" such as public sector sporting tournaments, and during the time of our meeting with MWDFM, a good number of the company's employees were absent from work on full pay for at least two weeks while taking part in a government sporting tournament in Alexandria. The Chairman of the company, working to the assumptions of maximizing profits and cutting costs, suggested that it would be good for company productivity and the workers morale to have these employees participate in the tournament.


**Concluding Comment**

Bread remains a highly strategic commodity in the eyes of the Egyptian government and although three of seven public sector companies have been privatized from the flour milling sector, the government in essence remains in control of all of the enterprises. Although the Holding Company has less than 51% equity in the privatized flour milling companies, the government's combined share is well over 51% since other public sector institutions, mostly from the financial sector, also have substantial equity in these companies. There is no significant private sector Board level representation as there is in the case of the privatized companies from **Group B**. Both public sector and privatized flour milling companies are given production targets by the Ministry of Supply and Trade, and are significantly restricted in the amount of 72% (profitable) bread they can produce. The bulk of their milling activities, as was the case under the public sector, is directed into milling wheat into flour for the production of the 82% dark bread, which is highly subsidized in price and consumed by the bulk of the Egyptian population.



## Misr Free Shops Company

### Background: Public Sector and Law 203

Misr Free Shops Company was founded in 1975 as a country wide chain of six government-owned duty free retail outlets. The company was established to import and sell duty free merchandise including alcoholic beverages, cigarettes, perfumes, household appliances, clothing and other items, to departing travelers; returnees within a period of 30 days of their arrival to Egypt; and to individuals holding diplomatic status. Tourism, like-wise a major source of hard currency for countless Egyptian government and non-government enterprises, has traditionally played a major role in the performance of Misr Free Shops and the company opened outlets in many of the country's major tourist destinations. The company was initially owned by Egypt Air (the national airline) but in 1981 separated from the national carrier to become the leader among three (state owned) duty free providers

However, as the country's leading duty free trader, Misr Free Shops provided only the very basic in duty free services while it belonged to the public sector. The government provided the company with a narrow range of  imported  products which it sold on to the consumer - the limited variety of  merchandise on offer being complemented by the company's management largely neglecting concepts such as fast and efficient sales methods and customer-friendly service. The government's non-commitance to any form of market research meant that the company acquired large volumes of obsolete inventory which held little demand among clientele. There were no showrooms exhibiting the company's range of products and many of its properties turned into warehousing space which stored obsolete products. Nevertheless, despite the lack of development of the company's marketing and sales techniques, the monopoly which the government held over the duty free industry together with rising volume of tourism arriving in Egypt during the 1980s meant that demand for the company's business was high. Its business continued to expand and just before Misr Free Shops joined the private sector, the company was operating 26 outlets and 13 warehouses throughout the country.

The company  became a Law 203 affiliate of the Holding Company for Housing Tourism and Cinema (HCHTC) in 1992 but liberalization of the duty free industry did not begin until 1995 (the sector was partially liberalized to allow competition from the private sector)  and it was not until this time that Misr Free Shops began to engage in some internal reorganizations. The main objective of the company's new Chairman, Mostapha El Sellawi (appointed in 1995) was to improve its financial performance and management policies became directed according to this objective.

### Privatization: Date and Method

The company was offered by the HCHTC in an IPO conducted through the Cairo Stock Exchange in January 1997. The offering resulted in the HCHTC selling 77% of its equity stake in Misr Free Shops.  In a secondary offering conducted in December 1997, the HCHTC offered its remaining 23% equity stake in the enterprise, selling off a further 20% equity stake and reducing its holdings in the company to just 3%



**Post Privatization Profile**

<u>Ownership Structure/Corporate Governance</u>

The first privatization of the company left the Holding Company remaining in control of Misr Free Shops, since the HCHTC remained the largest single equity holder with a 23% stake, the employee stock association (ESA) was allocated 10% and the remaining 67% was floated amongst the public with no concentration of ownership emerging. Mostapha El Sellawi remained the Chairman of the Board.

However, the company's second offering in late 1997 resulted in a further reduction in equity held in Misr Free Shops by the Holding Company to just 3%, which made more stock available to the private sector, though the Board of Directors for the moment remained unchanged. Between December 1997 and May 1998 however, a group of private sector investors, headed by Abdul Salam El Zidy (a trader from Port Said), acquired an ownership bloc of 35% in the company and called for a General Assembly meeting. The General Assembly elected El Zidy as the new Chairman, El Sellawi retained a position on the Board and continued as the Managing Director, and only two other members of the previous Boards elected after the respective public offerings retained their positions.

Hence the new ownership structure of Misr Free Shops Company appeared as:

35%      to the El Zidy Group
13.5%   to public sector and public enterprise banks and companies
13 %     to private sector Egyptian investment funds and banks
12.5%   to Banks and investment funds and foreign individuals
10%      to the ESA
16%      to the public (free floating equity)

The full Board of seven directors included Abdul Salam El Zidy (Chairman), Mohammed Mostapha El Sellawi (Managing Director), Tawfik Mansour Bebawy, Dr Mohammed Ashraf Abu El Wafa Marawan (retained from previous Board), a representative each from the Misr Insurance Company and the International Trade Company for Investment, and a representative of the ESA.

During the summer of 1998, with the private sector now seemingly in effective control of Misr Free Shops Company, analysts following the privatization were anticipating major changes to begin occurring at the company. However, on June 8th 1999, the Ministry of Supply and Trade passed a new decree reducing the amount of time within which returnees to Egypt could purchase duty free goods from 30 days to 24 hours after arrival in the country. This move by the government came as a major blow to Misr Free Shops since the majority of its sales are generated by returnees and tourists purchasing its duty free products within the 30 day period. The company' share price declined sharply from 40 LE to around 10 LE per share.

The decree had dire consequences for the company shareholders and an international arbitration case threatened. In June 1999 however, the Ministry of Public Enterprises appeared to have worked out a solution to Misr Free Shop's shareholders' crisis by proposing a plan where the company' s ESA would by back from investors any shares held prior to the June 8th 1999 Decree at the share price of June 7th 1999, 31.56 LE per share. The plan could raise the ESA's stake in the company from 10 to 82.4%, and the government is presently looking at how the plan shall be implemented.



Management/Operations

There were virtually no management changes at the company as a result of the first privatization in January 1997. The management practices and operations continued to develop at Misr Free Shops as they had since Mostapha Sellawi's appointment to the position of company Chairman in 1995. There were no noticeable new appointments to the company's middle or senior management, though the company's workforce has been reducing gradually, from around 1400 at the time of the privatization, to around 1000 at present.

After the El Zidy Group became the company's main ownership force in May 1998, it appeared that the private sector may seek to implement management changes and over-haul managerial staff as had been the case at other privatized companies where the private sector gained an ownership majority. However, when the company's new Board of Directors announced their new corporate mission for the company: "*renovating the company branches, selecting the best quality products and improving service performance; opening new branches located at the new tourist resorts;" and to further concentrate its sales activities in the tourism sector*", it became evident that these business development strategies were essentially the continuation of the company's central corporate policies from its period as a Law 203 affiliate of the HCHCT. These had been Mostapha El Sellawi's main priorities when he first became company Chairman in 1995 and for much of the first year since Al Zidy became the new Chairman, the company' management was primarily engaged in re-furbishing the company's outlets and making them more appealing to the consumer conscious public, improving the quality provided by the company's sales-staff, and making a finer and more diversified range of goods available to its customers.

Since the Decree of June 8 1999 however, the development of companies business has been severely restricted and subsequent new management strategies have been put on hold until the fate of the company is to be determined.

Financials

The company was operating profitably prior to the June 8th 1999 Decree, but this was again more due to its quasi monopoly position in the market and the weakness of its competition, rather than the to the strength of management's financial policies.

Capital Investment/ Upgrade of Machinery and New Technologies

There is no evidence of investment into the company outside of finance reinvested from operational revenue and profit.

Changes to Public Sector Corporate Culture

Several distinctly "public sector" characteristics have remained present in the daily operation of Misr Free Shops. While the company has sought to employ customer-friendly staff and greater efficiency in its sales techniques, the bureaucratic manner in which staff at the company's outlets treat their clientele has yet to show sign of fading. The company's administrative and sales staff remain on a remuneration system largely unchanged from the public sector days, making it difficult for shop floor workers to take their job any more seriously now than they would have



done previously. The long corridors and the many offices of the company's head-quarters in the Cairo suburb of Mohandessin have retained the shabbiness traditionally associated with Egypt's public enterprises, are over-crowded with numerous individuals which one would assume form part of the company's workforce, and continue to exhibit numerous antiquated infrastructural technologies. Public sector managerial hierarchies, and the prestige of management title are still visible and the workers still observe a largely similar hours of work regime.

<u>Labor, Wages and Compensations Packages</u>

There has been little change in labor relations or wages and compensations package at the enterprise since the privatization.

**Concluding Comment**

Although there was a strong degree of optimism at the company after the May 1998 General Assembly Meeting resulted in the election of a new Chairman and several new Board of Directors' members, Misr Free Shops company continued with the management style and business strategies it had adopted since the appointment of Mostapha El Sellawi to the position of Chairman in 1995. The company's business developed along the same line of consumer orientation initiated by El Sellawi, while the public sector corporate culture and remuneration package remained unchanged. This was despite the presence of a 35% concentrated private sector ownership bloc at the company. The June 8th 1999 Decree has left the company's shareholders in a position of substantial uncertainty however. If the government's current plan to compensate shareholders will be implemented and the ESA gains majority ownership of the company, one would be highly skeptical of the company's ability to further transform itself and or become independent of the state.



## Al Nasr Casting

**Background: Public Sector and Law 203**

Nasr Casting is the product of the Egyptian government's policies of urban infrastructural expansion of the early 1980s, when the company was established by the public sector to manufacture ductile metal pipes for sewerage and urban water networks. At the time, the company was equipped with comparatively modern production technologies, employed a workforce of over 4000 and owned four manufacturing plants around the country. It was highly protected by the state and the government managed the company's business in a manner similar to the other producers of industrial goods discussed in this study.

Up to the mid 1980s, the state nurtured the development of SOEs such as Nasr Casting by granting them "soft budgets" through public sector banks, which financed their capital investment and allowed them to take on excess labor. As of the late 1980s, when the Egyptian government's fiscal difficulties led to structural economic reform agreements with international financial agencies, SOEs such as Nasr Casting began to experience financial difficulties as the state was no longer in position to continue its lenient credit policies towards them. As the state's fiscal crisis mounted, government investment into SOEs declined, which inevitably led to the deterioration of output in numerous public sector enterprises, including Nasr Casting.

In 1992 Nasr Casting was legally re-incorporated as a Law 203 enterprise and was placed under the ownership and supervision of the Holding Company for Metallurgic Products (HCMP). The HCMP was entrusted by the Ministry of Public Enterprises to instruct Nasr Casting, which was no longer in a position to finance its operation through the conventional public sector lending system and was in debt to government banks, about obtaining credit to finance its operation on commercial terms. Under Law 203, the company was no longer subsidized through the government's traditional budgetary umbilical chord, and its management was given greater operational autonomy and encouraged to pursue profitability as a key operational principle. The HCMP further encouraged its affiliate to seek export markets for its products, which Nasr Casting successfully began as of 1992. However, Nasr Casting's management was unable to improve its weak financial position despite the more globalized outlook towards business and the HCMP brought in several public sector banks to assist in restructuring the company's debt

**The Privatization: Date and Method.**

During 1996-97, Nasr Casting's management was not able to improve upon its loss making business and its deteriorating financial position called for a re-adjustment of the original logic behind the HCMP's co-operation with the banks over the company's debt restructuring. After some consultation between the parties, in December 1997 the HCMP agreed to transfer a majority ownership stake in Nasr Casting to three public sector banks, and a minority stake to the company's ESA. The transaction was essentially a debt-equity swap.



**Post Privatization Profile**

<u>Corporate Governance/Ownership Structure</u>

The transaction created the following ownership structure at the company:

17.5%   Bank of Alexandria
15%      Misr Bank
35%      National Investment Bank
32.5%   The ESA of Nasr Casting

The transaction was essentially a trade, or swap, where the HCMP gave the banks the right to be equity holders (owners) in Nasr Casting in return for their acceptance of responsibility for the debt which had become incurred to them by the company. The debt-equity swap, in which ownership of Nasr Casting remained with the Egyptian government, would now give the banks a greater degree of control over the company's debts, since they became its legal owners and could decide over the type of restructuring program they felt was necessary to implement (ie, decide whether it is prudent to continue extending credit to Nasr Casting for loss making activities, or to either liquidate or privatize the enterprise).

The transaction, though shown to be a strategic investor privatization by the Egyptian government, cannot be called a privatization as such since none of its equity was transferred to private investors through either the stock exchange or through a strategic sale. By its own admission, the guidelines which the Ministry of Public Enterprises passed in 1992 for implementing the privatization program, would not account for Nasr Casting's debt-equity swap as an actual privatization - as suggested by the following Ministerial declaration:  "**It is natural that transferring the ownership of a public company to another public company or to a state-owned bank shall not be considered an extension in the private ownership base",** *or privatization program.* [1]

The transfer of ownership in Nasr Casting has not led to any notable changes in the company's management or Board of Directors. The same chairman has been retained at the company, whose chief priority for Nasr Casting during 1998 was to pursue its privatization to a strategic investor with a technological edge. However, while the debt-equity swap has not as such privatized the company, the transaction has directed Nasr Casting closer to the position of a private enterprise since it has removed the HCMP from involvement in its business. This has reduced the volume of government bureaucracy that continued to regulate the company's management while it was still government owned under Law 203.

---

[1] Arab Republic of Egypt, Ministry of Public Business Sector (Public Enterprises), <u>General Procedures & Guidelines of The Government Program for Privatization, Restructuring and Reward System</u>, Cairo, p.9. The section of the quotation "extension of the private ownership base" is taken to mean extension of the privatization program. Italics added.



Management/Operations

There have been no evident changes to the company's management or operations since the debt-equity swap. The early retirement program has continued to reduce the company's many redundant workers, though very slowly. Numbers of employees are down from 4000 to about 3500 since the transaction.

Financials

The company's financial position is still weak.

Capital Investment/Upgrade of Technologies and Machinery

Not applicable.

Change in Public Sector Corporate Culture

Though the HCMP is no longer involved in the company's management and Board of Directors decision-making process, there is little change to the manner in which the company was organized under the public sector. Management titles still carry prestige at the enterprise, public sector hours of work still apply, and a major incongruence exists between management title and compensations package.

Labor, Wages and Compensations Packages

Since the company can not be regarded as having left the public sector, the public sector wages and compensations package still applies to all of its employees, as do relations between the workers and the public sector national labor organization.

**Concluding Comment**

Nasr Casting remains under majority government ownership despite the debt-equity transaction.



## Section III: Conclusions and Recommendations

Over-all, the findings of this study can not be seen as being overly encouraging for the Egyptian privatization program. Based on the evaluations criteria for categorization of privatized companies into groups A, B or C as discussed in Section I,  we have only been able to include three companies into the most progressive Group A (Noticeably Reformed Privatized Companies). Of the remaining 12 companies researched in this study, six have been included into Group B (Transitional Privatized Companies) and six into the least progressive Group C (Slow to Reform Privatized Companies). Although this study is based on evidence gathered about 15 of Egypt's 142 privatized companies, its findings suggest that very few of the privatizations have led to the significant transformation of former Law 203 state owned enterprises. One should further take into account the significance of the findings of this study for the Egyptian privatization program, since the 142 privatized companies included no fewer than 45 companies which have been either liquidated or sold off to the employee stock association (ESA). Liquidations or ESA buyouts generally allude to little corporate or managerial transformation in a privatized company suggesting that the findings of this study are more typical of a wider sample of privatized companies in Egypt than the original figure of 15 from 142 (more like 15 of 95-100).

There were only three cases found in this study of a privatization having led to control of the enterprise being passed on to the private sector, which has further led to significant corporate governance, managerial, public sector corporate culture and other changes to have been effected by the new shareholders. In six of the remaining twelve privatized companies, the new shareholders have implemented some changes in business strategies, though some of these were already developed before the privatization when the companies were governed by Law 203. While some change has occurred in the corporate structure of these companies, and while some of the dominant shareholders have sought to implement further management and operational reforms at the companies, the essential public sector management structure and corporate culture has remained fundamentally unchanged after the privatization. The remaining six companies in the study were shown to have remained under the continued corporate governance and management control of public sector institutions despite the privatization

While the divestiture of 51% equity in a state owned enterprise (SOE) to independent (usually private sector) investors is in most cases referred to as a privatization and the subsequent transfer of enterprise ownership to the private sector, this study unequivocally demonstrates that in the case of the Egyptian privatization program, the selling-off of 51% equity in an SOE has not necessarily led to the transfer of control of such an enterprise to new private sector shareholders. In the majority of the 15 cases of privatized companies researched in this study, although 51% or more equity was sold off in an SOE by the government, the government (ie, the Holding Company) still remained as the largest single shareholder in the enterprise despite the privatization. This gave the government a disproportionately large – and often dominant – voice in decision making on the company's Board of Directors and shows that in the case of Egypt the state still remains a very influential, if not controlling, force in the corporate and managerial decision making of privatized enterprises.

Consequently, a 51% majority privatized company should not be considered as an enterprise where transfer of ownership and control has been passed across from the government to new majority stake shareholders from the private sector. We found this to have only occurred in three of the researched companies, all of which have transformed noticeably after their privatization. All three companies – Al Ahram Beverages, El Nasr Bottling Company (Coka Cola), and the

PCSU

Egyptian Bottling Company (Pepsi Cola) –  were  from the beverages and brewing sector and all were privatized to strategic investors in transactions which left the government with no remaining equity in the companies. While another two companies in this study – Ideal and Telemisr – are also without any remaining government equity after their privatization, for reasons yet undetermined these enterprises have so far not been able to do away with their public sector management structure or corporate culture. The remaining companies we have discussed in this study either continue to remain under the control of the government after their privatization, or the state has retained a leading voice along-side some of the new private sector shareholders in corporate and managerial decision making.

We can  subsequently make the following recommendations as a result of the findings of this study:

1/ The Egyptian government should take steps aiming to reduce Holding Company equity in privatized companies to 0% in order to allow the private sector full control of corporate governance and management

2/ Since the best results achieved by companies in this study were brought about by sales to strategic investors, it can be recommended that the Egyptian government continues to expand its efforts to employ this method of privatization.

3/ Two privatized companies, Ideal and Telemisr, presently have 0% government equity but have not been able to transform as effectively as the companies in Group A. Further study should be made of these two companies to assess why they have not been able to develop as effectively after their privatization despite the fact that the government has no Board of Directors level representation in them.

4/  In the case of a number of the privatized companies in this study (ie, the flour mills companies) the Chairman of the privatized enterprise was also the Board of Directors representative of the Holding Company which supervised the enterprise before the privatization. Retaining both the positions of Chairman of the privatized affiliate company and Holding Company representative on its Board of Directors can create a conflict of interests since the same individual is caught representing the public and private sectors in the one private company. The Egyptian government should take measures to separate these functions and ensure that the Chairman of the privatized company does not also represent the Holding Company (ie, the government). The most effective way to do this is to ensure that there is 0% Holding Company equity in the privatized company.

5/ The government should take urgent steps to clarify the position of the main shareholders in the case of Simo the paper company. At the moment Simo's majority shareholders are from the private sector and are presently unable to exercise their ownership rights at the company due to the suspension of the company's Board of Directors. The government should take steps to re-instate the company's Board of Directors since this action will send positive signals to investors and demonstrate that the government is concerned with the protection of shareholders basic rights. The government should also promote significantly greater levels of transparency in conducting transactions such as the Simo case.

**PCSU**

6/ If the government is to show its genuine commitment to the privatization program, it should allow for a far greater level of private sector participation in strategic sector Law 203 privatizations such as the flour milling companies. At the moment, while the Holding Company controls at least 39% equity in the three privatized companies, public sector financial institutions are amongst their other leading shareholders. This makes very little room for private sector investment in the mills sector and sends little favorable signal to the private sector.

7/ It is very unlikely that the lingering public sector corporate culture in Group B and C companies will change unless public sector management titles begin to be replaced by more conventional commercial titles employed in the private sector, or until the practice of allowing the national public sector labor organization (union) to take privatized companies' employees for sporting tournaments and other "rituals" for several weeks at a time on full pay and conditions is brought to a stop.

8/ With regards to Misr Free Shops Company, it is  very unlikely that raising the equity stake of the company's employees stock association to as much as 82%  will lead to the transformation of this company into a legitimate private sector enterprise, or resolve the shareholders' crisis brought upon by the June 8th Decree of 1999. It is hence recommended that the government takes steps to compensate the shareholders through alternative mechanisms, simultaneously to seeking to re-privatize the company to an anchor investor.

9/ It is recommended that El Nasr Casting should not be included in official statistics as a Law 203 enterprise privatized to a strategic investor – as is the case at the moment, but rather be included into a special case of transactions arising out of the privatization program, namely a debt-equity swap.

10/ It is finally recommended that the Egyptian government and the Donor Community reconsider their definition of "privatization" as it has been previously applied in the case of the Egyptian Structural Adjustment and Economic Reform Program. It is henceforth recommended that privatized Law 203 companies in Egypt are categorized along the following parameters:

a/ Fully Privatized Companies (0% government equity after the privatization)
b/ Privatized Companies (1%-50% government equity after the privatization)
c/ Minority Privatized Companies (51% or more government equity after the privatization)



# EXHIBIT 2



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DR. AHMED DIAA ELDIN ALI MOHAMED      :
HUSSEIN,                               :
                                       :
            Plaintiff,                 :
                                       :
       - against -                     :      1:22-cv-02592-JSR
                                       :
DR. MOHAMED AHMED MAAIT, in his        :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,         :
                                       :
            Defendant.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF LELA KASSEM IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR REMAND

        Lela Kassem declares as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

        1.      I am a Counselor at the Egyptian State Lawsuits Authority of the Arab Republic

of Egypt ("ESLA") and serve as a team leader in the Foreign Disputes Department, with

responsibility for reviewing all the letters and memos submitted to the ESLA Vice President,

who supervises the Foreign Disputes Department.  I am the ESLA team leader for this case.

        2.      I make this declaration to provide factual information supporting Defendant's

opposition to Plaintiff's motion to remand this case back to the Supreme Court of the State of

New York for the County of New York.  The facts based in this declaration are based on my

personal knowledge and my review of records maintained by ESLA.  Arabic is my first

language, but I regularly read and write English as part of my job.  ESLA does not waive, and

expressly reserves, all privileges and immunities associated with its work and its

communications with Dechert LLP ("Dechert") regarding this matter.

3.      ESLA advises the interests of the Arab Republic of Egypt before national and international courts and tribunals.  Its Department of Foreign Disputes advises the Arab Republic of Egypt in matters pending before foreign courts and arbitral tribunals.  ESLA's Department of Foreign Disputes also is tasked with receipt of service for pleadings related to lawsuits in foreign courts and international tribunals that implicate the interests of the Arab Republic of Egypt.

4.      On January 31, 2022, an employee of Egypt's Ministry of Justice received a Request for Service Abroad of Judicial or Extra Judicial Documents, dated January 24, 2022 ("Request").  The Request related to a civil lawsuit brought in the United States by Dr. Ahmed Diaa Eldin Ali Mohamed Hussein against Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt.

5.      On February 3, 2022, the Ministry of Justice served the Request by delivering it to an employee of ESLA who is responsible for receiving service in foreign lawsuits against the government of the Arab Republic of Egypt.  Under Egyptian law, ESLA also is authorized to receive service for government ministers sued in their official capacity.

6.      The Request attached several documents, each of which was filed in New York state court in the above-captioned case: (a) a Request for Judicial Intervention; (b) an Amended Summons; (c) an Amended Notice of Motion for Summary Judgment in Lieu of Complaint; (d) a Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint; (e) an Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, with an attached "Exhibit A"; (f) a Notice of Electronic Filing; and (g) an Notice of Suit and Attachment related to the United States Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*.

7.      The Request stated that Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, was "required to file a RESPONSE with the

Court and serve a copy upon Plaintiff's attorney within sixty (60) days after having received the Amended Summons and other documents herein."

8.      ESLA's ordinary protocol for engaging counsel to represent the Arab Republic of Egypt in a foreign litigation is as follows:

(a)      The Vice President of ESLA who supervises the Department of Foreign Disputes assigns the matter to a team of ESLA counselors.

(b)      Six senior counsel in ESLA's Foreign Disputes Department of ESLA and the team assigned to work on the case write a report addressing whether a law firm should be retained and, if so, what type of law firm should be retained.

(c)      The report is then summarized as part of a general report that is submitted to the President of ESLA, the Vice President of ESLA who supervises the Department of Foreign Disputes, the Secretary General of ESLA and the President of ESLA's Inspection Department.

(d)      If a decision is made to retain a law firm, the six senior counsel and the team working on the case prepare a second report identifying five law firms fitting the profile identified in the initial report.

(e)      The proposal regarding specific counsel is then summarized in a second report presented to the President of ESLA, the Vice President supervising the Department of Foreign Disputes, the Secretary General of ESLA and the President of ESLA's Inspection Department.

(f)      After obtaining authorization to proceed, ESLA transmits "Invitations to Contract" to at least five law firms.

(g)      After receiving the offers, the six senior counsel and the team working on the case prepare a third report analyzing the offers and select the best offer. The report is

then summarized as part of a general report that is submitted to the President of ESLA, the Vice President of ESLA who supervises the Department of Foreign Disputes, the Secretary General of ESLA and the President of ESLA's Inspection Department.

(h)    ESLA then sends a summary of these proposals with its recommendation to the High Authority for Arbitration and International Disputes, which also must approve funding for engaging a law firm.

(i)    After the High Authority selects a law firm, ESLA sends a letter to the law firm informing it of the selection, together with a draft contract.

(j)    Upon concluding any negotiations regarding the terms of the draft contract, we ask the law firm for two hand-signed originals, which we then transmit to the Vice President of ESLA supervising the Department of Foreign Disputes, who signs it on behalf of the President of ESLA.

(k)    ESLA then sends one hand-signed original back to the retained law firm.

9.    Ordinarily, this entire process takes at least five weeks.  However, given the 60-day time limit for a response stated in the Request, ESLA accelerated its ordinary process as follows:

(a)    After receiving a copy of the Request, the team assigned to work on the request (which I lead) submitted the names of three law firms in the United States to the ESLA Vice President who supervises the Department of Foreign Disputes.

(b)    At the same time, on February 10, 2022, an ESLA counselor on the team sent "Invitations to Contract" to the three law firms.  The "Invitations to Contract" stated that service had been made on January 31, 2022, which was the date that the Request had been delivered to the Ministry of Justice.  We were not aware that the relevant date for service purposes was the date that the Request was served upon ESLA.

(c)     In parallel, we wrote to the High Authority for Arbitration and International Disputes to inform them of the case, to ask for authorization to retain a U.S. law firm, and to authorize funding for the defense by the Ministry of Finance.

(d)     After receiving offers from the three law firms by the February 16, 2022 deadline we had given them, we recommended that Dechert be engaged.  The High Authority for Arbitration and International Disputes approved our recommendation.

(e)     We then sent a draft engagement letter to Dechert on February 22, 2022. We reached agreement with Dechert on the terms of the engagement on March 1, 2022 and requested that Dechert send us by courier two original, hand-signed copies of the letter for execution.  On March 3, 2022, we transmitted the relevant documents regarding the matter in ESLA's files to Dechert.

(f)     The first set of hand-signed copies received from Dechert were not acceptable to us.  The letters are drafted in both English and Arabic, and Dechert had electronically transmitted a copy of the engagement letter showing that they had executed only the English portion.  Accordingly, on March 4, 2022, we asked Dechert to send a replacement set of hand-signed originals by courier.  Original copies of the final engagement letter were hand-signed by ESLA on March 13, 2022 and then transmitted to Dechert by courier.  At Dechert's request, an electronic copy of the executed engagement letter was also transmitted on March 15, 2022.

10.     I have read the affirmation of Dr. Ahmed Hussein served in this case and understand that he alleges that he pursued compensation for SIMO shares in communications with various representatives of the government of the Arab Republic of Egypt, with the Ministerial Committee for Investment Dispute Settlement, and by making an arbitration demand.

To my knowledge, he has not submitted a claim to the Administrative Justice Court, which is the judicial authority with jurisdiction to hear claims for compensation against the government of the Arab Republic of Egypt.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 13th day of April 2022 at Mohandeseen, Giza, Egypt.

_____

Lela Kassem

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

DR. AHMED DIAA ELDIN ALI MOHAMED          :
HUSSEIN,                                                          :
                                                                       :
                            Plaintiff,                          :
                                                                       :
               - against -                                     :          1:22-cv-02592-JSR
                                                                       :
DR. MOHAMED AHMED MAAIT, in his        :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,          :
                                                                       :
                            Defendant.                        :
                                                                       :
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DECLARATION OF LINDA C. GOLDSTEIN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR REMAND**

Linda C. Goldstein, an attorney admitted to practice in New York and a member of the bar

of this Court, declares as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am a member of Dechert LLP ("Dechert"), counsel to Defendant Dr. Mohamed

Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt in

this matter.  I make this declaration to provide additional factual information relevant to

Defendant's opposition to Plaintiff Dr. Ahmed Diaa Eldin Ali Mohamed Hussein's motion to

remand this action back to New York County Supreme Court.

2.     The facts stated in this declaration are based on my own personal knowledge, my

review of the Amended Notice of Motion for Summary Judgment in Lieu of Complaint (ECF 3-

3), the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of

Complaint (ECF 3-2), and other materials filed in this matter, and my review of materials

provided to me by the Egyptian State Lawsuits Authority ("ESLA").  Defendant does not waive,

and expressly reserves, all privileges and immunities associated with Dechert's work product and attorney-client communications.

**Dechert's Engagement**

3.      On February 10, 2022, I was contacted by ESLA with an invitation for Dechert to submit an offer and proposal for it to represent the Arab Republic of Egypt in a claim for civil damages filed by Dr. Ahmed Diaa Eldin Ali Mohamed Hussein against Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, which was then pending before the Supreme Court of the State of New York for the County of New York. The invitation asked that Dechert submit its proposal by February 16, 2022.

4.      The invitation stated that the Arab Republic of Egypt was served on January 31, 2022, that the Arab Republic of Egypt had sixty (60) days after being served to file a response, and that a hearing was scheduled to be held on August 25, 2022 at 9:30 AM before the New York state court.  The invitation also enclosed the notice of suit and other materials that had been served on ESLA (the "Notice of Suit").

5.      On February 16, 2022, I emailed Dechert's proposal to ESLA.  On February 22, 2022, ESLA responded that it had chosen Dechert to represent the Arab Republic of Egypt in this case, and enclosed a draft engagement contract.  After some discussion of contract terms, Dechert and ESLA reached agreement on the terms of the engagement on March 1, 2022, and ESLA asked me to transmit two hand-signed copies of the engagement letter, in accordance with their requirement that engagement letters be executed in duplicate hard copies.

6.      I signed those letters and transmitted them to ESLA on March 2, my next day in the office.  I then re-transmitted them at ESLA's request on March 4, because I had not executed the Arabic portion of the letters.  I did not receive a countersigned copy of that engagement letter, which had an effective date of March 1, 2022, until March 15, 2022.  Consistent with 22

N.Y.C.R.R. § 1215.1, which states in part that "an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any free from a client shall provide to the client a written letter of engagement before commencing the representation," Dechert policy required a signed, written engagement letter in connection with this matter.  I did not wish to sign a pleading or enter an appearance in this Court until ESLA had delivered a signed engagement letter to Dechert.

**Preparation of the Notice of Removal**

7.        Our work to prepare the Notice of Removal began shortly after ESLA informed us that we would be engaged.  Our work involved reviewing the materials served upon ESLA and additional documents that ESLA had provided to us on March 3, 2022 and performing legal research regarding several issues, including the applicability of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, to this case.

8.        Additionally, because I initially understood that ESLA had been served with the Notice of Suit on January 31, 2022, Dechert also conducted research into the circumstances under which the 30-day removal deadline under 28 U.S.C. § 1446(d) could be extended under 28 U.S.C. § 1441(d) "for cause."  In this Circuit and elsewhere, "cause" is liberally construed, particularly where there has been little or no activity in the state court action.  That was certainly the case here, since Plaintiff had not yet filed a return of service form in New York state court.

9.        On March 15, 2022, I transmitted an initial draft of the Notice of Removal to ESLA.  At the same time, I requested additional details about the manner of service for use in the Notice.  My inquiry about the manner of service revealed that Dechert's original understanding of when ESLA was served with the Notice of Suit was incorrect.  On March 21, 2022, Dechert learned that ESLA was not served with the Notice of Suit until February 3, 2022.  Using that date, the 30-day period for removal ended on March 7, which, while a few days later than our

initially calculated removal deadline of March 2, still had already passed.  After learning this fact, Dechert continued to prepare the removal petition and sent a revised draft of the Notice of Removal to ESLA on March 24.  We received authorization to file it and did so on March 30, 2022.

10.     There was no strategic reason to file the Notice of Removal on March 30, 2022, as opposed to an earlier date.  Although we worked on preparing the Notice of Removal diligently, in March I was also engaged in filing an emergency stay application in the Second Circuit in *Al-Attabi v. Bank Audi S.A.L.*, No. 22-0524 (2d Cir.), as well as other filings and activities in that and other cases.  Had it not been for those other professional commitments, we likely would have been in a position to file the Notice of Removal a few days earlier.

11.     Plaintiff will not be prejudiced by removal of this case to federal court.  Plaintiff's motion for summary judgment in lieu of complaint was not scheduled to be heard in New York Supreme Court until August 25, 2022.  When I first spoke with David Schnapp, of Nixon Peabody LLP, counsel for Plaintiff, on April 1, 2022, Mr. Schnapp conceded that he had not been aware that service had been made upon Defendant or ESLA until he was served with the Notice of Removal on March 30, 2022.  No other activity has occurred in New York Supreme Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of April 2022 at New York, New York.

        */s/ Linda C. Goldstein*
        Linda C. Goldstein

- 4 -