# 22-1506

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

DR. AHMED DIAA ELDIN ALI HUSSEIN,

*Plaintiff-Appellant,*

—against—

DR. MOHAMED AHMED MAAIT, IN HIS OFFICIAL CAPACITY
AS MINISTER OF FINANCE OF THE ARAB REPUBLIC OF EGYPT,

*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX
VOLUME II OF II
(Pages A-223 to A-443)**

<div style="display:flex">

LINDA C. GOLDSTEIN
TIFFANY ENGSELL
DECHERT LLP
3 Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Defendant-Appellee*

JONATHAN R. JEREMIAS
ALAN E. SASH
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Plaintiff-Appellant*

</div>

# TABLE OF CONTENTS

PAGE

District Court Docket Entries .............................................. A-1

Defendant's Notice of Removal, dated March 30, 2022 ................... A-8

    Exhibit 1 to Notice of Removal—
    Plaintiff's Notice of Motion for Summary Judgment in Lieu
    of Complaint, dated December 13, 2021 ........................... A-18

    Exhibit 2 to Notice of Removal—
    Plaintiff's Memorandum of Law in Support of Motion
    for Summary Judgment in Lieu of Complaint,
    dated December 13, 2021 ........................................ A-21

    Exhibit 3 to Notice of Removal—
    Affirmation of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein,
    dated November 2, 2021 ......................................... A-37

    Exhibit 4 to Notice of Removal—
    Request for Judicial Intervention, dated December 13, 2021 ........ A-46

    Exhibit 5 to Notice of Removal—
    Amended Summons, dated December 27, 2021 ..................... A-49

    Exhibit 6 to Notice of Removal—
    Plaintiff's Amended Notice of Motion for Summary Judgment
    in Lieu of Complaint, dated December 27, 2021 ................... A-52

    Exhibit 7 to Notice of Removal—
    eFiled Document List ........................................... A-55

    Exhibit 8 to Notice of Removal—
    Request for Service Abroad of Judicial or Extra
    Judicial Documents, sworn to January 24, 2022 ................... A-57

    Exhibit 9 to Notice of Removal—
    Notice of Suit with Attachment ................................... A-61

ii

PAGE

Exhibit 10 to Notice of Removal—
Notice of Electronic Filing, dated December 27, 2021 .............. A-83

Exhibit 11B to Notice of Removal—
Certified Translation of Hussein Affirmation,
dated August 4, 2014 ........................................... A-86

Exhibit 12C to Notice of Removal—
Certified Translation of Hussein Affirmation...................... A-134

Plaintiff's Notice of Motion to Remand, dated April 8, 2022 ........... A-139

Declaration of Daniel A. Schnapp, for Plaintiff, in Support of Motion
to Remand, dated April 8, 2022................................... A-141

Exhibit 1 to Schnapp Declaration—
Results of LexisNexis Search.................................... A-143

Exhibit 2 to Schnapp Declaration—
PACER Spreadsheet ........................................... A-146

Declaration of Tiffany E. Engsell, for Defendant, in Opposition
to Motion for Remand, dated April 14, 2022 ..................... A-148

Exhibit 1 to Engsell Declaration—
The Post Privatization Development of Former Law 203
Companies June 2000 Special Study ............................. A-150

Exhibit 2 to Engsell Declaration—
Screenshot from the Bloomberg Terminal Professional Services
of Exchange Rate of the Egyptian Pound to US Dollar
as of April 13, 2022............................................ A-211

Declaration of Lela Kassem, for Defendant, in Opposition to Motion
for Remand, dated April 13, 2022 ............................... A-213

Declaration of Linda C. Goldstein, for Defendant, in Opposition
to Motion for Remand, dated April 14, 2022 ..................... A-219

iii

PAGE

Defendant's Notice of Errata, dated April 18, 2022 ..................... A-223

Conference Transcript, dated April 18, 2022.......................... A-225

Order of the Honorable Jed S. Rakoff, Denying Motion for Remand,
    dated April 20, 2022 ............................................. A-236

Defendant's Notice of Motion to Dismiss the Motion for Summary
    Judgment in Lieu of Complaint, dated April 20, 2022 .............. A-237

Declaration of Linda C. Goldstein, for Defendant, in Support
    of Motion to Dismiss, dated April 20, 2022 ....................... A-239

    Exhibit 1 to Goldstein Declaration—
    Notice of Arbitration, dated February 3, 2021 .................... A-242

    Exhibit 2 to Goldstein Declaration—
    Verified Complaint, dated October 4, 2013
    (*Hussein v. Sheldon Razin et al.,* Case No. 30-2013-00679600-
    CU-NP-CJC) ...................................................... A-306

    Exhibit 3 to Goldstein Declaration—
    Definitive Proxy Statement Pursuant to Section 14(a)
    of the Securities Exchange Act of 1934 .......................... A-349

    Exhibit 4 to Goldstein Declaration—
    Application for Authority of National Investments Co.,
    dated April 17, 1996 ............................................ A-387

    Exhibit 5 to Goldstein Declaration—
    Certificate of Status, dated April 14, 2022 ..................... A-395

    Exhibit 6 to Goldstein Declaration—
    Letter from Daniel A. Schnapp to Dr. Abo Bakr El-Sedeek Amer,
    dated March 24, 2021 ............................................ A-398

Declaration of Bahieldin H.Z. Elibrachy, in Support of Motion
    to Dismiss, dated April 18, 2022................................. A-403

iv

PAGE

Declaration of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein,
in Opposition to Motion to Dismiss, dated May 3, 2022............A-420

Exhibit A to Hussein Declaration—
Curriculum Vitae of Dr. Ahmed Diaa Eldin Ali
Mohamed Hussein ..............................................A-425

Exhibit B to Hussein Declaration—
Spreadsheet of Egyptian Stock Exchange Records
and Currency Values............................................A-427

Order Staying Merits Discovery Pending Disposition of Motion
to Dismiss Plaintiff's Summary Judgment Motion
in Lieu of Complaint, dated April 20, 2022......................A-419

Memorandum Order, dated June 13, 2022 ...........................A-429

Judgment Appealed From, dated June 14, 2022 .....................A-442

Plaintiff's Notice of Appeal, dated July 11, 2022 ...............A-443

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

DR. AHMED DIAA ELDIN ALI MOHAMED      :
HUSSEIN,                                                   :
                                                                     :
                    Plaintiff,                             :
                                                                     :
            - against -                                    :            1:22-cv-02592-JSR
                                                                     :
DR. MOHAMED AHMED MAAIT, in his    :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,      :
                                                                     :
                    Defendant.                           :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**NOTICE OF ERRATA**

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Defendant Dr. Mohamed Ahmed Maait respectfully submits this Notice of Errata to

correct the following inadvertent errors in his Memorandum of Law in Opposition to Plaintiff's

Motion for Remand, ECF No. 12, which was filed with the Court on April 14, 2022:

| Page | Correction |
|------|------------|
| 8 | The sentence "There was no activity of any kind in the State Court Action after December 13, 2021," should instead state that "There was no activity of any kind in the State Court Action after December 27, 2021." |
| 17 | Strike the reference to *Hyundai Corp. v. Republic of Iraq*, No. 02 CIV. 7199 (RCC), 2003 WL 22251349 (S.D.N.Y. Sept. 30, 2003). |
| 18 | Strike the explanatory parenthetical following *Rubin v. Air China Ltd.*, No. 10-CV-05110-LHK, 2011 WL 1002099, at *5 (N.D. Cal. Mar. 21, 2011). |

| 20 | Add the words "prior to reconsideration, the district court held that" at the beginning of the explanatory parenthetical for *Valero Energy Corp. v. Empresa Estatal Petroleos Del Ecuador*, 220 F.3d 584, No. 99-40800, 2000 WL 959511, at *2 (5th Cir. June 5, 2000) (unpublished table decision). |

Defendant is concurrently filing a corrected Memorandum of Law in Opposition to Plaintiff's

Motion for Remand that corrects these errors, revises the corresponding page references on the

Table of Authorities, and makes no other changes.

Dated: New York, New York
        April 18, 2022

                                    Respectfully submitted,


                          By: _____ */s/ Linda C. Goldstein* _____
                                Linda C. Goldstein
                                Three Bryant Park
                                1095 Avenue of the Americas
                                New York, New York 10036
                                (212) 698-3500

                                Tiffany Engsell
                                    (*pro hac vice motion forthcoming*)
                                Cira Centre
                                2929 Arch Street
                                Philadelphia, Pennsylvania 19104
                                (215) 994-4000

                                *Attorneys for Defendant Dr. Mohamed Ahmed*
                                *Maait, in his official capacity as Minister of*
                                *Finance of the Arab Republic of Egypt*

1

M4IAAHUSC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DR. AHMED DIAA ELDIN ALI
    MOHAMED HUSSEIN,
4
                    Plaintiff,
5
            v.                              22 CV 2592 (JSR)
6
    DR. MOHAMED AHMED MAAIT,
7
                    Defendant.
8
    ------------------------------x
9                                           New York, N.Y.
                                            April 18, 2022
10                                          4:00 p.m.

11  Before:

12                  HON. JED S. RAKOFF,

13                                          District Judge

14                        APPEARANCES

15  NIXO PEABODY LLP (NYC)
         Attorneys for Plaintiff Hussein
16  BY:  DANIEL A. SCHNAPP
         CATHERINE A. SAVIO
17
    DECHERT LLP (NYC)
18       Attorneys for Defendant Maait
    BY:  LINDA C. GOLDSTEIN
19       TIFFANY ENGSELL

20

21

22

23

24

25

M4IAAHUSC                    Conference

1          (Case called)

2          MR. SCHNAPP:  Good afternoon, your Honor.

3          This is Daniel Schnapp, from the law firm Nixon

4    Peabody, and I represent the plaintiff, Dr. Ahmed Hussein.  on

5    the line with me is my colleague, Catherine Savio, as well as

6    my client, Dr. Hussein.

7          THE COURT:  Thanks for calling.

8          For the defense?

9          MS. GOLDSTEIN:  Yes, your Honor.

10          Linda Goldstein, from Dechert.  And I am joined on the

11    phone by Tiffany Engsell and Christine -- Unfortunately, we

12    have an audio problem because I can hear myself in echo.

13          THE COURT:  So, yeah, you are echoing but I can still

14    make out what you have to say.  So for the moment at least,

15    let's proceed.  If it gets to be more of a problem, I'll let

16    you know.

17          So the first item is the motion to remand.  I've

18    received the parties' briefs.  Is there anything further that

19    moving counsel wanted to add?

20          MS. SCHNAPP:  Thank you, your Honor.

21          I don't wish to take up too much of the Court's time

22    but I do have a few things to add, as I have had the

23    opportunity to review the opposition papers submitted by the

24    defendant and there are several things that I think are not

25    entirely, I think, helpful to the Court.  In fact, certain

M4IAAHUSC                    Conference

1   cases I think are somewhat misleading.  As a general matter, I

2   think the Court is aware, that this matter has been pending in

3   one form or another for approximately 23 years, that there is

4   an enforceable ruling by the Administrative Court in Egypt to

5   cancel a decision of the ministerial committee to return the

6   ownership of shares to the government.  The prime minister

7   issued a decree in 2014 seeking to enforce the court ruling in

8   its entirety.  And as a result, my client made significant

9   efforts to cause the return of his compensation.

10          Notably the --

11          THE COURT:  I don't understand relevance of any of

12  that.  The only question in this motion is whether this action

13  is properly removed to federal court or not.

14          MR. SCHNAPP:  The action is not properly removed in

15  federal court.  Initially, whether or not -- I think it's

16  unquestionable that the defendant had 30 days to file their

17  removal notice, which they didn't do.  Their justification is

18  based upon, A, that Egypt is the real party at interest here

19  and, B, that they had cause.  Clearly unless the FSIA is

20  implicated, they have no basis for removal.

21          Their argument is that even though the prime

22  minister's decree directed the minister of finance to take an

23  action which he has unquestionably failed to do, that the FSIA

24  is, nonetheless, implicated and I think that the supreme

25  court's holding is very clear that we appropriately named the

M4IAAHUSC                    Conference

1    minister of finance in his official capacity and that has not

2    implicated the FSIA.

3         And from there the question is if the Court was to

4    agree with the defendant that the FSIA is, nonetheless,

5    implicated in whether or not good cause has been shown, I think

6    the defendant basically conceded that for a variety of reasons

7    they missed the deadline.  One of them is that they were

8    dealing with an emergency stay application elsewhere.  And in

9    another instance they say they were not willing, even though

10   they were retained weeks before the notice of removal was due,

11   that they did not wish to put in an engagement or put in a

12   notice of appearance.

13        And I will say to the Court that I had no idea in fact

14   that they, that anybody had been retained.  I received no

15   notice from defendant's counsel even though that law firm had

16   been retained by Egypt in the past.  No one reached out to me

17   to say, can we have some more time.  In fact, we didn't find

18   out anything about Dechert's appearance until they filed their

19   notice of removal 23 days late on March 30, 2022.

20        So, we didn't have the opportunity to review all of

21   the reasons why --

22        THE COURT:  It's hard for me to see how you are

23   prejudiced since by any possible reckoning this case will

24   proceed to conclusion in my court much, much more swiftly than

25   it would in state court which I would think would be normally a

M4IAAHUSC                    Conference

1   plaintiff's advantage.

2           MS. SCHNAPP:  Well, your Honor, I think -- and

3   respectfully, do appreciate that, and I know your Honor keeps a

4   very tight docket -- but I think first of all put this into

5   perspective, yes, it is true while this case has been pending

6   for 23 years and every effort has been made to cause my client

7   to be compensated the way he is supposed to be, one of the

8   problems we have here is that we can see that the defendant is

9   throwing up all kinds of charades and ways to distract the

10  Court.  For example, the 20 page or 25 page brief that they

11  submitted basically reads as almost a character assassination.

12  They want to imply that the FSIA is implicated and they've

13  threatened to appeal should the Court not agree with them.

14          So in other words, state court which was your initial

15  choice of fraud should be given deference.  My client's 81

16  years old.  He's gone through every effort to try and get his

17  deposition.  And while I appreciate the fact that your Honor

18  would keep this on a tight schedule, the state court is well

19  equipped to be able to deal with this.  This an Article 53

20  proceeding that state court has familiarity with.

21          And to the extent they even have the FSIJ objection,

22  state court is well equipped to deal with that as well.  So, if

23  for all those reasons this was our, for reasons that I hope the

24  Court would appreciate, this was our initial choice of forum

25  and I think it should be given deference.

M4IAAHUSC                    Conference

1          THE COURT:  Well, of course, deference is always to be

2   given to the initial choice of forum but it's not an

3   irrebuttable presumption.  So, I thank you for your comments

4   but I'm going to deny the motion to remand.  I do think the

5   FSIA is implicated, and I do think that the cause has more than

6   amply been shown to enlarge the time limitations for removal.

7          So let's turn then to the case management plan.  I

8   only received the case management proposal from one side.  I'm

9   not sure which side that was.

10          Was that from plaintiff or defendant?

11          MS. SCHNAPP:  I believe it was from the plaintiff,

12   your Honor.

13          THE COURT:  So, sort of following up on what I said a

14   few minutes ago, in the proposed case management plan that I

15   sent to you, both sides, I said in the first sentence in solid

16   caps -- excuse me -- in bold face:

17          This Court requires that this case shall be ready for

18   trial on September 19, 2022.

19          Apparently, my English must have been defective

20   because what I got back from plaintiff's counsel was a

21   substitution that this Court requires this case should be ready

22   for trial on December 14, 2022, which is much slower than I

23   would ever consider in a case like this.

24          On the other hand I didn't get anything from defense

25   counsel because they apparently decided they just would ignore

M4IAAHUSC                    Conference

1    the Court's requests for a civil case management plan.  And I'm

2    not happy to be blown off by defense counsel in that regard.

3    So let's now --

4              MS. GOLDSTEIN:  If I might, your Honor, we did submit

5    a letter on April 11, which we stressed our objection to a case

6    management or direct --

7              THE COURT:  I asked you for a case management plan,

8    not for an objection.  That objection is denied.  We are got

9    going to set the case management plan right now and it's going

10   to be for having this case ready for trial on September 19,

11   2022.

12             This is a jury case.  Joinder of additional parties

13   must be --

14             MS. GOLDSTEIN:  If I may, your Honor?

15             THE COURT:  Yes.

16             MS. GOLDSTEIN:  (Inaudible) no jury.

17             THE COURT:  Well, your adversary put it down as a

18   jury.  If you want to move later to say it's not a jury -- and

19   I think you may well be right -- you can so move.  I'll set a

20   date for that in a minute.  But since your adversary put it

21   down as a jury, I'm going to mark it a jury for now.

22             The joinder of additional parties must be accomplished

23   by May 18th which is a suggestion from plaintiff's counsel.

24   That's fine.  Amended pleadings without leave of court, May

25   18the.  That's fine.

M4IAAHUSC                    Conference

1          Now, first request for production of documents, why

2     can't if, this has been going on for 29 years, why can't that

3     be done tomorrow?  Both sides must know at this point what they

4     want for a first request for production of documents which does

5     not preclude any subsequent requests.  So I don't see any

6     reason, but I'll give you, in an excess of caution, I'll give

7     you to April 20th, to go for the extremely limited

8     interrogatories Local Rules 33.3 (A).  Please, familiarize

9     yourself with that rule because any other interrogatories will

10    be stricken.

11         With respect to depositions, other than expert

12    depositions, what depositions does plaintiff's counsel have in

13    mind?

14         MS. SCHNAPP:  None, your Honor.

15         THE COURT:  What about defense counsel?

16         MS. GOLDSTEIN:  That will depend on the exception to

17    the --

18         THE COURT:  Please give me an answer, not a argument.

19         MS. GOLDSTEIN:  (Inaudible) Plaintiff's deposition.

20         THE COURT:  Okay.  Experts, I can see there might be

21    need for experts, disclosure and reports in that case -- moving

22    papers on experts on either side must be filed by June 24.

23    Responses by July 11.  All depositions including expert

24    depositions must be completed by July 15th.  Requests to admit

25    must be served by June 15th.  All discovery must be completed

M4IAAHUSC                    Conference

1    by July 22nd.  Any moving papers on summary judgment must be

2    filed by August 12th.  Answering papers, August 26.  Reply

3    papers, September 7.  I will have a final pretrial conference,

4    as well as oral argument on any summary judgment on September

5    14, four o'clock.  So I'm signing the case management plan.  It

6    will be filed electronically and available to both sides.

7         Now, does defense counsel want to move to preclude a

8    jury trial?

9         MS. GOLDSTEIN:  Yes, your Honor, and also to object to

10   the initial disclosures.

11        THE COURT:  Object to the initial disclosure in what

12   way?

13        MS. GOLDSTEIN:  Again, your Honor, because the

14   (inaudible) -- be no discovery -- unless the foreign sovereign

15   has been resolved initially against the foreign sovereignty.

16   So there should be no discovery during the pendency against the

17   motion to dismiss which we (inaudible) tomorrow.  And if there

18   is a denial of that motion as stated in my letter, there is a

19   (inaudible) Second Circuit to interlocutory appeal.

20        THE COURT:  Right, which will not be granted by me.

21   That's for sure.

22        What is your motive in interposing these endless

23   delays?

24        MS. GOLDSTEIN:  There are no endless delays, your

25   Honor.  The plaintiff has failed to a (inaudible) available in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4IAAHUSC                    Conference

1    Egypt and he hasn't filed a lawsuit in Egypt seeking to

2    quantify or whatever (inaudible) as a result of the annulment

3    of the privatization of the FEMA.

4           My apologies for speaking (inaudible) but I hear

5    myself echoing.

6           THE COURT:  I can still understand you.

7           Well, any and all such motions, how soon can you file

8    them?

9           MS. GOLDSTEIN:  It's currently due to be filed

10   tomorrow, your Honor.  Then ideally, I would like an extra day

11   because we have not yet gotten our expert report on Egyptian

12   law.

13          THE COURT:  All right.  So you want till the 20th?

14          MS. GOLDSTEIN:  Correct, your Honor.

15          THE COURT:  Yeah, that's fine.

16          And how long does plaintiff's counsel want to respond?

17          MS. SCHNAPP:  Your Honor, may we have two weeks?

18          THE COURT:  All right.  So that would be May 4 and

19   reply papers May 11.  And if I need oral argument, I'll reach

20   out to you as soon as I get the reply papers.  Otherwise, I'll

21   just decide it on the papers.

22          All right.  Anything else?

23          MS. SCHNAPP:  Not from the plaintiff, your Honor.  We

24   thank you for your time.

25          MS. GOLDSTEIN:  Your Honor, we moved separately for

M4IAAHUSC                    Conference

1    discovery then in the motion --

2              THE COURT:  Well, when I see your motion I will see if

3    we have to alter the discovery schedule.  For now the case

4    management plan remains in place.  But I will notify you by --

5    what time on the 20th are you going to file your papers?

6              MS. GOLDSTEIN:  By six p.m.

7              THE COURT:  All right.  I will notify you by -- can't

8    you do a little bit better than that?

9              MS. GOLDSTEIN:  We could.  Two p.m., your Honor?

10             THE COURT:  That's perfect.  Then I will notify you by

11   five p.m. whether discovery needs to be stayed.  All right?

12             MS. GOLDSTEIN:  Thank you, your Honor.

13             THE COURT:  Thanks a lot.

14             All right.  Thanks again.  Bye-bye.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25

Case 22-1506, Document 58, 09/13/2022, 3381476, Page19 of 226

A-236

Case 1:22-cv-02592-JSR   Document 20   Filed 04/20/22   Page 1 of 1
Case 1:22-cv-02592-JSR   Document 16   Filed 04/14/22   Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ x

DR. AHMED DIAA ELDIN ALI MOHAMED
HUSSEIN,

                 Plaintiff,

       - against -

DR. MOHAMED AHMED MAAIT, in his
official capacity as MINISTER OF FINANCE
OF THE ARAB REPUBLIC OF EGYPT,

              Defendant.

------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

1:22-cv-02592-JSR

**[PROPOSED] ORDER DENYING MOTION FOR REMAND**

**AND NOW**, upon consideration of Plaintiff's Motion for Remand, Defendant's

Opposition thereto, Plaintiff's Reply in further support of his Motion, and oral argument by the

parties, it is hereby **ORDERED:**

Plaintiff's Motion to Remand this action to the Supreme Court of the State of New York,

County of New York, is hereby **DENIED**; and

The Court finds that removal was proper under 28 U.S.C. § 1441(d) and that Defendant

has shown cause to enlarge the time for removal.

**SO ORDERED.**

Dated: _____

_____
**Hon. Jed. S. Rakoff**
**United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DR. AHMED DIAA ELDIN ALI MOHAMED      :
HUSSEIN,                               :
                                       :
              Plaintiff,               :
                                       :
           - against -                 :       1:22-cv-02592-JSR
                                       :
DR. MOHAMED AHMED MAAIT, in his        :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,         :
                                       :
              Defendant.               :
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## NOTICE OF MOTION

PLEASE TAKE NOTICE that, upon Plaintiff's Motion for Summary Judgment in Lieu of Complaint; the accompanying Memorandum of Law in Support of Defendant's Motion to Dismiss the "Motion for Summary Judgment in Lieu of Complaint" and to Stay Merits Discovery; the Declaration of Linda C. Goldstein, together with its attached exhibits; the Declaration of Bahielden H. Z. Elibrachy; all prior pleadings and filings in this action; and such other and further matters as may be presented at any hearing on this Motion or before the Court's decision, Defendant Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt, will move this Court, before the Honorable Jed S. Rakoff, United States District Judge of the United States District Court, Southern District of New York, at 500 Pearl St., New York, New York 10007, on a date and at a time designated by the Court, for (i) an Order pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, dismissing Plaintiff's Motion for Summary Judgement in Lieu of Complaint, and (2) an Order

staying merits discovery during the pendency of this motion, and for such other and further relief as the Court deems necessary and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to the schedule set by the Court during the telephonic Case Management Conference held on April 18, 2022, papers in opposition to this Motion shall be due on or before May 4, 2022, and reply papers shall be due on or before May 11, 2022.

Dated: New York, New York
     April 20, 2022

<div align="center">DECHERT LLP</div>

By:    */s/ Linda C. Goldstein*   
    Linda C. Goldstein
    Three Bryant Park
    1095 Avenue of the Americas
    New York, New York 10036
    (212) 698-3500

    Tiffany Engsell
      (*pro hac vice motion forthcoming*)
    Cira Centre
    2929 Arch Street
    Philadelphia, Pennsylvania 19104
    (215) 994-4000

    *Attorneys for Defendant Dr. Mohamed Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DR. AHMED DIAA ELDIN ALI MOHAMED        :
HUSSEIN,                                 :
                                         :
                Plaintiff,               :
                                         :
        - against -                      :       1:22-cv-02592-JSR
                                         :
DR. MOHAMED AHMED MAAIT, in his          :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,           :
                                         :
                Defendant.               :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DECLARATION OF LINDA C. GOLDSTEIN IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS PLAINTIFF'S "SUMMARY JUDGMENT MOTION IN LIEU
OF COMPLAINT" AND TO STAY MERITS DISCOVERY**

Linda C. Goldstein, an attorney admitted to practice in New York and a member of the bar

of this Court, declares as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a member of Dechert LLP ("Dechert"), counsel to Defendant Dr. Mohamed

Ahmed Maait, in his official capacity as Minister of Finance of the Arab Republic of Egypt in

this matter.  I make this declaration in Support of Defendant's Memorandum of Law in Support

of his Motion to Dismiss Plaintiff's "Summary Judgment Motion in Lieu of Complaint" and to

Stay Merits Discovery to provide the Court with copies of the exhibits cited in that

Memorandum of Law and to provide additional factual information relevant to Defendant's

Motion to Dismiss.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a Notice of Arbitration

filed by Dr. Hussein with the International Centre for Settlement of Investment Disputes

("ICSID") on February 3, 2021, together with the Exhibits C-1 and C-2 thereto.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a Verified Complaint for Damages filed and verified by Dr. Hussein, the Plaintiff in this matter, in *Hussein v. Razin et al.*, No. 30-2013-00679600-CU-NP-CJC (Cal. Super. Ct. Orange Cnty.).

4.      Attached hereto as Exhibit 3 is a true and correct copy of a Definitive Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed by Dr. Hussein on July 20, 2012 in connection with a corporation named Quality Systems, Inc.  This Proxy Statement was obtained via the SEC's EDGAR database.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Application for Authority of National Investments Co. filed with the New York State Department of State on April 17, 1996.  This Application of Authority was obtained from the New York State Department of State Division of Corporations.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a Certificate of Status issued by the New York State Department of State for National Investments Co. on April 14, 2022.  This Certificate of Status was obtained from the New York State Department of State Division of Corporations.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a letter dated March 24, 2021 from Plaintiff's counsel, Daniel A. Schnapp, to Dr. Abo Bakr El-Sedeek Amer, President of the Egyptian State Lawsuits Authority, related to Plaintiff's demand for arbitration before the ICSID.

8.      Separately, my firm conducted a search in the Corporate Filings database in the Public Records section of LexisNexis, as well as on the Delaware Department of State, Division of Corporation's website, and found no evidence that a company by the name of Egyptian Chemical Holding Company or a similar name has registered to do business in any U.S. state.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

20th day of April 2022 at New York, New York.


_____*/s/ Linda C. Goldstein*_____
Linda C. Goldstein

# EXHIBIT 1

NOTICE OF ARBITRATION UNDER THE ARBITRATION RULES OF THE UNITED NATIONS
COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

## DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN

(CLAIMANT)

-AND-

THE ARAB REPUBLIC OF EGYPT

(RESPONDENT)

# NOTICE OF ARBITRATION

NIXON PEABODY LLP

Nixon Peabody LLP
Tower 46, 55 West 46th Street
New York, New York 10036-4120
212-940-3000
833-343-1753
Legal representative for Claimant

February 3, 2021

I.    **INTRODUCTION**

1.    This Notice of Arbitration, together with its Exhibits numbered C-1 to C-2, is submitted on behalf of Dr. Ahmed Diaa Eldin Ali Mohamed Hussein (hereinafter "**Claimant**") pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law in force as from 15 August 2010 (the "**UNCITRAL Arbitration Rules**") against the Arab Republic of Egypt (hereinafter "**Respondent**"), (hereinafter collectively referred to as the "Parties").

2.    This Notice of Arbitration contains information concerning the following:

    i.    The name, description and address of each of the Parties (**II**);

    ii.    The Parties' contractual relationship and the nature and circumstances of the Parties' dispute giving rise to Claimant's claims (**III**);

    iii.    The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (**IV**);

    iv.    Claimant's position as regards the composition of the arbitral tribunal (**V**);

    v.    Claimant's damages (**V**);

    vi.    A statement of the relief sought (**VI**);

3.    This dispute principally concerns Respondent's violation of Article III, 1 of the Bilateral Treaty between the United States and Egypt (the "U.S.-Egypt BIT") (Exhibit C-1) which guarantees that nationals of either country must be appropriately compensated in the event that the government expropriate their investment. Specifically, starting in 1997 Claimant, on behalf of himself and his family, purchased what became in excess of 70% of the shares of SIMO, a large manufacturing company with two locations in Egypt, from the Egyptian Stock Exchange—an investment worth approximately $20,000,000.00, at that time. Following Claimant's investment, SIMO was expropriated by Egypt. By letter dated September 8, 2020 (Exhibit C-2), the Egyptian Government informed Claimant that it would not be providing Claimant with adequate compensation for the investment that it expropriated.  The Egyptian Government's refusal to provide compensation to Claimant qualifies the action as an improper expropriation, a direct violation of the U.S.-Egypt BIT.

II.     **THE PARTIES**

A.      **Claimant**

4.      Claimant is Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, a dual citizen of the United
        States of America and the Arab Republic of Egypt.

5.      Claimant's address is:

> Dr. Ahmed Hussein
> 45 Rockefeller Center, Suite 2256
> New York, New York 10111
> 212-332-1700
> ahmednic@aol.com

6.      Claimant's representative, to whom all correspondence should be sent in this
        arbitration, are:

> Nixon Peabody LLP
> Daniel A. Schnapp, Esq.
> Catherine A. Savio, Esq.
> Tower 46, 55 West 46th Street
> New York, New York 10036-4120
> 212-940-3000
> 833-343-1753
> dschnapp@nixonpeabody.com

B.      **Respondent**

7.      Respondent is the Arab Republic of Egypt.

8.      Respondent's contact information is:

> The Arab Republic of Egypt
> Egyptian State Lawsuits Authority
> 42 Gameat El Dowal El Arabiya St.
> Mohandeseen, Cairo, Egypt
> Tel: +20 2 37617046
> Fax: +20 2 37621417

III.    **THE PARTIES' CONTRACT AND THE NATURE AND CIRCUMSTANCES
OF THE PARTIES' DISPUTE GIVING RISE TO THE CLAIMS**

> (a) **Factual Background**

9.      SIMO was a large company with locations in the Bahteem District and Mostorod,
        Egypt, that engaged in the manufacture and distribution of paper and cardboard

products. Starting in 1997, Claimant, on behalf of himself and his family, purchased what became in excess of 70% of the shares of SIMO from the Egyptian Stock Exchange—an investment worth approximately $20,000,000.00, at that time. Claimant purchased the shares with funds that originated with his investments in the United States.

10.    In March 1999, SIMO was expropriated by Egypt via a decision issued by the Chairman of the Companies Regulatory Authority, who appointed a Trustee for management of the Company and dissolved the Board of Directors.

11.    In 2006, following years of litigation surrounding the propriety of the March 1999 expropriation of SIMO, Egyptian courts effectively canceled the decision issued by the Chairman of the Companies Regulatory Authority, and all consequences therefrom, effectively ordering that the Company be returned to the shareholders, including Claimant, and awarding any damages that occurred since 1999. This was a final and binding decision upon the Egyptian Government. In 2007, the Chairman of the General Authority for Investment & Free Zones issued a decision confirming the Court's 2006 judgment.

12.    In 2014, the Administrative Court in Egypt ordered the return of SIMO to the State due to alleged deficiencies in connection with the sale of the Company to Claimant that caused, among other things, the shares of the Company to be sold at a price that was lower than actual value. That same year, in response to this Court Order, the Prime Minister issued a final decree implementing the Administrative Court's 2014 Order and directing the Minister of Finance to provide all necessary financial credits related to the shareholders' rights. The Egyptian Government did not, however, comply with the Prime Minister's decree.

13.    Claimant was never provided with any form of compensation for the expropriation of SIMO. Claimant communicated with the Minister of Treasury, the Minister of Public Sector, the Chairman of the Investment Authority, the Head of the Holding Company for Chemical Industries, and other government representatives, who advised Claimant to bring the matter before the Egyptian General Authority for Investment & Free Zones Technical Secretariat Ministerial Committee for Investment Disputes Settlement.

14.     Following an almost two-year delay by Egypt, and by letter dated September 8, 2020, and in response to Claimant's complaint that SIMO remained expropriated by Egypt and he not been provided with adequate compensation for the expropriation of SIMO, the Egyptian Government informed Claimant that it was not competent to render a decision on the matter and as a result, refused to provide Claimant with adequate compensation for the value of his investment. Such a refusal constitutes an improper expropriation, a direct violation of the U.S.-Egypt BIT.

**(b) Legal Basis of Claim/Respondent's Violations of Its Legal Obligations**

15.     The United States and Egypt entered into the U.S.-Egypt BIT in an effort to foster reciprocal encouragement and protection of investments made by nationals of either party. To that end, the U.S.-Egypt BIT requires, among other things, that Egypt provide Claimant, a national of the United States, with appropriate compensation in the event that Claimant's investment in SIMO, or any portion thereof, be expropriated by Egypt.

16.     Article III of the U.S.-Egypt BIT, entitled "Compensation for Expropriation," states in relevant part:

> 1. No investment or any part of an investment of a national or company of either Party shall be expropriated or nationalized by the other Party or by a subdivision thereof-or subjected to any other measure, direct or indirect, if the effect of such other measure, or a series of such other measures, would be tantamount to expropriation or nationalization (all expropriations, all nationalizations and all such other measures hereinafter referred to as "expropriation")-unless the expropriation
>
> (a) is done for a public purpose;
> (b) is accomplished under due process of law;
> (c) is not discriminatory;
> (d) is accompanied by prompt and adequate compensation, freely realizable; and
> (e) does not violate any specific contractual engagement.
>
> Compensation shall be equivalent to the fair market value of the expropriated investment on the date of expropriation. The calculation of such compensation shall not reflect any reduction in such fair market value due to either prior public notice or announcement of the expropriatory action, or the occurrence of the events that constituted or resulted in the expropriatory action. Such compensation shall include payments for delay as may be considered appropriate under international law, and shall be freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action.

17.     Claimant's investment in SIMO qualifies as an "investment of a national" of the United States pursuant to Article I, (c) of the U.S.-Egypt BIT. The U.S.-Egypt BIT requires that the nationalization of Claimant's investment be "accompanied by prompt and adequate compensation, freely realizable … equivalent to the fair market value of the

expropriated investment on the date of expropriated … [and] payments for delay." U.S.-Egypt BIT Article III, 1. By refusing, in the September 8, 2020 letter, to provide prompt and adequate compensation to Claimant for its expropriation of SIMO, Egypt has violated Article III of the U.S.-Egypt BIT.

## IV. DISPUTE RESOLUTION CLAUSE, GOVERNING LAW, SEAT AND LANGUAGE OF THE ARBITRATION

### (a) The Arbitration Clause

18.   Claimant hereby requests arbitration of the dispute set forth herein pursuant to the investor-state dispute settlement provision in Article VII, Sections 1-3 of the U.S.-Egypt BIT and in accordance with Articles 3(3)(a) and (3)(c) of the UNCITRAL Arbitration Rules.

### (b) The Place of Arbitration

19.   Claimant proposes that the arbitration be conducted at the International Centre for Settlement of Investment Disputes ("ICSID") in Washington, D.C. Claimant requests that Respondent consent to ICSID administration of the arbitration. If Respondent does not object in its response to this Notice of Arbitration, then Respondent will be deemed to have consented to ICSID administration of the arbitration.

### (c) Governing Law

20.   The instant dispute shall be resolved in accordance with Article VII, 3, (c) of the U.S.-Egypt BIT and the UNCITRAL Arbitration Rules.

### (d) The Language of Arbitration

21.   The parties have not previously agreed upon the language of the arbitration. Claimant proposes that the language of the arbitration shall be English.

## V. THE ARBITRAL TRIBUNAL

22.   The Parties have not previously agreed on the constitution of the tribunal, including the number of arbitrators or procedure of appointment. Claimant proposes that the tribunal be composed of one arbitrator and invites Respondent's comments. Claimant reserves the right to nominate a Co-Arbitrator in accordance with Article 9 of the UNCITRAL Rules.

## VI.   CLAIMANT'S DAMAGES

23.   Claimant has been damaged in the amount of the lost value of his investment of SIMO, an amount of no less than approximately $20,000,000.00 in 1997, payments for delay, and the attorney's fees and costs associated with Claimant's recovery of compensation for Egypt's improper expropriation.

24.   Claimant is also entitled to prejudgment and post judgment interest, as appropriate on the amounts owed, in accordance with international law and Article 3, 1 of the U.S.-Egypt BIT on these amounts.

## VII.   RELIEF SOUGHT

25.   As a result, Claimant respectfully requests the arbitral tribunal to issue an award:

   i.      declaring that the arbitral tribunal has jurisdiction to consider the dispute described herein between the Parties;

   ii.     declaring that Respondent violated its obligations by refusing to provide Claimant with adequate compensation for the lost value of his investment in SIMO is a violation of the unambiguous terms of Article III, 1 of the U.S.-Egypt BIT as described above;

   iii.    ordering Respondent to compensate Claimant for the damages and losses suffered as a result of Respondent's breaches of the U.S.-Egypt BIT;

   iv.     awarding Claimant pre-judgment and post-judgment interest, as appropriate, on the amounts owed by Egypt to Claimant;

   v.      ordering Respondent to pay all arbitration costs, including Claimant's representative's costs and expenses;

   vi.     ordering any further or other relief the Tribunal may consider appropriate; and

26.   For the avoidance of doubt, Claimant reserves its right to:

   i.      raise any and all further claims arising out of or in connection with the disputed matters described in this Notice of Arbitration or otherwise arising between the Parties; and

ii.     amend and/or supplement the relief sought herein;

iii.    produce such factual or legal arguments or evidence (including witness testimony, expert testimony and documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

iv.     seek interim and provisional measures before this arbitral tribunal or any competent national court.

Respectfully submitted,

_s/Daniel Schnapp_

Daniel A. Schnapp, Esq.
Catherine Savio, Esq.
Nixon Peabody LLP
Legal representative for Claimant
Tower 46, 55 West 46th Street
New York, New York 10036-4120
212-940-3000
833-343-1753
dschanpp@nixonpeabody.com
February 3, 2021

**Exhibits submitted with the Notice of Arbitration**

|   | Exhibit | Exhibit number |
|---|---------|----------------|
| 1. | Bilateral Treaty between the United States and Egypt | C-1 |
| 2. | Correspondence Dated September 8, 2020 | C-2 |

# Egypt Bilateral Investment Treaty

Signed March 11, 1986 (modified); Entered into Force June 27, 1992

99TH Congress 2d Session
SENATE Treaty Doc. 99-24

INVESTMENT TREATY WITH EGYPT

MESSAGE
FROM

THE PRESIDENT OF THE UNITED STATES

Transmitting

THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE ARAB REPUBLIC OF
EGYPT CONCERNING THE RECIPROCAL ENCOURAGEMENT AND PROTECTION OF
INVESTMENTS, SIGNED AT WASHINGTON ON SEPTEMBER 29 ,1982; WITH A RELATED
EXCHANGE OF LETTERS SIGNED MARCH 11, 1985; AND A SUPPLEMENTARY PROTOCOL
SIGNED MARCH 11 ,1986

June 2, 1986.-Treaty was read the first time and, together with the accompanying papers,
referred to the Committee on Foreign Relations and ordered to be printed for the use of the
Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1986

LETTER OF TRANSMITTAL

THE WHITE HOUSE, *June 2, 1986*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith
the Treaty Between the United States of America and the Arab Republic of Egypt concerning the
Reciprocal Encouragement and Protection of Investments, signed at Washington September 29,
1982; with a related exchange of letters signed March 11, 1985; and a supplementary protocol,
signed March 11, 1986. I transmit also, for the information of the Senate, the report of the
Department of State with respect to this Treaty.

The Bilateral Investment Treaty (BIT) program initiated in 1981, is designed to encourage and

protect U.S. investment in developing countries. The Treaty is an integral part of U.S. efforts to encourage Egypt and other governments to adopt macroeconomic and structural policies that will promote economic growth. It is also fully consistent with U.S. policy toward international investment. That policy holds that an open international investment system in which participants respond to market forces provides the best and most efficient mechanism to promote global economic development. A specific tenet, reflected in this treaty, is that U.S. direct investment abroad and foreign investment in the United States should receive fair, equitable, and non-discriminatory treatment. Under this treaty, the parties also agree to international law standards for expropriation and compensation; free financial transfers; and procedures, including international arbitration, for the settlement of investment disputes.

I recommend that the Senate consider this Treaty as soon as possible, and give its advice and consent to ratification of the treaty, with related exchange of letters and supplementary protocol, at an early date.

RONALD REAGAN.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, May 20, 1986.*
The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty Between the United States of America and the Arab Republic of Egypt Concerning the Reciprocal Encouragement and Protection of Investments, signed at Washington, September 29, 1982; with a related exchange of letters signed March 11, 1985; and a supplemental protocol, signed March 11, 1986. I recommend that this treaty, with related exchange of letters and supplementary protocol, be transmitted to the Senate for its advice and consent to ratification.

In accordance with the terms of the supplementary protocol, revisions made to the treaty and contained in that supplementary protocol will be integrated into a single unified text which will be published as the official treaty text after entry into force. For the information of the Senate, a copy of that consolidated text is attached to this report to facilitate reviewing the treaty. The consolidated text should be considered an unofficial text prior to ratification of the treaty, with related documents, by both Parties. As used herein, references to the treaty with Egypt should be considered as references to the consolidated text, as amended.

The Bilateral Investment Treaty (BIT) with Egypt was the first treaty signed under the BIT program which you initiated in 1981. Shortly after the signing, the Egyptian Government indicated a need to renegotiate a number of the treaty's provisions. The parties agreed to certain changes, now contained in the supplementary protocol. In particular, the supplementary protocol replaces entirely the original protocol of September 29, 1982. Accordingly, the Department considers the first protocol to be an unperfected instrument which should not be submitted to the Senate for advice and consent to ratification.

Development of the BIT program and the negotiation of the individual treaties have been pursued by the Office of the United States Trade Representative and the Department of State with the active participation of the Departments of Commerce and Treasury, in conjunction with other

interested U.S. Government agencies. On March 25 this year, BITs with six countries-Haiti, Morocco, Panama, Senegal, Turkey, and Zaire-were submitted to the Senate for its advice and consent to ratification. Additional BITs with Bangladesh, Cameroon and Grenada have also been signed and are being prepared for submission to the Senate.

In 1981 you initiated the global BIT program to encourage and protect U.S. investment in developing countries. By providing certain mutual guarantees and protections, a BIT creates a more stable and predictable legal framework for foreign investors in the territory of each of the treaty Parties. The negotiation of a series of bilateral treaties with interested countries establishes greater international discipline in the investment area.

The BITs which have been signed as well as others under negotiation are an integral part of U.S. efforts to encourage other governments to adopt macroeconomic and structural policies that will promote economic growth. They are also fully consistent with your policy statement on international investment of September 9, 1983, which states that international direct investment flows should be determined by private market forces and should receive fair, equitable and non-discriminatory treatment.

Our experience to date has shown that interested countries are willing to provide U.S. investors with significant investment guarantees and assurances as a way of inducing additional foreign investment. It is U.S. policy to advise potential treaty partners that conclusion of a BIT with the United States is an important and favorable factor in the investment relationship, but does not in of itself result in immediate increases in U.S. investment flows.

Congressional support for the BIT program is reflected in Section 601(a) and (b) of the Foreign Assistance Act, as amended, in particular at Section 601(b) which provides:

In order to encourage and facilitate participation by private enterprise to the maximum extent practicable in achieving any of the purposes of this Act, the President shall...(3) accelerate a program of negotiating treaties for commerce and trade, including tax treaties, which shall include provisions to encourage and facilitate the flow of private investment to, and its equitable investment in, friendly countries and areas participating in programs under this Act.

BITs are consistent in purpose with the network of treaties of Friendship, Commerce and Navigation (FCNs) which the United States negotiated from the early years of the Republic until the last successful negotiations with Thailand and Togo in the late 1960s. They continue the U.S. policy of securing by agreement standards of equitable treatment and protection of U.S. citizens carrying on business abroad, and institutionalizing processes for the settlement of disputes between investors and host countries, and between governments. We expect that a series of bilateral treaties with interested countries will establish greater international discipline in the investment area.

The BIT was designed to protect investment not only by treaty but also by reinforcing traditional international legal principles and practice regarding foreign direct private investment. In pursuit of this objective, the model BIT adopts FCN language and concepts. Traditional FCN provisions granting rights which are not important to the typical U.S. investor were eliminated and replaced with more specific language concerning investment protection. Perhaps most significantly, the BIT goes beyond the traditional FCN to provide investor-host country arbitration in instances where an investment dispute arises.

The U.S. BIT approach followed similar programs that had been undertaken with considerable success by a number of European counties, including the Federal Republic of Germany and the United Kingdom, since the early 1960s. Indeed, our industrialized partners already have nearly two hundred BITs in force, primarily with developing countries. U.S. treaties, which draw upon language used in the U.S. FCN treaties as well as European counterparts, are more

comprehensive and far-reaching than European BITs.


THE U.S.-EGYPT TREATY

The Treaty with Egypt was negotiated by an inter-agency team led by officials from the Office of the United States Trade Representative and the Department of State. The Treaty satisfies all four main BIT objectives:

-foreign investors are to be accorded treatment in accordance with international law and are to be treated no less favorably than investors of the host country or no less favorably than investors of third countries, whichever is the most favorable treatment ("national" or "most-favored-nation" treatment) subject to certain specified exemptions;

-international law standards shall apply to the expropriation of investments and to the payment of compensation for expropriation;

-free transfers shall be afforded to funds associated with an investment into and out of the host country; and

-procedures are to be established which allow an investor to take a dispute with a Party directly to binding third-party arbitration.

The provisions on treatment of foreign investment and arbitration, and in particular Egypt's acceptance of international law as the governing law, mark an important achievement for the BIT program and U.S. investment and international arbitration policies.

A technical memorandum explaining in detail the provisions of this treaty will be transmitted separately to the Senate Committee on Foreign Relations. That technical memorandum explains, clause by clause, the provisions of the treaty with Egypt.

The treaty with Egypt was the result of the first BIT negotiation undertaken by the United States. Those negotiations were conducted from an early model text which in light of experience has undergone some modification. In general, however, the treaty closely follows the objectives contained in current U.S. model text, the most significant provisions of which are as follows.

The model BIT's definition section clarified terms such as "company of a Party" and "investment." The BIT concept of "investment" is broad and designed to be flexible; although numerous types of economic interests are enumerated, the intent is to include all legitimate interests in the territory of either Party, whether directly or indirectly controlled by nationals of the other, having economic value or "associated" with an investment. Protected "companies of a Party" are those incorporated or otherwise organized under the laws of a Party in which nationals of that Party have a substantial interest.

The model BIT accords the better of national or most-favored-nation (MFN) treatment to foreign investment, subject to each Party's exceptions which are listed in a separate Annex. The exceptions are designed to protect state regulatory interests and for the United States to accommodate the derogations from national treatment in state or federal law relating to such areas as air transport, shipping, banking, telecommunications, energy and power production, insurance, and from national and MFN treatment in the case of ownership of real property. Any additional restrictions or limitations which a Party may adopt with respect to those matters or sectors excepted from the standards are not to affect existing investments. The model BIT also includes general treatment protections designed to be a guide to interpretation and application of the treaty. Thus, the Parties agree to accord investments "fair and equitable treatment" and "full

protection and security" in no case "less than that required by international law." It specifically grants nationals of a Party the right to establish investments in the territory of the other Party, restricts the right to impose performance requirements, and obliges Parties to observe their contractual obligations with investors. The U.S. model also provides that companies legally constituted under the laws of the other Party (i.e., subsidiaries of companies of a Party) with investments in that country shall be permitted to engage "top managerial personnel of their choice, regardless of nationality."

The model BIT also confers protection from unlawful interference with property interests and assures compensation in accordance with international laws standards. It provides that any direct or indirect taking must be: for a public purpose; nondiscriminatory; accompanied by the payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general standards of treatment discussed above. The meaning of "expropriation" as used in the model BIT is broad and flexible; it includes any measure which is "tantamount to expropriation or nationalization." Such compensation, which "shall be equivalent to the fair market value of the expropriated investment immediately before the expropriaty action was taken or became known," must be "without delay," "fully realizable," "freely transferable" and "include interest at a commercially reasonable rate from the date of expropriation...." The BIT grants the right to "prompt review" by the relevant judicial or administrative authorities in order to determine whether the compensation offered is consistent with these principles. It also extends national and MFN treatment to investors in cases of loss due to war or other civil disturbance. The BIT does not provide, however, a specific valuation method for compensating such losses.

The model BIT provides for free transfers "related to an investment," specifically of returns, compensation for expropriation, payments arising out of an investment dispute, contract payments, proceeds from sale, and contributions to capital for maintenance or development of an investment. Such transfers are to be made in a "freely convertible currency at the prevailing market rate of exchange on the date of transfer with respect to spot transactions in the currency to be transferred." The model text recognizes that notwithstanding this guarantee Parties can maintain certain laws, regulations or court-imposed obligations which could affect the disposition of investment assets. In particular, the model text provides that Parties can require reports of currency transfers and impose income taxes by such means as a withholding tax on dividends. The model text also recognizes that Parties retain the right to protect the rights of creditors and ensure the satisfaction of judgments in adjudicatory proceedings.

The model BIT provides that where certain defined investment disputes arise between a Party and a national or company of the other party, including disputes as to the interpretation of an investment agreement, and the dispute cannot be solved through negotiation, it may be submitted to arbitration in accordance with any dispute-settlement procedures to which the national or company and the host country have previously agreed. Unless the national or company has submitted the dispute to previously agreed dispute settlement procedures or to adjudication by domestic courts or other tribunals of the host country, the national or company may submit the dispute to the International Centre for the Settlement of Investment Disputes ("ICSID") for conciliation or binding arbitration. Exhaustion of local remedies is not required. In a separate provision, the BIT Parties also agree to provide effective means of asserting claims and enforcing rights with respect to investments.

The model BIT provides for state-to-state arbitration between the Parties in case of a dispute regarding the interpretation or application of the treaty. In the absence of an agreement that other rules apply, the BIT refers the Parties to specific procedural rules which must govern the arbitration. The BIT also outlines the procedures for the creation of the arbitral panel.

The model BIT exhorts Parties to apply their tax policies fairly and equitably. Because the United States specifically addresses tax matters in tax treaties, the BIT generally excludes such matters. Another BIT provision exempts disputes arising under Export-Import Bank programs, or other

credit guarantee or insurance arrangements providing for alternative dispute settlement arrangements, from the standard BIT arbitration clauses. The model BIT also states that the treaty shall not derogate from any obligations that require more favorable treatment of investments and declares that the treaty shall not preclude measures necessary for public order or essential security interests. The model BIT enters into force 30 days after exchange of ratifications and continues in force for at least ten years. Thereafter, either Party may terminate the treaty, subject to one year's written notice.

Each of these model provisions was developed after lengthy and extensive consultations within the U.S. Government and with the private sector. Nonetheless, in negotiating a particular treaty, the U.S. Government retains, of course, some flexibility to adopt modifications as necessary and in light of experience. While the U.S. model text has recently been simplified, the provisions summarized above have all been retained.

Some of the provisions of the U.S.-Egypt treaty differ from the model text. With the exception of the transfers provisions, none of the changes represent substantive departures from U.S. objectives. The more significant modifications are as follows:

(1). Definition of Investment (Article I): Although the treaty with Egypt, like the current model text, defines investment so as to include "every kind of asset, owned or controlled," paragraph 2 of the Protocol defines "control" as having "a substantial share of ownership rights and the ability to exercise decisive influence." While the United States would have preferred to omit this clause, paragraph 2 also states that differences as the existence of control "shall be resolved" in accordance with the binding dispute settlement provisions contained in the treaty. Also this treaty, unlike the current model text, does not specify that investments may be controlled "directly or indirectly." Since Article I(1)(d) of the treaty specifies that "own or control' includes ownership or control exercised through subsidiaries or affiliates," this omission is not significant.

(2). Existing Investments (Article II (2)(b)): Like the current model text, the treaty with Egypt specifically applies to pre-existing investments. This treaty provides, however, that pre-existing investments receive treaty protection if "accepted in accordance with the respective prevailing legislation of either party." U.S. investments established in Egypt after 1974 are covered by Egypt's Law 43 on Arab and Foreign Capital Investment and Free Zones (later amended by Law 32 of 1977)(Law 43). Law 43 and regulations thereunder contain application procedures, provisions on the assessment of assets, and registration of invested capital. The foreign investor's application, together with Egyptian government assessments, approvals, or certifications, entitle the investor to certain benefits and could be construed to constitute a contractual arrangement between the Egyptian government and the foreign investor, insofar as these arrangements are binding on both parties. While is it conceivable that such arrangements may in some respects be inconsistent with the present treaty and that U.S. investments established in Egypt under legislation in force prior to Law 43 may contain arrangements inconsistent with the treaty, U.S. negotiators are unaware of any such inconsistencies. Egypt has also agreed, in Article II (3)(a), that any additional limitations which a party may adopt with respect to those sectors excepted from the standards are not to affect existing investments.

(3). Right of establishment (Article II): The treaty with Egypt contains the same rights with respect to establishment of an investment as are contained in the model text subject to one minor qualification. Although the treaty contains model language which permits investments to be established on MFN and national treatment basis (the latter subject to exceptions listed in the annex), Article II(3)(b) states that consistent with these rights each Party "retains the discretion to approve investments according to national plans and priorities on a non-discriminatory basis."

(4). Excepted sectors (Annex; Protocol): Egypt's list of sectors to be excluded from national treatment, found in the Annex, is extensive and includes commercial activity such as distribution, wholesaling, retailing, import and export activities." Paragraph 12 of the Protocol limits this

exception by stating that "commercial activity" does not include integrated operations which combine production and sales activities for their products. In addition, in paragraph 13 of the Protocol each Party agrees to accord investments in investment banks, merchant banks and reinsurance companies whose activities are confined to foreign currency transactions "treatment no less favorable than that accorded under existing laws and regulations to investments by its own nationals and companies or to investments by nationals or companies of any third country, whichever is the more favorable." The Parties also agree to hold further discussions concerning the expansion of investment possibilities in the banking and insurance sectors. Finally, under paragraph 3(b) of the Protocol, United States investors may have a restricted right of establishment in "limited sensitive geographic area designated for exclusive Egyptian investment." This responds to Egypt's public order and national security concerns about foreign investment in certain sensitive border regions. In these areas, United States investors' right of establishment will be on an MFN basis. Egypt reserves the right to modify these areas, provided such areas are kept to a minimum and "will not substantially impair the investment opportunities" of the United States nationals.

(5). Customs Union Exemption (Paragraph 4 of Protocol): Under Paragraph 4 of the Protocol the Parties are not required to extend MFN treatment in excepted sectors if those advantages are derived from a special security or regional arrangement, including regional customs unions or free trade areas. Egypt requested this exception because it is a member of the Arab League. While the current model text does not contain a similar provision, similar customs union exceptions to MFN treatment are contained in United States BITs with Bangladesh, Haiti and Morocco.

(6). Treatment of Investment (Article II): This treaty deviates from the current model text on the treatment of investment in two respects:

(a) Although the treaty, like the current model text, grants national or MFN treatment to activities "associated" with an investment and includes the purchase of foreign exchange among these activities, Article II (2)(a) states that the purchase of foreign exchange for the operation of enterprises must be made "in accordance with national regulations and practices." This provision would essentially protect Egypt's foreign exchange reserves during periods of stringency. It was understood that such national laws and practices would not be discriminatory against the nationals and companies of the other Party.

(b) Article II (4) states that the "treatment, protection and security of investments shall never be less than that required by international law and national legislation." This clause is intended to place a floor under and reinforce the national/MFN treatment standard. It corresponds to a clause contained in the U.S. model BIT at the time the Egypt treaty was originally negotiated which includes additional language, not contained in the Egypt treaty and derived from European BITS, which is intended to supplement national or MFN treatment, such as "fair and equitable treatment" and "full protection and security."

(7). Employment (Article II (5)): Although this treaty, like the current model text, permits nationals of either party to enter and to reside in the territory of the other Party "for the purpose of establishing, developing, directing, administering or advising on the operations of an investment * * *," it deviates from the current model text concerning investors' rights to hire personnel of their choice in two minor respects. While the current model text permits investors to engage "top managerial personnel of their choice, regardless of nationality" this treaty grants this right with respect to "the managing director or their choice." In addition, the "regardless of nationality" phrase, included in the current model text to insure that companies of a Party investing in the United States otherwise comply with U.S. anti-discrimination employment laws in their hiring practices, was not included in this treaty. It is understood that the right to hire top managerial personnel remains nevertheless subject to U.S. anti-discrimination laws. (The "regardless of nationality" phrase was omitted in a similar provision in the U.S. BIT with Cameroon.) In addition, although Paragraph 5 of the Protocol states that the treaty does not derogate from each Party's

right to establish qualifications for the exercise of a profession, this paragraph also states that it does not derogate from investors' rights to engage professional and technical personnel of their choice.

(8). Performance Requirements (Article II(6)): While the current model text prohibits performance requirements, Article II(6) of this treaty employs only a hortatory standard ("seek to avoid"). Similar hortatory language concerning performance requirements is found in Unites States BITs with Bangladesh, Haiti, Morocco, Senegal and Turkey. In addition, while the current model text takes a broad approach to performance requirements (and includes "commitments to export goods produced, or which specify that goods or services must be purchased locally, or which impose any other similar requirements"), Paragraph 7 of the Protocol limits the definition of performance requirements to "conditions imposed which would require an investor to export a minimum percentage of final product or to source some inputs locally."

(9). Transfers (Article V; Paragraph 10 of the Protocol): The most significant departure from the current model text is in respect to transfers. Egypt has agreed to a transfers provision-Article V-which is substantially similar to that in the current model text. The current model text specifically states that "transfers related to an investment" shall be made "freely and without delay into and out of its territory * * *," and lists examples of types of funds subject to free transfer. This treaty by contrast simply states that each Party "shall in respect to investments by nationals or companies of the other Party grant to those nationals or companies the free transfer of," enumerated specific types of funds subject to free transfer. The types of funds listed are identical in substance to those in the current model text except that two categories identified in the current model text are not explicitly listed in the Egypt text: additional funds for the development (not merely the maintenance) of an investment and compensation payments arising from an investment dispute other than an expropriation.

In addition, under paragraph 10 of the Protocol, Egypt may temporarily delay transfers abroad of funds from liquidated investments if foreign exchange reserves are at a "very low level." In such cases, Egypt may delay transfers:

(i) in a manner not less favorable than that accorded to comparable transfers to investors of third countries; (ii) to the extent and for the time period necessary to restore its reserves to a minimally acceptable level, but in no case for period [s] of time longer than that permitted by the provisions of Law 43 in force on the date of signature of this Treaty; and (iii) after providing the investor an opportunity to invest the sales or liquidation proceeds in a manner which will preserve their real value free of exchange risk until transfer occurs.

Under Article 21 of Law 43, an investor may not, except in "exceptional circumstances," repatriate or dispose of his invested capital in less than five years after the importation of the capital into Egypt. (Within the statutory five year period, he may transfer the capital out of the country "at the highest rate prevailing and declared for freely convertible foreign currency in five equal annual installments.") Similar delays on the right to free transfers of liquidated capital on the basis of foreign exchange shortages where also accepted in United States BITs with Bangladesh, Turkey and Zaire.

(10) Expropriation (Article III): This treaty departs from the current model text expropriation provisions in several minor respects:

(a) Paragraph 8 of the Protocol states that "prompt" payment in the event of an expropriation "does not necessarily mean instantaneous * * *(the intent is that the Party diligently and expeditiously carry out any necessary formalities." This merely makes express what the United States has long regarded to be required under international law.

(b) While the treaty with Egypt omits specific use of the term "effective" compensation, the

substance of that concept-assurance that once compensation has been paid the investor is able to withdraw his assets in usable form from the expropriating country-is retained. Thus, the treaty with Egypt provides that compensation shall be "freely realizable" and "freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action."

(c) Article III (1) provides that compensation "include payments for delay as may be considered appropriate under international law." The current model text is more specific about the international law standard, stating that payments for delay "bear current interest from the date of expropriation."

(d) While both the current model text and the treaty with Egypt provide that compensation shall not reflect any reduction in value due to "the occurrence of the events that constituted or resulted in the expropriatory action," paragraph 9 of the Protocol clarifies that this refers to conduct attributable to the expropriatory Party and not to the conduct of the investor.

(e) Paragraph 9 of the Protocol also clarifies that the Article III (1) requirement that an expropriation not violate "a specific contractual engagement" is without prejudice to the measure of compensation due in the event of an expropriation.

(f) The March 11, 1985 exchange of letters between the Parties states that compensation for purposes of Article III (1) "shall be determined in a manner consistent with international legal norms and standards rather than norms and standards that are particular to a specific domestic legal system." This assurance, made at Egypt's insistence, is implicit in the current model text reference to international law standards.

(11) Consultations Between Parties (Article VI): Like the current model text, this treaty provides that consultations between the Parities be held promptly upon the request of either Party to discuss the interpretation or application of the treaty or resolve related disputes. At the request of Egypt, this treaty goes beyond the current model text and also provides for biennial consultations to review the operation of the treaty in encouraging investments.

(12) Dispute Settlement Between a Party and an Investor (Article VII): This treaty modified the dispute settlement provisions of the current model text in two respects:

(a) While the current model text specifically defines the types of "investment dispute" which are subject to arbitration to include "the interpretation or application of any investment authorization granted by a party's foreign investment authority," no such clause appears in this treaty. Nonetheless, since this treaty, like the current model text, defines such arbitrable disputes to include both the interpretation of an investment agreement as well as "any right conferred or created" by this treaty "with respect to an investment," the failure to mention specifically this third type of dispute is of doubtful significance.

(b) Article VII (4) of this treaty states that investors "shall not be entitled to compensation for more than the value of the affected assets, taking into account all sources of compensation within the territory of the Party liable for the compensation." The intent of this language, inserted at the insistence of Egypt, is to protect the Parties against "double indemnity." Egyptian negotiators were concerned that U.S. investors not receive payment for the value of a single claim from both a local Egyptian insurance company (which is likely to be publicly owned) and the Egyptian Government. The language would not limit a U.S. investor from collecting payment on the same claim from a third party (non-Egyptian) insurance company.

Submission of this treaty marks a significant development in our international investment policy. I join with the United States Trade Representative and other U.S. Government agencies in supporting this treaty, with related exchange of letters and supplemental protocol,  and favor its

transmittal to the Senate at an early date.

Respectfully submitted.


GEORGE P. SHULTZ.

Attachment: Consolidated text prepared by the Office of the U.S. Trade Representative and Department of State.

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE ARAB REPUBLIC OF EGYPT CONCERNING THE RECIPROCAL ENCOURAGEMENT AND PROTECTION OF INVESTMENTS

Whereas, the United States of America and the Arab Republic of Egypt (each hereinafter referred to as a "Party"), both recognize the importance of providing mutually beneficial support for the major efforts that each has contributed in fostering international peace both within and beyond their respective regions, and

Whereas, each Party recognizes that economic expansion and development are basic elements in the process of strengthening the efforts for and the bonds of international peace and friendship within an atmosphere of stability and security, and

Whereas, each agrees that economic cooperation through the pursuit of policies an practices which foster bilateral trade and investment, will contribute substantially to the long-term benefit and welfare of the peoples of each Party, and

Recognizing that agreement on a general framework for the encouragement and nondiscriminatory treatment of investments will stimulate the flow of productive capital and technology and thereby provide for a more effective use of capital and technical resources for development needs, further promoting economic stability and durable peace,

Both have resolved to conclude a bilateral Treaty pertaining to the reciprocal encouragement and protection of investments, and

Have agreed as follows:

ARTICLE I

## DEFINITIONS

1.[1] For the purposes of this Treaty,

([1] The original text contains a paragraph 1, but no paragraph 2.)

(a) "Company" means any kind of juridical entity, including any corporation, company, association, or other juridical entity, that is duly incorporated, constituted, or otherwise duly organized, regardless of whether or not the entity is duly organized for pecuniary gain, privately or publicly owned, or organized with limited or unlimited liability.

(b) "company of a Party" means a company duly incorporated, constituted or otherwise duly organized under the applicable laws and regulations of a Party or its subdivisions in which

(i) natural persons who are nationals of such Party, or

(ii) such Party or its subdivision or its agencies or instrumentalities have a substantial interest.

The juridical status of a company of a Party shall be recognized by the other Party and its subdivisions.

(c) "Investment" means every kind of asset owned or controlled and includes but is note limited to:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares, stock in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value due under an investment agreement;

(iv) valid intellectual and industrial property rights, including, but not limited to rights with respect to copyrights and related patents, trademarks and trade names, industrial designs, trade secrets and know-how, and goodwill.

(v) licenses and permits issued pursuant to law, including those issued for manufacture and sale of products.

(vi) any right conferred by law or contract, but not limited rights, within the confines of law, to search for or utilize natural resources, and rights to manufacture, use and sell products;

(vii) returns which are reinvested.

(d) "own or control" includes ownership or control exercised through subsidiaries or affiliates.

(e) "national" of a Party means a natural person who is a national of a party under its applicable law.

(f) "return" means an amount derived from an investment, including but not limited to, profit; dividend; interest; royalty payment; management, technical assistance or other fee; and payment in kind.

ARTICLE II
ENCOURAGEMENT AND PROMOTION OF INVESTMENTS

1. Each Party undertakes to provide an maintain a favorable environment for investments in its territory by nationals and companies of the other Party and shall, in applying its laws, regulations, administrative practices and procedures, permit such investments to be established and acquired on terms and conditions that accord treatment no less favorable than the treatment it accords to investments of its own nationals and companies of any third country, whichever is the most favorable.

2. (a) Each Party shall accord investments in its territory, and associated activities in connection with these investments of nationals or companies of the other Party, treatment no less favorable than that accorded in like situations to investments and associated activities of its own nationals and companies, or nationals and companies of any third country, whichever is the most favorable. Associated activities in connection with an investment include, but are not limited to:

(i) the establishment, control and maintenance of branches, agencies, offices, factories or other facilities for the conduct of business;

(ii) the organization of companies under applicable laws and regulations; the acquisition of companies or interests in companies or in the property; and the management, control, maintenance, use, enjoyment and expansion, and the sale, liquidation, dissolution or other disposition, of companies organized or acquired;

(iii) the making, performance and enforcement of contracts related to investment;

(iv) the acquisition (whether by purchase, lease or any other legal means), ownership and disposition (whether by sale, testament or any other legal means) of personal property of all kinds, both tangible and intangible;

(v) the leasing of real property appropriate for the conduct of business;

(vi) acquisition, maintenance and protection of copyrights, patents, trademarks, trade secrets, trade names, licenses and other approvals of products and manufacturing processes, and other industrial property rights; and

(vii) the borrowing of funds at market terms and conditions from local financial institutions, as well as the purchase and issuance of equity shares in the local financial markets, and, in accordance with national regulations and practices, the purchase of foreign exchange for the operation of the enterprise.

(b) This Treaty shall also apply to investments by nationals or companies of either Party, made prior to the entering into force of this Treaty and accepted in accordance with the respective prevailing legislation of either party.

3. (a) Notwithstanding the preceding provisions of this Article, each Party reserves the right to maintain limited exceptions to the standard of national treatment otherwise required concerning investments or associated activities if exceptions fall within one of the sectors listed in the Annex to this Treaty. Both Parties hereby agree to maintain the number of such exceptions to a minimum. In addition, each Party shall notify the other Party of any specific measures which constitute exceptions to the standard of national treatment provided herein. In no event, however, shall the treatment to be accorded pursuant to any exception be less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country. Moreover, no exception, within the sectors contained in the Annex, introduced after the date of entry into force of this Treaty shall apply to investments of nationals or companies of the other Party existing in that sector at the time the exception becomes effective.

(b) Each Party retains the discretion to approve investments according to national plans and priorities on a nondiscriminatory basis consistent with paragraphs (1) and (3)(a) of this Article.

4. The treatment, protection and security of investments shall never be less than that required by international law and national legislation.

5. (a) Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to reside in the territory of the other Party for the purpose of establishing, developing, directing, administering or advising on the operations of an investment to which they or the companies that employ them have committed or are in the process of committing a substantial amount of capital or other resources.

(b) Nationals and companies of either Party, and their companies which they own or control in the territory of the other Party, shall be able to engage the managing director of their choice. Further,

subject to employment laws of each Party, nationals and companies of either Party shall be permitted to engage, within the territory of the other Party, professional and technical personnel of their choice, for the particular purpose of rendering professional, technical and managerial assistance necessary for the planning and operation of investments.

6. In the context of its national economic policies and objectives, each Party shall seek to avoid the imposition of performance requirements of the investments of nationals and companies of the other Party.

7. Each Party recognizes that in order to maintain a favorable environment for investments in its territory by nationals or companies of the other Party, it should provide effective means of asserting claims and enforcing rights with respect to investment agreements, investment authorizations and properties. Each Party shall grant to nationals or companies of the other Party, on terms and conditions no less favorable than those which it grants in like situations to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, the right of access to its courts of justice, administrative tribunals and agencies, and all other bodies exercising adjudicatory authority, and the right to employ persons of their choice, who otherwise qualify under applicable laws and regulations of the forum for the purpose of asserting claims, and enforcing rights, with respect to their investments.

8. Each Party and its subdivisions shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to [or] affect investments in its territory of nationals or companies of the other Party.

ARTICLE III
COMPENSATION FOR EXPROPRIATION

1. No investment or any part of an investment of a national or company of either Party shall be expropriated or nationalized by the other Party or by a subdivision thereof-or subjected to any other measure, direct or indirect, if the effect of such other measure, or a series of such other measures, would be tantamount to expropriation or nationalization (all expropriations, all nationalizations and all such other measures hereinafter referred to as "expropriation")-unless the expropriation

(a) is done for a public purpose;
(b) is accomplished under due process of law;
(c) is not discriminatory;
(d) is accompanied by prompt and adequate compensation, freely realizable; and
(e) does not violate any specific contractual engagement.

Compensation shall be equivalent to the fair market value of the expropriated investment on the date of expropriation. The calculation of such compensation shall not reflect any reduction in such fair market value due to either prior public notice or announcement of the expropriatory action, or the occurrence of the events that constituted or resulted in the expropriatory action. Such compensation shall include payments for delay as may be considered appropriate under international law, and shall be freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action.

2. If either Party or a subdivision thereof expropriates the investment of any company duly incorporated, constituted or otherwise duly organized in its territory, and if nationals or companies of the other Party, directly or indirectly, own, hold or have other rights with respect to the equity of such company, then the Party within whose territory the expropriation occurs shall ensure that such nationals or companies of the other Party receive compensation in accordance with the

provisions of the preceding paragraph.

3. Except as otherwise provided in an agreement between the Parties, or between a Party and a national or company of the other Party, a national or company of either Party that asserts that all or part of its investment in the territory of the other Party has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of such other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any compensation thereof, conforms to the principals of international law.

ARTICLE IV
COMPENSATION FOR DAMAGES DUE TO WAR AND SIMILAR EVENTS

Nationals or companies of either Party whose investments or returns in the territory of either Party suffer

(a) damages due to war or other armed conflict between such other Party and a third country or

(b) damages due to any kind of civil disturbance or insurrection in the territory of such other Party,

shall be accorded treatment no less favorable than that which such other Party accords to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, when making restitution, indemnification, compensation or other appropriate settlement with respect to such damages.

ARTICLE V
TRANSFERS

1. Either Party shall in respect to investments by nationals or companies of the other Party grant to those nationals or companies the free transfer of:

(a) returns;
(b) royalties and other payments deriving from licenses, franchises and other similar grants or rights;
(c) installments in repayment of loans;
(d) amounts spent for the management of the investment in the territory of the other Party or a third country;
(e) additional funds necessary for the maintenance of the investment;
(f) the proceeds of partial or total sale or liquidation of the investment, including a liquidation effected as a result of any event mentioned in Article IV; and
(g) compensation payments pursuant to Article III.

2. To the extent a national or company of either Party has not made another arrangement with the appropriate authorities of the other Party in whose territory the investment of such national or company is situated, currency transfers made pursuant to Paragraph 1 of this Article shall be permitted in the currency of the original investment or in any other freely convertible currency. Such transfers shall be made at the prevailing rate of exchange on the date of transfer with respect to current transactions in the currency to be transferred.

3. Notwithstanding the preceding paragraphs, either Party may maintain laws and regulations: (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of the law.

ARTICLE VI
CONSULTATIONS AND EXCHANGE OF INFORMATION

1. The Parties shall, upon the written request of either of them, promptly hold consultations to discuss the interpretation or application of this Treaty or to resolve any disputes in connection therewith.

2. Further, for the purpose of reviewing the operation of this Treaty in encouraging investments, consultations should be held biennially between the two Parties. Those consultations should aim at exchanging information and views on the progress regarding investments.

3. If one Party requests in writing that the other Party supply information in its possession concerning investments in its territory by nationals or companies of the Party making the request, then the other Party shall, consistent with its applicable laws and regulations and with due regard for business confidentiality, endeavor to establish appropriate procedures and arrangements for the provision of any such information.

ARTICLE VII
SETTLEMENT OF LEGAL INVESTMENT DISPUTES BETWEEN ONE PARTY AND A
NATIONAL OR COMPANY OF THE OTHER PARTY

1. For purposes of this Article, a legal investment dispute is defined as a dispute involving (i) the interpretation or application of an investment agreement between a Party and a national or company of the other Party; or (ii) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of a legal investment dispute between a Party and a national or company of the other Party with respect to an investment of such national or company in the territory of such Party, the parties shall initially seek to resolve the dispute by consultation and negotiation. The Parties may, upon the initiative of either of them and as a part of their consultation and negotiation, agree to rely upon non-binding, third-party procedures. If the dispute cannot be resolved through consultation and negotiation, then the dispute shall be submitted for settlement in accordance with the applicable dispute-settlement procedures upon which a Party and national or company of other Party have previously agreed. With respect to expropriation by either Party, any dispute-settlement procedures specified in an investment agreement between such Party and such national or company shall remain binding and shall be enforceable in accordance with the terms of the investment agreement and relevant provisions of domestic laws of such Party and treaties and other international agreements regarding enforcement of arbitral awards to which such Party has subscribed.

3. (a) In the event that the legal investment dispute is not resolved under procedures specified above, the national or company concerned may choose to submit the dispute to the International Centre for the Settlement of Investment Disputes ("Centre") for settlement by conciliation or binding arbitration, if, within six (6) months of the date upon which it arose: (i) the dispute has not been settled through consultation and negotiation; or (ii) the dispute has not, for any good faith reason, been submitted for resolution in accordance with any applicable dispute-settlement procedures previously agreed to by the Parties to dispute: or (iii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the Party that is a Party to the dispute.

(b) Each Party hereby consents to the submission of an investment dispute to the Centre for settlement by conciliation or binding arbitration.

(c) Conciliation or binding arbitration of such disputes shall be done in accordance with the provisions of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States ("Convention") and the Regulations and Rules of the Centre.

4. In any proceeding , judicial, arbitral or otherwise, concerning a legal investment dispute between it and a national or company of the other Party, A Party Shall not assert, as a defense, counterclaim, right of set-off or otherwise, that the national or company concerned has received or Will receive, pursuant to an insurance contract, indemnification or other compensation for all or part of its alleged damages from any third Party whatsoever, whether public or private, including such other Party and its subdivisions, agencies and instrumentalities. Notwithstanding the foregoing, a national or company of the other Party shall not be entitled to compensation for more than the value of its affected assets, taking into account all sources of compensation within the territory of the Party liable for the compensation.

5. For the purpose of any proceedings initiated before the Centre in accordance with this Article, any company that, immediately prior to the occurrence of the event or events giving rise to the dispute was a company of the other Party, shall be treated as a national or company of such other Party.

6. The provisions of this Article shall not apply to a dispute arising under an official export credit, guarantee, or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.


ARTICLE VIII
SETTLEMENT OF DISPUTES BETWEEN THE PARTIES CONCERNING INTERPRETATION OR APPLICATION OF THIS TREATY

1. Any dispute between the Parties concerning the interpretation or application of this Treaty should, if possible, be resolved through diplomatic channels.

2. If the dispute cannot be resolved through diplomatic channels, it shall, upon the agreement of the Parties, be submitted to the International Court of Justice.

3. (a) In the absence of such agreement, the dispute shall, upon the written request of either Party, be submitted to an arbitral tribunal for binding decision in accordance with the applicable rules and principles of international law.

(b) The Tribunal shall consist of three arbitrators, one appointed by each Party, and a Chairman appointed by agreement of the other two arbitrators. The Chairman shall not be a national of either Party. Each Party shall appoint an arbitrator within 60 days, and the Chairman shall be appointed within 90 days, after a Party has requested arbitration of a dispute.

(c) If the period set forth in (b) above are not met, and in the absence of some other arrangement between the Parties, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties or is unable to act for any reason, either Party may invite the Vice President, or if he is also a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(d) In the event that an arbitrator is for any reason unable to perform his duties, a replacement shall be appointed within thirty (30) days of determination thereof, utilizing the same method by which the arbitrator being replaced was appointed. If a replacement is not appointed within the time limit specified above, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties

or is unable to act for any reason, either Party may invite the Vice President, or if he is also a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(e) Unless otherwise agreed to by the Parties to the dispute, all submissions shall be made. and all hearings shall be completed within one hundred and twenty (120) days of the date of the selection of the third arbitrator, and the Tribunal shall render its decision within thirty (30) days of the date of the final submissions or the date of the closing of the hearings, whichever is later, and such decision shall be binding on each Party.

(f) Except as otherwise agreed to by the Parties, arbitration proceedings shall be governed by the Model Rules on Arbitral Procedure adopted by the United Nations International Law Commission in 1958 ("Model Rules") and commended to Member States by the United Nations General Assembly in Resolution 1262 (XIII). To the extent that procedural questions are not resolved by this Article or the Model Rules they shall be resolved by the Tribunal. Notwithstanding any other provision of this Treaty or the Model Rules, the Tribunal shall in all cases act by majority vote.

(g) Each Party shall bear the costs of its own arbitrator and counsel in the arbitral proceeding. Expenses incurred by the Chairman and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at its discretion, direct that a higher proportion of the costs be paid by one of the Parties. Such a decision shall be binding.

4. The provisions of this Article shall not apply to a dispute arising under an official export credit, guarantee or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE IX

PRESERVATION OF RIGHTS

1. This Treaty shall not supersede, prejudice, or otherwise derogate from (a) laws, regulations, administrative practices or procedures, or adjudicatory decisions of either Party, (b) international legal obligations, or (c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, whether extant at the time of entry into force of this Treaty or thereafter, that entitle investments or associated activities of nationals or companies of the other Party to treatment more favorable than that accorded by this Treaty in like situations.

2. This Treaty shall not derogate from or terminate any other agreement entered into by the two Parties and in force as between the two Parties on the date on which this Treaty enters into force.

ARTICLE X

MEASURES NOT PRECLUDED BY TREATY

1. This Treaty shall not preclude the application by either Party or any subdivision thereof of any and all measures necessary for the maintenance of public order and morals, the fulfillment of its existing international obligations, the protection of its own security interests, or such measures deemed appropriate by the Parties to fulfill future international obligations.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments in its territory of nationals and companies of the other Party, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE XI

TAXATION

With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investments of nationals or companies of the other Party. Nevertheless, all matters relating to the taxation of nationals or companies of a Party, or their investments in the territories of the other Party or a subdivision thereof shall be excluded from this Treaty, except with regard to measures covered by Article III and the specific provisions of Article V.

ARTICLE XII
APPLICATION OF TREATY TO POLITICAL OR ADMINISTRATIVE SUBDIVISIONS OF THE PARTIES

This Treaty shall apply to the political and/or administrative subdivisions of each Party.

ARTICLE XIII
ENTRY INTO FORCE AND DURATION AND TERMINATION

1. This Treaty shall be ratified by each of the Parties, and the instruments of ratification thereof shall be exchanged as soon as possible.

2. This Treaty shall enter into force thirty (30) days after the date of exchange of the instruments of ratification. It shall remain in force for a period of ten (10) years and shall continue in force unless terminated in accordance with Paragraph 3 of this Article.

3. Either Party may, by giving one (1) year's written notice to the other Party, terminate this Treaty at the end of the initial ten (10) year period or at any time thereafter.

4. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall continue to be effective for a further period of ten (10) years from such date of termination.

5. The attached Annex and Protocol are integral parts of this Treaty.

DONE in duplicate at Washington this twenty-ninth day of September 1982* in the English and Arabic languages, both texts being equally authentic.


For the United States of America:
WILLIAM E. BROCK, Jr.


For the Arab Republic of Egypt:
WAJIH SHINDI.

* As modified by the Supplementary Protocol, signed at Cairo, March 11, 1986,


ANNEX

Consistent with Article II paragraph 3, each Party reserves the right to maintain limited exceptions in the sectors it has indicated below

THE UNITED STATES OF AMERICA

Air transportation, ocean and coastal shipping; banking; insurance; government grants; government insurance and loan programs; energy and power production; use of land and natural resources; custom house brokers; ownership of real estate; radio and television broadcasting; telephone and telegraph services; submarine cable services; satellite communications.


THE REPUBLIC OF EGYPT

Air and sea transportation; maritime agencies; land transportation other than that of tourism; mail, telecommunication, telegraph services and other public services which are state monopolies; banking and insurance; commercial activity such as distribution, wholesaling, retailing, import and export activities; commercial agency and broker activities; ownership of real estate; use of land; natural resources; national loans; radio, television, and the issuance of newspapers and magazines.


PROTOCOL*

On signing the Treaty concerning the Reciprocal Encouragement and Protection of Investments, the Arab Republic of Egypt and the United States of America have, in addition, agreed on the following provisions which should be regarded as an integral part of the Treaty:

1. Each Party reserves the right to deny the benefits of this Treaty to any company of either Party, or its affiliates or subsidiaries, if nationals of any third country control such company, affiliate or subsidiary; provided that, whenever one Party concludes that the benefits of this Treaty should not be extended for this reason, it shall promptly consult with the other Party to seek a mutually satisfactory resolution of this matter.

2. "Control" means to have a substantial share of ownership rights and the ability to exercise decisive influence. Differences as to the existence of control shall be resolved according to the provisions of Article VIII.

3. (a) The treatment accorded by the United States to nationals or companies of Egypt under the provisions of Article II (1) and (2) shall in any State of the United States or other territory, possession, or political or administrative subdivision of the United States be the treatment accorded therein to residents of or companies incorporated, constituted or otherwise duly organized in other States of the United States or territories, possessions, or political or administrative subdivisions of the United States.

(b) The treatment accorded by Egypt to nationals and companies of the United States with respect to the establishment and acquisition of investments in limited sensitive geographic areas designated for exclusive Egyptian investment shall be no less favorable than the treatment it accords to investments of nationals and companies of any third country. Egypt reserves the right to modify the areas covered, provided that such areas will be kept to a minimum and will not substantially impair the investment opportunities of United States nationals and companies.

4. The provisions of Article II, paragraph 3, relating to most favored nation treatment, shall not apply to advantages accorded by either Party to nationals or companies of a third country by virtue of a special security or regional arrangement, including regional customs unions or free trade areas. Further, these provisions do not apply to the ownership of real estate. The provisions of Article II paragraph 1, relating to most favored nation treatment, shall not be construed to oblige one Party to extend to nationals or companies of the other the benefit of any treatment, preference or privilege which may be extended by the former Party by virtue of a customs union or in the field of housing. Moreover, with regard to rights to engage in mining on the public

domain, each Party retains the right to accord to nationals or companies of the other Party treatment which is like or similar to that accorded by the other Party to nationals or companies of the first Party.

5. It is understood that this Treaty does not derogate from the rights of either Party regarding the establishment of qualifications as for the practice of professions, including law and accountancy. These qualifications may confine the practice of such professions to nationals or companies of a Party, provided that they are applied on a nondiscriminatory basis; and provided, further, that such nationality requirements do not derogate from the right of nationals and companies of either Party, pursuant to Article II (5)(b) to engage professional and technical personnel of their choice to render professional and technical services necessary for the internal planning and operation of the investment.

6. This Treaty, and in particular, the provisions of Article II, paragraph 5 (b) shall be subjected to the provisions of Article X.

7. With respect to Article II (6), performance requirements are conditions imposed which would require an investor to export a minimum percentage of final product or to source some inputs locally.

8. With regard to Article III, Paragraph 1(d) the term "prompt" does not necessarily mean instantaneous. The intent is that the Party diligently and expeditiously carry out any necessary formalities.

9. With regard to Article III, paragraph 1, the phrase "events that constituted or resulted in the expropriatory action" refers to conduct attributable to the expropriatory Party and not to conduct of the national or company, The inclusion of subparagraph (e) in Article III, paragraph 1, is without prejudice to the measure of compensation due in the event of expropriation.

10. The Parties recognize that restrictions on transfers abroad of sales or liquidation proceeds of an investment will adversely affect future capital inflows, contrary to the spirit of this Treaty and the interests of the Party imposing those restrictions. Nevertheless, the Parties recognize that it is possible that the Arab Republic of Egypt may find its foreign exchange reserves at a very low level. In these circumstances, the Arab Republic of Egypt may temporarily delay transfers required under Article V, Paragraph 1(f), but only: (i) in a manner not less favorable that accorded to comparable transfers to investors of third countries; (ii) to the extent and for the time period necessary to restore its reserves to a minimally acceptable level, but in no case for period of time longer than that permitted by the provisions of Law 43 in force on the date of signature of this Treaty; and (iii) after providing the investor an opportunity to invest the sales or liquidation proceeds in a manner which will preserve their real value free of exchange risk until transfer occurs.

11. Concerning Article VII (3)(a)(ii), it is understood that the Parties to the dispute may previously agree to submission of the dispute to the jurisdiction of domestic courts and tribunals. The Parties will maintain a nondiscriminatory policy regarding the inclusion and implementation of such provisions in any investment contract.

12. With regard to the Annex, the exceptions noted by the Arab Republic of Egypt under "commercial activity" do not include integrated operations which combine production and sales activities for their products.

13. Recognizing that international financial markets and institutions further stimulate the process of economic development through the international transmission of investment and associated technology, each Party undertakes to maintain a favorable environment for investment by nationals or companies of the other Party in the insurance and banking sectors. Therefore, each

Party accords to investments by nationals or companies of the other Party in investment banks, merchant-banks and reinsurance companies whose activities are confined to transactions in foreign currencies treatment no less favorable than that accorded under existing laws and regulations to investments by its own nationals and companies or to investments by nationals or companies of any third country, whichever is the more favorable. Both Parties agree to hold future discussions concerning the expansion of investment possibilities in these sectors by nationals or companies of either Party in the territory of the other Party.

DONE in duplicate at Cairo this 11th day of March 1986 in the English and Arabic languages, both texts being equally authentic.

For the Government of the United States of America:

NICHOLAS A. VELIOTES,
*Ambassador.*

For the Government of the Arab Republic of Egypt:
Sultan ABOU ALI,
*Minister of Economy and Trade.*

* Text as agreed in Supplementary Protocol, signed at Cairo. March 11, 1986. This replaces the protocol of September 29, 1982

THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE ARAB REPUBLIC OF EGYPT CONCERNING THE RECIPROCAL ENCOURAGEMENT AND PROTECTION OF INVESTMENTS

Whereas, the United States of America and the Arab Republic of EGYPT (each herein referred to as a "Party"), both recognize the importance of providing mutually beneficial support for the major efforts that has contributed in fostering international peace both within and beyond their respective regions, and

Whereas, each Party recognizes that economic expansion and development are basic elements in the process of strengthening the efforts for and the bonds of international peace and friendship within an atmosphere of stability and security, and

Whereas, each agrees that economic cooperation through the pursuit of policies and practices which foster bilateral trade and investment, will contribute substantially to the long-term benefit and welfare of the peoples of each Party, and

Recognizing that agreement on a general framework for the encouragement and nondiscriminatory treatment of investments will stimulate the flow of productive capital and technology and thereby provide for a more effective use of capital and technical resources for development needs, further promoting economic stability and durable peace,

Both have resolved to conclude a bilateral Treaty pertaining to the reciprocal encouragement and protection of investments, and Have agreed as follows:

ARTICLE I
DEFINITIONS

1. (a) "Company" means any kind of juridical entity, including any corporation, company

association, or other organization, that is duly incorporated, constituted, or otherwise duly organized, regardless of whether or not the entity is organized for pecuniary gain, privately or governmentally owned, or organized with limited or unlimited liability.

(b) "company of a Party" means a company duly incorporated, constituted or otherwise duly organized under the applicable laws and regulations of a Party or its political subdivisions in which

(i) natural persons who are nationals of such Party, or

(ii) such Party or its subdivision or its agencies or instrumentalities

have a substantial interest.

Each Party reserves the right to deny to any of its own companies or to a company of the other Party the advantages of this Treaty, if nationals of any third country own or control such company; provided that whenever one Party believes that the benefits of this Treaty should not be extended to a company of the other Party for this reason, it shall first consult with the other Party to seek a mutually satisfactory resolution of this matter.

The juridical status of a company of a Party shall be recognized by the other Party and its subdivisions.

(c) "Investment" means every kind of asset owned or controlled and includes but is note limited to:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares, stock, or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value, and associated with an investment;

(iv) intellectual property, including rights with respect copyrights and related patents, trade marks and trade names, industrial designs, trade secrets and know-how, and goodwill.

(v) licenses and permits issued pursuant to law, including those issued for manufacture and sale of products.

(vi) any right conferred by law or contract, including rights to search for or utilize natural resources, and rights to manufacture, use and sell products;

(vii) returns which are reinvested.

(d) "own or control" means ownership or control that is direct of indirect, including ownership or control exercised through subsidiaries or affiliates.

(e) 'national' or a Party means a natural person who is a national of a party under its applicable law.

(f) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee; and payment in kind.

**A-274**

ARTICLE II
ENCOURAGEMENT AND PROMOTION OF INVESTMENTS

1. Each Party undertakes to provide and maintain a favorable environment for investments in its territory by nationals and companies of the other Party and shall, in applying its laws, regulations, administrative practices and procedures, permit such investments to be established and acquired on terms and conditions that accord treatment no less favorable than the treatment it accords to investments of its own nationals or companies or to nationals and companies of any third country, whichever is the most favorable.

2. (a) Each Party shall accord investments in its territory, and associated activities related to these investments, of nationals or companies of the other Party treatment no less favorable than that which it accords in like situations to investments and associated activities of its own nationals or companies, or nationals or companies of any third country, whichever is the most favorable. Associated activities related to an investment include, but are not limited to:

(i) the establishment, control and maintenance of branches, agencies, offices, factories or other facilities for the conduct of business;

(ii) the organization of companies under applicable laws and regulations; the acquisition of companies or interests in companies or in their property; and the management, control, maintenance, use, enjoyment and expansion, and the sale, liquidation, dissolution or other disposition, of companies organized or acquired;

(iii) the making, performance and enforcement of contracts related to investment;

(iv) the acquisition (whether by purchase, lease or any other legal means), ownership and disposition (whether by sale, testament or any other legal means) of personal property of all kinds, both tangible and intangible.

(v) the leasing of real property appropriate for the conduct of business;

(vi) the acquisition, maintenance and protection of copyrights, patents, trademarks, trade secrets, trade names, licenses and other approvals of products and manufacturing processes, and other industrial property rights; and,

(vii) the borrowing of funds at market terms and conditions from local, financial institutions, as well as the purchase and issuance of equity shares in the local financial markets, and, in accordance with national regulations and practices, the purchase of foreign exchange for the operation of the enterprise.

2. (b) Consistent with paragraph 4 to this Article, each Party shall apply the present Treaty to investments in its territory by nationals or companies of the other Party made prior to the entry into force of this Treaty provided such application is not inconsistent with agreements, contractual arrangements, investment authorizations and licenses made under legislation existing at the time the concerned investments were made.

3. Notwithstanding the preceding provisions of this Article, each Party reserves the right to maintain limited exceptions to the standard of national treatment otherwise required concerning investments or associated activities if such exceptions fall within one of the sectors listed in the Annex to this Treaty. Both parties hereby agree to maintain the number of such exceptions to a minimum. In addition, each Party shall notify the other Party of any specific measures which constitute exceptions to the standard of national treatment provided herein. In no event, however, shall the treatment to be accorded pursuant to any exception be less favorable than that

**A-275**

accorded in like situations to investments and associated activities of nationals or companies of any third country. Moreover, no exception, within the sectors contained in the Annex, introduced after the date of entry into force of this Treaty shall apply to investments of nationals or companies of the other Party existing in that sector at the time the exception becomes effective.

4. The treatment, protection and security of investments shall never be less than that required by international law and national legislation.

5. (a) Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, directing, administering or advising on the operations of an investment to which they or the companies that employ them have committed or are in the process of committing a substantial amount of capital or other resources.

(b) Nationals and companies of either Party, and their companies which they own or control in the territory of the other Party, shall be able to engage the managing director of their choice. Further, subject to employment laws of each Party, nationals and companies of either Party shall be permitted to engage, within the territory of the other Party, professional and technical personnel of their choice, for the particular purpose of rendering professional, technical and managerial assistance necessary for the planning and operation of investments.

6. In the context of national economic policies and the desire to promote investment of all types, both private an public, the Parties recognize that conditions of competitive equality be should be maintained where investments owned or controlled within the territory of such Party, are in competition under similar conditions with privately owned or controlled investments of nationals and companies of the other Party.

7. In the context of its national economic policies and objectives, each Party shall seek to avoid the imposition of performance requirements on the investments of nationals and companies of the other Party.

8. Each Party recognizes that in order to maintain a favorable environment for investments in its territory by nationals or companies of the other Party, it should provide effective means of asserting claims and enforcing rights with respect to investment agreements, investment authorizations and properties. Each Party shall grant to nationals or companies of the other Party, on terms and conditions no less favorable than those which it grants in like situations to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, the right of access to its courts of justice, administrative tribunals and agencies, and all other bodies exercising adjudicatory authority, and the right to employ persons of their choice, who otherwise qualify under applicable laws and regulations of the forum for the purpose of asserting claims, and enforcing rights, with respect to their investments.

9. Each Party and its political or administrative subdivisions shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments in its territory of nationals or companies of the other Party.

ARTICLE III
COMPENSATION FOR EXPROPRIATION

1. No investment or any party of an investment of a national or a company of either Party shall be expropriated or nationalized by the other Party or a political or administrative subdivision thereof or subjected to any other measure, direct or indirect (including, for example, the levying of taxation, the compulsory sale of all or part of such an investment, or impairment or deprivation of management, control or economic value of such an investment by the national or company

concerned), if the effect of such other measure, or a series of such other measures, would be tantamount to expropriation or nationalization (all expropriations, all nationalizations and all such other measures hereinafter referred to as "expropriation") unless the expropriation

(a) is done for a public purpose;

(b) is accomplished under due process of law;

(c) is not discriminatory;

(d) is accompanied by prompt and adequate compensation, freely realizable; and

(e) does not violate any specific provision on contractual stability or expropriation contained in an investment agreement between the national or company concerned and the Party making the expropriation.

Compensation shall be equivalent to the fair market value of the expropriated investment on the date of expropriation. The calculation of such compensation shall not reflect any reduction in such fair market value due to either prior public notice or announcement of the expropriatory action, or the occurrence of the events that constituted or resulted in the expropriatory action. Such compensation shall include payments for delay as may be considered appropriate under international law, and shall be freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action.

2. If either Party or a political or administrative subdivision thereof expropriates the investment of any company duly incorporated, constituted or otherwise duly organized in its territory, and if nationals or companies of the other Party, directly or indirectly, own, hold or have other rights with respect to the equity of such company, then the Party within whose territory the expropriation occurs shall ensure that such nationals or companies of the other Party receive compensation in accordance with the provisions of the preceding paragraph.

3. Except as otherwise provided in an agreement between the Parties, or between a Party and a national or company of the other Party, a national or company of either Party that asserts that all or part of its investment in the territory of the other Party has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of such other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any compensation thereof, conforms to the principles of international law as set forth in this Article.

ARTICLE IV
COMPENSATION FOR DAMAGES DUE TO WAR AND SIMILAR EVENTS

Nationals or companies of either Party whose investments or returns in the territory of either Party suffer

(a) damages due to war or other armed conflict between such other Party and a third country or

(b) damages due to any kind of civil disturbance or insurrection in the territory of such other party, shall be accorded treatment no less favorable than that which such other Party accords to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, when making restitution, indemnification, compensation or other appropriate settlement with respect to such damages.

ARTICLE V

TRANSFERS

1. Either Party shall in respect to investments by nationals or companies of the other Party grant to those nationals or companies the free transfer of:

a. returns.

b. royalties and other payments deriving from licenses, franchises and other similar grants or rights.

c. installments in repayment of loans.

d. amounts spent for the management of the investment in the territory of the other Party or a third country.

e. Additional funds necessary for the maintenance of the investment.

f. the proceeds of partial or total sale or liquidation of the investment, including a liquidation effected as a result of any event mentioned in Article IV; and

g. compensation payments pursuant to Article III.

2. To the extent a national or company of either Party has not made another arrangement with the appropriate authorities of the other Party in whose territory the investment of such national or company is situated, currency transfers made pursuant to Paragraph 1 of this Article shall be permitted in the currency of the original investment or in any other freely convertible currency. Such transfers shall be made at the prevailing rate of exchange on the date of transfer with respect to current transactions in the currency to be transferred.

3. Notwithstanding the preceding paragraphs, either Party may maintain laws and regulations: (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law.

ARTICLE VI
CONSULTATIONS AND EXCHANGE OF INFORMATION

1. The Parties shall, upon the written request of either of them, promptly hold consultations to discuss the interpretation or application of this Treaty or to resolve any disputes in connection therewith. Consultations shall be held should one Party request consultations to discuss the effects on its national interests of laws, regulations, decisions, administrative practices or procedures, or that pertain to or affect investments of in the territory of such other Party, including conditions imposed on establishment of investments. The consultations will seek to avoid or ameliorate the adverse effects .that these laws, regulations, decisions, administrative practices or procedures, or policies may have on the Party requesting the consultations.

2. Further, for the purpose of reviewing the operation of this Treaty in encouraging investments, consultations should be held biennially between the two Parties. Those consultations should aim at exchanging information and views on the progress regarding investments.

3. If one Party requests in writing that the other Party supply information in its possession concerning investments in its territory by nationals or companies of the Party making the request, then the other Party shall, consistent with its applicable laws and regulations and with due regard

for business confidentiality, endeavor to establish appropriate procedures and arrangements for the provision of any such information.

ARTICLE VII
SETTLEMENT OF LEGAL INVESTMENT DISPUTES BETWEEN ONE PARTY AND A NATIONAL OR COMPANY OF THE OTHER PARTY

1. For purposes of this Article, a legal investment dispute is defined as a dispute involving (i) the interpretation or application of an investment agreement between a Party and a national or company of the other Party; or (ii) an alleged-breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of a legal investment dispute between a Party and a national or company of the other Party with respect to an investment of such national or company m the territory of such Party, the parties shall initially seek to resolve the dispute by consultation and negotiation. The Parties may, upon the initiative of either of them and as part of their consultation and negotiation, agree to rely upon non-binding, third-Party procedures. If the dispute cannot be resolved through consultation and negotiation, then the dispute shall be submitted for settlement in accordance with the applicable dispute-settlement procedures upon which a Party and national or company of the other Party have previously agreed. With respect to expropriation by either Party, any dispute-settlement procedures specified in an investment agreement between such Party and such national or company shall remain binding and shall be enforceable in accordance with the terms of the investment agreement and relevant provisions of domestic laws of such Party and treaties and other international agreements regarding enforcement of arbitral awards to which such Party has subscribed.

3. (a) In the event that the legal investment dispute is not resolved under procedures specified above, the national or company concerned may choose to submit the dispute to the International Centre for the Settlement of Investment Disputes ("Centre") for settlement by conciliation or binding arbitration, if, within six (6) months of the date upon which it arose: (i) the dispute has not been settled through consultation and negotiation; or (ii) the dispute has not, for any good faith reason, been submitted for resolution in accordance with any applicable dispute-settlement procedures previously agreed to by the Parties to the dispute; or (iii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the Party that is a Party to the dispute.

(b) Each Party hereby consents to the submission of an investment dispute to the Centre for settlement by conciliation or binding arbitration.

(c) Conciliation or binding arbitration of such disputes shall be done in accordance with the provisions of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States ("Convention") and the Regulations and Rules of the Centre.

4. In any proceeding, judicial, arbitral or otherwise, concerning a legal investment dispute between it and a national or company of the other Party, a Party shall not assert, as a defense, counterclaim right of set-off or otherwise, that the national or company concerned has received or will receive, pursuant to an insurance contract, indemnification or other compensation for all or part of its alleged damages from any third Party whatsoever, whether public or private, including such other Party and its political or administrative subdivisions, agencies and instrumentalities. Notwithstanding the foregoing, a national or company of the other Party shall not be entitled to compensation for more than the value of its affected assets, taking into account all sources of compensation within the territory of the Party liable for the compensation.

5. For the purpose of any proceedings initiated before the Centre in accordance with this Article, any company that, immediately prior to the occurrence of the event or events giving rise to the

dispute, was a company of the other Party, shall be treated as a national or company of such other Party.

6. The provisions of this Article shall not apply to a dispute arising under an official export credit, guarantee, or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE VIII

SETTLEMENT OF DISPUTES BETWEEN THE PARTIES CONCERNING INTERPRETATION OR APPLICATION OF THIS TREATY

1. Any dispute between the Parties concerning the interpretation or application of this Treaty should, if possible, be resolved through diplomatic channels.

2. If the dispute cannot be resolved through diplomatic channels, it shall, upon the agreement of the Parties, be submitted to the International Court of Justice.

3. (a) In the absence of such agreement, the dispute shall, upon the written request of either Party, be submitted to an arbitral tribunal for binding decision in accordance with the applicable rules and principles of international law.

(b) The Tribunal shall consist of three arbitrators, one appointed by each Party, and a Chairman appointed by agreement of the other two arbitrators. The Chairman shall not be a national of either Party. Each Party shall appoint an arbitrator within 60 days, and the Chairman shall be appointed within 90 days, after a Party has requested arbitration of a dispute.

(c) If the periods set forth in (b) above are not met, and in the absence of some other arrangement between the Parties, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties or is unable to act for any reason, either Party may invite the Vice President, or if he is a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(d) In the event that an arbitrator is for any reason unable to perform his duties, a replacement shall be appointed within thirty (30) days of determination thereof, utilizing the same method by which the arbitrator being replaced was appointed. If a replacement is not appointed within the time limit specified above, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties or is unable to act for any reason, either Party may invite the Vice President, or if he is also a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(e) Unless otherwise agreed to by the Parties to the dispute, all submissions shall be made and all hearings shall be completed within one hundred and twenty (120) days of the date of the selection of the third arbitrator, and the Tribunal shall render its decision within thirty (30) days of the date of the final submissions or the date of the closing of the hearings, whichever is later, and such decisions shall be binding on each Party.

(f) Except as otherwise agreed to by the Parties, arbitration proceedings shall be governed by the Model Rules on Arbitral Procedure adopted by the United Nations International Law Commission in 1958 ("Model Rules"), and commended to Member States by the United Nations General Assembly in Resolution 1262 (XIII). To the extent that procedural questions are not resolved by this Article or the Model Rules they shall be resolved by the Tribunal. Notwithstanding any other provisions of this Treaty or the Model Rules, the Tribunal shall in all cases act by majority vote.

(g) Each Party shall bear the costs of its own arbitrator and counsel in the arbitral proceeding. The cost of the Chairman and remaining expenses shall be borne in equal parts by the Parties.

4. The provisions of this Article shall not apply to a dispute arising under an official export credit, guarantee, or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE IX

PRESERVATION OF RIGHTS

1. This Treaty shall not supersede, prejudice, or otherwise derogate from (a) laws, regulations, administrative practices or procedures, or adjudicatory decisions of either Party, (b) international legal obligations, or (c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, whether extant at the time of entry into force of this Treaty or thereafter, that entitle investments or associated activities of nationals or companies of the other Party to treatment more favorable than that accorded by this Treaty in like situations.

2. This Treaty shall not derogate from or terminate any other agreement entered into by the two Parties and in force as between the two Parties on the date on which this Treaty enters into force.

ARTICLE X

MEASURES NOT PRECLUDED BY TREATY

1. This Treaty shall not preclude the application by either Party or any subdivision thereof of any and all measures necessary for the maintenance of public order and morals, the fulfillment of its existing international obligations, the protection of its own security interests, or such measures deemed appropriate by the Parties to fulfill future international obligations.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments in its territories of nationals and companies of the other Party, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE XI

TAXATION

With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investments of nationals or companies of the other Party. Nevertheless, all matters relating to the taxation of nationals or companies of a Party, or their investments in the territories of the other Party or a subdivision thereof shall be excluded from this Treaty, subject, except with regard to measures covered by Article III and the specific provisions of Article V.

ARTICLE XII

APPLICATION OF TREATY TO POLITICAL OR ADMINISTRATIVE SUBDIVISIONS OF THE PARTIES

This Treaty shall apply to the political and/or administrative subdivisions of each Party.

ARTICLE XIII

ENTRY INTO FORCE AND DURATION AND TERMINATION

1. This Treaty shall be ratified by each of the Parties, and the instruments of ratification thereof shall be exchanged as soon as possible.

2. This Treaty shall enter into force thirty (30) days after the date of exchange of the instruments of ratification. It shall remain in force for a period of ten (10) years and shall continue in force unless terminated in accordance with Paragraph 3 of this Article.

3. Either Party may, by giving one (1) year's written notice to the other Party, terminate this Treaty at the end of the initial ten (10) year period or at any time thereafter.

4. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall continue to be effective for a further period of ten (10) years from such date of termination.

5. The attached Annex and Protocol are integral parts of this Treaty.

DONE in duplicate at Washington this twenty-ninth day of September 1982[2] in the English and Arabic languages, both texts being equally authentic.

For the United States of America:
WILLIAM E. BROCK, Jr.

For the Arab Republic of Egypt:
WAJIH SHINDY.

[2] As modified by the Supplementary Protocol, signed at Cairo, March 11, 1986.

ANNEX

Consistent with Article II Paragraph 3, each Party reserves the right to maintain limited exceptions in the sectors it has indicated below:

THE UNITED STATES OF AMERICA

Air transportation, ocean and coastal shipping; banking; insurance; government grants; government insurance and loan programs; energy and power production; use of land and natural resources; custom house brokers; ownership of real estate; radio and television broadcasting; telephone and telegraph services; submarine cable services; satellite communications.

THE ARAB REPUBLIC OF EGYPT

Air and sea transportation; maritime agencies; land transportation other than that of tourism; mail; telecommunication, telegraph services and other public services which are state monopolies; banking and insurance; commercial activity such as distribution, wholesaling, retailing, import and export activities; commercial agency and broker activities; ownership of real estate; use of land; natural resources; national loans; radio, television, and the issuance of newspapers and magazines.

PROTOCOL[3]

[3] Text as agreed in Supplementary Protocol, signed at Cairo, March 11, 1986. This replaces the

protocol of September 29, 1982.

On signing the Treaty concerning the Reciprocal Encouragement and Protection of Investments, the Arab Republic of Egypt and the United States of America have, in addition, agreed on the following provisions which should be regarded as an integral part of this Treaty:

1. Each Party reserves the right to deny the benefits of this Treaty to any company of either Party, or its affiliates or subsidiaries, if nationals of any third country control such company, affiliate or subsidiary; provided that, whenever one Party concludes that the benefits of this Treaty should not be extended for this reason, it shall promptly consult with the other Party to seek a mutually satisfactory resolution of this matter.

2. "Control" means to have a substantial share or ownership rights and the ability to exercise decisive influence. Differences as to the existence of control shall be resolved according to the provisions of Article VIII.

3. (a) The treatment accorded by the United States to nationals or companies of Egypt under the provisions of Article II (1) and (2) shall in any state of the United States of other territory, possession, or political or administrative subdivision of the United States be the treatment accorded therein to residents of or companies incorporated, constituted or otherwise duly organized in other States of the United States or territories, possessions, or political or administrative subdivisions of the United States.

(b) The treatment accorded by Egypt to nationals and companies of the United States with respect to the establishment and acquisition of investments in limited sensitive geographic areas designated for exclusive Egyptian investment shall be no less favorable than the treatment it accords to investments of nationals and companies of any third country. Egypt reserves the right to modify the areas covered, provided that such areas will be kept to a minimum and will not substantially impair the investment opportunities of United States nationals or companies.

4. The provisions of Article II, paragraph 3, relating to most favored nation treatment, shall not apply to advantages accorded by either Party to nationals or companies of a third country by virtue of a special security or regional arrangement, including regional customs unions or free trade areas. Further, these provisions do not apply to the ownership of real estate. The provisions of Article II paragraph 1, relating to most favored nation treatment, shall not be construed to oblige one Party to extend to nationals or companies of the other the benefit of any treatment, preference or privilege which may be extended by the former Party by virtue of a customs union or in the field of housing. Moreover, with regard to rights to engage in mining on the public domain, each Party retains the right to accord to nationals or companies of the other Party treatment which is like or similar to that accorded by the other Party to nationals or companies of the first Party.

5. It is understood that this Treaty does not derogate from the rights of either Party regarding the establishment of qualifications as for the practice of professions, including law and accountancy. These qualifications may confine the practice of such professions to nationals or companies of a Party, provided that they are applied on a nondiscriminatory basis; and provided, further, that such nationality requirements do not derogate from the right of nationals and companies. of either Party, pursuant to Article II (5)(b) to engage professional

and technical personnel of their choice to render professional and technical services necessary for the internal planning and operation of the investment.

6. This Treaty, and in particular, the provisions of Article II, paragraph 5(b) shall be subject to the provisions of Article X.

7. With respect to Article II (6), performance requirements are conditions imposed which would require an investor to export a minimum percentage of final product or to source some inputs locally.

8. With regard to Article III, Paragraph 1(d) the term "prompt" does not necessarily mean instantaneous. The intent is that the Party diligently and expeditiously carry out any necessary formalities.

9. With regard to Article III, paragraph 1, the phrase "events that constituted or resulted in the expropriatory action" refers to conduct attributable to the expropriatory Party and not to conduct of the national or company. The inclusion of subparagraph (e) in Article III, paragraph 1, is without prejudice to the measure of compensation due in the event of expropriation.

10. The Parties recognize that restrictions on transfers abroad of sales or liquidation proceeds of an investment will adversely affect future capital inflows, contrary to the spirit of this Treaty and the interests of the Party imposing those restrictions. Nevertheless, the Parties recognize that it is possible that the Arab Republic of Egypt may find its foreign exchange reserves at a very low level. In these circumstances, the Arab Republic of Egypt may temporarily delay transfers required under Article V, Paragraph 1(t), but only: (i) in a manner not less favorable that that accorded to comparable transfers to investors of third countries; (ii) to the extent and for the time period necessary to restore its reserves to a minimally acceptable level, but in no case for period of time longer than that permitted by the provisions of Law 43 in force on the date of signature of this Treaty; and (ill) after providing the investor an opportunity to invest the sales or liquidation proceeds in a manner which will preserve their real value free of exchange risk until transfer occurs.

11. Concerning Article VII (3)(a)(ii), it is understood that the Parties to the dispute may previously agree to submission of the dispute to the jurisdiction of domestic courts and tribunals. The Parties will maintain a nondiscriminatory policy regarding the inclusion and implementation of such provisions in any investment contract.

12. With regard to the Annex, the exceptions noted by the Arab Republic of Egypt under "commercial activity" do not include integrated operations which combine production and sales activities for their products.

13. Recognizing that international financial markets and institutions further

stimulate the process of economic development through the international transmission of investment and associated technology, each Party undertakes to maintain a favorable environment for investment by nationals or companies of the other Party in the insurance and banking sectors. Therefore, each Party accords to investments by nationals or companies of the other Party in investment banks, merchant-banks and reinsurance companies whose activities are confined to transactions in foreign currencies treatment no less favorable than that accorded under existing laws and regulations to investments by its own nationals and companies or to investments by nationals or companies of any third country, whichever is the more favorable. Both Parties agree to hold future discussions concerning the expansion of investment possibilities in these sectors by nationals or companies of either Party in the territory of the other Party.

DONE in duplicate at Cairo this 11th day of March 1986 in the English and Arabic languages, both texts being equally authentic.

For the Government of the United States of America:

NICHOLAS A. VELIOTES,

Ambassador.

For the Government of the Arab Republic of Egypt:

Sultan Abou Ali,

Minister of Economy and Trade.

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE ARAB REPUBLIC OF EGYPT CONCERNING THE RECIPROCAL ENCOURAGEMENT AND PROTECTION OF INVESTMENTS

Whereas, the United States of America and the Arab Republic of Egypt (each hereinafter referred to as a "Party"), both recognize the importance of providing mutually beneficial support for the major efforts that each has contributed in fostering international peace both within and beyond their respective regions, and

Whereas, each Party recognizes that economic expansion and development are basic elements in the process of strengthening the efforts for and the bonds of international peace and friendship within an atmosphere of stability and security, and

Whereas, each agrees that economic cooperation through the pursuit of policies and practices which foster bilateral trade and investment, will contribute substantially to the long-term benefit and welfare of the peoples of each Party,

and

Recognizing that agreement on a general framework for the encouragement and nondiscriminatory treatment of investments will stimulate the flow of productive capital and technology and there by provide for a more effective use of capital and technical resources for development needs, further promoting economic stability and durable peace,

Both have resolved to conclude a bilateral Treaty pertaining to the reciprocal encouragement and protection of investments, and

Have agreed as follows:

ARTICLE I

DEFINITIONS

1. For the purposes of this Treaty, (a) "company" means any kind of juridical entity; including any corporation, company, association, or other organization, that is duly incorporated, constituted, or otherwise duly organized, regardless of whether or not the entity is duly organized for pecuniary gain, privately or publicly owned, or organized with limited or unlimited liability.

(b) "company of a Party" means a company duly incorporated, constituted, or otherwise duly organized under the applicable laws and regulations of a Party or a political or administrative subdivision thereof in which

(i) natural persons who are nationals of such Party, or

(ii) such Party or a; political or administrative subdivision thereof or their agencies or instrumentalities have a substantial interest.

Each Party reserves the right to deny to any of its own companies or to a company of the other Party the advantages of this Treaty, if nationals of any third country own or control such company; provided that whenever one Party believes that the benefits of this Treaty should not be extended to a company of the other Party for this reason, it shall first consult with the other Party to seek a mutually satisfactory resolution of this matter.

The juridical status of a company of a Party shall be recognized by the other Party and its political or administrative subdivisions.

(c) "investment" means every kind of investment, owned or controlled, including equity, debt, service and investment contracts; and includes, but is not limited to:

(i) tangible and intangible property, including rights, such as mortgages, liens and

pledges;

(ii) a company or shares of stock in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value due under an investment agreement;

(iv) valid intellectual and industrial property rights, including, but not limited to, rights with respect to copyrights, patents, trademarks, trade names, industrial designs, trade secrets and know-how, and goodwill;

(v) licenses and permits issued pursuant to law, including those issued for manufacture and sale of products;

(vi) any right conferred by law or contract including, but not limited to, rights, within the confines of law, to search for or utilize natural resources, and rights to manufacture, use and sell products;

(vii) returns which are reinvested.

(d) "own or control" means ownership or control that is direct or indirect, including ownership or control exercised through subsidiaries or affiliates, wherever located.

(e) "national" of a Party means a natural person who is a national of a Party under its applicable law.

(f) "return" means an amount derived from an investment, including but not limited to, profit; dividend; interest; royalty payment; management, technical assistance or other fee; and payment in kind.

ARTICLE II

ENCOURAGEMENT AND PROMOTION OF INVESTMENTS

1. Each Party undertakes to provide and maintain a favorable environment for investments in its territory by nationals and companies of the other Party and shall, in applying its laws, regulations, administrative practices and procedures, permit such investments to be established and acquired on terms and conditions that accord treatment no less favorable than the treatment it accords to investments of its own nationals or companies or to nationals and companies of any third country, whichever is the most favorable.

2. (a) Each Party shall accord investments in its territory, and associated activities related to these investments, of nationals or companies of the other Party treatment no less favorable than that which it accords in like situations to

investments and associated activities of its own nationals or companies, or nationals or companies of any third country, whichever is the most favorable. Associated activities related to an investment include, but are not limited to:

(i) the establishment, control and maintenance of branches, agencies, offices, factories or other facilities for the conduct of business;

(ii) the organization of companies under applicable laws and regulations; the acquisition of companies or interests in companies or in their property; and the management, control, maintenance, use, enjoyment and expansion, and the sale, liquidation, dissolution or other disposition, of companies organized or acquired;

(iii) the making, performance and enforcement of contracts related to investment;

(iv) the acquisition (whether by purchase, lease or any other, legal means), ownership and disposition (whether by sale, testament or any other legal means) of personal property of all kinds, both tangible and intangible.

(v) the leasing of real property appropriate for the conduct of business;

(vi) the acquisition, maintenance and protection of copyrights, patents, trademarks; trade secrets, trade names, licenses and other approvals of products and manufacturing processes, and other industrial property rights; and,

(vii) the borrowing of funds at market terms and conditions from local financial institutions, as well as the purchase and issuance of equity shares in the local financial markets, and, in accordance with national regulations and practices, the purchase of foreign exchange for the operation of the enterprise.

2. (b) Consistent with paragraph 4 of this Article, each Party shall apply the present Treaty to investments in its territory by nationals or companies of the other Party made prior to the entry into force of this Treaty provided such application is not inconsistent with agreements, contractual arrangements, investment authorizations and licenses made under legislation existing at the time the concerned investments were made.

3. Notwithstanding the preceding provisions of this Article, each Party reserves the right to maintain limited exceptions to the standard of national treatment otherwise required concerning investments or associated activities if such exceptions fall within one of the sectors listed in the Annex to this Treaty, Both parties hereby agree to maintain the number of such exceptions to a minimum. In addition, each Party shall notify the other Party of any specific measures which constitute exceptions to the standard of national treatment provided herein. In no event, however, shall the treatment to be accorded pursuant to any exception be less favorable than that accorded in like situations to investments and associated

activities of nationals or companies of any third country. Moreover, no exception, within the sectors contained in the Annex, introduced after the date of entry into force of this Treaty shall apply to investments of nationals or companies of the other Party existing in that sector at the time the exception becomes effective.

4. The treatment, protection and security of investments shall never be less than that required by international law and national legislation.

5. (a) Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, directing, administering or advising on the operations of an investment to which they or the companies that employ them have committed or are in the process of committing a substantial amount of capital or other resources.

b) Nationals and companies of either Party, and their companies which they own or control in the territory of the other Party, shall be able to engage the managing director of their choice. Further, subject to employment laws of each Party, nationals and companies of either Party shall be permitted to engage, within the territory of the other Party, professional and technical personnel of their choice, for the particular purpose of rendering professional, technical and managerial assistance necessary for the planning and operation of investments.

6. In the context of national economic policies and the desire to promote investment of all types, both private and public, the Parties recognize that conditions of competitive equality should be maintained where investments owned or controlled by a Party or its agencies or instrumentalities, within the territory of such Party, are in competition under similar conditions and situations with privately owned or controlled investments of nationals or companies of the other Party.

7. In the context of its national economic policies and objectives, each Party shall seek to avoid the imposition of performance requirements on the investments of nationals and companies of the other Party.

8. Each Party recognizes that in order to maintain a favorable environment for investments in its territory by nationals or companies of the other Party, it should provide effective means of asserting claims and enforcing rights with respect to investment agreements, investment authorizations and properties. Each Party shall grant to nationals or companies of the other Party, on terms and conditions no less favorable than those which it grants in like situations to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, the right of access to its courts of justice, administrative tribunals and agencies, and all other bodies exercising adjudicatory authority, and the right to employ persons of their choice, who otherwise qualify under applicable laws and regulations of the forum for the

purpose of asserting claims, and enforcing rights, with respect to their investments.

9. Each Party and its political or administrative subdivisions shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments in its territory of nationals or companies of the other Party.

ARTICLE III

COMPENSATION FOR EXPROPRIATION

No investment or any party of an investment of a national or a company of either Party shall be expropriated or nationalized by the other Party or a political or administrative subdivision thereof or subjected to any other measure, direct or indirect (including, for example, the levying of taxation, the compulsory sale of all or part of such an investment, or impairment or deprivation of management, control or economic value of such an investment by the national or company concerned), if the effect of such other measure, or a series of such other measures, would be tantamount to expropriation or nationalization (all expropriations, all nationalizations and all such other measures hereinafter referred to as "expropriation") unless the expropriation

(a) is done for a public purpose;

(b) is accomplished under due process of law;

(c) is not discriminatory;

(d) is accompanied by prompt and adequate compensation, freely realizable; and

(e) does not violate any specific provision on contractual stability or expropriation contained in an investment agreement between the national or company concerned and the Party making the expropriation.

Compensation shall be equivalent to the fair market value of the expropriated investment on the date of expropriation. The calculation of such compensation shall not reflect any reduction in such fair market value due to either prior public notice or announcement of the expropriatory action, or the occurrence of the events that constituted or resulted in the expropriatory action. Such compensation shall include payments for delay as may be considered appropriate under international law, and shall be freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action.

2. If either Party or a political or administrative subdivision thereof expropriates -

the investment of any company duly incorporated, constituted or otherwise duly organized in its territory, and if nationals or companies of the other Party, directly or indirectly, own, hold or have other rights with respect to the equity of such company, then the Party within whose territory the expropriation occurs shall ensure that such nationals or companies of the other Party receive compensation in accordance with the provisions of the preceding paragraph.

3. Except as otherwise provided in an agreement between the Parties, or between a Party and a national or company of the other Party, a national or company of either Party that asserts that all or part of its investment in the territory of the other Party has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of such other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any compensation thereof, conforms to the principles of international law as set forth in this Article.

ARTICLE IV

COMPENSATION FOR DAMAGES DUE TO WAR AND SIMILAR EVENTS

Nationals or companies of either Party whose investments or returns in the territory of either Party suffer

(a) damages due to war or other armed conflict between such other Party and a third country or

(b) damages due to any kind of civil disturbance or insurrection in the territory of such other party, shall be accorded treatment no less favorable than that which such other Party accords to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, when making restitution, indemnification, compensation or other appropriate settlement with respect to such damages.

ARTICLE V

1. Either Party shall in respect to investments by nationals or companies of the other Party grant to those nationals or companies the free transfer of:

a. returns.

b. royalties and other payments deriving from licenses, franchises and other similar grants or rights.

c. installments in repayment of loans.

d. amounts spent for the management of the investment in the territory of the

other Party or a third country.

e. Additional funds necessary for the maintenance of the investment.

f. the proceeds of partial or total sale or liquidation of the investment, including a liquidation effected as a result of any event mentioned in Article IV; and

g. compensation payments pursuant to Article III.

2. To the extent a national or company of either Party has not made another arrangement with the appropriate authorities of the other Party in whose territory the investment of such national or company is situated, currency transfers made pursuant to Paragraph 1 of this Article shall be permitted in the currency of the original investment or in any other freely convertible currency. Such transfers shall be made at the prevailing rate of exchange on the date of transfer with respect to current transactions in the currency to be transferred.

3. Notwithstanding the preceding paragraphs, either Party may maintain laws and regulations: (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law.

ARTICLE VI

CONSULTATIONS AND EXCHANGE OF INFORMATION

1. The Parties shall, upon the written request of either of them, promptly hold consultations to discuss the interpretation or application of this Treaty or to resolve any disputes in connection therewith. Consultations shall be held should one Party request consultations to discuss the effects on its national interests of laws, regulations, decisions, administrative practices ,or procedures, or policies of the other Party that pertain to or affect investments of its nationals or companies in the territory of such other Party, including conditions imposed on establishment of investments. The consultations, will seek to avoid or ameliorate the adverse effects that these laws, regulations, decisions, administrative practices procedures, or policies may have on the Party requesting the consultations.

2. Further, for the purpose of reviewing the operation of this Treaty in encouraging investments, consultations should be held biennially between the two Parties. Those consultations should aim at exchanging information and views on the progress regarding investments.

3. If one Party requests in writing that the other Party supply information in its

possession concerning'" investments. in its territory by nationals or companies of the Party making the request, then the other Party shall, consistent with its applicable laws and regulations and with due regard for business confidentiality, endeavor to establish appropriate procedures and arrangements for the provision of any such information.

ARTICLE VII

SETTLEMENT OF LEGAL INVESTMENT DISPUTES BETWEEN ONE PARTY AND A NATIONAL OR COMPANY OF THE OTHER PARTY

1. For purposes of this Article, a legal investment dispute is de fined as a dispute involving (i) the interpretation or application of an investment agreement between a Party and a national or company of the other Party; or (ii) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of a legal investment dispute between a Party and a national or company of the other Party with respect to an investment of such national or company-in the territory of such Party, the parties shall initially seek to resolve the dispute by consultation and negotiation. The Parties may, upon the initiative of either of them and as part of their consultation and negotiation, agree to rely upon non-binding, third-Party procedures. If the dispute cannot be resolved through consultation and negotiation, then the dispute shall be submitted for settlement in accordance with the applicable dispute-settlement procedures upon which a Party and national or company of the other Party have previously agreed. With respect to expropriation by either Party, any dispute-settlement procedures specified in an investment agreement between such Party and such national or company shall remain binding and shall be enforceable in accordance with the terms of the investment agreement and relevant provisions of domestic laws of such Party and treaties and other international agreements regarding enforcement of arbitral awards to which such Party has subscribed.

3. (a) In the event that the legal investment dispute is not ref solved under procedures' specified above, the national or company concerned may choose to submit the dispute to the International Centre for the Settlement of Investment Disputes ("Centre") for settlement by conciliation or binding arbitration, if, within six (6) months of the date upon which it arose: (i) the dispute has not been settled through consultation and negotiation; or (ii) the dispute has not, for any good faith reason, been submitted for resolution in accordance with any applicable dispute settlement procedures previously agreed to by the Parties. to. the dispute; or (iii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the Party that is a Party to the dispute.

(b) Each Party hereby consents to the submission of an investment dispute to the

Centre for settlement by conciliation or binding arbitration.

(c) Conciliation or binding arbitration of such disputes shall be done in accordance with the provisions of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States ("Convention") and the Regulations and Rules of the Centre.

4. In any proceeding, judicial, arbitral or otherwise, concerning a legal investment dispute between it and a national or company of the other Party, a Party shall not assert, as a defense, counter claim right of set-off or otherwise, that the national or company concerned has received or will receive, pursuant to an insurance contract, indemnification or other compensation for all or part of its alleged damages from any third Party whatsoever, whether public or private, including such other Party and its political or administrative subdivisions, agencies and instrumentalities. Notwithstanding the foregoing, a national or company of the other Party shall not be entitled to compensation for more than the value of its affected assets, taking into account all sources of compensation within the territory of the Party liable for the compensation.

5. For the purpose of any proceedings initiated before the Centre in accordance with this Article, any company that, immediately prior to the occurrence of the event or events giving rise to the dispute, was a company of the other Party, shall be treated as a national or company of such other Party.

6. The provisions of this Article shall not apply to a dispute arising under an official export credit, guarantee, or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE VIII

SETTLEMENT OF DISPUTES BETWEEN THE PARTIES CONCERNING INTERPRETATION OR APPLICATION OF THIS TREATY

1. Any dispute between the Parties concerning the interpretation or application of this Treaty should, if possible, be resolved through diplomatic channels.

2. If the dispute cannot be resolved through diplomatic channels, shall, upon the agreement of the Parties, be submitted to the international Court of Justice.

3.(a) In the absence of such agreement, the dispute shall, upon the written request of either Party, be submitted to an arbitral tribunal for binding decision in accordance with the applicable rules and principles of international law.

(b) The Tribunal shall consist of three arbitrators, one appointed by each Party, and a Chairman appointed by agreement of the other two arbitrators. The Chairman shall not be a national of either Party. Each Party shall appoint an

arbitrator within 60 days, and the Chairman shall be appointed within 90 days, after a Party has requested arbitration of a dispute.

(c) If the periods set forth in (b) above are not met, and in the absence of some other arrangement between the Parties, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties or is unable to act for any reason, either Party may invite the Vice President, or if he is also a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(d) In the event that an arbitrator is for any reason unable to perform his duties, a replacement shall be appointed within thirty (30) days of determination thereof, utilizing the same method by which the arbitrator being replaced was appointed. If a replacement is not appointed within the time limit specified above, either Party may invite the President of the International Court of Justice to make the necessary appointment. If the President is a national of either of the Parties or is unable to act for any reason, either Party may invite the Vice President, or if he is also a national of either Party or otherwise unable to act, the next most senior member of the International Court of Justice, to make the appointment.

(e) Unless otherwise agreed to by the Parties to the dispute, all submissions shall be made and all hearings shall be, completed within one hundred and twenty (120) days of the date of the selection of the third arbitrator, and the Tribunal shall render its decision within thirty (30) days of the date of the final submissions or the date of the closing of the hearings, whichever is later, and such decisions shall be binding on each Party.

(f) Except as otherwise agreed to by the Parties, arbitration proceedings shall be governed by the Model Rules on Arbitral Procedure adopted by the United Nations International Law Commission in 1958 ("Model Rules"), and commended to Member States by the United Nations General Assembly in Resolution 1262 (XITI). To the extent that procedural questions are not resolved by this Article or the Model Rules they shall be resolved by the Tribunal. Notwithstanding any other provisions of this Treaty.. or the Model Rules, the Tribunal shall in all cases act by majority vote.

(g) Each Party shall bear the costs of its own arbitrator and counsel in the arbitral proceeding. The cost of the Chairman and remaining expenses shall be borne in equal parts by the Parties.

4. The provisions of this Article shall not apply to a dispute arising under an official export credit; guarantee, or insurance arrangement, pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE IX

PRESERVATION OF RIGHTS

1. This Treaty shall not supersede, prejudice, or otherwise derogate from (a) laws, regulations, administrative practices or procedures, or adjudicatory decisions of either Party, (b) international legal obligations, or (c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, whether extant at the time of entry into force of this Treaty or thereafter, that entitle investments or associated activities of nationals or companies of the other Party to treatment more favorable that that accorded by this Treaty in like situations.

2. This Treaty shall not derogate from or terminate any other agreement entered into by the two Parties and in force as between the two Parties on the date on which this Treaty enters into force.

ARTICLE X

MEASURES NOT PRECLUDED BY TREATY

1. This Treaty shall not preclude the application by either Party or any political or administrative subdivision thereof of any and all measures necessary for the maintenance of public order and morals, the fulfillment of its existing international obligations, the protection of its own security interests, or such measures deemed appropriate by the Parties to fulfill future international obligations.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments in its territories of nationals and companies of the other Party, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE XI

Taxation

With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investments of nationals or companies of the other Party. Nevertheless, all matters relating to the taxation of nationals or companies of a Party, or their investments in the territories of the other Party or a political or administrative subdivision thereof shall be excluded from this Treaty, subject, however, to specific provisions of Articles III and V.

ARTICLE XII

APPLICATION OF TREATY TO POLITICAL OR ADMINISTRATIVE

SUBDIVISIONS OF THE PARTIES

This Treaty shall apply to the political and/or administrative subdivisions of each Party.

ARTICLE XIII

ENTRY INTO FORCE AND DURATION AND TERMINATION

1. This Treaty shall be ratified by each of the Parties, and the instruments of ratification thereof shall be exchanged as soon as possible.

2. This Treaty shall enter into force thirty (30) days after the date of exchange of the instruments of ratification. It shall remain in force for a period of ten (10) years and shall continue in force unless terminated in accordance with Paragraph 3 of this Article.

3. Either Party may, by giving one (1) year's written notice to the other Party, terminate this Treaty at the end of the initial ten (10) year period or at any time thereafter.

4. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty other wise applies, the provisions of all of the other Articles of this Treaty shall continue to be effective for a further period of ten (10) years from such date of termination.

5. The attached Annex and Protocol are integral parts of this Treaty.

DONE in duplicate at Washington this twenty-ninth day of September 1982 in the English and Arabic languages, both texts being equally authentic.

For the United States of America:

WILLIAM E. BROCK, Jr.

For the Arab Republic of Egypt:

WAJIH SHINDY.

ANNEX

Consistent with Article II paragraph 3, each Party reserves the right to maintain limited exceptions in the sectors it has indicated below:

THE UNITED STATES OF AMERICA

Air transportation, ocean and coastal shipping; banking; insurance; government grants; government insurance and loan programs; energy and power production; use of land and natural resources; custom house brokers; ownership of real estate; radio and television broadcasting; telephone and telegraph services; submarine cable services; satellite communications.

THE ARAB REPUBLIC OF EGYPT

Air and sea transportation; maritime agencies; land transportation other than that of tourism; mail, telecommunication, telegraph services and other public services which are state monopolies; banking and insurance; commercial activity such as distribution of wholesaling, retailing, import and export activities; commercial agency and broker activities; ownership of real estate; use of land; natural resources; national loans; radio, television, and the issuance of newspapers and magazines.

SUPPLEMENTARY PROTOCOL

The duly authorized Plenipotentiaries of the Parties have agreed upon the following provisions regarding the Treaty between the United States of America and the Arab Republic of Egypt concerning the Reciprocal Encouragement and Protection of Investments, signed in Washington, D.C. on September 29, 1982. The following changes will form an integral part of the Treaty. Upon the completion of the Parties' respective constitutional procedures for approval, these changes will be integrated into a single unified text of the Treaty which will, as modified, be published as the official Treaty text.

ARTICLE I

Paragraph 1(a) is changed to read as follows:

(a) "company" means any kind of juridical entity; including any corporation, company, association, or other juridical entity, that is duly incorporated, constituted, or otherwise duly organized, regardless of whether or not the entity is duly organized for pecuniary gain, privately or publicly owned or organized with limited or unlimited liability.

Paragraph 1(b) is changed to read as follows:

(b) "company of a Party" means a company duly incorporated, constituted, or otherwise duly organized under the applicable laws and regulations of a Party or its subdivisions in which

(i) natural persons who are nationals of such Party, or

(ii) such Party or its subdivisions or their agencies or instrumentalities have a substantial interest. The Juridical status of a company of a Party shall be recognized by the other Party and its subdivisions.

Paragraph 1(c) is changed to read as follows:

(c) investment means every kind of asset, owned or controlled, and includes but is not limited to:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock in a company or interests in the assets thereof,

(iii) a claim to money or a claim to performance having economic value due under an investment agreement;

(iv) valid intellectual and industrial property rights, including, but not limited to, rights with respect to copyrights, patents, trademarks, trade names, industrial designs, trade secrets, know-how, and goodwill;

(v) licenses and permits issued pursuant to law, including those issued for manufacture and sale of products;

(vi) any right conferred by law or contract including, but not limited to, rights, within the confines of law, to search for or utilize natural resources, and rights to manufacture, use and sell products;

(vii) returns which are reinvested.

Paragraph 1(d) is changed to read as follows:

(d) "own or control" includes ownership or control exercised through subsidiaries or affiliates.

## ARTICLE II

Paragraph 2 is changed to read as follows:

2. (a) Each Party shall accord investments in its territory, and associated activities in connection with these investments, of nationals or companies of the other Party treatment no less favorable than that which it accords in like situations to investments and associated activities of its own nationals or companies, or nationals or companies of any third country, whichever is the most favorable. Associated activities in connection with an investment include, but are not limited to:

(i) the establishment, control and maintenance of branches, agencies, offices, factories or other facilities for the conduct of business;

(ii) the organization of companies under applicable laws and regulations; the acquisition of companies or interests in companies or in their property; and the management, control, maintenance, use, enjoyment and expansion, and the sale, liquidation, dissolution or other disposition, of companies organized or acquired;

(iii) the making, performance and enforcement of contracts related to investment;

(iv) the acquisition (whether by purchase, lease or any other legal means), ownerships and disposition (whether by sale, testament or any other legal means) of personal property of all kinds, both tangible and intangible.

(v) the leasing of real property appropriate for the conduct of business;

(vi) the acquisition, maintenance and protection of copyrights, patents, trademarks, trade secrets, trade names, licenses and other approvals of products and manufacturing processes, and other industrial property rights; and,

(vii) the borrowing of funds at market terms and conditions from local financial institutions, as well

as the purchase and issuance of equity shares in the local financial markets, and, in accordance with national regulations and practices, the purchase of foreign exchange for the operation of the enterprise.

(b) This Treaty shall also apply to investments by nationals or companies of either Party, made prior to the entering into force of this Treaty and accepted in accordance with the respective prevailing legislation of either Party.

Paragraph 3 is renumbered as paragraphs 3(a) and 3(b) and changed to read as follows:

3. (a) Notwithstanding the preceding provisions of this Article, each Party reserves the right to maintain limited exceptions to the standard of national treatment otherwise required concerning investments or associated activities if exceptions fall within one of the sectors listed in the Annex to this Treaty. Both Parties hereby agree to maintain the number of such exceptions to a minimum. In addition, each Party shall notify the other Party of any specific measures which constitute exceptions to the standard of national treatment provided herein. In no event, however, shall the treatment to be accorded pursuant to any exception-be less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country. Moreover, no exception, within the sectors contained in the Annex, introduced after the date of entry into force of this Treaty shall apply to investments of nationals or companies of the other Party existing in that sector at the time the exception becomes effective.

(b) Each Party retains the discretion to approve investments according to national plans and priorities on a nondiscriminatory basis consistent with paragraphs (1) and (3)(a) of this Article.

Paragraph 5(a) is changed to read as follows:

5. (a) Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and reside in the territory of the other Party for the purpose of establishing, developing, directing, administering or advising on the operations of an investment to which they or the companies that employ them have committed or are in the process of committing a substantial amount of capital or other resources. Paragraph 6 is deleted and paragraphs 7, 8, and 9 are renumbered as paragraphs 6, 7, and 8, respectively.

Paragraph 8 (formerly paragraph 9) is changed to read as follows:

8. Each Party and its subdivisions shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to affect investments in its territory of the other Party.

ARTICLE III

Paragraph 1 is changed to read as follows:

1. No investment or any part of an investment of a national or company of either Party shall be expropriated or nationalized by the other Party or by a subdivision thereof-or subjected to any other measure, direct or indirect, if the effect of such other measure, or a series of such other measures, would be tantamount to expropriation or nationalization (all expropriations, all nationalizations and all such other measures hereinafter referred to as "expropriation")-unless the expropriation

(a) is done for a public purpose;

(b) is accomplished under due process of law;

(c) is not discriminatory;

(d) is accompanied by prompt and adequate compensation, freely realizable; and

(e) does not violate any specific contractual engagement. Compensation shall be equivalent to the fair market value of the expropriated investment on the date of expropriation. The calculation of such compensation shall not reflect any reduction in such fair market value due to either prior public notice or announcement of the expropriatory action, or the occurrence of the events that constituted or resulted in the expropriatory action. Such compensation shall include payments for delay as may be considered appropriate under international law, and shall be freely transferable at the prevailing rate of exchange for current transactions on the date of the expropriatory action.

Paragraph 2 is changed to read as follows:

2. If either Party or a subdivision thereof expropriates the investment duly incorporated, constituted or otherwise duly organized in its territory, and if nationals or companies of the other Party, directly or indirectly, own, hold or have other rights with respect to the equity of such company, then the Party within whose territory the expropriation occurs shall ensure that such nationals or companies of the other Party receive compensation in accordance with the provisions of the preceding paragraph.

Paragraph 3 is changed to read as follows:

3. Except as otherwise provided in an agreement between the Parties, or between a Party and a national or company of the other Party, a national or company of either Party that asserts that all or part of its investment in the territory of the other Party has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of such other party to determine whether any such expropriation has occurred and, if so, whether any such expropriation, and any compensation thereof, conforms to the principles of international law.

ARTICLE VI

Paragraph 1 is changed to read as follows:

1. The Parties shall, upon the written request of either of them, promptly hold consultations to discuss the interpretation or application of this Treaty or to resolve any disputes in connection therewith.

ARTICLE VII

Paragraph 4 is changed to read as follows:

4. In any proceeding, judicial, arbitral or otherwise, concerning a legal investment dispute between it and a national or company of the other Party, a Party shall not assert, as a defense, counterclaim, right of set-off or otherwise, that the national or company concerned has received or will receive, pursuant to an insurance contract, indemnification or other compensation for all or part of its alleged damages from any third party whatsoever, whether public or private, including such other Party and its subdivisions, agencies and instrumentalities. Notwithstanding the foregoing, a national or company of the other Party shall not be entitled to compensation for more than the value of its affected assets, taking into account all sources of compensation within the territory of the Party liable for the compensation.

ARTICLE VIII

Paragraph 3(g) is changed to read as follows:

(9) Each Party shall bear the costs of its own arbitrator and counsel in the arbitral proceeding. Expenses, incurred by the Chairman and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at its discretion, direct that a higher proportion of the costs be paid by one of the Parties. Such a decision shall be binding.

ARTICLE X

Paragraph 1 is changed to read as follows:

1. This Treaty shall not preclude the application by either Party or any subdivision thereof of any and all measures necessary for the maintenance of public order and morals, the fulfillment of its existing international obligations, the protection of its own security interests, or such measures deemed appropriate by the Parties to fulfill future international obligations.

ARTICLE XI

The paragraph is changed to read as follows:

With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investments of nationals or companies of the Party. Nevertheless, all matters relating to the taxation of nationals or companies of a Party, or their investments in the territories of the other Party or a subdivision thereof shall be excluded from this Treaty, except with regard to measures covered by Article III and the specific provisions of Article V.

PROTOCOL

The Protocol is changed to read as follows:

On signing the Treaty concerning the Reciprocal Encouragement and Protection of Investments, the Arab Republic of Egypt and the United States of America, have, in addition, agreed on the following provisions which should be regarded as an integral part of this Treaty:

1. Each Party reserves the right to deny the benefits of this Treaty to any company of either Party, or its affiliates or subsidiaries, if nationals of any third country control such company, affiliate or subsidiary; provided that, whenever one Party concludes that the benefits of this Treaty should not be extended for this reason, it shall promptly consult with the other Party to seek a mutually satisfactory resolution of this matter.

2. "Control" means to have a substantial share of ownership rights and the ability to exercise decisive influence. Differences as to the existence of control shall be resolved according to the provisions of Article VIII.

3. (a) The treatment accorded by the United States to nationals or companies of Egypt under the provisions of Article II(I) and (2) shall in any State of the United States or other territory, possession, or political or administrative subdivision of the United States be the treatment accorded therein to residents of or companies incorporated, constituted or otherwise duly organized in other States of the United States or territories, possessions, or political or administrative subdivisions of the United States.

(b) The treatment accorded by Egypt to nationals and companies of the United States with

respect to the establishment and acquisition of investments in limited sensitive geographic areas designated for exclusive Egyptian investment shall be no less favorable then the treatment it accords to investments of nationals and companies of any third country. Egypt reserves the right to modify the areas covered, provided that such areas will be kept to a minimum and will not substantially impair the investment opportunities of United States nationals and companies.

4. The provisions of Article II, paragraph 3, relating to most favored nation treatment, shall not apply to advantages accorded by either Party to nationals or companies of a third country by virtue of a specific security or regional arrangement, including regional customs unions or free trade areas. Further, these provisions do not apply to the ownership of real estate. The provisions of Article II paragraph 1, relating to most favored nation treatment, shall not be construed to oblige one Party to extend to nationals or companies of the other the benefit of any treatment, preference or privilege which may be extended by the former Party by virtue of a customs union or in the field of housing. Moreover, with regard to rights to engage in mining on the public domain, each Party retains the right to accord to nationals or companies of the other Party treatment which is like or similar to that accorded by the other Party to nationals or companies of the first Party.

5. It is understood that this Treaty does not derogate from the rights of either Party regarding the establishment of qualifications as for the practice of professions, including law and accountancy. These qualifications may confine the practice of such professions to nationals or companies of. a Party, provided that they are applied on a nondiscriminatory basis; and provided, further, that such nationality requirements do not derogate from the right of nationals and companies of either Party, pursuant to Article II (5)(b) to engage professional and technical personnel of their choice to render professional and technical services necessary for the internal planning and operation of the investment.

6 This Treaty, and in particular, the provisions of Article II, paragraph 5(b) shall be subject to the provisions of Article X.

7. With respect to Article II (6), performance requirements are conditions imposed which would require an investor to export a minimum percentage of final product or to source some inputs locally.

8. With regard to Article III, Paragraph 1(d) the term "prompt" does not necessarily mean instantaneous. The intent is that the Party diligently and expeditiously carry out any necessary formalities.

9. With regard to Article III, paragraph 1, the phrase "events that constituted or resulted in the expropriatory action" refers to conduct attributable to the expropriatory Party and not to conduct of the national or company. The inclusion of paragraph (e) in Article III, paragraph 1, is without prejudice to the measure of compensation due in the event of expropriation.

10. The Parties recognize that restrictions on transfers abroad of sales or liquidation proceeds of an investment will adversely affect future capital inflows, contrary to the spirit of this Treaty and the interests of the Party imposing those restrictions. Nevertheless, the Parties recognize that it is possible that the Arab Republic of Egypt may find its foreign exchange reserves at a very low level. In these circumstances, the Arab Republic of Egypt may temporarily delay transfers required under Article V, Paragraph 1(f), but only: (i) in a manner not less favorable than that accorded to comparable transfers to investors of third countries; (ii) to the extent and for the time period n to restore its reserves to a minimally acceptable level, but in no case for period of time longer than that permitted by the provisions of Law 43 in force on the date of signature of this Treaty; and (iii) after providing the investor an opportunity to invest the sales or liquidation proceeds in a manner which will preserve their real value free of exchange risk until transfer

occurs.

11. Concerning Article VII (3)(a)(ii), it is understood that the Parties to the dispute may Previously agree to submission of the dispute to the jurisdiction of domestic courts and tribunals. The Parties will maintain a nondiscriminatory policy regarding the inclusion and implementation of such provisions in any investment contract.

12. With regard to the Annex, the exceptions noted by the Arab Republic of Egypt under "commercial activity" do not include integrated operations which combine production and sales activities for their products.

13. Recognizing that international financial markets and institutions further stimulate the process of economic development through the international transmission of investment and associated technology, each Party undertakes to maintain a favorable environment for investment by nationals or companies of the other Party in the insurance and banking sectors. Therefore, each Party accords to investments by nationals or companies of the other Party in investment banks, merchant-banks and reinsurance companies whose activities are confined to transactions in foreign currencies treatment no less favorable than that accorded under existing laws and regulations to investments by its own nationals and companies or to investments by nationals or companies of any third country, whichever is the more favorable. Both Parties agree to hold future discussions concerning the expansion of investment possibilities in these sectors by nationals or companies of either Party in the territory of the other Party.

DONE in duplicate at Cairo this 11th day of March 1986 in the English and Arabic languages, both texts being equally authentic.

For the Government of the United States of America:
NICHOLAS A. VELIOTES
*Ambassador.*

For the Government of the Arab Republic of Egypt:
Sultan ABOU ALI,
*Minister of Economy and Trade.*


ARAB REPUBLIC OF EGYPT,
MINISTER OF PLANNING AND INTERNATIONAL COOPERATION,

*March 11, 1985.*

Hon. WILLIAM E. BROCK,
*US. Trade Representative,*
*Washington, D.C.*

DEAR MR. AMBASSADOR,


As part of the review of the signed Bilateral Investment Treaty prior to its submission for ratification, our two Governments have discussed the question of compensation for expropriation, under Article III. With regard to the issue of compensation, the Government of Egypt understands that in conformity with contemporary international law, compensation pursuant to Article III paragraph 1 shall be determined in a manner consistent with international legal norms and standards rather than norms and standards that are particular to a specific domestic legal system. I would appreciate confirmation that your government shares this understanding.

Sincerely,
Dr. KAMAL AHMED EL GANZOURI,
*Minister of Planning and*
*International Cooperation.*

THE UNITED STATES TRADE REPRESENTATIVE
*Washington, March 11, 1985.*

Dr. KAMAL AHMED EL GANZOURI,
*Minister of Planning and International Cooperation.*

DEAR MR. MINISTER: I have the honor to refer to your letter of March 11, 1985, in which you
state that: "With regard to the issue of compensation, the Government of Egypt understands that
in conformity with contemporary international law, compensation pursuant to Article II paragraph
1 shall be determined in a manner consistent with international legal norms and standards rather
than norms and standards that are particular to a specific domestic legal system." The
understanding you express conforms to the understanding of the Government of the United
States regarding the determination of the amount of compensation due to an investor pursuant to
Article III of the Bilateral Investment Treaty.

Very truly yours,
WILLIAM E. BROCK.

I certify this to be a true copy of the original.
EDWARD ROZYNSKI.

Technical Secretariat of the Ministerial Committee

To settlement of Investment Disputes.



General Authority for Investment and Free Zones.

Issued from the Office of the Chairman of the Authority.

registration No: 2514/w3

date: 08-09-2020

attachments:

Gentlemen/ Al Ahly Financial Investments Co.

Greetings,

In the light of the provisions of Article (87) of the Investment Law No. (72) of 2017, it was stated that, while the investor's right to access to justice is not violated. the committee's decisions are enforceable and binding to the competent administrative authorities and have the power of The executive bond, after its approved by the Council of Ministers, As stipulated in Article 12 of the Prime Minister's Resolution No. (3150) for 2019 in order to organize the work of the technical secretariat of the Ministerial Committee for the settlement of Investment Disputes in its first paragraph, the Technical Secretariat shall inform the relevant authorities of the decisions issued by the Committee after its approved by the Council of Ministers.

In this regard, please note that the Ministerial Committee for the settlement of Investment Disputes has considered at its session held on 27-07-2020 the dispute between Al Ahly Financial Investments Company against 1-Prime Minister 2- Minister of Business section, So the company demands that the defendants be obliged to compensate them for their responsibility for the losses suffered, provided that the compensation is in the present value of the company.

<u>The Committee decided:</u>

"The ministerial committee is not competent to settle investment disputes to looking into dispute".

This decision was approved by the Council of Ministers at its session held on 06-08-2020.

Kind regards.

<u>Adviser</u>

Mohammed Ahmed Abdul Wahab.

Chief Executive Office.

Chairman of the Technical Secretariat of the Ministerial Committee

for settlement of Investment Disputes.



Address/ 6 Dar al-Shifa Street - Garden City – Qasr al-Nil– Cairo.

# EXHIBIT 2

STEPHEN E. MORRISSEY (187865)
SUSMAN GODFREY L.L.P.
1201 Third Ave, 38th Floor
Seattle, WA 98101-3000
Telephone: (206) 373-7380
Fax: (206) 516-3883

STEVEN G. SKLAVER (237612)
OLEG ELKHUNOVICH (269238)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-1606
Telephone: (310) 789-3100
Fax: (310) 789-3150

Attorney for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**10/04/2013** at 09:45:56 AM
Clerk of the Superior Court
By Diana Cuevas, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| AHMED D. HUSSEIN,<br><br>                    Plaintiff,<br><br>v.<br><br>SHELDON RAZIN, STEVEN PLOCHOCKI, QUALITY SYSTEMS, INC. and DOES 1-10, Inclusive<br><br>                    Defendants. | Case No.  30-2013-00679600-CU-NP-CJC<br><br>Judge Luis Rodriguez<br><br>**VERIFIED COMPLAINT FOR DAMAGES FOR:**<br><br>**(1) FRAUD AND DECEIT;**<br>**(2) CONSTRUCTIVE FRAUD;**<br>**(3) NEGLIGENT MISREPRESENTATION**<br>**(4) BREACH OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED** |

1
COMPLAINT FOR DAMAGES

2883213v1/013471

1   Plaintiff Ahmed Hussein ("Plaintiff" or "Hussein"), by his attorneys, alleges
2   as follows on information and belief, except as to those allegations pertaining to his
3   own knowledge and conduct, which are made on personal knowledge:

### INTRODUCTION

5   1.   For more than twenty years, Plaintiff has been the second largest
6   shareholder of defendant Quality Systems, Inc. ("QSI" or "Quality Systems"), an
7   Irvine-based healthcare information technology company traded on the NASDAQ
8   under the ticker symbol QSII.  He currently owns approximately 5,687,696 shares of
9   QSI stock, 9.6% of the company's total shares outstanding.   Plaintiff suffered
10   enormous losses on his QSI stock on July 26, 2012, when QSI retracted projections
11   of 20%-25% revenue and earnings growth for fiscal 2013 that it had repeatedly made
12   and reconfirmed in public statements made in May, June and July 2012—as recently
13   as just thirteen days before the projections were retracted.  The announcement that
14   QSI was retracting its prior projections shocked the market, causing QSI's stock
15   price to plummet by more than 35% in a single day and causing plaintiff to suffer
16   more than $80 million in losses. Plaintiff seeks to recover those losses from QSI and
17   defendants Sheldon Razin ("Razin"), the founder of the company who now serves as
18   the non-executive chairman of QSI's board of directors and *de facto* CEO of the
19   company, and Steven Plochocki ("Plochocki"), the company's CEO.   Razin and
20   Plochocki orchestrated a course of wrongful and fraudulent conduct and breaches of
21   fiduciary duty that culminated in the dissemination in May, June and July 2012 of
22   fiscal 2013 projections of 20%-25% revenue and earnings growth.  Those projections
23   were factually baseless when they were made and were retracted less than two weeks
24   after they were last reaffirmed. By this action, plaintiff seeks to hold Razin,
25   Plochocki and QSI responsible for their wrongful conduct and to recover the
26   enormous losses he suffered as a result of that conduct.

2883213v1/013471

### NATURE OF THE ACTION

2.   QSI develops and markets computer-based practice management and electronic health records solutions for and to medical and dental groups and hospitals throughout the United States.

3.   Razin founded QSI in 1974, is the company's largest shareholder, and serves as the non-executive chairman of the board of directors.   Razin wields complete control over QSI's business to further his own interests and desires, and in recent years his actions have destroyed much of the value of the company.   Despite lacking any authority under the company's by-laws to manage QSI's day-to-day affairs—and despite the fact that he was ousted from his prior position as QSI's CEO as a result of his misconduct—Razin works in concert with Plochocki and his other hand-picked officers and directors to exert control over all aspects of the company's decision making, functioning as the *de facto* CEO.

4.   Under the leadership of Patrick Cline ("Cline"), the founder of a company that was acquired by QSI in 1996 and combined with another acquired company to become QSI's NextGen business unit, QSI became one of the industry's leaders in the development and provision of electronic health records. As a result of the success of Cline's NextGen business unit, QSI enjoyed a sustained period of growth between 2000 and 2011.   Between 2008 and 2011, also as a result of the success of Cline's NextGen business unit, QSI's revenues and earnings grew 20% per year, and the company's stock price and market capitalization more than doubled. By the end of that period, Cline's NextGen business unit, which was run autonomously from the overall company until 2011, accounted for approximately 95% of QSI's revenues and profits.   On September 30, 2011, QSI's stock price peaked at $50.70, with a market capitalization in excess of $3 billion.

5.   Beginning in mid-2010, Razin started implementing plans to consolidate his complete control over QSI.   For instance, Razin decided to sub-divide the successful NextGen business unit into separate inpatient and ambulatory divisions,

2883213v1/013471

and determined that a less experienced sales team, rather than the experienced and proven NextGen sales team, would not be responsible for servicing the company's new Hospital Solutions Divisions.  These business decisions, which Razin forced through without significant discussion by or disclosure to the board of directors, made no strategic sense in light of an ongoing wave of consolidation in the healthcare industry and were implemented solely to facilitate Razin's effort to assert further control over the company.

6.     Frustrated with Razin's decision making, and with the steps he had taken to exert control over the NextGen business unit that had provided the foundation for QSI's growth, Cline announced that he would resign from QSI at the end of 2011. Most of the other executives who were part of the successful NextGen senior management team left the company during the ensuing months.  Following Cline's resignation announcement and the implementation of the changes in QSI's strategic plans described above, QSI management, under Razin's direction, sought to perpetuate the market perception that the company was positioned to continue to grow and thrive, when in fact the opposite was happening.  For instance, on November 7, 2011, defendant Plochocki told *Investor's Business Daily* that "worries about flattening and saturation" in the healthcare software market "were baseless." According to Plochocki, "there is nothing drying up and there is nothing slowing down."

7.     At a meeting of the QSI board of directors on January 25, 2012, which plaintiff attended, Plochocki delivered a presentation in which he stated that QSI's growth was "rivaled only by Apple," and said that the company expected to achieve 30% revenue and net income growth during its 2013 fiscal year, which began on April 1, 2012.

8.     The company reaffirmed its highly favorable FY2013 projections in a series of statements made by company representatives, under Razin's direction and with Razin's approval, during the spring and summer of 2012:

2883213v1/013471

- During a May 17, 2012 earnings call held in conjunction with the release of QSI's fourth quarter and year-end results for the 2012 fiscal year, Plochocki stated that "[w]e remain confident about the growth opportunities, as evidenced by our recent guidance for the 2013 fiscal year.  We have stated that we expect revenues to increase 20 to 24%, and earnings per share to grow 20 to 25%."

- During the same May 17, 2012 earnings call, Paul Holt, QSI's CFO, stated that QSI's fiscal 2013 "guidance range of 20 to 24% revenue growth includes expected growth in all of our business segments and revenue categories," and that QSI was "confident in our ability to deliver on this guidance, which is very consistent with our five year compound annual growth rate of 23%."

- In proxy materials filed with the SEC on June 26, 2012 containing an "Open Letter to Quality Systems, Inc. Shareholders," which was signed by Razin, Plochocki and five QSI directors aligned with QSI management, QSI again stated that it was "confident about our growth prospects," and that "[f]or fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%."

- In its definitive proxy statement filed with the SEC on July 13, 2012, QSI stated that "for fiscal 2013, we expect that revenues will increase in the 20%-24% range and we expect earnings per share to grow by 20-25%." QSI further stated that its projections were based on "an annual planning and budgeting process and a continuous reforecasting process."

9. The statements in the July 13, 2012 proxy statement were made even after QSI received a July 3, 2012 comment letter from the SEC which noted that the proxy materials "contain[e]d very specific projections about the future performance

5

COMPLAINT FOR DAMAGES

of Quality Systems," and requested that the company "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." The SEC letter cautioned that "[s]ince the company and its management are in possession of all facts relating to the company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made."  In a follow-up letter on July 9, 2012, the SEC commented that revised language proposed by QSI provided only "generic support and discussion" and was "confusing."  QSI, at Razin's direction, nonetheless issued the July 13, 2012 proxy statement containing the same projections for its 2013 fiscal year, without any meaningful description of the assumptions on which the projections were based or any factors that could cause the projections not to be realized.

10.    At the time of the statements cited above in paragraphs 6 through 8, Razin and QSI management sought to reassure the market and QSI's shareholders regarding the financial condition and prospects for the company following Cline's departure and the company's announcement in May 2012 of disappointing earnings numbers for the fourth quarter of 2012.  QSI's stock price had begun drifting downwards at the end of March 2012, decreasing by 45.9% over the span of four months, from $43.73 per share on March 30, 2012 to $23.63 on July 25, 2012.

11.    But contrary to the public pronouncements and private statements made to plaintiff at board meetings regarding QSI's financial performance and projected growth, QSI's revenues and net income in fact were decreasing, not increasing, and the growth projections it had repeatedly trumpeted were in fact completely baseless. During the earnings call on July 26, 2012, Plochocki announced that QSI's net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year. On behalf of QSI, Plochocki also retracted the earnings guidance that had been provided

1   and reaffirmed in May, June and July 2012, and stated that QSI was "not affirming
2   our previous guidance nor providing revised guidance at this time."

3       12.   No one on QSI's management team provided any explanation how or
4   why QSI's actual financial expectations could have deteriorated to such a degree
5   since it made the projections it made in May and June and reaffirmed in the definitive
6   proxy statement it filed on July 13, 2012, *almost two weeks after the end of the first*
7   *quarter and just thirteen days before the earnings release*, that the company was
8   retracting the earnings forecasts altogether.  Given that QSI engages in what it
9   describes as a "continuous reforecasting process" based on real-time information
10  concerning QSI revenues and income, the true facts concerning QSI's business
11  performance must have been known to Razin and his management team when the
12  earlier statements were made. But QSI nonetheless made projections that lacked any
13  objective basis, and in fact were totally inconsistent with QSI's actual business
14  performance at and before the times the projections were disclosed.

15      13.   The retraction of QSI's previously issued fiscal 2013 earnings guidance
16  in July 2012 came as a total shock to the market and undermined the credibility of
17  QSI's management team.  Following the July 26, 2012 earnings release, and the
18  shock to the market resulting from QSI's retraction of its earnings guidance, QSI's
19  stock price immediately plunged from $23.63 per share to $15.04 per share, a one-
20  day drop of more than 36.3% that wiped out hundreds of millions of dollars from the
21  market value of the company, causing plaintiff more than $80 million in losses.

22      14.   Plochocki personally profited from the artificial inflation of QSI's stock
23  price during the first half of 2012.  Plochocki—who was privy to real-time
24  information regarding QSI's actual financial performance sales pipeline—sold QSI
25  stock while the price was artificially inflated as a result of the failure to disclose the
26  company's true financial condition.  On February 23, 2012, Plochocki sold 88,500
27  shares of QSI stock, which was almost all of his holdings, for $43.99 per share, a
28  price near the all-time high.  If Plochocki had retained his shares through the July

2012 earnings release, his shares would have been worth less than 35% of the price he obtained.

15.     Plaintiff has been a shareholder of QSI since shortly after its initial public offering in 1982, and served as a director of the company from 1999 until May 2013. As of July 2012, plaintiff held 9,333,700 shares of QSI stock, approximately 15.7% of the company's outstanding shares, and was the company's second largest shareholder.  Plaintiff remains the company's second largest shareholder to this day. Hussein accepted Razin's invitation to join the board in 1999 based on Razin's commitment to adopt corporate governance reforms designed to limit Razin's control over the company and provide independent oversight over corporate decision making.  Since joining the board, Hussein has advocated strategic business decisions and corporate governance reforms that, he believes, would have significantly increased the value of the company.   For many years, plaintiff had expressed concerns about QSI's corporate governance practices, its failure to abide by the procedural safeguards in the company's by-laws, the QSI board of directors' refusal to provide any meaningful oversight over Razin and QSI management, and Razin's unchecked control over corporate decision making.  Although plaintiff's ownership stake in the company was nearly as large as Razin's, Razin has long ignored plaintiff's input and prevented plaintiff from meaningfully participating in the company's affairs. Although Hussein served on QSI's board of directors, he, unlike Razin and his management team, was not privy to real-time internal information regarding the company's growth model and its projected sales and financial performance, and instead relied on the accuracy of the information that was provided in the company's public statements and in information provided to him as a member of the QSI board of directors.

16.     Due to ongoing disagreements with Razin and the QSI board of directors regarding management and corporate governance issues, plaintiff considered selling his QSI stock and discussed a potential sale of his stock with his

2883213v1/013471

investment bankers in late 2011 and early 2012; he disclosed the possibility of selling his QSI stock in a November 10, 2011 13D filing.  Ultimately, he decided to retain the stock based on representations regarding QSI's expected future growth that were made by QSI management and that turned out to be totally baseless.

17.   On June 15, 2012, plaintiff informed QSI's board of directors that he was nominating a rival slate of directors for the company's board of directors, and that he would be sponsoring a proxy contest in support of the election of those directors at the annual meeting that was to be held in August 2012. By reassuring the market regarding QSI's financial condition and growth prospects—and, as further alleged below, by downplaying the management and corporate governance concerns raised by plaintiff and seeking to undermine plaintiff's credibility in the proxy contest through false and misleading statements about plaintiff—Razin and QSI management sought to increase the prospects for the re-election of the incumbent directors and thereby to further consolidate Razin's control over the company.

18.   Plaintiff was completely surprised by the company's CEO's July 26, 2012 retraction of projections which the same CEO had repeatedly provided to the market and reconfirmed as recently as thirteen days earlier.  Although plaintiff had significant concerns about Razin and QSI management, and particularly about Razin's unfettered control over the company and the long-term threat that Razin's decision making posed to the company's potential success, Hussein had no idea that the company's financial projections had no factual basis, as he had relied on Razin's management team to provide truthful and accurate information regarding the company and its actual and projected financial performance. Had he known the truth about QSI's baseless projections, Hussein would have emphasized that fact in the proxy materials he submitted in support of his proposed slate of directors and would have brought the baseless projections to the attention of the company's board and its investors.

19.   Following the announcement of QSI's earnings for the first quarter of fiscal 2013 in July 2012, Hussein was forced to sell approximately 3.65 million shares of QSI stock to satisfy a call of an outstanding loan secured by his stock and other assets, and lost tens of millions of dollars on those shares.  Additionally, Hussein has lost tens of millions of dollars on the approximately 5.69 million QSI shares that he continued to hold but would have sold well before July 2012 if QSI management had disclosed accurate information about the company's growth prospects instead of destroying management and company credibility by disclosing projected earnings that had no factual basis.

20.   By this action, Hussein seeks to recover the enormous losses on his QSI investment that were caused by defendants' conduct, and also seeks to hold Razin, current QSI management, and the QSI board of directors to account for fraudulent and other wrongful conduct that has destroyed much of the company's value and caused plaintiff enormous market losses, as well as other tremendous and irreparable harm.

## JURISDICTION AND VENUE

21.   Jurisdiction is proper in this Court because the Superior Court is a court of general jurisdiction and because plaintiff seeks both damages and equitable relief.

22.   Venue is proper in this Court because defendants reside in Orange County, California.

## THE PARTIES

### PLAINTIFF

23.   Plaintiff Ahmed Hussein is a citizen of the United States and Egypt who resides in Cairo, Egypt.  Until July 2012, Hussein owned 9,333,700 shares of QSI common stock, representing approximately 15.7% of the outstanding shares. Following the dramatic drop in QSI's stock price after the earnings release on July

COMPLAINT FOR DAMAGES

2883213v1/013471

26, 2012, Hussein was forced to sell 3,646,004 shares of QSI stock that were held in a margin account. Hussein continues to hold approximately 5,687,696 QSI shares, approximately 9.6% of QSI's outstanding stock, and has been the company's second largest shareholder for more than twenty years.

## DEFENDANTS

24.    Defendant Sheldon Razin is the non-executive chairman of QSI's board of directors, and is a resident of Orange County, California.  Razin was the founder of QSI and served as its Chief Executive Officer until March 2000, when the QSI Board of Directors terminated his employment following misconduct that included an unauthorized attempt to sell the company and falsely denying that he had done so to the company's board of directors.

25.    Defendant Steven Plochocki is QSI's Chief Executive Officer ("CEO"), and is a resident of Orange County, California.

26.    Defendant QSI is a California corporation based in Irvine, California. QSI is engaged in the development and marketing of healthcare management systems, operating through four divisions (QSI Dental, NextGen, Hospital Solutions, and Revenue Cycle Management (RCM) Services) that serve various sectors of the healthcare industry. QSI is a public company whose shares trade on NASDAQ.

27.    The true names and capacities of defendants named as Does 1-10, inclusive, whether individual, corporate, associate, or otherwise, are presently unknown to plaintiff.  Plaintiff therefore sues these defendants by these fictitious names.  Plaintiff will amend the Complaint to substitute true names and capacities when they have been ascertained.  Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged.

28.    By reason of their positions and relationships with QSI and plaintiff, including their membership or representation on QSI board of directors, their status

2883213v1/013471

as QSI officers, their access to material non-public information concerning QSI, and their control of QSI, defendants were and are fiduciaries to plaintiff.  Defendants owed to plaintiff the obligations of utmost good faith, fair dealing, fidelity, trust, loyalty and due care and were required to use their powers (1) to act in furtherance of the best interests of plaintiff and other shareholders of QSI; and (2) to provide plaintiff with complete and accurate information concerning QSI.

29.   By engaging in the wrongful conduct alleged herein, defendants pursued a common course of conduct, acted in concert with each other, and conspired with one another, in furtherance of their common plan, scheme or design.  In addition, each of the defendants aided and abetted each other in breach of their respective fiduciary duties, as alleged herein.  In aiding and abetting the other defendants' breaches of fiduciary duties, the defendants rendered substantial assistance to the other defendants with knowledge or in reckless disregard of the breaches of duty committed by such defendants.

## FACTUAL BACKGROUND

30.   Hussein has been a shareholder of QSI since around the time of its initial public offering ("IPO") in 1982.  Hussein subsequently purchased additional QSI shares, and had invested in excess of $8 million in the company by the mid-1990s.  Hussein invested in QSI because of a keen interest in the use of technology to improve the delivery of healthcare services, and a belief that QSI had the potential to become a leading player in that field.  Until 1999, despite owning nearly 20% of the company and having the right to elect two directors through cumulative voting, Hussein remained a relatively passive investor in the company, and did not request to be nominated to the company's board of directors, did not exercise his cumulative voting rights, and generally did not involve himself in issues relating to the corporate governance of QSI.

COMPLAINT FOR DAMAGES

31.   Razin, the founder and largest shareholder of QSI, served as QSI's CEO from its inception in 1974 until March 2000, and has served as the Chairman of QSI's Board of Directors from 1974 to the present.

32.   In May 1999, Razin traveled to Egypt to ask Hussein, who then owned 18.5% of the company's outstanding stock, to join the QSI board of directors.  At the time, QSI was embroiled in securities litigation involving allegations that, *inter alia*, Razin had made false statements in connection with the 1996 public offering of QSI stock, as well as a shareholder derivative lawsuit alleging that QSI directors had breached their fiduciary obligations by seeking to entrench themselves and by failing to maximize shareholder value. One of QSI's largest shareholders at the time, Lawndale Capital Management LLC, had filed a Schedule 13D amendment in which it stated that the QSI board of directors had "failed to do its job largely as a result of dysfunctional and not sufficiently independent board composition and a lack of any or poor corporate governance practices." Lawndale had indicated that it would seek changes to QSI's senior management and to the composition of its board of directors, as well as corporate governance reforms.  Hussein agreed to help resolve the dispute if Razin would agree to corporate governance reforms, alleged in more detail below, under which Razin would relinquish his control over the company and agree to have the company managed under the direction of a truly independent board of directors.

33.   On August 6, 1999, Hussein, Lawndale and the company ultimately reached a written Memorandum of Understanding ("MOU"), under which Razin would resign as CEO as soon as a replacement could be found, Razin would remain on the board of directors, and Razin would agree to support the corporate governance reforms requested by Hussein. The corporate governance reforms required by the MOU included, *inter alia*, the creation of an independent board of directors that would be responsible for overseeing the company, the removal of a "poison pill" that reinforced Razin's ability to prevent independent investors from gaining control over the company, the adoption of corporate by-laws that would protect the interests of

QSI shareholders, and Razin's resignation from his position as the company's CEO as soon as a replacement could be found.

34.   The corporate governance provisions included in the MOU included requirements that: (i) at least three-quarters of the members of the board of directors would be independent; (ii) the attendance of at least half of the directors would be required for any corporate action to be valid; (iii) the principal committees of the board, including the audit, nominating, compensation and transaction committees, would be comprised solely of independent directors; (iv) a separate meeting of the independent directors would be held at least as frequently as meetings of the full board; and (v) one independent director (which, initially, was Hussein) would serve as the Co-Chairman of the board and the Lead Director whenever the Chairman was not an independent director, preside over committees of the board, and serve on all board committees.  The MOU sought to limit Razin's further influence over the corporation by providing that (i) he would resign his position as CEO as soon as a new candidate was identified and elected; (ii) he would continue to serve as the Chairman of the board of directors for two years, and for any further period only if requested to do so by the board; and (iii) he could not serve on any committees of the board of directors because he was not qualified to serve as an independent director. Under the MOU, any modification or repeal of the corporate governance provisions required a majority vote of the company's shareholders or a two-thirds vote of both the entire board of directors and the independent directors. The MOU stipulated that these corporate governance provisions would become an integral part of the company's by-laws.

35.   Within months after agreeing to the MOU, Razin contravened those restrictions by unilaterally seeking to orchestrate a sale of QSI without prior notice to or approval by the board of directors.  In response to Razin's insubordination, the QSI board of directors, in a unanimous decision supported even by the directors selected by Razin, immediately terminated Razin from the QSI CEO position in

March 2000 and agreed to issue a written reprimand of Razin for his insubordinate violation of the requirements of the MOU. Razin was replaced by interim CEO Patrick Cline, the head of QSI's NextGen business unit, which had developed out of two acquisitions completed by QSI in the mid-1990's. However, because he continued to be the largest QSI shareholder, Razin remained on the QSI board of directors.

36.   In 2002, Razin had a dinner meeting with Hussein in Irvine, California, and during that meeting urged Hussein to support a request for the company to re-purchase Razin's outstanding shares. Hussein persuaded Razin that the re-purchase price proposed by Razin was too low, that the company was positioned for tremendous growth, and that Razin would benefit substantially from retaining rather than selling his shares. Razin consequently abandoned the idea of selling his shares and remained on the board of directors.

37.   Following his dinner meeting with Hussein in 2002, and his decision to abandon his plans to sell his QSI stock, Razin began to reassert control over the company. That effort culminated at the 2004 annual meeting of QSI's shareholders, during which Razin orchestrated the appointment of a new slate of directors who would abide by his instructions, in defiance of the MOU and by-laws of the corporation and the rights of Hussein and the other independent directors under California law. Razin did so after two of the four members of the nominating committee purported to declare themselves a "subcommittee," despite lacking the required majority support for that proposal, and then proceeded to nominate the directors supported by Razin. This was done without approval of the full board of directors or a majority of the independent directors or the full nominating committee, in contravention of the corporate governance reforms required by the MOU and the by-laws of the corporation and the rights under California law of the directors who opposed the nominating process, and over the written and vocal objections of a three-

2883213v1/013471

member majority of the independent directors, including two of the four members of the nominating committee.

38.   After securing the appointment of the slate of directors aligned with him at the September 2004 annual meeting, Razin's new slate of directors proceeded to adopt amendments to the corporate by-laws to enable Razin to be deemed an "independent director," notwithstanding his obvious lack of independence. Previously, Razin did not qualify as an independent director, but Razin persuaded his new slate of directors to change the company's by-laws so that, under a newly adopted definition, Razin could be considered independent and participate in the corporate decision making functions that were to be controlled by independent directors under the terms of the MOU.  The decision to revise the by-laws to allow Razin to serve as an independent director was made at a board meeting during which Razin enticed the company's directors to support his proposals with cash payments and stock option grants that provided the directors with substantial compensation worth far in excess of generally accepted levels of director compensation for a company of QSI's size and financial performance and much more than *ten times* the compensation the directors previously received, even though the directors had already been nominated and elected and had accepted their positions based on the previously existing compensation terms.  Notwithstanding the QSI directors' willingness to designate Razin an "independent" director, Razin in fact is not, and never legitimately has been, an independent director, notwithstanding that title, because (1) he founded the company, served as its CEO, served as the Chairman of the company's board of directors throughout its history, and at all times has been its largest individual shareholder; (2) the by-laws of the corporation had, since the inception of the company, precluded any former employee from being considered an independent director; and (3) Razin's son, David Razin, served and functioned as an executive officer of QSI, which under applicable NASD rules precluded Razin from being independent, although David Razin's executive status was inappropriately,

2883213v1/013471

inexplicably and surreptitiously modified without board knowledge, discussion or approval to facilitate Razin's effort to become an independent director.

39.   Also following the appointment of Razin's new beholden slate of directors, the board, at Razin's request and with the support of the directors he had selected, and over Hussein's objection, increased the size of the board to add two members of the management team to the board of directors, thereby further bolstering the ability of Razin to exert control over the company by ensuring that a majority of the board would consist of Razin and the interested directors he selected. These changes to the corporate by-laws were totally inconsistent with the MOU, which had been designed to limit Razin's control over the company as a result of his prior conduct.

40.   Since beginning to reassert control over QSI's corporate decision making in 2002, and increasingly after the new slate of directors supported by Razin was appointed in 2004, Razin has used his power over the QSI board of directors to implement a series of decisions that served Razin's interests and reinforced Razin's control over the company, at the expense of the best interests of the company and its shareholders. Those decisions included, *inter alia*:

- Restructuring the composition of board committees to increase Razin's power and influence over the company by ensuring that all committees would be chaired by the directors most closely aligned with Razin and that there would be no ability for Hussein or his nominees influence corporate decision making;

- Circumventing a decision, approved by a 6-1 vote at a special board meeting held in June 2004, to replace the corporate counsel chosen by Razin with a new independent counsel and to retain the new counsel to investigate inaccuracies in board minutes and legal recommendations prepared by the prior counsel by causing QSI management to fail to fund the retainer for the independent counsel;

17
COMPLAINT FOR DAMAGES

- Denying Hussein any opportunity to serve on standing board committees, while all other independent directors, except Hussein's nominee Murray Brennan, served on two or more committees;

- Changing corporate by-laws to place decision making power in so-called "independent directors' committees" controlled by Razin that were independent in name only, while excluding Hussein from participation in those committees;

- Ignoring the procedural requirements of the MOU by removing Hussein as the Lead Director and replacing him with a director aligned with Razin, even though that decision was not approved by a majority of the independent directors and was thus invalid;

- Refusing to appoint independent counsel to investigate and assess Razin's claimed "independence," notwithstanding repeated requests by Hussein and Hussein's willingness to fund such an investigation;

- Substantially increasing the compensation packages for QSI executives under which the executives would receive significantly higher compensation than they had previously even if the company's business performance deteriorated;

- Substantially increasing the compensation packages for QSI directors to levels far in excess of the amounts QSI directors had previously made, and more than ten times in excess of the compensation that the directors were to have received when they joined the board; and

- In early August 2012, NextGen president Scott Decker, one of the key executives along with Cline in the NextGen business that had been responsible for the growth of QSI, informed Razin and QSI management and his subordinates that he was resigning from the company because of objections to Razin claiming the status of an independent director while maintaining an office in the company and

2883213v1/013471

functioning as its CEO. Razin and Plochocki did not inform the full QSI board of this fact and delayed announcing Decker's resignation until after the contested board election at the annual shareholders meeting held in mid-August 2012. Razin and Plochocki engaged in this subterfuge in order to ensure the election of Razin's slate of directors, thereby depriving Hussein and the company's shareholders of the right to a fair and informed election.

41.   In 2006, Cline, on behalf of QSI, and based on Razin's instructions, approached Hussein to discuss the issues Hussein had raised regarding the contested board election in 2005, the validity of the prior board selection, QSI's corporate governance issues, and QSI's continued use of the corporate counsel who was beholden to Razin despite the prior decision to terminate him and concerns that Hussein had raised regarding the corporate counsel's lack of independence and the accuracy of the minutes and legal recommendation he had prepared.  Ultimately, Hussein and QSI, under Razin's direction, entered into a Settlement Agreement relating to those issues. Under the Settlement Agreement, which resolved a lawsuit that Hussein had previously initiated relating to those issues and his 2005 proxy context, QSI agreed to nominate the independent directors proposed by Hussein, to ensure that one-half of the members of the nominating and compensation committees of the board would be nominated by Hussein, and to terminate the corporate counsel chosen by Razin and appoint new outside counsel from a national law firm to attend board meetings and prepare the minutes of those meetings.  In conjunction with the Settlement Agreement, Razin traveled to New York to meet with Hussein and told him that he viewed Hussein as an important partner in the business, that he would abide by the previously adopted corporate governance reforms, including the termination of Razin's chosen corporate counsel, and that Hussein would chair the transactions committee of the board that would be responsible for considering all material transactions.  Razin never followed through on those commitments, despite

Hussein's requests that he do so.  The transactions committee never held substantive discussions regarding any transactions completed after the execution of the 2006 Settlement Agreement, even though Razin and his management team completed several material transactions, including one which ultimately resulted in a write-off of approximately $17.4 million in 2013.

42.    After the Settlement Agreement was executed, the company did retain Gibson, Dunn & Crutcher LLP ("GDC") as its new corporate counsel.  However, contrary to the main considerations underlying Hussein's decision to enter into the Settlement Agreement, QSI never terminated its prior counsel, and GDC resigned shortly after its appointment. Upon GDC's resignation, Razin's hand-picked personal lawyer continued to serve as corporate counsel, notwithstanding Hussein's objection and contrary to the requirements of the Settlement Agreement.  Hussein offered to pay for an arbitrator to determine whether the continued appointment of the prior counsel was consistent with the requirements of the 2006 Settlement Agreement, but Razin and his board refused.

43.    Since the 2006 Settlement Agreement, Razin has continued to exploit the lack of any truly independent oversight by the directors he selected to implement significant corporate actions without any prior notice to or direction to the full board and without any regard for the procedural requirements and protections set forth in the company's by-laws. For instance, in September 2009, the QSI board of directors was given two days' notice in advance of a scheduled board meeting of the decision to appoint Philip Kaplan to a new Chief Operating Officer ("COO") position, along with a copy of a proposed employment contract for Kaplan.  Until that time, Kaplan had served as an independent director and chairman of the nominating committee, but he resigned those positions shortly before the meeting.  Hussein, despite serving as a director, was not given any prior notice of the decision to create the COO position, the nature of the search for a new COO, or the manner in which the terms of

Kaplan's proposed compensation were negotiated and determined to be fair and reasonable.

44.    Just six months later, Razin orchestrated the termination of Kaplan from the newly created COO position in an extraordinarily unusual, flawed and deceptive fashion that was completely lacking in transparency. At the May 26, 2010 board meeting, Razin proposed the creation of a new committee called the "Independent Directors Compensation and Executive Personnel Committee," on which all of the independent directors, including Hussein and his nominee Dr. Murray Brennan, were to serve. The creation of this committee was not on the agenda distributed in advance of the meeting, and the materials for the meeting did not provide any explanation of the reasons for creating this new committee.  Hussein, Brennan and Davis were falsely told by Razin that the only reason to form this new committee was to resolve any disputes between the directors on the compensation committee.  Hussein, Brennan and Davis also were not told that the new committee would have the power to remove corporate officers, and the minutes of the meeting did not reflect that the committee would have such powers or that the committee could be convened without prior notice to its members.  Hussein questioned whether there was any need to form the new committee in light of the fact that the existing compensation committee had three members, and thus could not be deadlocked, and in light of the existence of a standing seven-member independent directors committee that was chartered by the by-laws to resolve disputes between the members of any independent directors committee, including the compensation committee.  Notwithstanding the fact that the committee actually was being formed to execute Kaplan's termination, Razin told directors Hussein, Brennan and Davis that the committee was being formed to resolve disputes among the directors on the compensation committee, and the minutes of the board meeting reflected Razin's false statement of the purpose for forming the committee.

2883213v1/013471

45.   Hussein and Brennan had scheduling conflicts that required them to leave prior to the end of the May 2010 meeting.  Before departing the meeting they inquired whether any additional material action was to be taken, and Razin told them that no further action would take place.  However, Razin did not inform Hussein and Brennan that Razin had met with three directors aligned with him the previous day at QSI headquarters and, together with outside counsel and an employment consultant, had discussed and agreed to the termination of Kaplan.  Razin did not bring those prior discussions to the attention of Hussein, Davis or Brennan, and those discussions and the reasons for them were never discussed or approved in advance by the QSI board.  Nothing in the QSI by-laws allowed the use of corporate resources for such a meeting, and proceeding with that meeting without notice to or the involvement of three of the independent directors was a violation of the rights of the three independent directors under California law.  QSI's outside corporate counsel and the members of the board of directors aligned with Razin who were present at the meeting who knew the true purpose for forming the new committee, and the powers that the new committee intended to assert, but remained silent and thus enabled Razin to mislead independent directors Hussein, Brennan and Davis regarding the real reasons for forming the committee.  After Hussein and Brennan left the meeting, Razin immediately convened a meeting of the newly created committee, without any notice to Hussein and Brennan.  At the new committee meeting, Razin proposed asking for Kaplan's resignation, and he did so without any notice to or input from Hussein or Brennan.  Shortly after the meeting, Kaplan resigned. The "Independent Directors Compensation and Executive Personnel Committee" never met again after May 26, 2010, and apparently was created for the sole purpose of facilitating Razin's decision to terminate Kaplan's employment, for reasons that were never explained to Hussein, Brennan, or the full board of directors.

46.   In May 2010, an independent director, Joseph Davis, alerted the QSI board of directors that Razin had, for the past seven years, falsely certified that he

was a full-time employee of the company in order to obtain health insurance coverage for himself and his wife under the company's benefit plan.  Razin had accepted those benefits, the value of which totaled at least $75,000, without prior knowledge or approval of the board of directors or any of its committees, and in violation of company policy.  Those false certifications of employment status were, of course, fundamentally inconsistent with Razin's contemporaneous claim that he was qualified to serve as an "independent" director of the company. Davis also suggested that Razin may be using corporate resources for his personal benefit, without board approval. Davis introduced a resolution seeking an independent investigation of Razin and Razin's qualifications to serve as an independent director, which Hussein seconded, and which also was supported by Brennan, but the resolution was voted down by Razin and the directors aligned with him, with Razin casting the deciding vote, even after Hussein volunteered to fund the investigation himself.  Razin did not recuse himself from that vote despite a clear conflict of interest, and he introduced a successful resolution to strike any mention of the resolution from the minutes of the meeting, despite the fact that the resolution proposed by Davis was an agenda item and was voted upon and supported by three of the seven independent directors, or half of the independent directors excluding Razin.

47.    Davis was subsequently not nominated for re-election to the board at the next annual meeting of QSI's shareholders.  After the company became self-insured, the board subsequently approved a resolution, proposed by Razin, under which Razin and his wife receive life insurance benefits.  Without any prior board approval, and consistent with his past practice of using corporate resources for personal ends, Razin directed the company's corporate counsel to prepare the proposal, despite his status as an independent director without any authority to do so. This arrangement also contravened a 2000 severance agreement under which Razin only was to receive insurance for the three years following his termination. Under this new arrangement,

there is no independent check on Razin's receipt of insurance benefits, and the ultimate decision whether to provide him with benefits is under his control.

48.    Razin additionally denied Hussein any meaningful opportunity to participate in QSI's decision making, despite Hussein's substantial ownership of QSI stock and his service as a QSI director. Razin excluded Hussein from the independent directors committees, removed Hussein from QSI board committees, and determined that important decisions regarding QSI's business would be made within independent directors committees from which Hussein was excluded and that were comprised of directors who were hand-picked by Razin and loyal to him.

49.    Between 2004 and 2013, Hussein was not appointed to any board committees except the transaction committee, which he chaired between 2006 and 2008 (a period during which that committee never materially considered any transactions because the QSI board, at Razin's request, transferred the powers of the transaction committee to company management), and the Independent Directors Compensation and Executive Personnel Committee (which, as alleged above, was created in 2010 and met once without prior notice).  In August 2012, Razin created an independent directors executive committee that included all of the independent directors except Hussein.  By excluding Hussein from QSI board committees, while assuring that all meaningful director decisions were made within the committees rather than the full board, Razin excluded Hussein from QSI's corporate decision making and undermined Hussein's rights as a substantial shareholder with a right under California law to representation on the QSI board.

50.    Razin also used the facilities and resources of the corporation, as well as outside resources such as consultants and lawyers, to conduct board committee meetings without notifying Hussein, Brennan or Cline in advance, or providing them with minutes of what had transpired at those meetings.

51.    Razin also has engaged in a longstanding campaign to disparage, belittle and undermine Hussein and the corporate governance concerns he has raised by

disseminating false and misleading information about Hussein in an effort to undermine Hussein's credibility and reinforce Razin's control over the company. For instance, at Razin's behest, QSI claimed in public filings that Hussein had violated company policy by holding his stock in margin accounts while he served as a director, and falsely suggested that it was previously unaware of Hussein's margin accounts. However, QSI knew Hussein had always held his stock in margin accounts, including long prior to the adoption of any such policy, and in fact had worked with Hussein to establish those accounts in the first place. Razin and his corporate counsel also had engaged in prior unsuccessful efforts over a ten year period to adopt policies restricting the use of margin accounts. Razin and QSI also knew that the company had no right to impose its newly established policy regarding margin accounts on Hussein, who had an unfettered right to serve as a QSI director as a result of his stock ownership and immediately informed the company that he would not abide by the new policy when it was adopted. Additionally, in opposing the slate of director nominees Hussein put forward in his 2012 proxy statement, QSI, at Razin's behest, made false and misleading claims about Hussein and decades-old legal proceedings in which Hussein had been involved in an attempt to undermine Hussein and his reform proposals and impugn Hussein's integrity, motives and character. QSI's actions caused tremendous and irreparable harm to Hussein, including reputational harm in the investor community, financial harm resulting from lost investment opportunities, destroyed business relationships, and financing arrangements that were suddenly cancelled on highly unfavorable terms without prior notice and at inopportune times, and preventing the election of the highly qualified slate of independent directors Hussein had proposed in the 2012 proxy contest.

52.    Razin's actions since 2002 have resulted in the creation of a board of directors and executive management team that is completely beholden to him and totally incapable of standing up to him or providing meaningful oversight over the company. As a result of Razin's actions, the QSI board of directors does nothing to

ensure the validity of the company's business plans, financial and operational results, and financial projections.

53.    Despite Razin's usurpation of the corporate governance reforms that had been implemented at QSI in 1999, and despite the absence of meaningful oversight from the board and management team that were beholden to him, QSI's business actually performed well while Cline and his team were responsible for the operation of the NextGen business.  During Cline's leadership of the NextGen business, that business unit enabled QSI to enjoy a period of sustained growth between 2000 and 2011. Between 2000 and 2009, the NextGen business unit led by Cline grew by 1300%, while the remainder of QSI's business actually shrank by 20%. Cline's NextGen business unit ultimately accounted for approximately 95% of QSI's revenues and profits.

54.    The success of QSI during Cline's leadership of NextGen was also reflected in the company's stock price. Between 2008 and 2011, QSI's revenues and profits grew by at least 20% per year, and the company's stock price and market capitalization more than doubled. QSI's stock price peaked at $50.70 per share on September 30, 2011, reflecting a market capitalization of $3 billion. At that time, Hussein's QSI stock had a market value in excess of $470 million.

55.    In July 2011, as Razin was progressively reasserting control over QSI's operations, and in particularly the NextGen division, Cline announced his resignation from QSI, effective at the end of the year.  Most of the QSI executives involved in the successful NextGen business resigned during the ensuing months. Razin and QSI management recognized that the market viewed Cline and his management team as important to QSI's continued success, and accordingly sought to reassure the market that QSI would continue to grow and thrive under Razin's control.  For instance, in a November 7, 2011 interview, defendant Plochocki, QSI's CEO, told *Investor's Business Daily* that "worries about flattening and saturation" in the healthcare software market "were baseless." According to Plochocki, "there is nothing drying

up and there is nothing slowing down." Plaintiff read those statements at or around the time they were made, and relied upon them in deciding to retain his QSI stock.

56.   Later, at a meeting of the QSI board of directors on January 25, 2012, which plaintiff attended, Plochocki delivered a presentation in which he stated that QSI's growth was "rivaled only by Apple."  Plochocki further said that the company had budgeted for 30% revenue and net income growth during its 2013 fiscal year, which would begin on April 1, 2012.

57.   QSI reaffirmed its favorable revenue and net income projections during a May 17, 2012 earnings call that plaintiff listened to and relied upon in deciding to retain his stock. During that earnings call, Paul Holt, QSI's CFO, stated that QSI's revenue and earnings growth for FY2013 were projected to be in the 20%-25% range.

58.   In a proxy statement issued on June 26, 2012—just four days before the end of the first quarter of QSI's 2013 fiscal year—QSI reiterated that "for fiscal 2013, we expect that revenues will increase in the 20-25% range and we expect earnings per share to grow by 20-25%."  Hussein specifically read and relied upon that proxy statement when deciding to refrain from selling his QSI shares.

59.   QSI stood by those projections even after its first quarter ended, and even after it received a July 3, 2012 comment letter from the SEC noting that the company's proxy materials "contain[e]d very specific projections about the future performance of Quality Systems" and urged the company to "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized."  The SEC comment letter warned QSI and its directors and management team who signed the proxy materials that "[s]ince the company and its management are in possession of all facts relating to the company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made."  In a subsequent letter dated July 9, 2012, the SEC commented that QSI had provided

only "generic support and discussion" in support of its projections and that the stated basis for the projections was "confusing." Nonetheless, QSI, under Razin's direction, issued its definitive proxy statement on July 13, 2012, two weeks after the end of the first quarter, in which it reaffirmed the prior projections.

60.    Razin served as the chairman of the special committee that authored and was responsible for QSI's June 26, 2012 proxy materials and signed the proxy materials on behalf of that committee. The special committee responsible for the proxy materials was formed by Razin and included only directors who were closely aligned with Razin and chosen by him. In addition to his formal responsibilities, Razin in fact serves as the *de facto* CEO of the company. Without board authorization, Razin maintains an office at QSI, controls and directs the use of QSI facilities and resources, and manages the company on a day-to-day basis. All significant decisions regarding the direction of the company are made by Razin, and the company's executive officers do not make public statements regarding the company, its operations, or its financial performance or future prospects without Razin's approval.

61.    At the end of March 2012, QSI's stock price had begun to decline. Between March 30, 2012 and July 2012, QSI's stock price decreased from $43.73 per share to $23.63 per share, a 45.9% decline. That decline in QSI's stock price cannot be explained by overall market performance or the publicly available information regarding the performance of QSI's competitors during that time frame, or by any publicly available information regarding QSI's own financial performance that was disseminated during that period. QSI's CEO, defendant Plochocki, regularly communicates with the institutional investor community, and some of the institutional investors that previously invested in QSI and with whom Plochocki regularly communicates sold sufficient quantities of QSI stock during that period to cause the price decline.

62. Razin's management team made the false statements in May, June and July 2012 regarding QSI's fiscal 2013 earnings projections after consulting with Razin and obtaining his approval, as they did on all important matters pertaining to the management of QSI. Razin and his management team were eager to assure the market that QSI's growth and financial performance would continue and to ensure that Razin would maintain his ability to control QSI's future direction. The earnings projections in QSI's June 26, 2012 letter to shareholders, reaffirmed in the definitive proxy statement filed on July 13, 2012, were made in the context of a proxy contest, which plaintiff had announced to the QSI board of directors on June 15, 2012. Plaintiff was sponsoring a rival slate of nominees to the QSI board of directors that, if successful, would have substantially curtailed Razin's power over the company. By reassuring investors regarding QSI's financial performance and growth prospects, Razin and his management team sought to dissuade QSI investors from supporting plaintiff's proposed slate of directors.

63. Notwithstanding the public statements and communications to plaintiff at QSI board meetings, there in fact was no factual basis whatsoever for the statements that "there is nothing slowing down" as of November 2011, or for the projections of 20%-25% revenue and net income growth for the 2013 fiscal year that were made in May, June and July 2012. Razin and his management committee had access to real-time information concerning QSI's operating and financial performance, and must have known that those statements—the last of which made *two weeks after the first quarter had ended*—had no factual basis and were false when made. It is simply impossible that the financial results that the company disclosed on July 26, 2012 beset the company only after the June 26, 2012 statements and were not known to the company at least by July 13, 2012, and it is equally impossible that Razin and his management team did not know there was no factual basis whatsoever for the revenue and earnings projections that were made in May,

June and July 2012 and reaffirmed on July 13, 2012 when the prior statements were made.

64.   In fact, as Razin and his management team knew, QSI's financial performance had begun slowing down in late 2011.   Contrary to the growth projections provided to Hussein and the marketplace, QSI's new bookings had, in fact, begun declining a year earlier, in the first quarter of fiscal 2012, and QSI's sales pipeline had begun declining in the fourth quarter of fiscal 2012.

65.   During the earnings call held on July 26, 2012, Plochocki announced that QSI's net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year. Plochocki said the results were attributable to "lower than expected revenue from large, higher margin software system sales."  On behalf of QSI, Plochocki also retracted the earnings guidance that had been provided in May, June and July 2012, and reaffirmed less than two weeks earlier on July 13, 2012, and stated that QSI was "not affirming our previous guidance nor providing revised guidance at this time." This retraction by the CEO of the company, without any explanation of any change in the company's prospects that could account for the deviation from the earnings guidance that the company had re-affirmed as recently as just thirteen days earlier, *destroyed the credibility of QSI management* and the value of QSI shares in the marketplace, causing a 36.3% price drop in one day and causing the company to trade at a substantial discount to the price to earnings ratios at which its key competitors were trading.

66.   The retraction of QSI's previously issued earnings guidance, without any explanation or the identification of any change in the company's sales or financial performance during the thirteen-day period since it had last re-affirmed its fiscal 2013 earnings guidance, came as a total shock to the market.  On July 26, 2012, QSI's stock price immediately plunged from $23.63 per share to $15.04 per share, a

2883213v1/013471

1  one-day 36.3%% drop that wiped out hundreds of millions of dollars in shareholder

2  value.

3      67.   The disclosure of accurate information concerning QSI's financial

4  performance and growth prospects, coupled with the revelation that the information

5  previously disclosed in May, June and July was false, caused QSI's stock price to

6  drop far more than it would have dropped if QSI management had disclosed accurate

7  information in the first place.  Based on QSI's fundamental business performance,

8  and based on the performance of comparable companies in QSI's industry, QSI's

9  stock likely would have continued trading at far higher prices if QSI management

10 had provided timely and accurate information to the market place.   Due to the

11 destructive effects of defendants' conduct, QSI's stock continues to trade at price to

12 earnings ratios that are substantially lower than those at which peer companies in its

13 industry trade.

14     68.   Over the years, Hussein had grown increasingly frustrated with Razin's

15 flouting of the corporate governance reforms that had been implemented in 1999,

16 Razin's exercise of complete control over QSI decision making despite his nominal

17 status as an "independent" director, Razin's increasing compensation to QSI directors

18 to facilitate his control over the company, and Razin's providing himself with

19 valuable employee benefits for which he was not qualified, as well as the QSI

20 directors' continual rubber stamping of Razin's decisions and willingness to turn a

21 blind eye to Razin's conduct.  Consequently, Hussein considered selling his QSI

22 shares at various times. For instance, in a November 2011 13D filing, when QSI's

23 stock was trading near its all-time high, Hussein noted that he had considered selling

24 his shares. Later, in late 2011 and early 2012, Hussein discussed the possibility of

25 selling his QSI shares with more than one trading firm. Hussein ultimately decided

26 not to sell his QSI shares based on his consideration of the financial information that

27 was provided to him by QSI management, including particularly the statements by

28 Plochocki and Holt noted above.  Had he known that Plochocki and his management

team, at the behest of Razin, was concealing important information concerning QSI's deteriorating growth prospects, and were making statements regarding QSI's anticipated growth that had no basis in the actual performance of QSI's business, Hussein would have immediately sold his QSI stock while it was trading at a much higher price than it traded at following the July 26, 2012 earnings release.

69.     Following the QSI earnings release on July 26, 2012, Hussein was forced to sell approximately 3.64 million shares of QSI stock between July 26 and July 30, 2012.  Those QSI shares were held in margin accounts with UBS, and served as collateral for a loan issued to Hussein by UBS.  Before selling the stock, UBS did not provide Hussein with an opportunity to satisfy the margin call, which he could have done using other assets, and instead called the entire loan due and liquidated millions of shares of Hussein's stock without any prior notification.  Plaintiff is informed and believes that a representative of UBS, which served as QSI's investment banker, and which Razin once stated to the QSI board of directors managed more than $100 million of Razin's own investments for him, did call James Sullivan, QSI's Executive Vice President and General Counsel, and informed him of UBS's plans to sell Hussein's stock, in violation of Hussein's rights to maintain the privacy of his financial accounts. Sullivan did not inform Hussein of the call, or tell UBS that QSI had no right to involve itself in the sale of Hussein's stock, but rather told UBS that QSI had no objection to UBS proceeding with the sale of Hussein's stock. These forced sales took place while QSI's stock price was at highly depressed levels as a result of the complete retraction of the company's projections in the July 26, 2012 earnings release and conference call, and caused Hussein to lose tens of millions of dollars on the shares that were sold.  Hussein also suffered tens of millions of dollars in market losses on the approximately 5.7 million QSI shares he continued to hold.  QSI directly enabled these forced sales through Sullivan's conversation with UBS, and made no effort to prevent them even though the sale of a

1    substantial portion of Hussein's stock was likely to exacerbate the adverse effects of

2    the retraction of QSI's projections on the company's stock price.

3        70.    Following the July 26, 2012 QSI earnings release and management's

4    retraction, without explanation, of the company's revenue and earnings projections

5    that had been reaffirmed and disseminated to the investment community less than

6    two weeks earlier, the value of Hussein's QSI investment, which once was worth

7    more than $470 million, had dropped below $140 million.

8        71.    At the QSI board meeting held on August 16, 2012, the board of

9    directors refused to investigate or even discuss the incredible discrepancy between

10   the projections made and re-affirmed in May, June and July 2012 and the retraction

11   of the company's projections on July 26, 2012.  There were only thirteen days

12   between the July 13, 2012 proxy statement reaffirming the prior 20% to 25% growth

13   projections and the company's disclosure of its actual first quarter results and

14   retraction of its projections on July 26, 2012. At some point during those thirteen

15   days, the company must have concluded that the projections would not be reaffirmed

16   in the July 26, 2012 earnings release and that no further projections would be made.

17   Yet, even despite the magnitude of the one-day 36.3% price drop and destruction of

18   market value that occurred on July 26, 2012, QSI's board of directors declined to

19   fulfill its fiduciary responsibility to conduct any investigation of what led to that

20   conclusion, let alone any investigation of what led the company to make the baseless

21   projections in May, June and July 2012 and then retract those projections just thirteen

22   days after they had last been re-affirmed.

23       72.    At the August 2012 board meeting, Razin confronted Hussein and told

24   him that he "enjoyed seeing [Hussein's] demise" and "seeing Hussein squirm," and

25   that he wished he had been there to purchase Hussein's shares at a depressed price.

26       73.    Following the July 26, 2012 QSI earnings release and retraction of the

27   company's projections, Hussein also confronted Plochocki and Holt and asked them

28   how the company could issue projections and then retract them less than two weeks

after they had been reaffirmed. In response, Plochocki said he had authorized the prior projections because they were "even less than what Shelly [Razin] wants." Holt stated that he did not remember signing off on the prior projections.

74. Under the direction of Razin and his management team, QSI continued to struggle following the July 26, 2012 earnings announcement and sudden retraction of the company's recently reaffirmed projections. Despite requests from Hussein, the board of directors refused to conduct any investigation of Razin and his management team concerning the earnings statements or take any action to investigate how the company could have made projections that were so fundamentally baseless.

75. On January 14, 2013, Cline resigned from QSI's board of directors, stating that "[a]fter careful consideration I have decided that given the current board environment and company issues, I am unable to help the company." In disclosing Cline's resignation, the company did not state the reasons for Cline's resignation or attach Cline's letter to their disclosure, and omitted the fact that Cline's resignation letter had been addressed to the entire board of directors.

76. QSI's Executive Vice President and General Counsel James Sullivan subsequently resigned from the company in May 2013, shortly after Hussein's resignation from the board of directors, but QSI made no disclosure of the fact of Sullivan's resignation or the reasons for his resignation.

77. QSI has continued to struggle following the July 26, 2012 earnings announcement and retraction of its revenue and earnings projections. Razin's unchecked exercise of control over the company, which previously caused the departure of the NextGen management team that had engineered the company's prior growth, and which previously destroyed the company's market credibility through the dissemination of false information, has continued to undermine the value of the company and harm plaintiff since the summer of 2012. On May 23, 2013, QSI announced its fourth quarter and full-year earnings for fiscal 2013. Rather than the 20%-25% revenue growth that the company had projected back in May and June

2012, QSI's revenues in fact grew by a meager 7% in fiscal 2013. QSI's earnings and net income per share declined by 44% from fiscal 2012 to fiscal 2013, in contrast to the 20%-25% growth that the company had previously projected. The company also announced that, as a result of an "operational review," it had recorded a $17.4 million goodwill impairment charge during the fourth quarter of 2013, and that as a result the company had suffered a net loss of $4.1 million in the fourth quarter of fiscal 2013, in contrast to a $15.1 million net profit the prior year. The $17.4 million goodwill impairment, which was enormous in relation to the relatively modest size of the transaction, resulted from an acquisition that Razin completed without any material discussion by the transactions committee, of which Hussein was the chairman at the time of the transaction, in violation of provisions in the corporate by-laws and the 2006 Settlement Agreement requiring transactions of that magnitude to be considered and approved by the transactions committee. Upon information and belief, defendants omitted material information concerning the basis for this impairment in its prior earnings statements and projections.

78.    In contrast to the enormous losses suffered by Hussein, some of the individual defendants profited from the artificially inflated QSI stock price during the spring of 2012. Plochocki sold 88,500 shares of QSI stock on February 23, 2012 for $43.99 per share, a price near its all-time high. Plochocki was privy to accurate real-time information concerning QSI's sales and financial performance.

79.    Hussein resigned from the QSI board of directors on May 14, 2013.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**(Against All Defendants for Fraud and Deceit)**

80.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 79 inclusive, as set forth above.

81.    Defendants violated the common law of fraud and California Civil Code §§ 1709, 1710 and 1572 through the material misrepresentations and non-disclosures

alleged above, including the false and deceitful representations made in November 2011 that "there is nothing slowing down," and the false representations in May, June and July 2012 that the company expected 20%-25% earnings and revenue growth in the 2013 fiscal year.

82.   Defendants made their material misrepresentations and non-disclosures knowing that their statements were false and misleading and with the intent to defraud plaintiff.  As alleged above, defendants Razin and Plochocki conspired with one another to make the material misrepresentations and non-disclosures, and acted in furtherance of their conspiracy by making false and misleading statements regarding QSI's actual projected financial performance.

83.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

84.   Hussein reasonably relied on defendants' material misrepresentations and non-disclosures by retaining his QSI stock. Hussein considered selling his QSI stock in late 2011 and early 2012, and discussed doing so with his stockbrokers.  If he had known that the statements made by QSI management regarding the company's projected growth for the 2013 fiscal year were not based on any legitimate factual foundation, Hussein would have sold his QSI stock.  If Hussein had known the true facts concerning QSI's dismal financial performance, he would have disclosed those facts in his own proxy statement because doing so would have provided further support for his effort to replace the incumbent board.

85.   As a proximate result of relying on defendants' material misrepresentations and non-disclosures, plaintiff incurred actual damages consisting of the loss in value of his QSI stock.

86.   Hussein nominated an independent slate of proposed directors that would have stood up to Razin and safeguarded the company and its shareholders. Through their misrepresentations, as well as the disparaging attacks on Hussein's

character alleged above, defendants ensured the defeat of Hussein's proposed slate of directors and the election of the slate of directors aligned with Razin. Defendants' conduct caused tremendous and irreparable reputational and financial harm to Hussein, causing him to suffer enormous losses on his QSI stock, harming his reputation in the investment community, leading Hussein's lenders to call outstanding loans, and causing Hussein to lose future investment opportunities.

87.   Defendants' fraudulent conduct alleged above was done intentionally, through malice, fraud and oppression, and with the intention on the part of the defendants to deprive Hussein of the true value of his stock, and was despicable conduct that subjected plaintiff to cruel and unjust hardship in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

### SECOND CAUSE OF ACTION
**(By Plaintiffs against all Defendants for Constructive Fraud)**

88.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 87 inclusive, as set forth above.

89.   Defendants are liable to plaintiff for constructive fraud under Cal. Civil Code § 1573 in that they breached their fiduciary duties to Hussein as a QSI shareholder and fellow director to protect the interests of plaintiff and to disclose to plaintiff all material facts as to the business and financial prospects of QSI. Defendants failed to comply with their duties and, in the case of defendant Plochocki, instead actually profited from the non-disclosure of material information concerning QSI.

90.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

91.   As a proximate result of relying on defendants' constructive fraud, plaintiff incurred actual damages consisting in the loss of the value of his QSI stock,

2883213v1/013471

as well as tremendous and irreparable financial and reputational harm, as alleged above.

92.    Defendants' fraudulent conduct alleged above was done intentionally, through malice, fraud and oppression, and was despicable conduct that subjected plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to justify an award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION
**(Against All Defendants for Negligent Misrepresentation)**

93.    Plaintiff realleges and incorporates by reference paragraphs 1 through 92, as set forth above.

94.    Defendants violated the common law of fraud and California Civil Code §§ 1709 and 1710 through the material misrepresentations and non-disclosures alleged above, including the false representations to plaintiff in November 2011 that "there is nothing slowing down," and the false representations in May, June and July 2012 that the company expected 20%-25% earnings and revenue growth in the 2013 fiscal year.

95.    Defendants knew and intended that plaintiff would rely on their representations regarding QSI's expected earnings and revenue growth, but had no reasonable grounds for believing that their representations were true when they were made.

96.    Hussein reasonably relied on defendants' material misrepresentations and non-disclosures by retaining his QSI stock. Hussein considered selling his QSI stock in late 2011 and early 2012, and discussed doing so with his stockbrokers.  If he had known that the statements made by QSI management regarding the company's projected growth for the 2013 fiscal year were not based on any legitimate factual foundation, Hussein would have sold his QSI stock.

2883213v1/013471

97.   As a proximate result of relying on defendants' material misrepresentations and non-disclosures, Hussein incurred actual damages consisting of the loss in value of his QSI stock.

98.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(Against All Defendants for Breach**
**of Fiduciary Duty)**

</div>

99.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 98, as set forth above.

100.   As directors or officers of QSI, Razin and Plochocki owed fiduciary duties to plaintiff as a shareholder of QSI.

101.   From late 2011 through July 2012, defendants breached their fiduciary duties of care, loyalty, honesty and good faith by falsely reassuring plaintiff and the market regarding QSI's financial condition and projected future performance, as alleged above, either by directly making false statements about the company and its anticipated future growth, and by omitting material information from the statements that were made, or, in the case of Razin, by authorizing such false statements and omissions to be made by other defendants.

102.   Defendants Razin and Plochocki engaged in the wrongful conduct alleged above as officers and directors of QSI and on behalf of QSI, and QSI is thus responsible for their actions.

103.   As a result of defendants' breaches of fiduciary duty, defendants' credibility with the marketplace was destroyed on July 26, 2012, when QSI retracted the revenue and growth projections it had made in May, June and July 2012 and reaffirmed less than two weeks earlier, on July 13, 2012. Since the July 26, 2012

2883213v1/013471

1  disclosures, QSI's stock has traded at price/earnings ratios far below those of

2  comparable companies as a result of that loss of credibility.

3       104.  As a result defendants' breaches of fiduciary duty, plaintiff's Quality

4  Systems stock is worth far less than it would have been worth had defendants

5  fulfilled their fiduciary obligations.

6       105.  The breaches of fiduciary duty and acts to assist in the completion of

7  breaches of fiduciary duty by defendants alleged above were done intentionally,

8  through malice, fraud and oppression.  This was calculated and despicable conduct

9  that subjected plaintiff to cruel and unjust hardship in conscious disregard of

10 plaintiff's rights, so as to justify an award of exemplary and punitive damages.

11

12                          **PRAYER FOR RELIEF**

13       WHEREFORE, plaintiff prays for judgment, jointly and severally, against

14 defendants, as follows:

15   1.  Compensatory damages in an amount to be proven at trial;

16   2.  Punitive and exemplary damages based on defendants' intentional, malicious,

17       cruel and unjust disregard of plaintiffs' rights and interests; and

18   3.  Pre-judgment interest, costs, attorneys' fees and such other legal and equitable

19       relief as the Court deems appropriate.

20

21 Dated: October 4, 2013          By:  /s/   Stephen E. Morrissey
                                   Stephen E. Morrissey (187865)
22                                 E-Mail:  smorrissey@susmangodfrey.com
                                   SUSMAN GODFREY L.L.P.
23                                 1201 3rd Avenue, Suite 3800
                                   Seattle, WA 98101
24                                 Tel:  (206) 516-3861
                                   Fax:  (206) 516-3883
25
26                                 Steven G. Sklaver (237612)
                                   Oleg Elkhunovich (269238)
27                                 E-Mail:  ssklaver@susmangodfrey.com
                                   SUSMAN GODFREY L.L.P.
28                                 1901 Avenue of the Stars, Suite 950
                                   Los Angeles, CA 90067-1606

2883213v1/013471

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (310) 789-3100

*Attorneys for Plaintiff Ahmed Hussein*

COMPLAINT FOR DAMAGES

2883213v1/013471

<u>**VERIFICATION**</u>

I, Ahmed Hussein, have read the foregoing Verified Complaint know the contents thereof. The matters alleged by me based on my personal knowledge are true and correct, and I believe those matters alleged by me on information and belief are true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: October 4 2013                  By: /s/
                                       Ahmed D. Hussein
                                       Plaintiff

# EXHIBIT 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**
(Rule 14a-101)

INFORMATION REQUIRED IN PROXY STATEMENT

SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934

(Amendment No. )

Filed by the Registrant ☐

Filed by a Party other than the Registrant ☒

Check the appropriate box:

☐     Preliminary Proxy Statement

☐     Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒     Definitive Proxy Statement

☐     Definitive Additional Materials

☐     Soliciting Material Under Rule 14a-12

QUALITY SYSTEMS, INC.
(Name of Registrant as Specified in Its Charter)

AHMED D. HUSSEIN
MURRAY F. BRENNAN, M.D.
PATRICK B. CLINE
THOMAS R. DIBENEDETTO
IAN A. GORDON
JOHN MCDUFFIE
JOHN MUELLER
(Name of Persons(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒     No fee required.

☐     Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)      Title of each class of securities to which transaction applies:

_____

(2)      Aggregate number of securities to which transaction applies:

_____

(3)      Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

_____

(4)      Proposed maximum aggregate value of transaction:

_____

(5)      Total fee paid:

_____

☐      Fee paid previously with preliminary materials:

_____

☐      Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously.  Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

_____

(1)      Amount previously paid:

_____

(2)      Form, Schedule or Registration Statement No.:

_____

(3)      Filing Party:

_____

(4)      Date Filed:

_____

_____

**AHMED D. HUSSEIN**
**630 Fifth Avenue, Suite 2258**
**New York, NY 10111**

July 20, 2012

Dear Fellow Shareholder:

I am the beneficial owner of an aggregate of 9,333,700 shares of common stock, par value $.01 per share, of Quality Systems, Inc., a California corporation ("QSII" or the "Company"), representing approximately 15.7% of the shares of common stock outstanding. For the reasons set forth in the attached Proxy Statement, I believe the Board of Directors of the Company (the "Board") is not acting in the best interests of its shareholders. I am therefore seeking your support at the annual meeting of shareholders scheduled to be held at the Marriott Hotel located at 18000 Von Karman Avenue, Irvine, California 92612, on August 16, 2012 at 1:00 p.m., local time, including any adjournment or postponement thereof and any meeting which may be called in lieu thereof (the "Annual Meeting"), for the following:

    1.    To elect the seven (7) individuals I have nominated (the "Nominees") to the Board in opposition to the Company's director nominees;

    2.    To hold an advisory vote on the Company's executive compensation for its named executive officers;

    3.    To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending March 31, 2013; and

    4.    To transact such other business that may properly come before the Annual Meeting.

The Board is currently composed of nine (9) directors whose terms expire at the Annual Meeting. The Company has nominated eight (8) persons, including seven (7) current directors, for election at the Annual Meeting. Our purpose in seeking seven (7) seats on the Board is to ensure that the Company is run in the interests; and for the benefit; of all shareholders, the true owners of the Company. If five (5) or more of our Nominees are elected, they will represent a majority of the members of the Board.

The enclosed Proxy Statement is soliciting proxies to elect only the Nominees listed therein. Accordingly, the enclosed GOLD proxy card may only be voted for the Nominees and does not confer voting power with respect to any of the Company's director nominees. Shareholders who return the GOLD proxy card will only be able to vote for the seven (7) Nominees listed on the card and will not have the opportunity to vote for the two (2) other seats up for election at the Annual Meeting. See "Voting and Proxy Procedures" on page 17 for additional information. You can only vote for the Company's director nominees by signing and returning a proxy card provided by the Company. Shareholders should refer to the Company's proxy statement for the names, backgrounds, qualifications and other information concerning the Company's nominees. I intend to vote all of my shares of QSII in favor of the Nominees, subject to cumulative voting procedures as described on page 17.

Please carefully consider the information contained in the attached Proxy Statement and then sign, date and return the enclosed GOLD proxy card today. The attached Proxy Statement and the enclosed GOLD proxy card are first being furnished to shareholders of QSII on or about July 20, 2012.

---

**A-353**

If you have already voted for the management slate on the White card, you have every right to change your vote by signing, dating and returning a later dated **GOLD** proxy.  Please vote each and every **GOLD** proxy card you receive.

If you have any questions or require any assistance with your vote, please contact AST Phoenix Advisors at their address and toll-free numbers listed below.

Thank you for your support,

Ahmed D. Hussein

*If you have any questions, require assistance in voting your **GOLD** proxy card,*
*or need additional copies of our proxy materials,*
*please contact AST Phoenix Advisors at the telephone numbers listed below.*

**AST Phoenix Advisors**
**110 Wall Street, 27th floor**
**New York, NY 10005**
**Shareholders call toll-free: (800) 581-4729**
**Banks and Brokers call collect:  (212) 493-3910**

**ANNUAL MEETING OF SHAREHOLDERS**
**OF**
**QUALITY SYSTEMS, INC.**

——————————————

**PROXY STATEMENT OF AHMED D. HUSSEIN AND THE OTHER PARTICIPANTS**

**IN OPPOSITION TO THE BOARD OF DIRECTORS OF**

**QUALITY SYSTEMS, INC.**

——————————————

**PLEASE SIGN, DATE AND MAIL THE ENCLOSED GOLD PROXY CARD TODAY**

Ahmed D. Hussein is a significant shareholder of Quality Systems, Inc., a California corporation ("QSII" or the "Company"). Mr. Hussein believes that the Board of Directors of the Company (the "Board") is not acting in the best interests of the Company's shareholders. He and the other participants named herein (collectively, "we" or "us" or "Participants") are seeking your support for the election of his director nominees to the Board at the annual meeting of shareholders scheduled to be held at the Marriott Hotel located at 18000 Von Karman Avenue, Irvine, California 92612, on August 16, 2012 at 1:00 p.m., local time, including any adjournments or postponements thereof and any meeting which may be called in lieu thereof (the "Annual Meeting"), for the following:

1. To elect Mr. Hussein's director nominees, Ahmed D. Hussein, Murray F. Brennan, M.D., Patrick B. Cline, Thomas R. DiBenedetto, Ian A. Gordon, Lieutenant General (Ret) John M. McDuffie, and John J. Mueller (each a "Nominee" and, collectively, the "Nominees"), to serve as directors of the Company until the 2013 annual meeting of shareholders or until their successors are elected and qualified, in opposition to the Company's director nominees;

2. To hold an advisory vote on the Company's executive compensation for its named executive officers (the "Say on Pay Proposal");

3. To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending March 31, 2013; and

4. To transact any other business that may properly come before the Annual Meeting.

Mr. Hussein and his other six Nominees are the Participants in the proxy solicitation pursuant to this Proxy Statement, which is soliciting proxies to elect only Mr. Hussein's Nominees. Accordingly, the enclosed GOLD proxy card may only be voted for Mr. Hussein's Nominees and does not confer voting power with respect to any of the Company's director nominees. Shareholders who return the GOLD proxy card will only be able to vote for Mr. Hussein's seven (7) Nominees. See "Voting and Proxy Procedures" on page 17 for additional information. You can only vote for the Company's director nominees by signing and returning a proxy card provided by the Company. Shareholders should refer to the Company's proxy statement for the names, backgrounds, qualifications and other information concerning the Company's nominees.

QSII has set the record date for determining shareholders entitled to notice of and to vote at the Annual Meeting as June 18, 2012 (the "Record Date"). The mailing address of the principal executive offices of QSII is 18191 Von Karman Avenue, Suite 700, Irvine, California 92612. Shareholders of record at the close of business on the Record Date will be entitled to vote at the Annual Meeting. According to QSII, as of the Record Date, there were 59,342,817 shares of common stock, par value $.01 per share (the "Shares") outstanding and entitled to vote at the Annual Meeting. As of the Record Date, Mr. Hussein is the beneficial owner of 9,333,700 Shares, which represents approximately 15.7% of the Shares outstanding. Mr. Hussein intends to vote his Shares FOR the election of the Nominees, FOR the ratification of the appointment of PricewaterhouseCoopers LLP, as described herein, and in a manner consistent with the recommendation of Institutional Shareholder Services Inc. ("ISS"), a leading proxy advisory firm, with respect to the advisory vote on executive compensation, as described herein.

THIS SOLICITATION IS BEING MADE BY AHMED D. HUSSEIN AND HIS NOMINEES AND NOT ON BEHALF OF THE BOARD OR MANAGEMENT OF QSII.  THE PARTICIPANTS ARE NOT AWARE OF ANY OTHER MATTERS TO BE BROUGHT BEFORE THE ANNUAL MEETING.  SHOULD OTHER MATTERS, WHICH THE PARTICIPANTS ARE NOT AWARE OF A REASONABLE TIME BEFORE THIS SOLICITATION, BE BROUGHT BEFORE THE ANNUAL MEETING, THE PERSONS NAMED AS A PROXY IN THE ENCLOSED GOLD PROXY CARD WILL VOTE ON SUCH MATTERS IN THEIR DISCRETION.

WE URGE YOU TO SIGN, DATE AND RETURN THE GOLD PROXY CARD IN FAVOR OF THE ELECTION OF MR. HUSSEIN'S NOMINEES.

IF YOU HAVE ALREADY SENT A PROXY CARD FURNISHED BY COMPANY MANAGEMENT OR THE BOARD, YOU MAY REVOKE THAT PROXY AND VOTE FOR EACH OF THE PROPOSALS DESCRIBED IN THIS PROXY STATEMENT BY SIGNING, DATING AND RETURNING THE ENCLOSED GOLD PROXY CARD.  THE LATEST DATED PROXY IS THE ONLY ONE THAT COUNTS.  ANY PROXY MAY BE REVOKED AT ANY TIME PRIOR TO THE ANNUAL MEETING BY DELIVERING A WRITTEN NOTICE OF REVOCATION OR A LATER DATED PROXY FOR THE ANNUAL MEETING OR BY VOTING IN PERSON AT THE ANNUAL MEETING.

**Important Notice Regarding the Availability of Proxy Materials
for the Annual Meeting**

**This Proxy Statement and GOLD proxy card are available for review at
www.abetterqsii.com**

———————————————

2

**IMPORTANT**

     **Your vote is important, no matter how few Shares you own. We urge you to sign, date, and return the enclosed GOLD proxy card today to vote FOR the election of Mr. Hussein's Nominees.**

- **If your Shares are registered in your own name**, please sign and date the enclosed **GOLD** proxy card and return it to Mr. Hussein c/o AST Phoenix Advisors in the enclosed postage-paid envelope today.

- **If your Shares are held in a brokerage account or bank,** you are considered the beneficial owner of the Shares, and these proxy materials, together with a **GOLD** voting form, are being forwarded to you by your broker or bank. As a beneficial owner, you must instruct your broker, trustee or other representative how to vote. **Your broker cannot vote your Shares on your behalf without your instructions.**

- Depending upon your broker or custodian, you may be able to vote either by toll-free telephone or by the Internet. Please refer to the enclosed voting form for instructions on how to vote electronically. You may also vote by signing, dating and returning the enclosed voting form.

     Since only your latest dated proxy card will count, we urge you not to return any proxy card you receive from the Company. Even if you return the management proxy card marked "withhold" as a protest against the Company's director nominees, it will revoke any proxy card you may have previously sent to Mr. Hussein. Remember, you can vote for Mr. Hussein's Nominees only on the Participants' **GOLD** proxy card. So please make certain that the latest dated proxy card you return is the **GOLD** proxy card.

<div align="center">

**AST Phoenix Advisors**
**110 Wall Street, 27th floor**
**New York, NY 10005**
**Shareholders call toll-free: (800) 581-4729**
**Banks and Brokers call collect: (212) 493-3910**

</div>

<div align="center">3</div>

## BACKGROUND TO THE SOLICITATION

The following is a chronology of events leading up to this proxy solicitation:

- Ahmed Hussein has been a shareholder of the Company since its initial public offering ("IPO") in 1982.

- According to the Company's annual report on Form 10-K for the fiscal year ended March 31, 1999 (the "1999 10-K"), shareholders' equity was $29,644,000 and additional paid-in capital was $35,568,000, resulting in an accumulated deficit (negative retained earnings) of $5,966,000. Between 1996 and 1999, QSII's share price dropped by almost 90%. Also, the Company had not paid any cash dividends through 1999.

- Also as described in the 1999 10-K, in 1997 three separate lawsuits were filed by shareholders of the Company seeking class action status. The lawsuits, which remained unresolved at the time of filing the 1999 10-K, were described as alleging that the Company and certain of its officers and directors, including Sheldon Razin, had issued knowingly false statements in order to assist the Company and other defendants in selling Common Stock at an inflated price in the Company's 1996 public offering and at other times. The 1999 10-K also described another lawsuit filed in March 1999 as a shareholder derivative action alleging that certain of the Company's directors had breached their fiduciary duties by seeking to entrench themselves in their positions of control and failing to assure the maximization of shareholder value.

- In March 1999, Lawndale Capital Management, LLC ("Lawndale"), then a 9.99% shareholder of the Company, filed an amendment to its Schedule 13D in which it stated, "Lawndale believes that the Board [of Quality Systems, Inc.] has failed to do its job largely as the result of dysfunctional and not sufficiently independent board composition and the lack of any or poor corporate governance practices." Lawndale stated its intentions to submit a shareholder proposal relating to corporate governance and to cumulate its votes at the 1999 annual shareholders meeting in order to cast them for director nominees who it felt were most likely to support substantial improvements to the composition and corporate governance practices of the Company's Board, as well as changes in its senior management.

- In May 1999, QSII's Chairman and CEO, Sheldon Razin, traveled to Egypt to meet with Mr. Hussein and requested his assistance in resolving the Company's disputes with its shareholders. Prior to this request, Mr. Hussein, then the beneficial owner of 18.5% of the Company's outstanding common stock, had not requested to be nominated as a director, exercised his cumulative voting rights, or requested that the Company make improvements in its corporate governance practices. Following discussions with Mr. Razin, Mr. Hussein agreed to support Mr. Razin and to join the Board; provided that: (i) the Company agreed to terminate its "poison pill" rights plan, to establish an independent Board to oversee the Company, and to adopt state-of-the-art corporate governance provisions; and (ii) **Mr. Razin agreed to resign as CEO as soon as a replacement was found.** Mr. Hussein also recommended that Lawndale be a party to any agreement between Mr. Razin and Mr. Hussein. On August 6, 1999, a memorandum of understanding was entered into among Lawndale, Mr. Hussein and the Company which put in place the provisions that Mr. Hussein had requested.

- In March 2000, the Board unanimously approved the immediate termination of Mr. Razin's employment with the Company and appointed Patrick Cline as interim CEO, until a new CEO was hired in July 2000. Although Mr. Razin ceased to be an employee, he continued to be, and remains, a member of the Board. The reason for Mr. Razin's employment termination at this time, as well as an analysis of the Company's performance and its corporate governance after its IPO in 1982 to 2000, is outlined in Mr. Hussein's proxy statement of 2005.

- In Mr. Hussein's proxy statement of 2005, he stated his belief that Mr. Razin was asserting undue influence over the Board, beginning in August 2002, and that this influence resulted in poor corporate governance practices. In particular, Mr. Hussein described a special meeting of the independent directors of the Company scheduled on June 2, 2004, in which the directors resolved unanimously to replace the Company's outside counsel and hire an independent attorney to investigate the minutes of the Board and the recommendation on compensation to the Board by its outside counsel. On June 10, 2004, the Board met and resolved by a vote of 6 to 1 (with Mr. Razin dissenting); to adopt the above-referenced resolution previously adopted by the independent directors. Although an independent counsel was engaged by the independent directors, the Company's management failed to abide by that Board resolution; by refusing to pay the retainer for the independent counsel. Mr. Hussein also described certain actions taken by the Board after five new independent directors were elected to the Board in September 2004. In late September 2004, the Board appointed the same outside counsel (which had previously been removed by the outgoing Board) as corporate counsel. Shortly thereafter, in October 2004, the Board revised the Bylaw definition of independence and declared Mr. Razin an independent director.

- In August 2006, after being approached by the Company, Mr. Hussein entered into a settlement agreement with the Company (the "Settlement Agreement") pursuant to which the Company agreed to nominate Mr. Hussein's nominees for election to the Board at

the 2006 annual meeting of shareholders and the 2007 annual meeting of shareholders (together, the "2006/2007 Annual Meetings"). Mr. Hussein, among other things, agreed to refrain from submitting any shareholder proposal or director nominations at the 2006/2007 Annual Meetings and to terminate his then-pending litigation concerning the election of directors at the 2005 annual meeting of shareholders. The Settlement Agreement provided that the Company would appoint as corporate counsel an independent, national law firm (which the Company's then corporate counsel was not), which would be responsible for preparing Board and committee minutes. The Settlement Agreement also provided that one-half of the members of each of the Board's compensation and nominating committees would be Mr. Hussein's nominees. Although the Company did retain new corporate counsel, Mr. Razin continued to invite the Company's prior corporate counsel to attend Board meetings. When the new corporate counsel resigned shortly after it was retained, Mr. Razin recommended that the Company retain its prior counsel. Mr. Hussein expressed his strong objections to the reappointment of the Company's prior counsel, as he believed it violated the terms of the Settlement Agreement. In addition, the attorney who had assisted Mr. Hussein in negotiating the Settlement Agreement argued that the intent of the agreement was being vitiated and that, as the agreement had been drafted by the Company's lawyers, any ambiguities should be interpreted in favor of Mr. Hussein. Mr. Hussein offered to enter into binding arbitration to resolve the dispute at Mr. Hussein's cost, but the Company refused.

4

- In 2008, Mr. Hussein delivered a letter to QSII announcing his intention to nominate six nominees for election to the Board and subsequently filed a proxy statement with the SEC in which he cited continued poor corporate governance practices of the Company and Mr. Razin's failure to abide by the terms of the Settlement Agreement.  Mr. Hussein argued that the Board minutes continued to be inaccurate, incomplete, and misleading, and that Mr. Razin continued to set the agenda of the Board and control the preparation of the minutes in a manner which was not consistent with his status as an independent director.  At the 2008 annual meeting of shareholders, Mr. Hussein and Dr. Brennan were elected to the Board as a result of Mr. Hussein's solicitation.

- On November 10, 2011, Mr. Hussein filed an amendment to his Schedule 13D stating that he was deeply troubled by the deterioration in corporate governance at the Company.  Mr. Hussein expressed his concern that the state of corporate governance was having a detrimental effect on the Company's operations because the Board was failing to perform its main function of exercising meaningful supervision over management and the Company.  Mr. Hussein stated that he considered resigning from the Board, but that such action would be an abdication of his commitment to the shareholders who have voted for him and would adversely affect his ability to safeguard the significant personal investment he has made in the Company.

- On June 15, 2012, Mr. Hussein delivered a notice to the Company of his intention to nominate the Nominees to the Board at the Annual Meeting.

- On June 18, 2012, Mr. Hussein issued a press release announcing his intention to nominate the Nominees to the Board at the Annual Meeting.

5

### REASONS FOR THIS SOLICITATION

Mr. Hussein is soliciting your support to elect his Nominees at the Annual Meeting. Mr. Hussein, the second largest shareholder of the Company and a current independent Board member, has nominated seven highly-qualified director nominees, including Dr. Murray Brennan, another current independent Board member, and Patrick Cline, the Company's former President, Chief Strategy Officer and a director until his resignation in December 2011. Mr. Cline joined the Company in 1996 as a result of the Company's acquisition of Clinitec, which Mr. Cline co-founded. Mr. Cline was President of Clinitec, which later became the Company's NextGen Healthcare division, from its inception until he became the Company's President in November 2009. During the period from fiscal 2000 through fiscal 2009, NextGen's annual revenues increased from $17.4 million to $229.7 million, while the Company's total revenues increased from $36.4 million to $245.5 million, clearly illustrating that the NextGen division, under Mr. Cline's leadership, has been the primary driver of the Company's growth. While the NextGen division grew over thirteen-fold, the remainder of the Company's operations actually shrank by approximately 20% over the same nine-year period.

Mr. Hussein's Nominees are, with the exception of Mr. Cline, undisputedly independent and will answer to all shareholders. The Nominees will bring substantial strategic, operational, financial and investment experience to the Board and will work with management to address the challenges facing the Company to achieve the Company's potential.

*Mr. Hussein is deeply concerned that the governance of the Company is unduly influenced by the Company's current Chairman of the Board, Sheldon Razin.*

On numerous previous occasions, the latest being on November 11, 2011, Mr. Hussein has publicly disclosed his concerns about the structure of the Board and the Company's corporate governance under the influence of the Company's Chairman of the Board, Sheldon Razin. Although Mr. Razin claims to be an independent director, Mr. Hussein has stated repeatedly to the Company, directly and through his counsel, and in public filings, his view that the Board lacks truly independent oversight of the Company. As a current independent director on the Board, Mr. Hussein is deeply troubled that Mr. Razin often presents what Mr. Hussein understands to be significant corporate actions for approval by the Board, with resolutions and underlying documentation prepared at Mr. Razin's behest, without any prior notice to or direction by the Board. In Mr. Hussein's experience, every proposal brought to the Board by Mr. Razin has been approved by a majority of the Board.

Consider the following Board actions:

- In September 2009, with only two days' advance notice, a Board meeting was scheduled to discuss the creation of a new Chief Operating Officer (COO) position and the appointment of Philip Kaplan to the position. Mr. Kaplan had been, until the time of his appointment, serving as an independent director and the Chairman of the Nominating Committee. Included in the Board materials for the meeting was a proposed employment contract for Mr. Kaplan. Not until the Board meeting did the full Board learn that Mr. Kaplan had resigned from the Board just prior to the meeting. At the same meeting, without prior notice, a new agenda item was proposed to approve the appointment of Craig Barbarosh as a new director to fill the vacancy left by Mr. Kaplan's resignation. Mr. Hussein strongly objected to both appointments, expressing the following concerns:

  o Who determined Mr. Kaplan was the best choice for the new COO position, particularly in light of his being an independent director and the Chairman of the Nominating Committee, and authorized the Company's corporate counsel to draft an employment agreement for Mr. Kaplan without first convening a meeting of the full Board to discuss his potential employment and the conflict of interest?

  o Who determined the terms of and negotiated Mr. Kaplan's employment agreement when the full Board had not even met to discuss Mr. Kaplan's potential employment?

6

o    What made Mr. Kaplan so confident that he would be appointed to the new COO position that he resigned from the Board before the issue of his employment was ever discussed by the full Board?

Mr. Hussein strongly objected to Mr. Barbarosh's appointment as a new independent director because Mr. Hussein had not been given adequate notice to determine his qualifications and independence.  Mr. Hussein's objections were not materially addressed, despite repeated letters to the Company's counsel by Mr. Hussein's attorney.

Less than a year later, at a Board meeting held on May 26, 2010, Mr. Razin introduced a new agenda item, not previously distributed to the Board, to create a new standing committee comprised of all independent directors including Mr. Hussein and Dr. Brennan, **The Independent Directors Compensation and Executive Personnel Committee**.  Mr. Razin indicated that the purpose of the new committee was to resolve any impasse among the members of the standing compensation committee of the Board, which at the time consisted of three directors.  It was unclear to Mr. Hussein why the new committee was necessary, since the standing compensation committee was comprised of three directors and, in the event of a deadlock, the compensation committee's charter defaulted to the vote of the already existing standing committee of seven independent directors.  Despite Mr. Hussein's objections, the creation of the new committee was approved by a majority of the Board.  Thereafter, in light of prior schedule conflicts of which Mr. Razin had been advised, Mr. Hussein and Dr. Brennan asked Mr. Razin whether there was any further material action to be taken by the Board.  Mr. Razin informed them, in the presence of other Board members and the Company's corporate counsel, that no further material action would be taken that day.  What Mr. Razin failed to disclose, however, was that a day earlier, Mr. Razin had met with three directors at the Company's headquarters, together with outside counsel and an employment consultant, to discuss the termination of Mr. Kaplan as the Company's Chief Operating Officer.  **Mr. Hussein questions on what authority a non-executive Chairman can organize a meeting of half the Board and retain counsel and consultants to advise on a significant corporate action, without prior discussion and approval by the full Board.**  Mr. Hussein thereafter learned that a meeting of the new committee was convened by Mr. Razin shortly after Mr. Hussein and Dr. Brennan departed from the Board meeting.  At the new committee meeting, Mr. Razin proposed the termination of Mr. Kaplan.  Without the input of Mr. Hussein or Dr. Brennan and without consulting or advising the Company's CEO, Steven T. Plochocki, the new committee agreed that Mr. Kaplan should resign from his position at the Company.  Shortly thereafter, Mr. Kaplan resigned.  Mr. Hussein has the following concerns:

o    How could a new standing committee be created with more power than any other standing committee (e.g., with the power to terminate a senior management position) and then not have a requirement that all directors appointed to the committee be given proper notice before a meeting is convened?

7

- o  How could Mr. Razin inform Mr. Hussein and Dr. Brennan, in the presence of other directors and the Company's outside corporate counsel, that there would be no further material action taken that day and then shortly thereafter be allowed, with no protest from the other directors or the Company's outside corporate counsel, to convene a meeting of the new committee and vote on the termination of the Company's COO?

- o  The new committee has not met since May 26, 2010. Was this committee formed solely to allow the Chairman of the Board and certain other directors the ability to terminate a senior member of management without full Board discussion?

- o  **What message does this send to the Company's senior management if a new committee can be created to terminate an employee without input from the Company's CEO or all independent directors? Job security is high in the minds of senior management at any company.**

- Also in May 2010, Joseph Davis, a former independent director of the Company, brought to the Board's attention the fact that Mr. Razin had, for the past seven years, signed forms certifying that he was a full-time employee of the Company in order to obtain coverage for himself and his wife under the Company's health insurance plan. Mr. Davis also brought to the attention of the Board certain allegations that Mr. Razin was using corporate funds for his personal benefit, without prior Board approval. Mr. Davis introduced a Board resolution that was an agenda item for the meeting, which Mr. Hussein seconded, authorizing the Company to hire an independent third party to investigate the issue of Mr. Razin's independence and the allegations made against him with respect to the misuse of corporate funds. This resolution was voted down by a majority of the Board, including Mr. Razin, who did not abstain from the vote despite his conflict of interest. The directors who voted against the resolution argued that such an investigation would be a waste of corporate funds. The same directors voted to delete the resolution and the vote count from the Board minutes. In response, Mr. Hussein offered to use his personal funds to pay for the expense of the investigation, but a majority of the Board still rejected the resolution. **Mr. Hussein is deeply troubled that Mr. Razin was allowed to vote on a resolution involving an investigation of his own independence and certain allegations made against him. If Mr. Razin had abstained from voting, the independent directors would have been deadlocked.** Subsequently, Mr. Davis was not nominated for re-election to the Board at the next annual meeting of shareholders.

- In response to the discovery that Mr. Razin for seven years had been falsely certifying that he was a full-time employee of the Company in order to obtain coverage for himself and his wife under the Company's health insurance plan, Mr. Razin reimbursed the Company $75,000, which was represented to be the aggregate amount of health insurance premiums paid by the Company on Mr. Razin's behalf. The Company's definitive proxy materials filed on July 1, 2011, state on page 39 that, in fiscal 2011, the Company's audit committee was responsible for reviewing and approving transactions with related parties. The materials further state that a related party transaction is one in which "the aggregate amount involved will or may be expected to exceed $30,000 in any calendar year, [the Company] is a participant, and any related party has or will have a direct or indirect interest." Mr. Razin and his spouse are related parties. Mr. Hussein is not aware that the Company's audit committee approved the $75,000 reimbursement by Mr. Razin to the Company.

8

The incidents described above, as well as those described in Mr. Hussein's proxy materials in 2005 and 2008, call into question the Company's assertion that its "nominees are committed to continuing to improve and maintain the highest standards of corporate governance." The Company has failed to refute any of the details of these events, to which there are many credible witnesses, including the present and former directors of the Company named above. Mr. Hussein believes that a truly independent board would not allow these actions to take place.

Mr. Hussein is concerned that the Company's financial results are being adversely affected by the Board's failure to perform its main function of exercising meaningful oversight over the Company. **In particular, Mr. Hussein is concerned that the current Board is failing to properly oversee the development and execution by senior management of a proposed strategic direction and resulting business plan for the Company or to evaluate the reasonableness of the assumptions underlying the budget. Mr. Hussein is of the strong opinion that it is time for a change at the Board level.**

***Mr. Hussein strongly believes that the Board has failed to examine crucial issues facing the Company, negatively affecting the Company's financial performance.***

The Company's proxy statement asks shareholders to support the Company's slate of nominees, detailing the financial performance of the Company and expecting that financial performance to continue if the shareholders elect the Company's nominees. However, the stock market represents the collective judgment of all market participants. Shareholders have suffered an approximately 40% decline in the Company's stock price from a close of $41.97 on July 18, 2011 to a close of $23.97 on July 18, 2012. In Mr. Hussein's view, a 43% drop in the Company's stock price over the past twelve months is indicative of the market's assessment of the Company's financial performance.

As reported in numerous recent stories in the national media, market forces, including reduced reimbursements by government and private health plans, increased investment in electronic medical records systems, and the advent of accountable care organizations under the federal health care overhaul, are driving a new wave of consolidation in the health care industry as independent medical practices merge into major medical systems. Consequently, health care providers are looking for combined inpatient-outpatient technology solutions, such as those currently offered by some of QSII's competitors. Yet, despite the objections of Mr. Hussein and Dr. Brennan that such a significant strategic and structural issue should be the subject of material discussion and debate by the Board, a majority of the directors approved the resolutions prepared at Mr. Razin's instructions to implement his plan to reorganize NextGen into separate inpatient and ambulatory operating divisions. In addition, a separate 5-member sales team is now servicing the Company's new Hospital Solutions Division, rather than allowing NextGen's experienced and well-respected sales team of more than 70 sales representatives to also service the Company's inpatient space. Mr. Hussein strongly disagrees with the changes in strategic direction recently taken by the Company and, as described in more detail below, believes that the Company's revenues could be significantly higher if its inpatient and outpatient business units were integrated. For example, publicly available reports by Zachs Equity Research downgraded QSII to Underperform (published June 5, 2012), noting "growth of its pipeline metric has been on a falling trend along with progressively lower number of signed deals on a quarterly basis," while upgrading its competitor Cerner Corporation to Outperform (published July 9, 2012), stating, "We believe long-term investors may consider Cerner, which serves a sizeable installed inpatient base that requires composite, clinically-focused applications" and has "long-standing, integrated and seamless solutions for both inpatient and ambulatory settings."

Mr. Hussein believes his Nominees will be better equipped to work with management to consolidate the Company's inpatient-outpatient solutions, consider capital raising strategies to fund accretive and strategic acquisitions, and expand the Company's international footprint through strategic partnerships. Mr. Hussein, in this proxy contest, is giving shareholders a distinct choice between the present Board whose actions are described above and a truly independent and distinguished Board that can face the challenges ahead to help the Company achieve its potential.

9

*The Nominees have a strategic plan to maximize shareholder value.*

It is Mr. Hussein's strong opinion that a reconstituted Board with a majority of truly independent, highly-qualified and experienced directors, focused on reviewing all strategic options, is the best way to create value going forward. If elected, the Nominees will exercise their independent judgment in accordance with the fiduciary duties imposed by law in all matters that come before the Board and will act in your best interests to maximize shareholder value, including to:

- **Support the Company's new cloud-based architecture and integrated inpatient/ambulatory products and oversee the integration of the Company's ambulatory business unit with its inpatient unit to better serve an increasingly integrated market and improve efficiency;**

- Institute shareholder friendly corporate governance reforms to ensure transparency and accountability to <u>all</u> shareholders, including to reform the nomination process for directors and elect a truly independent Chairman of the Board;

- Enhance (but not replace) the management team with committed and talented managers and executives to reduce execution risk;

- Improve margins through prudent capital allocations and cost controls, while still investing in appropriate areas of technology, product development, marketing and customer service;

- Expand the Company's focus on recurring revenue, including growth in consulting, revenue cycle management (RCM), and software-as-a-service models;

- Explore larger, accretive and strategic acquisitions; and

- Expand the Company's international footprint through strategic partnerships and retention of global marketing and delivery teams.

Mr. Hussein asserts that a newly constituted Board comprised of a majority of truly independent and highly qualified directors will provide the necessary oversight of the Company to excel in competing with other companies in its industry.

10

---

PROPOSAL NO. 1

ELECTION OF DIRECTORS

The Board is currently composed of nine (9) directors whose terms expire at the Annual Meeting. The Company has nominated eight (8) directors for election at the Annual Meeting. For the reasons stated above, the Participants are seeking your support at the Annual Meeting to elect the Nominees in opposition to the Company's director nominees. Your vote to elect the Nominees will have the legal effect of replacing up to seven (7) directors of the Company with the Nominees. If five (5) or more of the Nominees are elected, the Nominees will represent a majority of the members of the Board.

**THE NOMINEES**

The following information sets forth the name, age, business address, present principal occupation, and employment and material occupations, positions, offices, or employments for the past five years of each of the Nominees. The nominations were made in a timely manner and in compliance with the applicable provisions of the Company's governing instruments. With the exception of Mr. Hussein, who is a citizen of both Egypt and the United States of America, and Ian A. Gordon who is a citizen of the United Kingdom, the Nominees are citizens of the United States of America.

**Ahmed D. Hussein (Age 71)** has served as a director of the Company since 1999. Mr. Hussein is the Chairman of the Board of Directors of National Investment Company, Cairo, Egypt, a company he founded in 1996. Mr. Hussein held several academic posts with the City College of New York and the American University in Cairo. Mr. Hussein was the recipient of the Cairo University gold medal and a Fulbright scholarship. Mr. Hussein served as a Senior Vice President of Dean Witter Reynolds from 1993 to 1996 and, earlier, served as an investment banker with several firms. Mr. Hussein is a member of the board of trustees of the Six of October University. Mr. Hussein holds a Bachelors degree in Electrical Engineering from Cairo University, a Masters of Science degree from the American University in Cairo, a Postgraduate degree in Statistics from Cairo University, a Masters of Science degree in Mathematics from the Polytechnic Institute of Brooklyn (New York), and a Doctorate degree in Electrical Engineering from the Polytechnic Institute of Brooklyn (New York). Mr. Hussein's extensive knowledge of technology and banking, coupled with his financial and leadership experience, enable him to provide valuable executive insights. Mr. Hussein's principal business address is 630 Fifth Avenue, Suite 2258, New York, NY 10111.

**Murray F. Brennan, M.D. (Age 72)** has served as a director of the Company since 2008. Dr. Brennan is Emeritus Chairman of the Memorial Sloan-Kettering Cancer Center's Department of Surgery and previously served as its Chairman from 1985 to 2007. Dr. Brennan served as director of the American Board of Surgery, Chairman of the American College of Surgeons Commission on Cancer, President of the Society of Surgical Oncology, President of the American Surgical Association, and Vice President of the American College of Surgeons. Dr. Brennan is currently a member of the Institute of Medicine of the National Academy of Sciences. Dr. Brennan currently serves on the Board of Directors of ZIOPHARM Oncology, Inc. (NASDAQ:ZIOP), a publicly-held biopharmaceutical company engaged in the development and commercialization of a diverse portfolio of cancer drugs to address unmet medical needs. Dr. Brennan also serves on the Board of Directors of the de Beaumont Foundation. Dr. Brennan's extensive leadership experience and knowledge of the Company make him an ideal candidate for re-election to the Board. Dr. Brennan's principal business address is 1275 York Avenue, New York, NY 10065.

**Patrick B. Cline (Age 51)** is currently retired. From November 2009 until December 2011, Mr. Cline served as the President and Chief Strategy Officer of the Company. Mr. Cline was a co-founder of Clinitec (now NextGen Healthcare), which was acquired by the Company in 1996, and served as its President from its inception in January 1994 until he was appointed President of the Company in November 2009. Mr. Cline also served as a director from 2005 until his retirement and as the Company's interim Chief Executive Officer from April 2000 to July 2000. Prior to co-founding Clinitec, Mr. Cline served from July 1987 to January 1994 as Vice President of Sales and Marketing with Script Systems, a subsidiary of InfoMed, a healthcare information systems company. Mr. Cline has held senior positions in the healthcare information systems industry since 1981. Mr. Cline's leadership experience and service to the Company make him an asset to the Board. Mr. Cline's principal business address is 2707 York Ct., Southlake, TX 76092.

**John "Jack" Mueller (Age 55)** has been an independent business consultant since 2006. Mr. Mueller has served as a director of Apex CoVantage, a private global process outsourcing concern, since 2008. From 2007 to 2009, Mr. Mueller was a director and subsequently elected Chairman of the Compensation Committee of Centennial Communications Corporation (NASDAQ:CYCL), a provider of regional wireless and integrated communications services. From 2007 to 2008, Mr. Mueller was the interim CEO of Connexion Technologies, a communications network company. From 2006 to 2008, Mr. Mueller was Chairman of the Board and Chairman of the Nominating and Governance Committee of Idearc Inc. (NYSE: IAR), the publisher of Verizon Yellow Pages and Superpages.com, and served as the Chief Executive Officer briefly in 2008. Mr. Mueller was Chief Executive Officer and President and a director of Valor Communications Group, Inc. (NYSE:VCG), a telecommunications company he took public in 2005, from 2004 to 2006. He was President and Chief Operating Officer of Valor from 2002 to 2004. Mr. Mueller's past board experience also includes a position on the board of directors of the United States Telecom Association, a trade association that represents service providers and suppliers for the telecom industry. Prior to Valor, Mr. Mueller spent 23 years at Cincinnati Bell Inc., serving in various positions including President, General Manager, and President and Chief

Executive Officer of CBD, a Cincinnati Bell subsidiary. Mr. Mueller has a Bachelor of Science degree in Marketing and Management from Northern Kentucky University and has completed an Executive Education Certification at the University of Cincinnati. Mr. Mueller's significant board and operating experience will enable him to provide valuable strategic and managerial insights. Mr. Mueller's principal business address is 705 Chatham Court, Southlake, TX 76092.

     **John "Mike" McDuffie (Age 63)**, a retired Lieutenant General in the U.S. Army, has been the Vice President of Americas Services, Sales and Business Development covering the United States, Canada, and Latin America of Microsoft Corporation (NASDAQ:MSFT) ("MSFT") since 2009. Mr. McDuffie joined MSFT as the Vice President of U.S. Public Sector Services of MSFT in February 2006, a position he maintained until 2009. From 2004 to 2006, Mr. McDuffie served as the Executive Vice President of Sales, Marketing, & Business Development of Telos Corporation (OTC:TLSRP), an information technology solutions company. Mr. McDuffie was the President of the Information Systems Group, Anteon International (General Dynamics Information Technology), an information technology solutions company, from 2003 to 2004. As the Director for Logistics of the Joint Chiefs of Staff from 1998 through 2001, Mr. McDuffie advised on critical logistics, engineering and medical issues and programs impacting the Department of Defense. While a Lieutenant General, Mr. McDuffie oversaw the Joint Medical Community for the Department of Defense and was deeply involved in Military HealthCare Policy and execution. Mr. McDuffie currently sits on the boards of directors of Enterworks Corporation, a business solutions company, Global Reach, a non-profit humanitarian organization, and the Association for Enterprise Information, a non-profit defense organization. Mr. McDuffie is an advisor to Our Military Kids, a non-profit humanitarian organization and served on the Hewlett Packard Advisory Board from 2004 through 2006. Mr. McDuffie holds a M.S. in Logistics Management from the Florida Institute of Technology, and a B.S. in Aerospace Management from the Embry-Riddle Aeronautical University Industrial College of the Armed Forces. Mr. McDuffie's extensive leadership and strategy development experience, particularly in the technology field, would be invaluable to the Board. Mr. McDuffie's principal business address is 6831 Turnberry Isle Ct., Lakewood Ranch, FL 34202.

11

**Thomas R. DiBenedetto (Age 63)** has been the President of Boston International Group ("BIG"), an investment management firm, since 1983 and the President of Junction Investors Ltd., an affiliate of BIG and an investment management firm, since 1991. Since 2011, Mr. DiBenedetto has been the President and Chairman of the Board of AS Roma (BIT:ASR.MI), one of the leading global football clubs. Mr. DiBenedetto has been Chairman of the Board of Jefferson Watermann International, a business intelligence and government relations firm, since 1997. Mr. DiBenedetto also serves as Chairman of Route 2 Digital, Inc., a company that incorporates sports, marketing, new media and technology for digital and video applications, and as a director of Alexander's, Inc. (NYSE:ALX), a real estate investment trust and affiliate of Vornado Realty, Inc., one of the largest real estate companies in the United States. Mr. DiBenedetto previously worked as an investment banker with Morgan Stanley & Co., Salomon Brothers, Inc. and Allen & Company, Incorporated. Mr. DiBenedetto also served on the board of directors of NWH, Inc. and its subsidiary, Electronic Network Systems, Inc., which was one of the original companies in the paperless data management industry for healthcare. Mr. DiBenedetto is a partner in the Boston Red Sox baseball club. Mr. DiBenedetto is a member of the Board of Trustees of Trinity College, the Boston Biomedical Research Institute, Inc., Kents Hill School, the Nahant Preservation Trust, and the Ted Williams Museum in Florida. Mr. DiBenedetto received a Bachelor of Arts degree with honors in Economics from Trinity College and a Master of Business Administration from the Wharton School, University of Pennsylvania. Mr. DiBenedetto's over 40 years in investment banking, his experience as an investor, and his previous service on several boards make him especially qualified to contribute financial know-how and leadership to the Board. Mr. DiBenedetto's principal business address is 151 Tremont Street, #10L, Boston, MA 02111.

**Ian A. Gordon (Age 66)** is a Chartered Accountant and entrepreneur who has focused on developing residential and commercial real estate and investment properties in the United Kingdom since 2001. From 1981 to 2001, Mr. Gordon served as the CEO and Financial Controller of Atlantic Estates PLC, a property investment and development company focusing on Retail and Commercial projects. Mr. Gordon operated his own private professional practice specializing in international taxation, financial planning, forensic accounting and corporate and individual matters from 1974 to 1981. Mr. Gordon received a BSc in economics from the London School of Economics (London University) and was qualified and appointed as a Fellow of The Institute of Chartered Accountants in England and Wales on July 6, 1977, which is the equivalent of being a certified public accountant. If elected, Mr. Gordon will bring a wealth of taxation and accounting expertise to the Board. Mr. Gordon's principal business address is 5 Elm Tree Close, St. Johns Wood, London NW8 9JS, United Kingdom.

12

As of the date hereof, Mr. Hussein beneficially owns 9,333,700 Shares. Dr. Brennan owns 12,500 Shares, which includes 7,500 Shares underlying options. None of the other Nominees directly owns any Shares. Each of the Nominees disclaims being a member of a group with each other as a result of Mr. Hussein's nomination of the Nominees for election to the Board at the Annual Meeting, their efforts to solicit proxies, or otherwise. For information regarding purchases and sales during the past two years by Mr. Hussein and the other Nominees of securities of the Company, see Schedule I.

Mr. Hussein has entered into a letter agreement with Mr. Cline pursuant to which he agreed to indemnify Mr. Cline from and against claims arising from this solicitation and any related transactions.

Other than as stated herein, there are no arrangements or understandings between any of the Nominees or any other person or persons pursuant to which the nomination of the Nominees described herein is to be made, other than the consent by each of the Nominees to be named in this Proxy Statement and to serve as a director of the Company if elected as such at the Annual Meeting. None of the Nominees are a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries in any material pending legal proceedings.

Other than Mr. Cline, each Nominee presently is, and if elected as a director of the Company would be, an "independent director" within the meaning of (i) applicable NASDAQ listing standards applicable to board composition, including Rule 5605(a)(2), and (ii) Section 301 of the Sarbanes-Oxley Act of 2002. No Nominee is a member of the Company's compensation, nominating or audit committee that is not independent under any such committee's applicable independence standards.

13

The Participants do not expect that the Nominees will be unable to stand for election, but, in the event that such persons are unable to serve or for good cause will not serve, the Shares represented by the enclosed **GOLD** proxy card will be voted for substitute nominees, to the extent this is not prohibited under the Bylaws and applicable law.  In addition, the Participants reserve the right to nominate substitute persons if the Company makes or announces any changes to its Bylaws or takes or announces any other action that has, or if consummated would have, the effect of disqualifying the Nominees, to the extent this is not prohibited under the Bylaws and applicable law.  In any such case, Shares represented by the enclosed **GOLD** proxy card will be voted for such substitute nominees.  The Participants reserve the right to nominate additional persons, to the extent this is not prohibited under the Bylaws and applicable law, if the Company increases the size of the Board above its existing size.  Additional nominations made pursuant to the preceding sentence are without prejudice to the position of the Participants that any attempt to increase the size of the current Board constitutes an unlawful manipulation of the Company's corporate machinery.

**YOU ARE URGED TO VOTE FOR THE ELECTION OF THE NOMINEES ON THE ENCLOSED GOLD PROXY CARD.**

14

**PROPOSAL NO. 2**

**THE COMPANY'S PROPOSAL TO APPROVE THE NON-BINDING ADVISORY RESOLUTION ON EXECUTIVE COMPENSATION, OFTEN REFERRED TO AS "SAY ON PAY"**

As discussed in further detail in the Company's proxy statement, the Company is asking shareholders to cast a non-binding advisory vote to approve the compensation of the Company's named executive officers.  The Company is asking shareholders to vote for the following resolution:

"RESOLVED, that the Company's shareholders approve, on an advisory basis, the compensation of its named executive officers, as disclosed in the Company's proxy statement for its annual meeting of shareholders held on August 16, 2012 (or any adjournments or postponements of the annual meeting) pursuant to the compensation disclosure rules of the SEC, including the Compensation Discussion and Analysis section, the tabular disclosures regarding executive compensation and the accompanying narrative disclosures set forth in the proxy statement."

According to the Company's proxy statement, your vote on this proposal is advisory and non-binding**.**  Please refer to the Company's proxy statement for additional discussion of this proposal.

**THE PARTICIPANTS MAKE NO RECOMMENDATION WITH RESPECT TO THIS PROPOSAL. MR. HUSSEIN INTENDS TO VOTE HIS SHARES CONSISTENT WITH THE RECOMMENDATION OF ISS WITH RESPECT TO THIS PROPOSAL.  IF YOU SIGN THE GOLD PROXY CARD BUT DO NOT SPECIFY ANY SPECIFIC CHOICE RELATED TO PROPOSAL NO. 2, YOUR SHARES WILL BE VOTED "ABSTAIN" WITH RESPECT TO THIS PROPOSAL.**

15

---

**PROPOSAL NO. 3**

**COMPANY PROPOSAL TO RATIFY APPOINTMENT OF INDEPENDENT
REGISTERED PUBLIC ACCOUNTING FIRM**

As discussed in further detail in the Company's proxy statement, the Board has selected PricewaterhouseCoopers LLP to serve as the Company's independent registered public accounting firm for the fiscal year ending March 31, 2013. Please refer to the Company's proxy statement for additional discussion of this proposal.

**THE PARTICIPANTS DO NOT OBJECT TO THE RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING MARCH 31, 2013. MR. HUSSEIN INTENDS TO VOTE HIS SHARES "FOR" THIS PROPOSAL. IF YOU SIGN THE GOLD PROXY CARD BUT DO NOT SPECIFY ANY SPECIFIC CHOICE RELATED TO PROPOSAL NO. 3, YOUR SHARES WILL BE VOTED "FOR" THIS PROPOSAL.**

16

## VOTING AND PROXY PROCEDURES

Only shareholders of record on the Record Date will be entitled to notice of and to vote at the Annual Meeting. Each Share is entitled to one vote. Shareholders who sell Shares before the Record Date (or acquire them without voting rights after the Record Date) may not vote such Shares. Shareholders of record on the Record Date will retain their voting rights in connection with the Annual Meeting even if they sell such Shares after the Record Date. Based on publicly available information, Mr. Hussein believes that the only outstanding classes of securities of QSII entitled to vote at the Annual Meeting are the Shares.

Each shareholder will be entitled to one vote, in person or by proxy, for each Share held of record on the Record Date, except that all shareholders have cumulative voting rights in the event any shareholder gives notice prior to the voting of an intention to cumulate his, her or its votes in the election of directors. We have given notice to QSII of our intention to cumulate our votes in the election of directors. As a result, shareholders entitled to vote at the Annual Meeting may cumulate their votes in the election of directors. Cumulative voting means that a shareholder has the right to give any one candidate whose name has been properly placed in nomination prior to the voting a number of votes equal to the number of directors to be elected multiplied by the number of Shares such shareholder would otherwise be entitled to vote, or to distribute such votes on the same principle among as many properly nominated candidates (up to the number of persons to be elected) as the shareholder may wish.

A proxy marked "FOR ALL EXCEPT NOMINEE(S) WRITTEN BELOW" may only be voted for the Nominees for whom you have not otherwise specifically withheld authority to vote and, unless you instruct otherwise, the proxy holder may allocate the votes among them as he determines; a proxy marked "WITHHOLD AUTHORITY TO VOTE FOR ALL NOMINEES" may not be voted for any of the Nominees; and a proxy marked "FOR ALL NOMINEES" may be voted for all of the Nominees and, unless you instruct otherwise, the proxy holder may allocate the votes among them as he determines. In exercising discretion with respect to cumulating votes, the proxy holder may cumulate and cast the votes represented by your proxy for any of our Nominees as to whom you have not otherwise withheld authority.

For example, if you own 100 Shares, you may grant a proxy with respect to shares representing 900 cumulative votes. If you mark "FOR ALL EXCEPT NOMINEE(S) WRITTEN BELOW" and write the name of one of our Nominees, the proxy holder may cast the 900 votes for any or all of our other six Nominees; moreover, of those other Nominees, the proxy holder may allocate the 900 votes among them as he determines, such that the Nominees may receive unequal portions of the 900 votes or one or more of the Nominees may receive no votes.

Because we have given notice of our intention to cumulate votes, unless you specifically instruct otherwise, the proxy holder may vote the proxies solicited hereby in such manner as to provide for the election of the maximum number of the Nominees (for whom authority is not otherwise specifically withheld), including, without limitation, determining the prioritization of such Nominees to whom such votes may be allocated. Although we will endeavor to elect all seven Nominees, if it is necessary for us to prioritize among the Nominees and allocate votes, we intend, to the extent consistent with the maximization of the number of our Nominees to be elected, to prioritize election of our Nominees in the order listed under "Proposal No. 1--Election of Directors" beginning on page 11 of the Proxy Statement.

If you grant a proxy to us and have not specifically instructed otherwise, your shares will be voted at the discretion of the proxy holder with respect to all of your shares (for whom authority is not otherwise specifically withheld). If you wish to exercise your own discretion as to allocation of votes among our Nominees, and you are a record holder of shares, you will be able to do so by attending the meeting and voting in person, by appointing another person as your representative to vote on your behalf at the meeting, or by providing us with specific instructions as to how to allocate your votes.

If you wish to provide vote allocation instructions, you must submit a proxy card by mail and should hand mark the number of votes you wish to allocate to any particular Nominee next to the name of such Nominee on the enclosed GOLD proxy card. You do not need to check the "FOR ALL NOMINEES" box to allocate votes among all of the Nominees. If you provide vote allocation instructions for less than all of the votes that you are entitled to cast, the proxy holder will retain discretionary authority to cast your remaining votes, other than for any Nominee for whom you have withheld authority by marking the "FOR ALL EXCEPT NOMINEE(S) WRITTEN BELOW" box. If you provide vote allocation instructions for more than the number of votes that you are entitled to cast, the proxy holder will subtract the excess votes from the Nominee or Nominees to whom you have allocated the fewest votes.

Any shareholder who holds shares in street name and desires to specifically allocate votes among **the** Nominees may do so by either informing the shareholder's broker, trustee or other representative of the shareholder's desire to attend the annual meeting and requesting a legal proxy to attend the meeting, or by providing the broker, trustee or other representative with instructions as to how to allocate votes among Nominees. **Because each broker, trustee or other representative has its own procedures and requirements, a shareholder holding shares in street name who wishes to allocate votes to specific Nominees should contact its broker, trustee or other representative for specific instructions on how to obtain a legal proxy or provide vote allocation instructions.**

Any shareholder that has any questions regarding the procedures for specifically allocating votes among Nominees may call our proxy solicitor, AST Phoenix Advisors, at 1-800-581-4729.

You are being asked to elect the Nominees. Although there are nine positions to be voted on at the Annual Meeting, Shareholders who return the GOLD proxy card will only be able to vote for Mr. Hussein's seven (7) Nominees and will not have the opportunity to vote for the two (2) other seats up for election at the Annual Meeting. There is no assurance that any of the nominees of Quality Systems will serve as Directors if any of the Nominees are elected to the Board. If you vote using the GOLD proxy card, you will not be able to vote for any of the Quality Systems nominees for director.  You can only vote for the Company's nominees by signing and returning a proxy card provided by QSII.  Mr. Hussein intends to vote all of his Shares in favor of the Nominees in accordance with the objectives of maximizing Nominees elected and prioritization described above.

Shares represented by properly executed **GOLD** proxy cards will be voted at the Annual Meeting as marked and, in the absence of specific instructions, will be voted **FOR** the election of the Nominees to the Board, **ABSTAIN** on the Say on Pay Proposal**,** and **FOR** the ratification of the appointment of PricewaterhouseCoopers LLP, and in the discretion of the persons named as proxies on all other matters as may properly come before the Annual Meeting.

**QUORUM; DISCRETIONARY VOTING**

The presence at the Annual Meeting, in person or by proxy, of the holders of at least a majority of the outstanding Shares on the Record Date is required to constitute a quorum for the transaction of business at the Annual Meeting.   Votes withheld for director nominees and abstentions on the other proposals to be considered at the Annual Meeting will be counted in determining whether a quorum has been reached, but the failure to execute and return a proxy will result in a shareholder not being considered present at the meeting. Broker non-votes will be counted as present for purposes of determining the existence of a quorum.

Shares held by brokerage firms, bank nominees or other institutions (i.e. in "street name") may not be voted by such brokerage firms, bank nominees or other institutions on the proposal to elect directors or the Say on Pay Proposal unless the beneficial owners of such Shares provide them with instructions on how to vote.  Shares held by brokerage firms, bank nominees or other institutions may be voted by such brokerage firms, bank nominees or other institutions on the proposal to ratify the appointment of PricewaterhouseCoopers LLP if the beneficial owners of such Shares do not provide them with instructions on how to vote.  If your Shares are held in the name of a brokerage firm, bank nominee or other institution, you should contact the person responsible for your account and give instructions for a proxy to be issued so that your Shares will be represented at the 2012 Annual Meeting.

17

## VOTES REQUIRED FOR APPROVAL

*Election of Directors.* Only nine directors may be elected at the Annual Meeting. The directors elected will be the nine nominees that receive the highest number of "FOR" votes cast at the Annual Meeting by shareholders present, in person or by proxy, and entitled to vote. Abstentions and broker non-votes will have no effect on the election of directors.

Shareholders should indicate a vote "FOR" the Nominees or a "WITHHOLD" vote with respect to the Nominees, as provided on the proxy card. A properly executed proxy marked "WITHHOLD" with respect to the election of one or more Nominees will not be voted with respect to the person or persons indicated, although it will be counted for purposes of determining whether there is a quorum. See page 17 for a discussion of the effect of cumulative voting.

*Say on Pay Proposal.* The vote presented in Proposal 2 is an advisory vote, and therefore, is not binding on the Company, its Compensation Committee or the Board. According to the Company's proxy statement, this proposal will be considered approved if the vote constitutes both: (i) the affirmative vote of a majority of common stock present in person or represented by proxy and voting on the proposal and (ii) the affirmative vote of a majority of the quorum. For purposes of this proposal, abstentions and broker non-votes will not affect the outcome under clause (i), which recognizes only actual votes for or against the proposal. Abstentions and broker non-votes may affect the outcome under clause (ii) because abstentions and broker non-votes are counted for purposes of determining the quorum and have the effect of a vote against the proposal.

*Vote required for the ratification of the appointment of PricewaterhouseCoopers LLP.* According to the Company's proxy statement, this proposal will be considered approved if the vote constitutes both: (i) the affirmative vote of a majority of common stock present in person or represented by proxy and voting on the proposal and (ii) the affirmative vote of a majority of the quorum. For purposes of this proposal, abstentions and broker non-votes will not affect the outcome under clause (i), which recognizes only actual votes for or against the proposal. Abstentions and broker non-votes may affect the outcome under clause (ii) because abstentions and broker non-votes are counted for purposes of determining the quorum and have the effect of a vote against the proposal.

## REVOCATION OF PROXIES

Shareholders of the Company may revoke their proxies at any time prior to exercise by attending the Annual Meeting and voting in person (although attendance at the Annual Meeting will not in and of itself constitute revocation of a proxy) or by delivering a written notice of revocation. The delivery of a subsequently dated proxy which is properly completed will constitute a revocation of any earlier proxy. The revocation may be delivered either to Mr. Hussein in care of AST Phoenix Advisors at the address set forth on the back cover of this Proxy Statement or to the Company at 18111 Von Karman Avenue, Suite 700, Irvine, California 92612, or any other address provided by the Company. Although a revocation is effective if delivered to the Company, Mr. Hussein requests that either the original or photostatic copies of all revocations be mailed to Mr. Hussein in care of AST Phoenix Advisors at the address set forth on the back cover of this Proxy Statement so that Mr. Hussein will be aware of all revocations and can more accurately determine if and when proxies have been received from the holders of record on the Record Date of a majority of the outstanding Shares. Additionally, AST Phoenix Advisors may use this information to contact shareholders who have revoked their proxies in order to solicit later dated proxies for the election of the Nominees.

**IF YOU WISH TO VOTE FOR THE ELECTION OF THE NOMINEES TO THE BOARD PLEASE SIGN, DATE AND RETURN PROMPTLY THE ENCLOSED GOLD PROXY CARD IN THE POSTAGE-PAID ENVELOPE PROVIDED.**

18

## SOLICITATION OF PROXIES

The solicitation of proxies pursuant to this Proxy Statement is being made by the Participants. Proxies may be solicited by mail, facsimile, telephone, telegraph, Internet, in person and by advertisements.

Mr. Hussein has entered into an agreement with AST Phoenix Advisors for solicitation and advisory services in connection with this solicitation, for which AST Phoenix Advisors will receive a fee not to exceed $50,000, together with reimbursement for its reasonable out-of-pocket expenses, and will be indemnified against certain liabilities and expenses, including certain liabilities under the federal securities laws. AST Phoenix Advisors will solicit proxies from individuals, brokers, banks, bank nominees and other institutional holders. Mr. Hussein has requested banks, brokerage houses and other custodians, nominees and fiduciaries to forward all solicitation materials to the beneficial owners of the shares of Common Stock they hold of record. Mr. Hussein will reimburse these record holders for their reasonable out-of-pocket expenses in so doing. It is anticipated that AST Phoenix Advisors will employ up to 15 persons to solicit shareholders for the Annual Meeting.

The entire expense of soliciting proxies is being borne by Mr. Hussein. Costs of this solicitation of proxies are currently estimated to be approximately $140,000. Mr. Hussein estimates that through the date hereof the aggregate expenses in connection with this solicitation total approximately $82,000. Mr. Hussein intends to seek reimbursement from the Company of all expenses he incurs in connection with this solicitation. Mr. Hussein does not intend to submit the question of such reimbursement to a vote of security holders of the Company.

## OTHER PARTICIPANT INFORMATION

Mr. Hussein and the other Nominees are the Participants in this solicitation. The principal occupation of Mr. Hussein is serving as the Chairman of the Board of Directors of National Investment Company, Cairo, Egypt, a company he founded in 1996.

As of the date hereof, Mr. Hussein beneficially owns 9,333,700 Shares; all the Shares are pledged as collateral for margin accounts he has with various brokerage firms. Dr. Brennan beneficially owns 12,500 Shares, which includes 7,500 Shares underlying options. Except for Mr. Hussein and Dr. Brennan, none of the other Nominees own any Shares. Each of the Nominees and Mr. Hussein disclaims being a member of a group as a result of Mr. Hussein's nomination of the Nominees for election to the Board at the Annual Meeting, their efforts to solicit proxies, or otherwise. For information regarding purchases and sales of securities of the Company during the past two years by the participants in this solicitation, see Schedule I.

Except as set forth in this Proxy Statement (including the Schedules hereto), (i) during the past 10 years, no Participant in this solicitation has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors); (ii) no Participant in this solicitation directly or indirectly beneficially owns any securities of the Company; (iii) no Participant in this solicitation owns any securities of the Company which are owned of record but not beneficially; (iv) no Participant in this solicitation has purchased or sold any securities of the Company during the past two years; (v) no part of the purchase price or market value of the securities of the Company owned by any Participant in this solicitation is represented by funds borrowed or otherwise obtained for the purpose of acquiring or holding such securities; (vi) no Participant in this solicitation is, or within the past year was, a party to any contract, arrangements or understandings with any person with respect to any securities of the Company, including, but not limited to, joint ventures, loan or option arrangements, puts or calls, guarantees against loss or guarantees of profit, division of losses or profits, or the giving or withholding of proxies; (vii) no associate of any Participant in this solicitation owns beneficially, directly or indirectly, any securities of the Company; (viii) no Participant in this solicitation owns beneficially, directly or indirectly, any securities of any parent or subsidiary of the Company; (ix) no Participant in this solicitation or any of his or its associates was a party to any transaction, or series of similar transactions, since the beginning of the Company's last fiscal year, or is a party to any currently proposed transaction, or series of similar transactions, to which the Company or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $120,000; (x) no Participant in this solicitation or any of his or its associates has any arrangement or understanding with any person with respect to any future employment by the Company or its affiliates, or with respect to any future transactions to which the Company or any of its affiliates will or may be a party; and (xi) no Participant in this solicitation has a substantial interest, direct or indirect, by securities holdings or otherwise in any matter to be acted on at the Annual Meeting.

19

There are no material proceedings to which the Participants in this solicitation or any of their associates is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries. Except as set forth below, with respect to each of the Nominees, none of the events enumerated in Item 401(f)(1)-(8) of Regulation S-K of the Exchange Act occurred during the past ten years.

Mr. Mueller served as Chairman of the Board from 2006 to 2008 and as Chief Executive Officer of Idearc Inc. for approximately 8 days in 2008. Idearc Inc. filed for bankruptcy in 2009, approximately one (1) year after Mr. Mueller had resigned from the Board.

Mr. Cline was a director and the President and Chief Strategy Officer of the Company from November 2009 until December 2011. On July 29, 2011, Mr. Cline and the Company entered into a Separation Agreement and General Release of All Claims ("Retirement Agreement") concerning Mr. Cline's resignation from the Company. Under the terms of the Retirement Agreement, Mr. Cline received all unpaid base salary and a pro-rata bonus payment equal to two-thirds of the cash bonus amount the Company would have paid to Mr. Cline under the Company's 2012 Compensation Program. Mr. Cline also forfeited all outstanding and unexercised stock options. Accordingly, during the Company's last fiscal year, Mr. Cline received compensation from the Company consisting of approximately $1,130,056. As of the date hereof, Mr. Cline does not directly own any shares of Common Stock. He remains subject to a Separation Agreement and General Release of All Claims agreement with the Company.

For service as a director on the Board during the last fiscal year, each of Dr. Brennan and Mr. Hussein received (1) $80,000 in cash compensation, and (2) stock awards valued at $79,300. Each of Dr. Brennan and Mr. Hussein have been granted options pursuant to the Company's prior option arrangements. Dr. Brennan currently serves on the compensation committee of the Board.

Kim Cline, Executive Vice President, Professional Services, of NextGen Healthcare, a subsidiary of the Company, is the sister of Mr. Cline. Kim Cline earned approximately $308,865 in salary and bonus for the fiscal year 2011.

## OTHER MATTERS

The Participants are unaware of any other matters to be considered at the Annual Meeting. However, should other matters, which the Participants are not aware of a reasonable time before this solicitation, be brought before the Annual Meeting, the persons named as a proxy on the enclosed **GOLD** proxy card will vote on such matters in their discretion.

20

## SHAREHOLDER PROPOSALS

According to the Company's proxy statement, the Company has two separate and distinct rules concerning the timing of submission of shareholder proposals:

**SEC Regulation**. Pursuant to Rule 14a-8 of the SEC, proposals by shareholders that are intended for inclusion in the Company's proxy statement and proxy and to be presented at the Company's next annual meeting must be received by the Company by March 1, 2013, in order to be considered for inclusion in the Company's proxy materials. Such proposals should be addressed to the Company's Secretary and may be included in next year's proxy materials if they comply with certain rules and regulations of the SEC governing shareholder proposals.

**Company Bylaws**. Under the Company's Bylaws, for all proposals by shareholders (including nominees for director) to be timely, a shareholders' notice must be delivered to, or mailed and received at, the Company's principal executive offices not less than 60 days nor more than 120 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; provided, however, that if less than 70 days' notice or public disclosure of the date of the scheduled annual meeting is given or made, then notice by the shareholder, to be timely, must be delivered or received not later than the close of business on the tenth day following the earlier of the day on which notice of the date of the scheduled annual meeting was mailed or the day on which public disclosure was made. The shareholder notice must also comply with certain other requirements set forth in the Company's Bylaws, a copy of which may be obtained by written request delivered to the Company's Secretary.

The information set forth above regarding the procedures for submitting shareholder proposals for consideration at the 2013 annual meeting of shareholders is based on information contained in the Company's proxy statement.

21

## SCHEDULE I

### TRANSACTIONS IN SECURITIES OF THE COMPANY
### DURING THE PAST TWO YEARS

| Shares of Common Stock Purchased / (Sold) | Date of Purchase / Sale |
|---|---|
| **MURRAY F. BRENNAN, M.D.**[1] | |
| 1,000 | 08/11/2010 |
| **PATRICK B. CLINE** | |
| 15,000 | 02/01/2011 |
| (10,000) | 02/01/2011 |
| 45,000 | 05/31/2011 |
| 7,736 | 06/10/2011 |
| (7,736) | 06/10/2011 |
| 32,014 | 06/27/2011 |
| 3,000 | 06/27/2011 |
| (53,764) | 06/27/2011 |
| 1,500 | 06/30/2011 |
| (3,000) | 11/28/2011 |
| **THOMAS R. DIBENEDETTO** | |
| None. | |
| **IAN A. GORDON** | |
| None. | |

---

[1] Represents award of restricted stock units. Dr. Brennan has not made any purchases or sales in the Shares during the past two (2) years.

I-1

**AHMED D. HUSSEIN**[2]

| | |
|---|---|
| 1,000 | 08/11/2010 |
| 1,000 | 08/11/2011 |
| 2,500 | 08/18/2011 |
| 5,000 | 08/18/2011 |
| 5,000 | 08/18/2011 |
| 20,000 | 08/18/2011 |
| 14,000 | 08/18/2011 |
| 2,500 | 11/10/2011 |

**JOHN M. MCDUFFIE**

None.

**JOHN J. MUELLER**

None.

---

[2]    Mr. Hussein has not made any direct purchases or sales in the Shares during the past two years. The transactions reported here are the result of acquisitions of Shares due to the exercise of options under the Company's director compensation plan, as reported in Form 4s filed with the SEC.

I-2

## SCHEDULE II

The following table is reprinted from the Company's definitive proxy statement filed with the Securities and Exchange Commission on July 13, 2012, with the addition of footnote 11.

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Except as otherwise indicated in the related footnotes, the following table sets forth information with respect to the beneficial ownership of our common stock as of the record date, June 18, 2012, by:

- each of our directors and director nominees;

- each of our "named executive officers" identified in the "Summary Compensation Table for Fiscal Year Ended March 31, 2012" contained in this proxy statement;

- each person known by us to beneficially own more than 5% of the outstanding shares of our common stock; and

- all of our directors and executive officers as a group.

Beneficial ownership is determined in accordance with the rules of the SEC, and includes voting or investment power with respect to the securities. To our knowledge, unless indicated by footnote, and subject to community property laws where applicable, the persons named in the table below have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them. Except as indicated in the footnotes to the table below, shares of common stock underlying options, if any, that currently are exercisable or are scheduled to become exercisable for shares of common stock within 60 days after the date of the table are deemed to be outstanding in calculating the percentage ownership of each listed person or group but are not deemed to be outstanding as to any other person or group. Percentage of beneficial ownership is based on 59,342,817 shares of common stock outstanding as of the record date, June 18, 2012.

Unless otherwise indicated, the address of each of the beneficial owners named in the table is c/o Quality Systems, Inc., 18111 Von Karman Avenue, Suite 700, Irvine, California 92612. Messrs. Barbarosh, Bristol, Pflueger, Plochocki, Razin and Rosenzweig and Ms. Spivack are current directors of our company and are director nominees. Messrs. Hussein and Brennan are current directors but, for reasons described above under the discussion of Proposal No. 1, Election of Directors, were not renominated for election as directors. Mr. Davis, who is not a current director, is a director nominee. Messrs. Plochocki, Holt, Decker, Neufeld and Sandler are our named executive officers.

| Name of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned | Percent of Common Stock Beneficially Owned |
|---|---|---|
| Sheldon Razin | 10,209,010(1) | 17.2% |
| Ahmed D. Hussein | 9,333,700(11) | 15.7% |
| Craig A. Barbarosh | 5,542 | * |
| Murray F. Brennan, M.D. | 12,500(2) | * |
| George H. Bristol | 13,250(3) | * |
| Mark H. Davis | — | — |
| D. Russell Pflueger | 35,250(4) | * |
| Steven T. Plochocki | 12,800(5) | * |
| Lance Rosenzweig | — | — |
| Maureen A. Spivack | 3,000 | * |
| Scott Decker | 32,600(6) | * |
| Paul A. Holt | 9,900(7) | * |
| Donn E. Neufeld | 9,464(8) | * |
| Monte Sandler | 7,534(9) | * |
| All directors and executive officers as a group (16 persons) | 19,697,650(10) | 33.1% |

_____

II-1

\*        Represents less than 1.0%.

(1)        Includes 27,500 shares underlying options.

(2)        Includes 7,500 shares underlying options.

(3)        Includes 7,500 shares underlying options.

(4)        Includes 27,500 shares underlying options.

(5)        Includes 4,800 shares underlying options.

(6)        Includes 23,600 shares underlying options.

(7)        Includes 2,400 shares underlying options.

(8)        Includes 3,600 shares underlying options.

(9)        Includes 4,634 shares underlying options.

(10)      Includes 120,134 shares underlying options.

(11)      All the Shares listed are pledged as collateral for margin accounts with various brokerage firms.

II-2

**IMPORTANT**

Tell your Board what you think!  Your vote is important.  No matter how many Shares you own, please give Mr. Hussein your proxy **FOR** the election of Mr. Hussein's Nominees by taking three steps:

- SIGNING the enclosed **GOLD** proxy card,

- DATING the enclosed **GOLD** proxy card, and

- MAILING the enclosed **GOLD** proxy card TODAY in the envelope provided (no postage is required if mailed in the United States).

**If any of your Shares are held in the name of a brokerage firm, bank, bank nominee or other institution, only it can vote such Shares and only upon receipt of your specific instructions.**  Depending upon your broker or custodian, you may be able to vote either by toll-free telephone or by the Internet. You may also vote by signing, dating and returning the enclosed **GOLD** voting form.

If you have any questions or require any additional information concerning this Proxy Statement, please contact AST Phoenix Advisors at the address or telephone numbers set forth below.

**AST Phoenix Advisors**
**110 Wall Street, 27th floor**
**New York, NY 10005**
**Shareholders call toll-free: (800) 581-4729**
**Banks and Brokers call collect:  (212) 493-3910**

---

**GOLD PROXY CARD**

**QUALITY SYSTEMS, INC.**

**2012 ANNUAL MEETING OF SHAREHOLDERS**

**THIS PROXY IS SOLICITED BY AHMED D. HUSSEIN AND THE OTHER PARTICIPANTS**

**THIS SOLICITATION IS BEING MADE IN OPPOSITION TO THE BOARD OF DIRECTORS OF QUALITY SYSTEMS, INC.**

**P R O X Y**

The undersigned appoints Ahmed D. Hussein, Murray F. Brennan and Patrick B. Cline, and each of them, attorneys and agents with full power of substitution, to vote all shares of common stock of Quality Systems, Inc. (the "Company") which the undersigned would be entitled to vote if personally present at the 2012 Annual Meeting of Shareholders of the Company scheduled to be held at The Marriott Hotel located at 18000 Von Karman Avenue, Irvine, California 92612 at 1:00 p.m., local time, on Thursday, August 16, 2012, and including at any adjournments or postponements thereof and at any meeting called in lieu thereof (the "Annual Meeting").

The undersigned hereby revokes any other proxy or proxies heretofore given to vote or act with respect to the shares of common stock of the Company held by the undersigned, and hereby ratifies and confirms all action the herein named attorneys and proxy, their substitutes, or any of them may lawfully take by virtue hereof. If properly executed, this Proxy will be voted as directed on the reverse and in the discretion of the herein named attorneys and proxy or their substitutes with respect to any other matters as may properly come before the Annual Meeting that are unknown to Mr. Hussein a reasonable time before this solicitation. Shareholders have the right to vote cumulatively in Proposal No. 1 and, unless otherwise instructed, the shares represented by this Proxy will be voted cumulatively in favor of one or more of the Nominees, at the proxy holders' sole discretion, in order to elect as many of the Nominees as possible and, consistent with such maximization, to prioritize the election of our Nominees in the order listed on the reverse side.

**IF NO DIRECTION IS INDICATED WITH RESPECT TO THE PROPOSALS ON THE REVERSE, THIS PROXY WILL BE VOTED "FOR" PROPOSALS 1 AND 3 AND "ABSTAIN" ON PROPOSAL 2.**

**UNLESS SPECIFICALLY INSTRUCTED OTHERWISE, THIS PROXY CONFERS DISCRETIONARY AUTHORITY TO CUMULATE VOTES FOR ANY OR ALL OF MR. HUSSEIN'S NOMINEES FOR ELECTION AS DIRECTORS FOR WHICH AUTHORITY TO VOTE HAS NOT BEEN WITHHELD. AS DESCRIBED IN THE PROXY STATEMENT, THE PROXY HOLDER INTENDS TO VOTE THE PROXIES SOLICITED HEREBY IN SUCH A MANNER AS TO PROVIDE FOR THE ELECTION OF THE MAXIMUM NUMBER OF OUR NOMINEES AND, TO THE EXTENT NECESSARY AND CONSISTENT WITH SUCH MAXIMIZATION, TO PRIORITIZE THE ELECTION OF OUR NOMINEES IN THE ORDER LISTED ON THE REVERSE SIDE.**

**IF YOU WISH TO PROVIDE VOTE ALLOCATION INSTRUCTIONS, YOU MUST SUBMIT THE PROXY CARD BY MAIL AND SHOULD HAND MARK THE NUMBER OF VOTES YOU WISH TO ALLOCATE TO ANY PARTICULAR NOMINEE NEXT TO THE NAME OF SUCH NOMINEE. YOU DO NOT NEED TO CHECK THE "FOR ALL NOMINEES" BOX TO ALLOCATE VOTES AMONG ALL OF THE NOMINEES. IF YOU PROVIDE VOTE ALLOCATION INSTRUCTIONS FOR LESS THAN ALL OF THE VOTES THAT YOU ARE ENTITLED TO CAST, THE PROXY HOLDER WILL RETAIN DISCRETIONARY AUTHORITY TO CAST YOUR REMAINING VOTES, OTHER THAN FOR ANY NOMINEE FOR WHOM YOU HAVE WITHHELD AUTHORITY BY MARKING THE "FOR ALL EXCEPT NOMINEE(S) WRITTEN BELOW" BOX. IF YOU PROVIDE VOTE ALLOCATION INSTRUCTIONS FOR MORE THAN THE NUMBER OF VOTES THAT YOU ARE ENTITLED TO CAST, THE PROXY HOLDER WILL SUBTRACT THE EXCESS VOTES FROM THE NOMINEE OR NOMINEES TO WHOM YOU HAVE ALLOCATED THE FEWEST VOTES. PLEASE CALL AST PHOENIX ADVISORS AT (800) 581-4729 IF YOU HAVE ANY QUESTIONS.**

**NOTE: IF YOU HOLD YOUR SHARES IN STREET NAME AND WISH TO PROVIDE VOTE ALLOCATION INSTRUCTIONS, YOU MUST CONTACT YOUR BROKER, TRUSTEE OR OTHER REPRESENTATIVE FOR INSTRUCTIONS.**

**IF ANY OF THE NOMINEES NAMED IN PROPOSAL 1 DECLINES OR IS UNABLE TO SERVE AS A DIRECTOR, THE PROXY HOLDER SHALL HAVE THE AUTHORITY TO VOTE FOR ANY OTHER PERSON WHO MAY BE DESIGNATED BY THE PARTICIPANTS AS A SUBSTITUTE.**

Although there are nine positions to be voted on at the Annual Meeting, this proxy cannot be used to vote for more than seven nominees. There is no assurance that any of the nominees of Quality Systems will serve as Directors if any of the Nominees are elected to the Board. If you vote using this proxy, you will not be able to vote for any of the Quality Systems nominees for director.

**A-385**

This Proxy will be valid until the sooner of one year from the date indicated on the reverse side and the completion of the Annual Meeting.

**Important Notice Regarding the Availability of Proxy Materials
for the Annual Meeting**

**The Participants' Proxy Statement and this GOLD proxy card are available for review at**

**www.abetterqsii.com**

_____

**IMPORTANT: PLEASE SIGN, DATE AND MAIL THIS PROXY CARD PROMPTLY!**

**CONTINUED AND TO BE SIGNED ON REVERSE SIDE**

**GOLD PROXY CARD**

**THE PARTICIPANTS RECOMMENDS A VOTE "FOR" THE NOMINEES LISTED BELOW IN PROPOSAL NO. 1**

**[X] Please mark vote as in this example**

1.   ELECTION OF DIRECTORS

|  | FOR ALL NOMINEES | WITHHOLD AUTHORITY TO VOTE FOR ALL NOMINEES | FOR ALL EXCEPT NOMINEE(S) WRITTEN BELOW |
|---|---|---|---|
| Ahmed D. Hussein | [    ] | [    ] | [    ] |
| Murray F. Brennan, M.D. |  |  | _____ |
| Patrick B. Cline |  |  |  |
| John J. Mueller |  |  | _____ |
| Lieutenant General (Ret) John M. McDuffie |  |  |  |
| Thomas R. DiBenedetto |  |  |  |
| Ian A. Gordon |  |  |  |

2.   THE COMPANY'S PROPOSAL TO APPROVE THE NON-BINDING ADVISORY RESOLUTION ON EXECUTIVE COMPENSATION, OFTEN REFERRED TO AS "SAY ON PAY"

| FOR | AGAINST | ABSTAIN |
|---|---|---|
| [    ] | [    ] | [    ] |

3.   THE COMPANY'S PROPOSAL TO RATIFY THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING MARCH 31, 2013

| FOR | AGAINST | ABSTAIN |
|---|---|---|
| [    ] | [    ] | [    ] |

**This Proxy when properly executed will be voted in the manner directed herein by the undersigned shareholder.  If no direction is made, this Proxy will be voted "For" Proposals No. 1 and No. 3 and "Abstain" with respect to Proposal No. 2.  Unless vote allocation instructions are provided, this proxy confers discretionary authority upon the proxy holder to cumulate votes in favor of one or more of the Nominees, at the proxy holder's sole discretion, in order to elect as many of the Nominees listed above as possible.  The shares represented by this Proxy will not be cumulated with respect to any Nominee for whom the authority to vote has been withheld.**

DATED: _____

_____
(Signature)

_____
(Signature, if held jointly)

_____
(Title)

**WHEN SHARES ARE HELD JOINTLY, JOINT OWNERS SHOULD EACH SIGN. EXECUTORS, ADMINISTRATORS, TRUSTEES, ETC., SHOULD INDICATE THE CAPACITY IN WHICH SIGNING. PLEASE SIGN EXACTLY AS NAME APPEARS ON THIS PROXY.**

# EXHIBIT 4

APR-15-96 12:51 FROM:LEGAL-SERVICES                    ID: F960417000351   PAGE 5/6

APPLICATION FOR AUTHORITY

OF

NATIONAL INVESTMENTS CO.

Under Section 1304 of the
Business Corporation Law

UNI-37

The undersigned corporation does hereby apply, pursuant to Section
1304 of the Business Corporation Law of the State of New York, for authority
to do business in the State of New York, and for that purpose does hereby
set forth:

FIRST: The name of the corporation is:

NATIONAL INVESTMENTS CO.

which will do business in the State of New York under the name
National Investments Co., Inc.

SECOND:  The jurisdiction of the incorporation of the corporation
is Egypt.  The date of incorporation in said jurisdiction is the 10th day of
December, 1994.

THIRD:  The corporation proposes to do the following business in
the State of New York, which it is authorized to do in the jurisdiction of
its incorporation:

To engage in any lawful act or activity for which a
corporation may be organized under the Business Corporation Law,
provided that it is not engaged in any act or activity requiring
the consent or approval of any state official, department, board,
agency or other body, without such approval or consent first being
obtained.

FOURTH: The office of the corporation in the State of New York
shall be located in the County of New York.

FIFTH: The Secretary of State is designated as the agent of the
corporation upon whom process against the corporation may be served, and the
address to which the Secretary of State shall mail a copy of any process
against the corporation served upon him is 30 Rockefeller Plaza, Suite 1936,
New York, New York  10112.

APR-15-96 12:51 FROM:LEGAL-SERVICES          ID:                    PAGE  6/6

SIXTH:  The corporation has not since its incorporation engaged in
any activity in this state, except as set forth in paragraph (b) of Section
1301 of the Business Corporation Law of the State of New York.


IN WITNESS WHEREOF, the undersigned executes this document and
affirms that the statements made herein are true under the penalties of
perjury, this fifteenth day of April, 1996.


S/AHMED HUSSEIN
  Ahmed Hussein, President

# State of New York,
# Banking Department

I, Edmund P. Rogers III, Deputy Superintendent of Banks of the State of New York, hereby approve, pursuant to the New York General Business Law Section 130(2)(b) as amended, the use of the word or a derivative of the word **"Investment"** in **NATIONAL INVESTMENTS CO., INC.** the fictitious name of National Investments Co.

**Witness,** *my hand and official seal of the Banking Department at the City of New York,* this _____8th_____ *day of* _____April_____ *in the Year of our Lord* *one thousand nine hundred and* ninety-six.

Deputy       *Superintendent of Banks.*

**NATIONAL INVESTMENTS Co.**    شركة الأهلى للاستثمارات

---

March 11, 1996

# To whom it may concern

The Investment General Authority Certifies that " the National Investment Company, An Egyption Joint Stock Company according to law No. 230 / 1989 is registered in the commercial register, No. 24480 on December 1994, issued at the Investment Commercial Registry Office, Cairo Governerate and the registration is current and in good standing ".

**Investment General Authority**



N. B. E. Building , Capital Branch

8 Ibrahim Nagib St. Garden city , 7 Th. Floor

Tel. : 3564226 – Fax : 3564218

Com. R . 24480 , Cairo South

مبنى البنك الأهلى المصرى " فرع العاصمة "

٨ شارع إبراهيم نجيب – جاردن سيتى – الدور السابع

تليفون : ٣٥٦٤٢٢٦ – فاكس : ٣٥٦٤٢١٨

سجل تجارى ٢٤٤٨٠ جنوب القاهرة

EGYPT
CERTIFICATION
EMBASSY OF THE UNITED
STATES OF AMERICA

I certify that the official of
Ministry of Foreign Affairs named
below, whose true signature and
official seal are, respectively,
subscribed and affixed to
the annexed document, was on
this day, empowered to act to
the official capacity designated
in the annexed document, to
which faith and credit are due.

For the contents of the annexed
document, the Embassy assumes no
responsibility.

Mohamed Ahmed Siam

This 13 day of   March 1996

Vice Consul of the
United States of America

```
N. Y. S. DEPARTMENT OF STATE                              162 WASHINGTON AVENUE
DIVISION OF CORPORATIONS AND STATE RECORDS                ALBANY, NY 12231

                            FILING RECEIPT
================================================================================
ENTITY NAME      : NATIONAL INVESTMENTS CO., INC.


DOCUMENT TYPE    : NAME RESERVATION (NEW) (FOR. BUSINES

SERVICE COMPANY  : UNITED CORPORATE SERVICES              SERVICE CODE: 37

APPLICANT NAME   : NATIONAL INVESTMENTS CO., INC.
================================================================================
FILED: 04/02/1996  DURATION: 06/03/1996  CASH #: 960402000438  FILM #: 960402000415

ADDRESS FOR PROCESS
```

```
REGISTERED AGENT



** SUBMIT RECEIPT WHEN FILING CERTIFICATE **
```

```
================================================================================
FILER                          FEES        45.00  PAYMENTS        45.00

C/O BURNS HANDLER & BURNS LLP   FILING  :   20.00  CASH            0.00
ATT: BRUCE A. BURNS, ESQ.       TAX     :    0.00  CHECK           0.00
220 EAST 42ND ST.               CERT    :    0.00  BILLED         45.00
NEW YORK, NY 10017              COPIES  :    0.00
                                HANDLING:   25.00
                                                   REFUND:         0.00
================================================================================
DOS-1025 (11/89)
```

APR-15-96 12:58 FROM:LEGAL-SERVICES                ID:                PAGE   4/6

F 96041700035

APPLICATION FOR AUTHORITY

OF

NATIONAL INVESTMENTS CO.

Under Section 1304 of the
Business Corporation Law

Burns Handler & Burns LLP
220 East 42nd Street
New York, New York  10017

UNI-37

BILLED

96041700036

A-395

# EXHIBIT 5

**STATE OF NEW YORK**

**DEPARTMENT OF STATE**

**Certificate of Status**

    I, ROBERT J. RODRIGUEZ, Secretary of State of the State of New York and custodian of the records required by law to be filed in my office, do hereby certify that upon a diligent examination of the records of the Department of State, as of the date and time of this certificate, the following entity information is reflected:

| | |
|---|---|
| **Entity Name:** | NATIONAL INVESTMENTS CO. |
| **DOS ID Number:** | 2020814 |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Entity Status:** | NO LONGER AUTHORIZED |
| **Date of Initial Filing with DOS:** | 04/17/1996 |

I certify that the following is a list of documents on file in the Department of State for said entity:

| | |
|---|---|
| **Document Type:** | APPLICATION OF AUTHORITY |
| **Date of Filing:** | 04/17/1996 |
| **Entity Name:** | NATIONAL INVESTMENTS CO. |

| | |
|---|---|
| **Document Type:** | ANNULMENT OF AUTHORITY |
| **Date of Filing:** | 12/27/2000 |

Above space is left blank intentionally.

No information is available from this office regarding the financial condition, business activity or practices of this entity.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on April 14, 2022 at 12:40 P.M.



ROBERT J. RODRIGUEZ, Secretary of State

By Brendan C. Hughes
Executive Deputy Secretary of State

Authentication Number: 100001399515 To Verify the authenticity of this document you may access the
Division of Corporation's Document Authentication Website at http://ecorp.dos.ny.gov

# EXHIBIT 6



**NIXON PEABODY LLP**
**ATTORNEYS AT LAW**

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Daniel A. Schnapp**
*Partner*
T 212-940-3026
dschnapp@nixonpeabody.com

Tower 46
55 West 46th Street
New York, NY  10036-4120
212-940-3000

March 24, 2021

**<u>VIA ELECTRONIC MAIL</u>**

Dr. Abo Bakr El-Sedeek Amer
President of the Egyptian State Lawsuits Authority
Arab Republic of Egypt
42 Gameat El Dowal, El Arabiya St. Mohandesen
P.O. Box 12311
Giza, Egypt

<div align="center">

**RE: Arbitration Between: Dr. Ahmed Diaa Eldin Ali Mohamed Hussein**
**<u>and The Arab Republic of Egypt</u>**

</div>

Dear Dr. Abo Bakr El-Sedeek Amer:

As you know, this Firm represents Dr. Ahmed Hussein in connection with the above-referenced Arbitration, arising out of the expropriation by Egypt of Dr. Hussein's investment in SIMO, in violation of Egyptian law and the explicit terms of the Bilateral Investment Treaty between the United States of America and Egypt (the "BIT").

We write to notify you that, absent the Egypt's consent within ten days of the date of this letter to ICSID Arbitration pursuant to UNICTRAL Rules, as requested by ICSID on March 8, 2021, and to which Egypt has provided no response, we will pursue ICSID arbitration using the Rules and Regulations of ICSID, and to which Egypt has already explicitly consented.

<div align="center">

**<u>Egypt has Undermined its Own Judicial Authorities and Prime Minister</u>**

</div>

In March 1999, SIMO was illegally nationalized by Egypt via the decision issued by the Chairman of the Companies' Regulatory Authority, who appointed a Trustee for management of the Company and dissolved the Board of Directors.  As a result, Dr. Hussein immediately instituted legal action in Egypt regarding the seizure of SIMO. Between 2005 and 2006, Egyptian appellate courts ordered that SIMO be returned to its rightful owners, and canceled the decision of the Chairman of the Companies' Regulatory Authority and all the repercussions that resulted from that decision.  In 2007, the Chairman of the Investment Authority likewise ordered that the Company be returned to its rightful owners. However, the Egyptian Government did not honor the courts' binding decision, or the Government's own decision, which had been issued by the Chairman of the Investment Authority.

Dr. Ahmed Hussein
March 24, 2021
Page 2

In 2013, the Administrative Court ordered the return of SIMO to the State because it was sold to shareholders at an inappropriately low price. In 2014, In response to this court order, the Prime Minister issued a decree implementing the Administrative Court's 2013 order, and directed that the Minister of Finance compensate all shareholders of SIMO for the loss of their investment in the Company.  The Government did not, however, comply with the Prime Minister's decree.

As a result, Dr. Hussein communicated with the Minister of Finance, the Minister of Public Sector, the Chairman of the Investment Authority, the Head of the Holding Company for Chemical Industries, and other responsible government representatives, who advised Dr. Hussein to bring the matter before the Egyptian General Authority for Investment & Free Zones Technical Secretariat Ministerial Committee for Investment Disputes Settlement in order to obtain his compensation, which Dr. Hussein did in 2018.

By letter dated July 6, 2020, Dr. Hussein was informed that the Ministerial Committee for Investment Dispute Settlement, in its meeting held on June 8, 2020, issued a decision stating: "[t]he incompetence of ministerial committee for investment dispute settlement to try and hear the current dispute[.]" The July 6, 2020 letter continues on to state that the decision was approved by the cabinet at its meeting held on June 17, 2020.

Next, by letter dated September 8, 2020, Dr. Hussein was informed that, at its session on July 27, 2020, the Ministerial Committee for Investment Dispute Settlement decided that it was "not competent to settle investment disputes …[.]" The September 8, 2020 letter also stated that this decision was approved by the Council on Ministers in its session held on August 6, 2020, effectively cancelling the equitable, legal, and binding decree from the Prime Minister, which had been issued in compliance with the court order returning the Company to the country.

The September 8, 2020 letter misstates the compensation that Dr. Hussein had requested, which was clearly stated in the July 6, 2020 letter, by stating that Dr. Hussein's request was for "the present value of the Company." Dr. Hussein has consistently requested that he be compensated in accordance with the decision of the Egyptian courts, the highest authority on investment in Egypt, and the Prime Minister of Egypt's decree, in an amount equivalent to the present value of the Company on the date that the Company was nationalized.

Further, the binding decree by the Prime Minister of Egypt, and its legal and equitable obligations, should never have been cancelled or tampered with by the Ministerial Committee for Investment Dispute Settlement nor the Council on Ministers.  The alleged decision contained in the September 8, 2020 letter is illegal, and a blatant violation of the BIT, which guarantees that nationals of the United States be appropriately compensated in the event that the Egyptian government expropriate their investments in Egypt. BIT Article III, 1.

### Egypt is Required to Provide Dr. Hussein with Compensation for his Expropriated Investment in Accordance with the BIT

The United States and Egypt entered into the BIT in an effort to foster reciprocal encouragement and protection of investments made by nationals of either party. To that end, the BIT requires, among other things, that Egypt provide Dr. Hussein, a national of the United

Dr. Ahmed Hussein
March 24, 2021
Page 3

States, with appropriate compensation in the event that Dr. Hussein's investment in SIMO, or any portion thereof, be expropriated by Egypt.

Dr. Hussein's investment in SIMO qualifies as an "investment of a national" of the United States pursuant to Article I, (c) of the BIT. The BIT requires that the nationalization of Dr. Hussein's investment be "accompanied by prompt and adequate compensation, freely realizable … equivalent to the fair market value of the expropriated investment on the date of expropriated … [and] payments for delay." BIT Article III, 1. Egypt's illegal actions described herein constitute a legal investment dispute which are now subject to international arbitration. BIT Article VII, 1.

### Egypt's Refusal to Respond

On February 8, 2021, we notified Egypt of our intention to institute arbitration, and served a Notice of Arbitration Under the Arbitration Rules of the United Nations Commission on International Trade Law on the Egyptian State Lawsuits Authority.

On February 13, 2021, Egypt sent us an email, requesting "the pertinent power of attorney" to represent Dr. Hussein in this dispute.  On February 16, 2021, we provided you with a redacted engagement letter between our Firm and Dr. Hussein.

In our February 16, 2021 letter, we also asked that you confirm that The Arab Republic of Egypt consents to ICSID administration of the arbitration in accordance with the Notice of Arbitration, and that upon receiving your response to our February 16, 2021 letter, we would provide a proposed request for ICSID to administer the arbitration for your review and execution.   We received no response to our February 16, 2021 correspondence.

On February 26, 2021, having heard nothing from Egypt, we again sent a letter and asked that Egypt confirm that The Arab Republic of Egypt consents to ICSID administration of the arbitration in accordance with the Notice of Arbitration, and we provided you with a proposed joint request for ICSID to administer the arbitration in anticipation of your prompt cooperation.  We received no response to our February 26, 2021 correspondence.

On March 8, 2021, we proceeded to file a request that ICSID administer the arbitration and provide ICSID with, among other things, the Notice of Arbitration that was served upon The Arab Republic of Egypt.

On March 10, 2021, Jara Mínguez Almeida, Legal Counsel at ICSID, asked the Arab Republic of Egypt to confirm whether it agrees to appoint ICSID as the administering authority in this case.   To date, Egypt has not responded.

Egypt's actions in refusing to compensate Dr. Hussein in accordance with its own judicial authorities and the decree of the Prime Minister, its violation of the BIT, as well as its current refusal to even respond to Dr. Hussein or ICSID, are unfortunate examples of bad-faith that will lead to a public loss of faith in Egypt's ability to stand by its international obligations. Egypt's willful avoidance of international arbitration pursuant to the BIT, will lead to significant erosion of trust of Egypt by international investors, as Egypt's actions contravene

Dr. Ahmed Hussein
March 24, 2021
Page 4

the letter and spirit of the BIT, which was intended to foster reciprocal encouragement and protection of investments made by nationals of either country.

We will not allow Egypt to delay our efforts to protect our client and seek his full compensation pursuant to international law.  Again, absent Egypt's consent within ten days of the date of this letter to ICSID Arbitration pursuant to UNICTRAL Rules, as requested by ICSID on March 8, 2021, we will proceed with ICSID arbitration using the Rules and Regulations of ICSID, and to which Egypt has already explicitly consented.

We look forward to your immediate cooperation.  We reserve all rights at law and in equity.

Sincerely,
/s/
Daniel A. Schnapp, Esq.

_____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN |
| Plaintiff |
| v. |
| DR. MOHAMED AHMED MAAIT, in his official capacity |
| as Minister of Finance of the Arab Republic of Egypt |
| Defendant |
| 1.  FILE NO. 22-cv-02592-JSR |

| |
|---|
| DECLARATION |
| OF |
| BAHIELDIN H.Z. ELIBRACHY, LAWYER |

I,  Bahieldin H.Z. Elibrachy, declare pursuant to 28 U.S.C. § 1746:

1.      I am an Egyptian lawyer, admitted before the Egyptian Court of Cassation in Egypt and a member of the Egyptian Bar Association.  I graduated from the Faculty of Law, Cairo University in 1977.  I also graduated from Georgetown University Law School with a Masters of Comparative Law, 1981 and Juris Doctor in 1985.  I am fluent in both Arabic and English.

2.      I have been practicing law in the Egyptian Law Firm, Ibrachy & Dermarkar ("I&D") since 1985.  I&D is the oldest Egyptian law firm with a continued history of existence.  It was established in 1932.  I am currently the managing partner at I&D.  During my career, I have advised clients on various issues of the Egyptian law.  I advised clients in the areas of administrative, banking, civil, contracts, energy, merger and acquisitions, and technology, media and telecommunications (TMT).  My clients include major international companies, as well as multinational companies headquartered in Egypt.

3.      I represented La Farge SA, in a similar case initiated by ex-employees of Beni Suef Cement Company, who requested to annul the privatization of Beni Suef Cement Company bought by La Farge SA.

43213/65j Administrative Court.  The plaintiffs' requests were denied.  The case raised many of the grounds and arguments brought in the SIMO case.

4.     I submit this Declaration in support of the request by the Defendant to dismiss the motion brought by the Plaintiff.

I.     Introduction:  Scope of the Assignment

5.     I have been requested by Linda C. Goldstein, Esq. of Dechert LLP, to opine on three documents and their possible execution by the courts in New York, NY, USA.

6.     The three documents that I received are:

a.  A copy of the Egyptian Court decision issued by the Administrative Court, Division for Economic and Investments, 7th. Circuit No. 6193/66j and its translation. The decision was issued on 2014-03-15.

b.  A copy of the Prime Ministerial Decree No. 961/2014 and its translation.

c.  A copy of an affirmation by Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, plaintiff ("Affirmation").  It contains six

pages.  Attached to it is an annex of one page excluding the title page which is entitled "Exhibit A".

7.  I have been specifically instructed to:

   a.  comment on whether the Administrative Court Decision referred to above ("Admin Dec") is enforceable under Egyptian law as a money judgement in favor of the Plaintiff;

   b.  comment on whether the Prime Ministerial Decree referred to above ("PMD 961/2014") is enforceable under Egyptian law as a money judgement in favor of the Plaintiff; and

   c.  opine on whether certain statements in the Affirmation were consistent with the foregoing documents and Egyptian law.

8.  In reviewing the Admin. Dec. and PMD 961/2014, I relied upon the Arabic copies of the documents.  In my opinion, the translation of the Admin. Dec. provided by the Plaintiff does not clearly capture all of the technical aspects of the Court's reasoning.

II.    Facts as Described in the Admin Dec

9.    The Paper Company for Middle East ("SIMO") is owned by the Holding Company for Chemical Industries ("HCCI").  After an increase of the capital of SIMO on 1995-12-05, HCCI owned 68,15% and the National Investment Bank ("NIB") owned 31,85%.

10.    On 1997-04-06, SIMO became registered on the Egyptian Stock Exchange ("EGX").  On 1997-06-03, the Government of Egypt ("GOE") accepted to sell 10% of SIMO's shares to the public at a price of EGP 20/share for exploratory purposes.  This sale could then be increased to 90% of the total shares of SIMO.  GOE also agreed to sell 10% of SIMO's shares to SIMO's labor union.  In making this decision, the GOE was represented by a special Ministerial Committee assigned to review the privatization of Public Companies.

11.    In 2011, a group of concerned citizens, who were mainly ex-employees of SIMO and members of its workers' Union, brough an action against GOE and requested the Court to annul the decision to privatize SIMO as per GOE decision dated 1997-06-03.

12.    Defendants objected to the jurisdiction of the Administrative Court on the basis that the contracts of sale took place on EGX, a public

stock exchange, and are therefore not deemed an administrative contract.
The Court disagreed.  The Court held that the decision of the GOE on
1997-06-03 is the basis for the later sale of shares contracts on the EGX.
The Court therefore held that the annulment of the decision of the GOE
would necessarily result in the annulment of the subsequent sale contracts
that took place on the EGX.

13.    The Court then found that the plaintiffs were properly positioned
to represent the public interest.  It also allowed additional plaintiffs to join
the original plaintiffs in the action.

14.    Article 24 of the Law 47/1972 on Administrative Courts allows
challenging the administrative decisions within 60 days of the publication or
notification of the administrative decision.  Since the decision of the GOE
on 1997-06-03 was not published (and therefore not deemed to have
provided notice to the public/plaintiffs), the Court found that it is not barred
to consider the nullification of the GOE decision on 1997-06-03.

15.    The Court went on to review the circumstances under which the
1997-06-03 GOE decision was made.  The Extraordinary General
Assembly ("EGA") of HCCI authorized the sale of the shares of SIMO on
1996-08-25.  HCCI also agreed with NIB on the sale.  SIMO's general

assembly agreed on the sale of the shares.  The board of NIB then decided to plan for the sale of SIMO's shares.  The GOE decision of 1997-06-03 was based on the prior decisions of HCCI including the decision of HCCI's EGA dated 1996-08-25 was made in contravention to the law, which required the EGA to detail the basis upon which it made its decisions.  By reviewing the minutes of meeting of HCCI's EGA dated 1996-08-25, the Court found that this detailed basis was never provided.

16.    The Court therefore ruled that the GOE decision dated 1997-06-03 to privatize SIMO should be annulled because of the defective authorization by HCCI's EGA.

17.    There is no mention in the Admin. Dec. that the annulment of the GOE decision dated 1997-06-03 to privatize SIMO had anything to do with the price of the shares purchased by Plaintiff, as he stated in paragraph 17 of his Affirmation.

18.    The Court also found that the termination of employment of former employees of SIMO was not according to the law.  It therefore ordered their reinstatement and payment of their unpaid salaries.

19.    The Court's decision does not make any specific ruling with respect to the rights of the purchasers of SIMO shares.  This includes the

Plaintiff in this matter.  It is not a "judgement granting a recovery of a sum of money" as Plaintiff contends in paragraph 22 of his Affirmation.

20.    Article 44 of Law 47/1972 on Administrative Courts allows any of the parties to challenge the Administrative Court decision before the High Administrative Court.  The deadline for bringing an appeal of the Admin. Dec. was 60 days from the date the decision is issued. *Id.* Plaintiff's Affirmation does not state whether he or any of the other defendants appealed Admin. Dec. to the High Administrative Court. Rather, it appears that he accepted the annulment decision of the Administrative Court.

III.    PMD 961/2014

21.    Prime Ministerial Decree No. 961/2014 is a decree by the Prime Minister of Egypt.  It is not a decision of a court.  It does not "affirm" the Admin. Dec., as Plaintiff asserts in paragraph 19 of his Affirmation.

22.    In PMD 961/2014, the Prime Minister of Egypt ordered:

    a.  In Article 1:  the execution of the Admin. Dec.  He ordered
        that SIMO should become a public company under HCCI
        and therefore subject to Law 203/1991.

    b. In Article 2:  HCCI should take all legal procedures to reinstate SIMO as a public company including amending its statutes, subjecting it to the supervision of the Central Accounting Office and forming a new board for it.

    c. In Article 3:  the Minister of Treasury should make sufficient funds available relating to the rights of shareholders and unpaid salaries and benefits of the ex-employees.  What the decree does not do is to state where those funds will come from.  It also does not calculate the specific amount of money due to any of the shareholders or the employees.

23.    As per Article 142 of the Egyptian Civil Code 131/1948, the result of the annulment of the sale contracts is to reinstate the parties to their position prior to the sale.  The entities with legal obligation to pay the shareholders are HCCI and NIB.  The entity with legal obligation to pay the reinstated employees is SIMO.  When the Prime Minister directed his Minister of Treasury to make necessary provisions for such payments, he charged his Minister of Treasury to assure that those entities would have sufficient funds to make the payments ordered by the Court.  It is possible that when HCCI sold SIMO's shares, HCCI paid the revenues of the sale to

the Ministry of Public Business Sector.  If this was the case, the Ministry of

Public Business Sector would have paid these revenues to the Ministry of

Treasury.  In such a case, the Ministry of Treasury would have to pay this

money back to the Ministry of Public Business Sector so that it would in

turn pay it to HCCI.  HCCI would then reimburse the shareholders whose

shares it repossessed.  If for any reason HCCI would not have sufficient

funds to pay the shareholders, the Ministry of Treasury was instructed by

the Prime Minister of Egypt to make the necessary funds available to it.

Such funds would normally flow from Ministry of Treasury to the Ministry of

Public Business Sector and then to HCCI.  In all cases in my opinion, the

language of the PMD 961/2014 is not intended to directly benefit the

shareholders or the employees, nor does it establish a direct obligation

from the GOE vis a vis the shareholders or employees.

24.    PM 961/2014 is not a "judgement granting a recovery of a sum

of money" as Plaintiff contends in paragraph 22 of his Affirmation

IV.   The Affirmation

25.    While I have not been asked to research the accuracy of the

Plaintiff's account of SIMO's history in his Affirmation, I note that a number

of his statements are not consistent with the facts as recounted in the Admin. Dec. and are inconsistent with my knowledge of Egyptian law and experience.

26.     My legal comments on the Affirmation are as follows:

    a. Re. Paragraph 2:  Plaintiff should have brought legal action against HCCI and NIB for the value of his shares that have been repossessed by both.  There is no reference in the papers that he has taken this action against those entities.

    b. I also note that the Plaintiff does not attach any evidence to his Affirmation showing that he possessed and was dispossessed of shares in SIMO.  It is normal that a plaintiff requesting compensation for his SIMO shares to present stock certificates or similar indicia of ownership or expropriation.

    c. Re. Paragraph 9:  It is not possible for me to comment on the issue of Plaintiff's loss of control of SIMO due to Companies' Authority intervention.  I draw the attention to the different version of events provided in Admin. Dec.  The decision refers to a felony conviction against the Plaintiff in

the case 2202/2014 Banha Felony Court.  It also refers to a

sequestration order against the assets of the Plaintiff and

the appointment of a receiver to manage SIMO in view of

Plaintiff's ownership of more than 60% of the shares of

SIMO. Plaintiff refers to court decisions supporting his right

to take control back.  I have not reviewed such decisions

nor is there in his claims in the current proceedings any

claim based on his loss of control of SIMO, as opposed to

the repossession of his shares by HCCI and NIB.

d. Re. Paragraph 17:  The Admin. Dec. did not annul the sale

of SIMO shares because Plaintiff, or any other shareholder,

had paid too low of a price for their shares.  The decision is

based on a defect in the process for authorization of the

sale, as explained above.

V.     My Opinion

27.     The Admin Dec provided that the sale of the shares should be

annulled.  This annulment means the reinstatement of the legal status prior

to the sale of shares.  Although not stated explicitly in the Admin. Dec., two

things necessarily result from this annulment.  The first that ownership of the shares in SIMO should revert to HCCI and NIB.  The second is that both HCCI and NIB should return the price originally paid for the shares that they received back to the shareholders.

28.    Normally, HCCI and NIB would be obliged to repay the amounts they had originally received from the former SIMO shareholders.  Since the shares were bought in Egyptian pounds the reimbursement would be made in the same currency and the same amount paid.

29.    The return of the price paid for SIMO shares to each individual shareholder is not a matter of easy calculation.  There are potentially many issues that could arise from calculating what might be due to a shareholder whose purchase has been annulled.  In the event that there were a disagreement between the shareholder and HCCI/NIB regarding the amount of money owned to a shareholder, an Egyptian court would need to decide these issues.  Potential issues could include, *inter alia*:

> a. Whether the shareholder is entitled to interest on the amount owned to him as compensation for his shares and from what date that interest starts running.  I anticipate HCCI and NIB would refuse to pay such interest, since

Page 13 of 16

there is no delay attributable to them.  Their obligation to

pay is from the date the annulment was ordered by the

Administrative Court;

b. If SIMO paid dividends during the ownership of the Plaintiff,

I would expect HCCI and NIB to claim reimbursement of

such dividends or its setoff against the price of shares.

c. Whether a shareholder can claim to peg the value of what

he paid to a non-Egyptian currency such as the USD,

which Plaintiff attempts to do here;

d. Whether the purported shareholder has adequately

demonstrated his ownership interest in SIMO and what

forms of evidence of ownership are acceptable.

e. How to deal with the issue of shareholders who did not

acquire their shares directly from HCCI/NIB, but rather

purchased them from third parties who had purchased

them (directly or indirectly) from HCCI/NIB.  In that case,

there could be a dispute as to whether reimbursement

should be made at the price for which HCCI/NIB sold the

shares to the initial purchasers, or for the price at which the shareholder bought the shares from the third parties.

f.  Even once there has been a determination of the amount of money due to a shareholder from HCCI/NIB as compensation for the SIMO shares, the amount of money may be subject to setoffs (e.g. dividends as referred to above, or disputed salaries paid to board members etc.).

g.  None of these issues were addressed in the Admin. Dec. Therefore, the Admin Dec. does not calculate the money due to Plaintiff or any other former SIMO shareholder.

h.  It is standard procedures that in case Plaintiff would disagree with HCCI or NIB, that they would seek a judgement for the exact amount from an Egyptian court. The Egyptian courts would not be barred to address the issue of quantum of damages, since the Admin. Dec. did not address this issue.  The court would not have to revisit the question of liability to pay the value of the shares.  The court will only decide on the amount of shares owned by the Plaintiff and on the amount due for each shareholder.

VI.    Conclusions

1.      The Administrative Court, Division for Economic and Investments, 7th. Circuit No. 6193/66 j is not capable of being enforced by any court in Egypt to grant a sum of money certain to Dr. Ahmed Diaa Eldin Ali Mohamed Hussein.

2.      The Prime Ministerial Decree No. 961/2014 is not capable of being enforced by any court in Egypt to grant a sum of money certain to Dr. Ahmed Diaa Eldin Ali Mohamed Hussein.

3.      Together the Administrative Court, Division for Economic and Investments, 7th. Circuit No. 6193/66 j and the Prime Ministerial Decree No. 961/2014 are not capable of being enforced by any court in Egypt to grant a sum of money certain to Dr. Ahmed Diaa Eldin Ali Mohamed Hussein.

I declare under the penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed in Montreal, Qc, Canada on the 18th. Day of April, 2022.

Bahieldin H.Z. Elibrachy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
DR. AHMED DIAA ELDIN ALI MOHAMED   :
HUSSEIN,                            :
                                   :
                    Plaintiff,     :
                                   :
        - against -                :        1:22-cv-02592-JSR
                                   :
DR. MOHAMED AHMED MAAIT, in his    :
official capacity as MINISTER OF FINANCE :
OF THE ARAB REPUBLIC OF EGYPT,     :
                                   :
                    Defendant.     :
                                   :
------------------------------------- x

## [PROPOSED] ORDER STAYING MERITS DISCOVERY PENDING DISPOSITION OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S "SUMMARY JUDGMENT MOTION IN LIEU OF COMPLAINT"

**AND NOW**, upon consideration of Defendant's request in his Motion to Dismiss

Plaintiff's "Summary Judgment Motion in Lieu of Complaint" and to Stay Merits Discovery for

an order staying merits discovery and upon preliminary review of Defendant's argument under

Rule 12(b)(1) that this Court lacks subject matter jurisdiction to hear this case because Defendant

is immune from suit pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*,

it is hereby **ORDERED**:

Defendant's request for a stay of merits discovery is hereby **GRANTED**; and

All merits discovery is **STAYED** until the Court rules on the issue of subject matter

jurisdiction and this Court issues a further Order allowing such discovery.

**SO ORDERED.**

Dated: _____4/20/22_____

                                                    _____
                                                    Hon. Jed. S. Rakoff
                                                    **United States District Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,

Plaintiff,

- vs -

DR. MOHAMED AHMED MAAIT, in his official capacity
as Minister of Finance of the Arab Republic of Egypt,

Defendant.

Civil Action No.: 1:22-cv-
02592

**<u>DECLARATION OF DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND STAY MERITS
DISCOVERY</u>**

Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, pursuant to 28 U.S.C. § 1746 hereby

declares as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this

Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.      I am the Plaintiff in the above-captioned matter, and submit this Declaration in

opposition to the Motion to Dismiss and Stay Merit's Discovery filed by Defendant Dr.

Mohamed Ahmed Maait ("Defendant", together with Egypt, "Defendants").

3.      I maintain an office and an apartment in New York City, and reside in the Arab

Republic of Egypt ("Egypt"). I am a dual citizen of the United States of America and Egypt and I

am almost eighty-one years old.

4.     A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.

5.     In 1994, I partnered with the National Bank of Egypt, which is owned by the Egyptian Government and is by far the largest bank in Egypt, to found a full service investment bank in Egypt, known as the National Investment Company. I did so, in order to conduct brokerage, money management, underwriting, and hedge fund services.

6.     In 1997, I purchased all the shares of the National Investment Company and transferred the company into a holding company that owned my personal and immediate family's investments in Egypt.

7.     Under the auspices of this newly formed holding company, I transferred in excess of $200 million from my personal accounts in New York, in addition to funds borrowed using my investments in the United States used as collateral, to fund this company.

8.     Also in 1997, using the funds which originated from my account in New York to fund my company, I purchased what amounted to about 72% of SIMO Middle East Paper Company ("SIMO" or the "Company") through an open market transaction.

9.     My investment in SIMO was equivalent to approximately $15.714 million at the time that it was made.

10.     My ability to repay borrowed amounts from United States banks, and the value and ownership of my investments in the United States used to leverage my investment in SIMO were negatively affected as a direct consequence of the seizure of SIMO by the Egyptian Government and Defendant's failure to provide me and my family with the present value that we paid for the SIMO shares, in parallel with the cancelling of the sale of the shares after the transfer of the shares to the Egyptian Government, as required by Egyptian law.

11.     The records of all transactions to buy shares in SIMO are from the Egyptian Stock

Exchange, which is under the control of the Egyptian Government. These records are relied upon

by both by Egyptian representatives and myself. There is a documented exchange of a

quantifiable amount of money—there can be no factual dispute as to this amount. A correct copy

of a document prepared by my auditors which reflects the value of my investments in SIMO over

the years, **according to official Egyptian Stock Exchange Records**, and the currency value

**according to the Central Bank of Egypt**, is attached hereto as **Exhibit B.**

12.     There is no mechanism, under Egyptian law or elsewhere, that would permit a

party to transfer shares under the Exchange Rules without remitting the present value of the

purchase price back to the purchasers.  Cancelling the sale of shares is done on the Egyptian

Stock Exchange frequently and on a daily basis—there is a defined procedure for handling such

transactions and it necessarily involves returning the present value of the purchase price back to

the purchaser.

13.     The state owns and control both the National Investment Bank

(https://www.reuters.com/article/egypt-ipos/update-2-egypt-names-23-state-companies-to-float-

shares-in-privatisation-scheme-idUSL8N1R021A) and the Chemical Industries Holding

Company (https://www.globalmarketsinternational.com/latestmarketpost/egypt-chemical-

industry-companies-projects-petrochemical-agrochemical-pharmaceutical/ ).

14.     In 2021, following repeated requests for meetings from Mostafa El Bahabety, the

Minister of Justice of Arbitration and International Disputes in Egypt, I had some meetings with

Mr. El Bahabety, approximately a dozen of his assistants, and three of my attorneys.  Mr. El

Bahabety acknowledged that the Egyptian Judgment obligates that a payment be made to me on

behalf of the Chemical Industries Holdings Company. Mr. Bahabety specifically offered to make

a payment on behalf of the Chemical Industries Holdings Company in the amount that I paid to

purchase the shares of SIMO. However, such offer was made in current Egyptian pounds which

have been devalued by 80% and interest calculated only from 2014. That offer was clearly not

worth my consideration.

15.     As far as I know, there is not a single case in the history of the Egyptian Stock

Exchanges Rules or the Financial Regulatory Authority of Egypt where a transfer of ownership

of shares did occur without a return of the present value of the shares, with the exception of this

case in front of this Court.  I do not see how it is possible to transfer the shares and break the sale

without paying for them, either in Egypt or in any other country that I have dealt with.

16.     The Egyptian Judgment has already been enforced—the ownership of all shares

has returned to the Egyptian Government under the auspices of the Chemical Industries Holdings

Company, a process that cannot be reversed.

17.     The Prime Minister, at the time, who heads the executive branch of the

government, and was the military ruler of Egypt, under emergency conditions, issued a decree to

enforce the court ruling in its entirety. There is absolutely no way, and Defendant cannot

rationally identify such a way, to reverse that final and unquestionably irreversible decision.

18.     Defendant's submissions in support of his Motion to Dismiss contain blatant

factual misrepresentations aimed at obfuscating the actual dispute and relevant facts in this

matter. For example, Defendant claims I was "fired" as Chairman of SIMO when I was never an

executive or employee of the company. Defendant repeatedly references my two wives in an

effort to portray me as a bigamist, when my late ex-wife Dr. Marjorie Helen Battersby never

owned any shares in SIMO and we were amicably divorced two decades prior to when the events

relevant to this matter took place.  Likewise, Defendant describes the National Investment

- 4 -

Company as an unknown company, when, as Defendant is well aware, it is indisputably one of the largest personal investment companies in Egypt.

19.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 3, 2022.


_____
DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN

# Exhibit A

Excerpts from page 534 in Who's Who in the World .

HUSSEIN, AHMED DIA, investment banker; b. Cairo, Egypt, May 28, 1941; came to U.S. 1966.; s. Ali Mohamed and Yemen Mostafa (El-Emawy) H.; m. Marjorie Battersby, May 20, 1977 (div. 1981); 1 child. Ali; m. Maha Anwar Nowailaty, Dec. 7, 1990; 1 child, Youmn. BEE, Cairo U., 1963; MSc, Am. U. Cairo, 1965; postgrad. diploma in stats., Cairo U., 1965; MSC in Math., Poly. Inst. N.Y., Bklyn., 1969; PhD in Elec. Engrng., Poly. Inst. N.Y., 1969.   Research assoc. Nat. Research Inst., Cairo, 1963-66; lectr. CUNY, 1966-70; sr. engr. IBM, East Fishkill, N.Y., 1969-70; asst. to assoc. prof. Am. U. Cairo, 1970-77; cons. engr. N.Y.C., 1977-79; account exec. Moseley Hallgarten, N.Y.C., 1979-80; v.p. L.F. Rothschild, N.Y.C., 1980-81; sr. v.p. Prudential Bache Securities, N.Y.C., 1981-86, Oppenheimer & Co., N.Y.C., 1986-87; v.p. Smith Barney, N.Y.C., 1987-89; sr. v.p. Shearson Lehman Hutton, Inc., N.Y.C., 1989-92, Dean Witter Reynolds, Inc., 1992—. Contbr. articles to profl. jours.  Received Gold medal for social svcs. Cairo U., 1958; Fulbright scholar, 1965. Moslem.  Office: Dean Witter Reynolds 2 World Trade Ctr New York NY 10048

HUSSEIN, SADDAM, president of Republic of Iraq; b. Tikrit Dist., Iraq, Apr. 28, 1937; m. Sajida Khair-Allah; 2 sons, 3 daus.  Student, College of Law, Egypt, 1961; law degree, U. Baghdad, 1971.  Joined Arab Ba'ath (Renaissance) Socialist Party, 1956; participant attempt to overthrow Abdul-Karim Qasem, 1959; second in command Arab Ba'ath Socialist Party; mem. Regional Leadership, 1963; imprisoned, 1964-66, escaped 1966; re-elected mem. Nat. Command, Ba'ath Party, 1965; acting dep. chmn. Revolution Command Council, 1968-69, dep. chmn., 1969-79, chmn., 1979—; dep. sec. Ba'ath Regional Command, 1968-79, sec., 1979—; mem. Nat. Leadership, asst. sec.-gen., 1977-79; pres. Republic of Iraq, 1979—; defacto chmn. Revolutionary Council, from 1968; dep. sec. Nat. Command, Ba'ath Party, from 1979. Author polit. and other treatises.  Decorated 1st degree (civil) Rafidain, 1976.  Address: Office of Pres. Baghdad Iraq*

HUSSEIN BIN TALAL, HIS MAJESTY, King of Jordan; b. Amman, Jordan, Nov. 14, 1935; s. Crown Prince Talal and Zein; m. Princess Dina, 1955 (marriage dissolved); 1 dau., Alia; m. Antoinette Gardiner, 1961 (div. 1972); children: Abdallah, Feisal, Zein and Ayesha (twins); m. Allia Baha Eddin Toukan, 1972 (dec. 1977); children: Haya, Ali; m. Lisa Halaby (Queen Noor), June 1978; children: Hamzeh, Hashem, Iman, Raiyah.  Ed., Victoria Coll., Alexandria, Egypt. Harrow Sch., Eng., Royal Mil. Acad., Sandhurst, Eng., 1952-53.  Succeeded his father, Aug. 1952, came to power, May 1953. Author: Uneasy Lies the Head, 1962; subject of books My War With Israel, 1969; Hussein, 1972, Mon Metier du Roi, 1975, Hussein of Jordan, 1989. Decorated Order Al-Nahda, Order Al-Kawkab, Order Al-Istiqlal, numerous others.  Address: Royal Palace, Amman Jordan*

# Exhibit B

INDEX NO. 161134/2021
RECEIVED NYSCEF: 12/13/2021

the value of simo shares according to the offical egyptian exchange records and the currency value according of the center bank of egypt at the same date

|  | dollar price | number of shares | the value EG | the value $ |
|---|---|---|---|---|
| 1997 | 3.388 | 1,202,865 | 32,114,877 | 9,479,007.38 |
| 1998 | 3.388 | 372,528 | 5,971,479 | 1,762,538.08 |
| 1999 | 3.405 | 118,842 | 1,101,816 | 323,587.67 |
| 2000 | 3.69 | 16,731 | 97,172 | 26,333.88 |
| 2001 | 4.49 | 7,245 | 30,738 | 6,845.88 |
| 2002 | 4.5 | 11,793 | 54,693 | 12,154.00 |
| 2003 | 6.146 | 6,950 | 28,053 | 4,564.43 |
| 2004 | 6.131 | 3,708 | 15,668 | 2,555.54 |
| 2005 | 5.726 | 2,100 | 6,053 | 1,057 |
| 2007 | 5.513 | 75,694 | 1,627,661 | 295,240.5 |
| 2008 | 5.503 | 135,974 | 5,729,765 | 1,041,207.5 |
| 2009 | 5.475 | 1,239,105 | 12,391,050 | 2,263,205.5 |
| 2011 | 6.021 | 78,581 | 541,922 | 90,005.3 |
| 2012 | 6.309 | 238,202 | 1,838,074 | 291,341.6 |
| 2013 | 6.928 | 53,227 | 403,933 | 58,304.4 |
| 2014 | 7.13 | 40,177 | 397,033 | 55,684.9 |
| total |  | 3,603,722 | 62,349,987 | 15,713,633.64 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- x
DR. AHMED DIAA ELDIN ALI MOHAMED      :
HUSSEIN,                              :
                                     :
          Plaintiff,                 :          22-cv-2592 (JSR)
                                     :
          -v-                        :          MEMORANDUM ORDER
                                     :
DR. MOHAMED AHMED MAAIT, in his       :
official capacity as MINISTER OF      :
FINANCE OF THE ARAB REPUBLIC OF       :
EGYPT,                               :
                                     :
          Defendant.                 :
---------------------------------- x

JED S. RAKOFF, U.S.D.J.

     Plaintiff, Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, filed a
motion for summary judgment in lieu of complaint in New York state
court seeking enforcement of an "Egyptian judgment" against
defendant Dr. Mohamed Ahmed Maait in Maait's official capacity as
Minister of Finance of the Arab Republic of Egypt. ECF No. 1. After
Maait removed the case to federal court, Hussein filed a motion to
remand. On April 18, 2022, the Court denied Hussein's motion to
remand on the ground that Egypt is the real party-in-interest and
that the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1602
et seq., applies.

     Now before the Court is Maait's motion to dismiss Hussein's
motion for summary judgment in lieu of complaint and to dismiss
the case pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6). For the reasons set out below, the Court finds that it lacks jurisdiction and accordingly grants the motion to dismiss pursuant to Rule 12(b)(1).

## BACKGROUND

Unless otherwise indicated, the following factual allegations are taken from the motion for summary judgment in lieu of complaint that Hussein filed in New York state court pursuant to N.Y. C.P.L.R. § 3213. That motion was supported by Hussein's affirmation, ECF No. 3-3, as well as three attached exhibits, ECF Nos. 303, Ex. A, ECF No. 3-11, and ECF No. 3-12. In response, Maait also references Hussein's arbitration demand against Egypt, ECF No. 22-1, various other of Hussein's judicial and regulatory filings, and a declaration of an expert on Egyptian law, Bahielden Elibrachy, ECF No. 23.[1]

Hussein is a dual Egyptian and American citizen who resides in Egypt, though he also owns a residence in New York. Hussein alleges that in 1994, he partnered with the National Bank of Egypt to found an investment bank in Egypt, the National Investment Company ("NIC"), which is incorporated under the laws of Egypt. In

_____

[1] On a 12(b)(1) motion to dismiss for lack of jurisdiction, the Court may consider additional factual materials outside the complaint. See Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

a proxy statement filed with the U.S. Securities & Exchange Commission in 2012, Hussein described his occupation as Chairman of the Board of Directors of NIC. Hussein further alleges that in 1997, he purchased all shares of NIC and transferred them to an unnamed holding company in Egypt.

Hussein alleges that in 1997, he or the unnamed holding company purchased shares amounting to about 72% of SIMO, an Egyptian company that manufactures and sells paper products in Egypt, in an open-market transaction. This purchase of shares was made in connection with the privatization of SIMO, which was formerly owned by the Egyptian government. Hussein asserts that when he purchased the SIMO shares, he used funds from his personal accounts in New York as well as funds borrowed from banks in the U.S. leveraged with his investments in the U.S. Hussein asserts that his purchase of the SIMO shares, made on the Egyptian Stock Exchange, was equivalent to approximately $15.714 million at the time it was made.

Hussein further alleges that in 1999, the Chairman of the Egyptian Companies' Regulatory Authority gave control of SIMO to the Egyptian government, under the auspices of the Chemical Holding Company, "effectively expropriating all of the shares of SIMO." Hussein does not allege that the Egyptian government actually took ownership of the SIMO shares then or at any later point, and

-3-

Hussein affirms that he continued to acquire SIMO shares from 2000 through 2014.

Hussein alleges that he "immediately" began to pursue compensation for the alleged expropriation of shares by filing a lawsuit in the Egyptian courts "to return the Company to the rightful owners, and obtain compensation for the damage caused by this illegal taking." ECF No. 3-3. ¶ 11. While Hussein asserts that in 2005 and 2006, the Egyptian courts ruled that SIMO should be returned to its "rightful owners" and awarded damages, he does not provide copies of those rulings and his motion pursuant to N.Y. C.P.L.R. § 3213 does not seek to enforce those rulings.

Instead, Hussein's motion pursuant to N.Y. C.P.L.R. § 3213 seeks recognition and enforcement of the "Egyptian Judgment," which Hussein characterizes as a foreign money judgment, but which consists of two components: an executive decree issued on June 2, 2014, by the Egyptian Prime Minister (Decree 961), and a judgment issued in a case brought in 2011 in Egypt's Administrative Justice Court (Judgment 6193). Decree 961 directs that SIMO be "returned back to sector of public businesses" and directs the Minister of Finance to "provide all necessary financial credits related to the shareholders' rights . . . ." ECF No. 3-12. Decree 961 does not define "necessary financial credits" or provide for how they are to be calculated; neither does it identify the shareholders who

are to be paid. Decree 961 leaves its execution to "the concerned agencies." Id.

Judgment 6193 was issued on April 8, 2014, in a case, brought by plaintiffs who were mostly former SIMO employees, that named Hussein as a defendant, along with the Egyptian Stock Exchange and various Egyptian government officials in their official capacities. ECF No. 3-11. The plaintiffs sought to annul SIMO's privatization as well as to annul disposing of the shares sold to Hussein, his family members, and his companies -- i.e., it did not seek compensation on behalf of Hussein, but rather against him. Hussein did not present any crossclaim for compensation. In Judgment 6193, Egypt's Administrative Justice Court ruled that the privatization of SIMO was not properly authorized and thus in contradiction with the law, and should be annulled. The judgment cancelled the decision to privatize SIMO, "particularly the annulment of disposition by selling of the shares of the company," and directed that SIMO was to be returned to the state "free from encumbrances and mortgages . . . ." Id. Judgment 6193 mentions only compensation as to the plaintiff former employees, not as to defendant Hussein. Hussein did not appeal Judgment 6193 to any Egyptian appellate court.

One of Hussein's holding companies asked the Ministerial Committee for Investment Disputes to hear his claims, but the

-5-

authority declined. He also sought to commence an investment
arbitration against Egypt, but the authority declined to hear the
claim.

On December 13, 2021, Hussein filed a motion for summary
judgment in lieu of complaint pursuant to C.P.L.R. § 3213 in New
York state court, seeking recognition of Judgment 6193 and Decree
961 as the "Egyptian Judgment." He then filed an amended summons
and amended notice of motion for summary judgment in lieu of
complaint on December 27, 2021. Service was effectuated on February
3, 2022. On March 30, 2022, Maait filed a notice of removal;
Hussein subsequently moved to remand the case to state court. On
April 18, 2022, the Court denied Hussein's motion to remand on the
ground that Egypt is the real party-in-interest and that the FSIA
applies. On April 20, 2022, the Court stayed merits discovery
pending the disposition of defendant's instant motion to dismiss.

## LEGAL STANDARD

The plaintiff bears the burden of proving the Court's
jurisdiction by a preponderance of the evidence in order to survive
a 12(b)(1) motion to dismiss for lack of subject matter
jurisdiction. Makarova v. United States, 201 F.3d 110, 113 (2d
Cir. 2000). Once a defendant has established that it enjoys
immunity under the FSIA, the plaintiff must adduce sufficient facts

-6-

to show that his claims fall within one of the FSIA's statutory exceptions to immunity. <u>Kensington Int'l Ltd. v. Itoua</u>, 505 F.3d 147, 153 (2d Cir. 2007).


## DISCUSSION

Maait's motion to dismiss contends, first, that the court lacks subject matter jurisdiction because Hussein has not established that any of the FSIA's statutory exceptions to immunity applies in this case, and second, that Hussein fails to state a claim upon which relief can be granted. Because the Court agrees with the first contention, it need not address the second.

The FSIA provides the sole basis for a U.S. court's exercise of jurisdiction over a foreign sovereign. <u>See Rukoro v. Federal Rep. of Germany</u>, 976 F.3d 218, 223 (2d Cir. 2020). Under the FSIA, the Arab Republic of Egypt -- the "real party in interest" in this case -- is immune from suit in the U.S. unless the plaintiff can establish that his claim falls within one of the FSIA's statutory exceptions.

Hussein argues that his summary judgment motion in lieu of complaint under New York's Article 53 falls within the third prong of the "commercial activity" exception to the FSIA. The FSIA's commercial activity exception to foreign sovereign immunity applies to cases "in which the action is based upon . . . an act

outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Consequently, to qualify for the exception, Hussein must establish that the action (1) is "based . . . upon an act outside the territory of the United States; (2) [] was taken in connection with a commercial activity of [Egypt] outside this country; and (3) [] cause[d] a direct effect in the United States." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992) (fourth alteration in original) (internal quotation marks omitted).

Applying these requirements to this case, the Court must first "identify the act" of the foreign state that serves as the basis for a claim, Garb v. Republic of Poland, 440 F.3d 579, 586 (2d Cir. 2006), that is, identify the "particular conduct" that constitutes the "gravamen" or "core" of the suit, OBB Personenverkehr AG v. Sachs, 577 U.S. 27, 33, 35 (2015).

Hussein argues that the relevant acts are those that underly the Egyptian judgment, not the elements of a claim to recognize a foreign judgment under New York state law. Hussein argues that to hold otherwise would prevent a plaintiff from enforcing any foreign judgments against foreign sovereigns in U.S. courts under § 1605(a)(2), because the elements of that enforcement action

-8-

would never be based upon the underlying commercial activity. Hussein argues that because his lawsuit arose out of Egypt's cancellation of the sale of SIMO shares, the case is based upon an act of a foreign state that is truly the gravamen of his suit. But the Second Circuit subsequently clarified that the case on which Hussein relies for this proposition, International Housing Ltd. v. Rafidain Bank Iraq, 893 F.2d 8, 11-12 (2d Cir. 1989), is in tension with the Supreme Court's subsequent decision in Nelson. See Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 389 n.4 (2d Cir. 2000) (observing that there is "some tension" but declining to take a position on the impact of Nelson on the Second Circuit's approach in International Housing Limited).

Hussein argues that the sale of the SIMO shares is commercial in nature because it is the type of activity commonly performed by private citizens within the private market, and so Egypt's obligation to repay the price after cancellation of the sale is itself commercial in nature. The claim is not, however, Egypt's "cancellation of the shares of SIMO," but instead a straightforward taking. Indeed, Hussein's motion for summary judgment in lieu of complaint nowhere mentions the claim as being about Egypt's cancellation of the SIMO shares. Moreover, Hussein's own declaration concedes that the "cancellation" of the SIMO shares

-9-

was the mechanism by which SIMO was returned to the government-owned holding company -- and any emphasis on the cancellation that ignores the return to government ownership misses the mark.[2]

In an action seeking recognition of a foreign money judgment, the claim must be "based upon" the judgment itself, not the conduct giving rise to the judgment, because identifying the gravamen of the suit requires identifying "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Saudia Arabia v. Nelson, 507 U.S. 349, 357 (1993). Even if the court were to look at the conduct underlying the "Egyptian Judgment," the gravamen of the claim would still be Egypt's alleged expropriation of private property, (namely, Hussein's shares in SIMO) -- a sovereign, and not commercial act. See Barnet as Tr. of 2012 Saretta Barnet Revocable Tr. v. Ministry of Culture & Sports of the Hellenic Republic, 961 F.3d 193, 201 (2d Cir. 2020) ("Nationalizing property is a distinctly sovereign act."); Garb,

---

[2]      Hussein's reliance on Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A. is misplaced. 895 F.3d 194, 199 (2d Cir. 2018). In that case, the Second Circuit held that a suit to enforce contractual by-law provisions, triggered by the Argentinian government's acquisition of a majority stake in a company, fell within the FSIA's commercial activity exception. Id. at 207. Unlike this case, the gravamen of the claim in Petersen was to enforce the by-law obligation where the investor still held shares in the company, in stark contrast to expropriation based on the rescission of Hussein's purchases of SIMO shares that returned the shares to a government-owned holding company.

440 F.3d at 586-87 ("Expropriation is a decidedly sovereign—rather than commercial—activity.").

Hussein has thus not met its burden to establish by a preponderance of the evidence that the action upon which his claim is based was taken in connection with commercial activity.

Hussein has also failed to meet his burden to establish that the action had any direct effect on the U.S. An effect is "direct" for purposes of § 1605(a)(2) "if it follows as an immediate consequence of the defendant's activity." Weltover, 504 U.S. at 618 (internal citations and quotation marks omitted). The effect need not be "substantial" nor "foreseeable," but it cannot be "purely trivial" or "remote and attenuated." Id. at 611.

Hussein argues that he purchased the SIMO shares using funds from his personal accounts in New York, and funds borrowed from banks in the U.S. leveraged with his investments in the U.S. He further argues that his ability to repay the borrowed amounts from U.S. banks, as well as the value and ownership of his investments in the U.S., were negatively affected because Egypt cancelled the sale of SIMO shares and did not compensate Hussein, which Hussein argues Egypt was required to do by the "Egyptian Judgment."

But these effects are contingent on the actions of Hussein himself, not on any act by Egypt. The fact that Hussein's ability to repay borrowed amounts from U.S. banks and the value and

-11-

ownership of his U.S. investments are impacted by nonpayment are

because Hussein decided to borrow against his U.S. assets to buy

the SIMO shares and then to forego making payment on those loans.

Because of this contingency, independent of any act by Egypt, the

effect is not sufficiently "direct": it is not an immediate

consequence of Egypt's nonpayment because the effect depends on

circumstances independent of Egypt's actions. See Guirlando v.

T.C. Ziraat Bankasi A.S., 602 F.3d 69, 75 (2d Cir. 2010) (holding

that "the requisite immediacy is lacking where the alleged effect

depend[s] crucially on variables independent of the conduct of the

foreign state (internal quotation marks omitted, alteration in

original)).[3]

    In  addition,  because  Hussein  cannot  establish  that  the

"Egyptian Judgment" called for payment in the U.S., he cannot

---

[3]    Furthermore, any loss that Hussein suffered as an "American
investor" is not sufficient to constitute a "direct effect" on the
U.S. Hussein's argument is based on Atlantica Holdings v. Sovereign
Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98, 112 (2d Cir. 2016),
but this reliance is misplaced. In that case, the Second Circuit
held that a court assessing the "direct effect" in the U.S. of an
alleged tort should consider the tort's locus, or place of wrong.
Id. at 109-10. Hussein does not assert that Egypt committed any
tort, but instead seeks recognition of a foreign money judgment.
In any event, the locus of any tort would likely be in Egypt, where
any action or inaction of Egypt occurred and where Hussein resides.
Hussein, an Egyptian citizen and resident, cannot claim that any
financial loss he suffered was to "an American investor," and thus
cannot argue that any such financial loss has a "direct effect" in
the U.S.

establish a direct effect in the U.S. from the alleged nonpayment. See, e.g., <u>Valambhia v. United Republic of Tanzania</u>, 964 F.3d 1135, 1142 (D.C. Cir. 2020), <u>cert. denied,</u> 141 S. Ct. 2512 (2021). Not only do Decree 961 and Judgment 6193 contain no indication that shareholders would be paid in the U.S., Hussein makes no allegation that Egypt undertook to pay any purported obligation in the U.S. Hussein fails establish that Egypt's action had any direct effect in the U.S.

Because Hussein has not met his burden to establish that any of the FSIA exceptions apply in this case, the Court grants the Rule 12(b)(1) motion to dismiss for lack of jurisdiction.[4]

### CONCLUSION

For the reasons above, the Court hereby grants Maait's motion to dismiss the summary judgment motion in lieu of complaint. The Clerk of Court is directed to enter judgment dismissing the complaint for want of jurisdiction and to close the case.

Dated:   New York, NY

June 13, 2022

JED S. RAKOFF, U.S.D.J.

---

[4]   Because the lack of jurisdiction is sufficient grounds to dismiss Hussein's motion for summary judgment in lieu of complaint, the Court declines to address the arguments to dismiss pursuant to Rule 12(b)(6).

-13-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
DR. AHMED DIAA ELDIN ALI MOHAMED
HUSSEIN,

                        Plaintiff,

        -against-                                  22 **CIVIL** 2592 (JSR)

                                                        **JUDGMENT**

DR. MOHAMED AHMED MAAIT, in his
Official capacity as MINISTER OF FINANCE OF
THE ARAB REPUBLIC OF EGYPT,

                        Defendant.
------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum Order dated June 13, 2022, Maait's motion to dismiss the

summary judgment motion in lieu of complaint is granted. Judgment is entered dismissing the

complaint for want of jurisdiction; accordingly, the case is closed.

**Dated:**  New York, New York

       June 14, 2022

                                    **RUBY J. KRAJICK**
                                    _____
                                        **Clerk of Court**
              **BY:**      *K. Mango*
                                    _____
                                        **Deputy Clerk**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/12/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. AHMED DIAA ELDIN ALI MOHAMED HUSSEIN,<br><br>Plaintiff,<br><br>- against -<br><br>DR. MOHAMED AHMED MAAIT, in his Official capacity as MINISTER OF FINANCE OF THE ARAB REPUBLIC OF EGYPT,<br><br>Defendant. | 22-cv-2592 (JSR)<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that the following party, Dr. Ahmed Diaa Eldin Ali Mohamed Hussein, in the above-named case appeal to the United States Court of Appeals for the Second Circuit from the judgment entered on June 14, 2022.

Dated: July 11, 2022

/s/ Dr. Ahmed Diaa Eldin Ali Mohamed Hussein
Dr. Ahmed Diaa Eldin Ali Mohamed Hussein
630 Fifth Avenue
Suite 2258
New York, NY, 10111
(212) 332-1700
ahmednic@aol.com